**[ORAL ARGUMENT NOT YET SCHEDULED]**

No. 25-5290

───────────────────────────────

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

───────────────────

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

Plaintiffs-Appellants,

v.

DONALD TRUMP, et al.,

Defendants-Appellees.

───────────────────

On Appeal from the United States District Court
for the District of Columbia

───────────────────

**BRIEF OF APPELLANTS**

───────────────────

Kaitlyn Golden
Pooja A. Boisture
Kayla M. Kaufman
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kgolden@democracyforward.org

Lauren E. Bateman
Karla Gilbride
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
lbateman@citizen.org

*Counsel for Appellants*

November 26, 2025

**CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.    Parties and Amici**

Plaintiffs-Appellants are American Foreign Service Association; American Federation of Government Employees; and Oxfam America.

Defendants-Appellees are Donald Trump; United States Department of State; United States Agency for International Development; United States Department of the Treasury; Marco Rubio, Secretary of State and Acting Administrator for the United States Agency for International Development; and Scott Bessent, Secretary of the Treasury.

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants state that none of them has a parent, subsidiary, or affiliate that has issued shares or debt securities to the public.

Results Educational Fund, Inc.; ActionAid USA; Unitarian Universalist Service Committee; 202 Members of Congress; Constitutional Accountability Center; and Former Senior National Security Officials were amici in the district court.

i

There are no intervenors or amici in this Court as of this filing.

## B.    Rulings Under Review

The rulings under review are the Order issued on July 25, 2025 (Dkt. No. 90) and the Memorandum Opinion (Dkt. No. 91), entered by the Honorable Carl J. Nichols on July 25, 2025, granting Defendants' motion to dismiss and denying Plaintiffs' motion for summary judgment. *See* JA 179, 180.

## C.    Related Cases

This case has not been in any court other than the district court from which it originated.

In a separate appeal, Plaintiff-Appellant Personal Services Contractor Association has appealed from the same district court opinion at issue in this appeal. *Personal Servs. Contractor Ass'n v. Trump*, No. 25-5291 (D.C. Cir.). The cases, however, were litigated independently below and the district court's conclusions of law as to each case do not overlap.

The undersigned counsel is unaware of any other related cases currently pending in this Court or any other court.

Respectfully submitted,

/s/ Allison M. Zieve
Allison M. Zieve

Counsel for Appellants

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................ i

TABLE OF AUTHORITIES .................................................. vi

GLOSSARY ........................................................................ x

INTRODUCTION ............................................................... 1

JURISDICTIONAL STATEMENT ....................................... 3

STATEMENT OF THE ISSUES .......................................... 3

PERTINENT STATUTE ..................................................... 4

STATEMENT OF THE CASE .............................................. 4

Factual Background ......................................................... 4

    A.  Establishment of USAID ........................................ 4

    B.  Shutdown of USAID ............................................. 6

    C.  Impact on Plaintiffs-Appellants ........................... 11

Proceedings Below ......................................................... 16

SUMMARY OF ARGUMENT ............................................. 17

STANDARD OF REVIEW .................................................. 19

ARGUMENT ..................................................................... 20

I.   Plaintiffs have standing ............................................ 20

    A.  Oxfam has standing. .......................................... 21

B.   AFSA and AFGE have standing. ..............................................27

II.   Plaintiffs' claims are not properly channeled to an administrative forum. ........................................................................................31

A.   Oxfam's claims cannot be channeled to an administrative forum............................................................................................32

B.   AFSA's and AFGE's claims cannot be channeled to an administrative forum. ...........................................................33

CONCLUSION .........................................................................................38

CERTIFICATE OF COMPLIANCE.......................................................39

CERTIFICATE OF SERVICE................................................................40

# TABLE OF AUTHORITIES*

**Cases**                                                                **Pages**

*Abigail Alliance for Better Access to Developmental Drugs v.
    Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) ...........................30

*Advocates for Highway & Auto Safety v. Federal Motor
    Carrier Safety Administration*,
    41 F.4th 586 (D.C. Cir. 2022) ........................................................28

*American Anti-Vivisection Society v. USDA*,
    946 F.3d 615 (D.C. Cir. 2020) ........................................................25

*American Federation of Government Employees, AFL-CIO v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) ........................................................31

*Axon Enterprise, Inc. v. FTC*,
    598 U.S. 175 (2023) ................................... 19, 31, 33, 34, 35, 37, 38

*Biden v. Nebraska*,
    600 U.S. 477 (2023) .......................................................................27

*Bullock v. Department of Air Force*,
    80 M.S.P.R. 361 (M.S.P.B 1998) ...................................................34

*Carr v. Saul*,
    593 U.S. 83 (2021) .........................................................................37

*Community Services Administration*,
    7 F.L.R.A. 762 (1982) ....................................................................34

*Center for Biological Diversity v. U.S. Department of the Interior*,
    144 F.4th 296 (D.C. Cir. 2025) .................................................19, 25

_____

\* Authorities on which we chiefly rely are marked with asterisks.

vi

*Center for Sustainable Economy v. Jewell*,
    779 F.3d 588 (D.C. Cir. 2015)........................................................30

*Doctors for America v. OPM*,
    766 F. Supp. 3d 39 (D.D.C. 2025).................................................26

*Elgin v. Department of Treasury*,
    567 U.S. 1 (2012) ...................................................................31, 37

*Equal Rights Center v. Post Properties, Inc.*,
    633 F.3d 1136 (D.C. Cir. 2011).....................................................21

*\*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024) ................................................20, 21, 23, 24

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
    561 U.S. 477 (2010) ...............................................................35, 38

*Harris County v. Kennedy*,
    786 F. Supp. 3d 194 (D.D.C. 2025)...............................................28

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977) .......................................................................21

*In re Idaho Conservation League*,
    811 F.3d 502 (D.C. Cir. 2016).......................................................29

*Institutional Shareholder Services, Inc. v. SEC*,
    142 F.4th 757 (D.C. Cir. 2025).......................................................29

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ...........................................................30

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) .......................................................................28

*National Treasury Employees Union v. Vought*,
    149 F.4th 762 (D.C. Cir. 2025)................................................32, 37

*People for the Ethical Treatment of Animals v. USDA,
   797 F.3d 1087 (D.C. Cir. 2015)...........................................21, 22, 25

Ralls Corp. v. Committee on Foreign Investment in the United States,
   758 F.3d 296 (D.C. Cir. 2014).......................................................19

Spokeo, Inc. v. Robins,
   578 U.S. 330 (2016) ...............................................................20, 27

Thunder Basin Coal Co. v. Reich,
   510 U.S. 200 (1994) ...............................................................33, 38

United States Information Agency v. Krc,
   989 F.2d 1211 (D.C. Cir. 1993).....................................................31

Widakuswara v. Lake,
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025)...............36

Widakuswara v. Lake,
    No. 25-5144, 2025 WL 2787974 (D.C. Cir. May 28, 2025)............36

Widakuswara v. Lake,
   No. 25-cv-1015, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ...........36

**Statutes**

5 U.S.C. § 7703 ........................................................................34

22 U.S.C. § 4140 .......................................................................34

22 U.S.C. § 6202(c) ...................................................................36

22 U.S.C. § 6563(a) ..................................................................4, 5

28 U.S.C. § 1291 .........................................................................3

28 U.S.C. § 1331 ....................................................................3, 31

Pub. L. No. 118-47, 138 Stat 460 (2024) ...................................................6

Pub. L. No. 118-47, 138 Stat 460 (2024) ...................................................6

Pub. L. No. 119-4, 139 Stat. 12 (2025) ......................................................6

**Rules**

Federal Rule of Appellate Procedure 4(1)(B) ............................................3

**Other Authorities**

The American Presidency Project, *Executive Order 10973 –
Administration of Foreign Assistance and Related Functions*
(Nov. 3, 1961),
https://perma.cc/NS77-9DZF..........................................................4

Executive Order 14169, 90 Fed. Reg. 8619 (2025) ...................................7

Daniella Medeiros Cavalcanti, et al., *Evaluating the impact of two
decades of USAID interventions and projecting the effects of
defunding on mortality up to 2030*, The Lancet (July 19, 2025),
https://perma.cc/ND8X-T7HH........................................................1

Emily McCabe, Congressional Research Service, *U.S. Agency for
International Development: An Overview* (Jan. 6, 2025),
https://perma.cc/77QD-VVPU .....................................................4, 5

Elissa Miolene, *USAID's 'final mission' has just ended. Now what?*,
Devex Newswire (Sept. 2, 2025),
https://www.devex.com/news/devex-newswire-usaid-s-final-
mission-has-just-ended-now-what-110751. ...................................10

## GLOSSARY

AFGE      American Federation of Government Employees

AFSA      American Foreign Service Association

USAID     United States Agency for International Development

## INTRODUCTION

Defendants have, by their own account, shut down an agency created by Congress—the United States Agency for International Development (USAID). JA 161. To effectuate what they described as "USAID's final mission," they closed USAID missions abroad, emptied its buildings, decommissioned its assets, and eliminated nearly every position at the agency. In sweeping cuts, they terminated the vast majority of foreign assistance awards. Scientists estimate that this action will cost 14 million lives by 2030.[1]

Defendants' action violates the Constitution and federal statutes. The district court, however, did not reach the merits of Plaintiffs' claims because it held, incorrectly, that it lacked jurisdiction to do so. But Plaintiffs are proper parties to challenge Defendants' unlawful actions, and only a federal district court can grant Plaintiffs the relief that they seek. The district court's decision should be reversed.

---

[1] Daniella Medeiros Cavalcanti, et al., *Evaluating the impact of two decades of USAID interventions and projecting the effects of defunding on mortality up to 2030*, The Lancet (July 19, 2025), https://perma.cc/ND8X-T7HH.

1

To start, the district court found that plaintiff Oxfam America, a humanitarian organization that provides emergency relief in disaster and conflict areas around the world, lacks standing. The evidentiary record, however, shows that Defendants' decision caused Oxfam to incur financial burden and directly impaired its core work. Oxfam was forced to halt critical projects, such as the provision of clean drinking water in South Sudan, and to incur additional costs. The harm to Oxfam's projects and finances firmly establishes its standing.

The district court also erred by holding that plaintiffs American Federation of Government Employees (AFGE) and American Foreign Service Association (AFSA) could not pursue their claims in court. The court's error was two-fold. First, the court held that, because the unions' injury was tied to the employment-related consequences of the destruction of the agency, they had standing to pursue only employment-related claims, rather than claims challenging the action that generated their injury: the decision to shut down USAID. In so doing, the court incorrectly narrowed the scope of their standing. Second, having wrongly recast the legal claims as challenges to personnel actions, the court wrongly held that those claims should be channeled to administrative

2

fora. Because AFSA and AFGE do not bring claims challenging personnel actions, and because no other forum can provide the relief sought, they properly brought their claims in district court.

This Court should reverse the district court's order granting Defendants' motion to dismiss and remand the case to the district court so that the merits of Plaintiffs' claims can be adjudicated.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. On July 25, 2025, it entered judgment against plaintiffs, disposing of all claims of all parties. JA 179. On August 5, 2025, plaintiffs timely filed their notice of appeal. JA 217; *see* Fed. R. App. P. 4(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The questions presented are (1) whether the district court erred in holding that Plaintiff Oxfam America lacks standing, (2) whether the district court erred in holding that Plaintiffs AFSA and AFGE have standing only to challenge personnel actions; and (3) whether the district

3

court erred in concluding that AFSA's and AFGE's claims must be channeled to administrative agencies.

## PERTINENT STATUTE

22 U.S.C. § 6563(a) provides:

Unless abolished pursuant to the reorganization plan submitted under section 6601 of this title, and except as provided in section 6562 of this title, there is within the Executive branch of Government the United States Agency for International Development as an entity described in section 104 of title 5.

## STATEMENT OF THE CASE

**Factual Background**

**A.     Establishment of USAID**

Since its founding in 1961, USAID has "provide[d] assistance to strategically important countries and countries in conflict; le[d] U.S. efforts to alleviate poverty, disease, and humanitarian need; and assist[ed] U.S. commercial interests by supporting developing countries' economic growth and building countries' capacity to participate in world trade."[2]  Until this year, USAID did so with a workforce of almost 10,000,

---

[2] Emily McCabe, Cong. Rsch. Serv., *U.S. Agency for International Development: An Overview* (Jan. 6, 2025), https://perma.cc/77QD-VVPU; *see* The Am. Presidency Proj., *Executive Order 10973 – Administration of Foreign Assistance and Related Functions* (Nov. 3, 1961), https://perma.cc/NS77-9DZF (text of Executive Order 10973).

as well as through more than 60 country and regional missions that designed and managed projects, most implemented—"through a grant, cooperative agreement, or contract—by one of thousands of foreign and U.S. development partners, including nonprofit organizations, for-profit contractors, universities, international organizations, and foreign governments."[3]

By statute, USAID is a distinct agency, outside the Department of State. 22 U.S.C. § 6563(a) (providing "there is within the Executive branch of Government the United States Agency for International Development"). Since establishing the agency, Congress has repeatedly appropriated funds for USAID. *See, e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 § 7063(a), 138 Stat 460 (2024). In the 2024 Appropriations Act, Congress explicitly prohibited using the "[f]unds appropriated by this Act, prior Acts making appropriations for the Department of State, foreign operations, and related programs, or any other Act … to implement a reorganization, redesign, or other plan … by the Department of State, the United States Agency for International Development, or any other Federal department,

---

[3] McCabe, *supra* note 2.

5

agency, or organization funded by this Act without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." *Id*. The Act defined "reorganization, redesign, or other plan" to include, *inter alia*, any action to "eliminate, consolidate, or downsize covered departments, agencies, or organizations," to "eliminate, consolidate, or downsize the United States official presence overseas," or to "reduce the size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce" of USAID "from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024." *Id*. § 7063(b). Congress has twice since appropriated funding under the same "conditions." Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4 §§ 1101(a) & (a)(11), 1102, 139 Stat. 12 (2025) (appropriating funds through September 30, 2025); Continuing Appropriations Act, 2026, § 101 (2025) (appropriating funds through September 30, 2026).

## B.  Shutdown of USAID

In the early months of this administration, Defendants made a decision to shut down USAID. Although they acknowledged that

legislation is necessary to "abolish USAID as an independent establishment," JA 168,[4] they decided to shut down the agency without congressional authorization.

First, on January 20, 2025, Defendant Trump issued an Executive Order titled "Reevaluating and Realigning United States Foreign Aid," directing an immediate "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy." Exec. Order 14169, 90 Fed. Reg. 8619 (2025). The funding freeze applied "immediately" to all "obligations and disbursements of development assistance funds." *Id*.

Four days later, on January 24, 2025, Defendant Rubio directed his staff to halt "foreign assistance funded by or through" USAID and required the "immediate[]" issuance of "stop-work orders" for existing foreign assistance grants and contracts. JA 67 & n.8.

Further implementing the decision to close the agency, Defendants issued sweeping orders terminating the overwhelming majority of grants,

---

[4] Defendants filed the administrative record on May 16, 2025. Both parties cited to the administrative record in briefing on the motion to dismiss, *see* ECF 70-1, 74, 83; the district court likewise did so in its memorandum opinion, *see* JA 180.

contracts, and cooperative agreements that had been awarded to agency partners who performed humanitarian work abroad. Ultimately, Defendants cancelled nearly 90 percent of all awards administered by USAID. JA 178.

On Monday, February 3, Elon Musk stated that he had spent the previous weekend "feeding USAID into the wood chipper." JA 72 & n.30. He continued: "With regards to the USAID stuff, I went over it with [President Trump] in detail and he agreed that we should shut it down." JA 72.

Next, Defendant Trump appointed Defendant Rubio to serve as Acting Administrator of the agency. JA 72 & n.31. On February 4, the State Department ordered that all overseas USAID missions be shut down and that thousands of USAID employees overseas be recalled by February 7, 2025. JA 74. That same day, Defendants placed thousands of USAID employees on administrative leave, directing them "not to enter USAID premises, access USAID systems, or attempt to use [their] position or authority with USAID in any way without [the] prior permission [of a political appointee] or prior permission of a supervisor in your chain of command." *Id*. Without any overseas missions—or any

employees—USAID would be unable to continue its life-saving humanitarian work.

On February 4, 2025, Defendants announced that "all USAID direct hire personnel will be placed on administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership, and specially designated programs." JA 75. Consistent with this plan, on February 7, Defendant Trump posted on Truth Social, "USAID IS DRIVING THE RADICAL LEFT CRAZY … CLOSE IT DOWN!" JA 76.

In late March, Defendants announced that the Department of State would absorb certain functions of USAID and that the remaining functions would be "discontinued," thereby "obviat[ing] the need for USAID to continue operating as an independent establishment" by July 1. JA 162, 166. That process, Defendants explained, entailed separating "substantially all USAID personnel … from federal service." JA 166. As Defendants described their actions, agency assets were "decommission[ed]," "USAID missions overseas [were] closed, U.S. direct hire personnel overseas [were] returned to the United States, and most USAID locally employed staff [were] separated from U.S. government

service." JA 162, 171. Defendants have since completed the reductions in force laid out in their announcement, terminating substantially all staff from USAID.[5]

Defendants describe their decision to shut down USAID as "USAID's Final Mission." JA 161. But the decision was not in line with USAID's mission and was not authorized by Congress. Defendants' decision had predictable life-threatening consequences: Clinics stopped distributing HIV medication. JA 68. Staff who manage humanitarian operations at refugee camps in Syria were told to stop work, leaving thousands of people vulnerable to instability and violence at the hands of ISIS. *Id*. Soup kitchens that feed nearly a million people in famine-stricken Khartoum were shut down. *Id*. Toddlers in Zambia were deprived of rehydration salts to treat life-threatening diarrhea. *Id*. Doctors at U.S.-funded medical facilities in Sudan that treat severely malnourished children were forced to choose whether to obey Defendants' orders and immediately stop their operations, letting up to 100 babies and toddlers die. *Id*.

---

[5] Elissa Miolene, *USAID's 'final mission' has just ended. Now what?*, Devex Newswire (Sept. 2, 2025), https://www.devex.com/news/devex-newswire-usaid-s-final-mission-has-just-ended-now-what-110751.

### C.    Impact on Plaintiffs-Appellants

**1.** Plaintiff-Appellant Oxfam America (Oxfam) is a global nonprofit organization that fights inequality to end poverty and injustice. JA 62. Oxfam conducts humanitarian action in over 30 countries, including providing famine abatement in South Sudan, providing humanitarian assistance to Ukrainian war refugees, and providing clean drinking water in East Africa. JA 94. Although Oxfam does not rely on funds from the U.S. government to perform this life-saving work, it works with a worldwide network of humanitarian organizations, including USAID, that provides relief for communities affected by the world's most serious disasters. JA 93, 97.

The sudden and complete halt of USAID's global humanitarian work directly impaired Oxfam's mission critical activities, requiring it to either abandon or postpone work, or make up the shortfall with its own resources. To start, Oxfam had to halt several projects undertaken in partnership with the United Nations agencies that relied on the U.S. government as a donor. JA 98. Oxfam submitted a declaration attesting that, as a result, more than $800,000 in standing commitments were placed at risk, including projects "providing water, sanitation, and other

humanitarian assistance in which work has been conducted" but for which Oxfam had not received payment. *Id*. To take one example: Oxfam provides clean and safe drinking water for around 400,000 people from South Sudan who are living as refugees. JA 138. Because that project is partly funded by a United Nations agency, which is in turn funded by the U.S. government, the project budget radically shrank when Defendants froze USAID contributions to the United Nations. The project was therefore put on hold and, as Oxfam's president and CEO explained in her declaration in February, may have to be entirely discontinued—putting people at risk and requiring the expenditure of additional Oxfam resources. *Id*.; *see* JA 139 (noting that Oxfam "will almost certainly be unable to identify an alternate source of funding" so "will be forced to incur budget deficits or divert funds from other essential, lifesaving activities to merely wind down such projects").

In addition, like other humanitarian organizations, Oxfam complies with industry-agreed minimum standards to ensure that people benefiting from its assistance survive the humanitarian crises they are enduring and that they recover with dignity. JA 96. But as Oxfam attested in February, with the discontinuation of USAID programming—

12

which often complemented Oxfam's own programming—"Oxfam will fail to meet minimum standards in its own programs, fail to address the most urgent needs … may exacerbate tensions within communities over the distribution of resources and accessibility of services … [and] will be forced to participate in recalibration exercises everywhere USAID funding ceased to be available, at substantial cost to [its] own operations." JA 96–97. Oxfam estimated that this forced recalibration, in the "best-case scenario … will leave millions of children, women and men living without food, water, sanitation services, medicine, education, shelter, protection, or other essential emergency relief in disaster and conflict areas around the world." JA 97. The declaration further explained that Oxfam would be forced to "incur additional financial responsibility, as well as to make life-or-death decisions about which communities [it] will and will not serve." *Id*.

By forcing Oxfam to put its projects on hold, Defendants placed Oxfam employees at risk. As the president and CEO attested, most members of communities experiencing humanitarian crises "do not follow international politics closely, and are likely to hold Oxfam responsible for an abrupt and inhumane discontinuation of lifesaving support." JA 139.

13

Moreover, Oxfam will likely "be unable to fulfill contractual obligations to vendors." *Id*. As a result, Defendants' actions endangered the physical safety of Oxfam staff located in challenging and unstable environments. *Id*.

Finally, USAID had been a significant source of logistical support for Oxfam's humanitarian projects. Sometimes, that support came in the form of unique and irreplaceable "technical know-how, research, and evidence" on which Oxfam and other humanitarian organizations relied. JA 99. USAID staff had technical expertise that helped them understand how to effectively target communities with assistance on the basis of need and without doing harm in volatile environments. *Id*. Removing this support hindered Oxfam's ability to do its humanitarian work. *Id*.

**2.** Plaintiffs AFGE and AFSA—two unions representing workers who had been employed by the agency—are both directly harmed as organizations and likewise represent workers who have been harmed by the dissolution of USAID.

Both AFGE and AFSA have suffered organizational harm from the abolition of the agency. Because of Defendants' actions, they have lost membership: AFGE Local 1534 represented more than 800 USAID

14

employees, JA 49, and AFSA represented nearly 2,000 USAID Foreign Service Officers, as well as 485 non-career Foreign Service Limited officers. JA 51. The unions have both been deprived of the opportunity to continue representing members subject to the reduction in force and been stripped of dues associated with those members, *see* JA 81, and have undisputedly been forced to divert substantial resources away from other priorities to address their members' questions and concerns about the dismantlement of the agency and to process changes to members' accounts. *See* JA 78, 81; *see also* JA 126, 143. The dissolution of the agency, then, has substantially interfered with each union's core activity: representing member-workers. *See* JA 126 ("AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interest of AFSA members."); JA 143 ("AFGE advocates on behalf of its members and seeks to promote dignity, safety, and fairness for government employees.").

Members of both organizations have likewise faced extraordinary harms from the abolition of the agency. Members lost their jobs and incomes as a result of the USAID shutdown. JA 127, 131–32, 145. And

for the AFSA members stationed overseas, that job loss was coupled with a forced relocation back to the United States, which meant potential job loss for their spouses, taking their children out of schools and services, and returning to a place where many employees had no place to live. JA 126–30.

**Proceedings Below**

Plaintiffs filed this action on February 6, 2025, and filed an amended complaint on February 13, challenging the dissolution of USAID on statutory and constitutional grounds. JA 58. By orders dated February 7 and 13, the district court granted a motion for a temporary restraining order in part, enjoining Defendants from putting employees on leave or involuntarily evacuating them from their host countries, through February 21. ECF 15 & 31. The court subsequently denied a motion for a preliminary injunction and lifted the temporary restraining order. ECF 48. USAID then terminated "[s]ubstantially all" of its employees. JA 166.

Plaintiffs then filed a motion for summary judgment. ECF 51. Defendants opposed and filed a cross-motion to dismiss the complaint, or, in the alternative, a motion for summary judgment. ECF 70.

On July 25, 2025, the district court denied Plaintiffs' motion for summary judgment and granted Defendants' motion to dismiss. JA 179. The court did not address the merits of the claims. Instead, it held that it lacked jurisdiction, for two reasons. JA 181. First, it ruled that Oxfam lacked standing to challenge the government's decision to dissolve the agency because Oxfam's injuries were either not traceable to the government's conduct or did not result in interference with core business activities. JA 195–99. Second, the court ruled that AFSA and AFGE had standing to challenge only Defendants' conduct tied to employment-based harms, but that such claims could be pursued only through schemes of administrative review. JA 193–94, 199–208.

Plaintiffs timely filed a notice of appeal on August 5, 2025. JA 217.

## SUMMARY OF ARGUMENT

There is no jurisdictional barrier to this suit. This Court should therefore reverse the district court's order granting Defendants' motion to dismiss.

**I.** All three Plaintiffs have standing to pursue their claims. Oxfam has standing to challenge the dissolution of the agency because uncontested evidence shows that Defendants' actions have damaged

17

Oxfam's finances and compromised its ability to complete its humanitarian projects. As for AFSA and AFGE, the district court proceeded on the incorrect premise that, because AFSA and AFGE represent employees who have been injured by Defendants' shutdown of USAID, they have standing to challenge only the employment-related consequences of Defendants' actions. Defendants, though, did not terminate USAID employees in a vacuum; they did so to give effect to the unlawful decision to shut down the agency. It is that unlawful decision that is challenged here. And because AFSA and AFGE have a personal stake in Defendants' unlawful closure of the agency, the court erred in defining their interest so narrowly.

II. Additionally, the district court erred in holding that it was the incorrect forum to hear this case. Oxfam's claims undisputably cannot be channeled to another forum, and the district court did not suggest otherwise. As to AFSA and AFGE, however, the court incorrectly concluded that their claims can be heard only by administrative bodies created by Congress to adjudicate certain federal personnel-related labor and employment disputes. Their claims do not challenge Defendants' personnel actions, but, again, the unlawful closure of USAID.

18

Furthermore, by creating agencies to hear ordinary employment claims, Congress did not implicitly strip federal courts of their jurisdiction to resolve "fundamental, even existential" questions about Executive power and the structure of our constitutional system. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 180, 185 (2023).

## STANDARD OF REVIEW

This Court reviews the district court's dismissal of a complaint de novo, treating "the complaint's factual allegations as true" and granting plaintiffs "the benefit of all inferences that can be derived from the facts alleged." *Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 314–15 (D.C. Cir. 2014). In determining standing, the court may consider materials outside the complaint, including declarations submitted in support of standing. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 303 (D.C. Cir. 2025).

## ARGUMENT

## I.    Plaintiffs have standing.

Defendants' decision to shut down USAID has harmed all three Plaintiffs, and those harms can be remedied by a favorable judicial

19

decision. Plaintiffs therefore each have standing to challenge Defendants' decision.

The "irreducible constitutional minimum" of Article III standing "consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citation omitted) Like individuals, organizations have standing "to sue on their own behalf for injuries they have sustained" so long as they satisfy those requirements. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (citation omitted). And membership organizations have standing to sue on behalf of their members when (1) the members could sue in their own right; (2) the interests the organization seeks to protect are germane to its purpose; and (3) neither the claim pursued nor the relief requested requires the participation of individual members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

**A. Oxfam has standing.**

Oxfam has standing to challenge Defendants' shutdown of USAID because Defendants' actions have impeded Oxfam's ability to work and

20

damaged it financially. Accordingly, this Court should reverse and remand with instructions to proceed to the important and time-sensitive issues underlying this action.

**1.** An organization has standing when the challenged action directly interferes with the organization's core activities. *All. for Hippocratic Med.*, 602 U.S. at 394–96. To determine whether an organization has standing on this basis, this Court asks whether the agency's act or omission "injured the [organization's] interest" and whether the organization "used its resources to counteract that harm." *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (*PETA*) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). In *PETA*, for example, the plaintiff organization had standing where the Department of Agriculture's failure to apply animal-welfare protections to birds injured the organization's interest in protecting animals from cruel and inhumane treatment, and where the organization alleged that it had expended resources to counter those injuries. *Id.* at 1094–95.

Here, as in *PETA*, Defendants' actions have injured Oxfam's interests. Oxfam offers life-saving support in times of crisis as part of its

21

mission to "end poverty and injustice," JA 93, and, as of February, was conducting humanitarian action in over 30 countries. JA 94. By dissolving the agency on which Oxfam relied for technical and logistical support, and by gutting Oxfam's organizational partners, Defendants forced Oxfam to halt life-saving support projects and to engage in recalibration efforts worldwide—and to expend considerable amounts of its own time, effort, and resources to do so. Defendants therefore placed an "inordinate burden" on Oxfam, causing it to be "fundamentally challenged and overstretched in an attempt to fill the $63 billion void left by USAID's abrupt dissolution." JA 96; *see* JA 97 (describing "massive shortfall" caused by USAID's abrupt closure and Oxfam's need to "reallocate funds away from critical programs" to address it); JA 98 (stating that Oxfam had already been told to halt work on several UN-funded projects that rely on U.S. government funds, including "three humanitarian projects providing water, sanitation, and other humanitarian assistance in which work has been conducted and [Oxfam has] not received payment"); JA 137–41 (describing effects of Defendants' actions on Oxfam's humanitarian programs, staff safety, and budget, as well as Oxfam's efforts to "assess gaps and fill in where needed"). Oxfam's

president and CEO further declared that Oxfam "will be forced to incur budget deficits or divert funds from other essential, lifesaving activities" to "wind down" the projects it can no longer pursue because of Defendants' actions. JA 139. Because Defendants' actions "directly affected and interfered with" Oxfam's "core business activities," *All. for Hippocratic Med.*, 602 U.S. at 395, Oxfam has standing to challenge them.

**2.** In holding that Oxfam's injuries are insufficient to support standing, the district court erroneously reduced Oxfam's injuries to those based on the "termination of USAID grants." JA 190; *see* JA 195–96 (describing Oxfam's theory of standing as that it "will be harmed as a result of harms that USAID's spending cuts have inflicted on other organizations"). In fact, Oxfam does not base its standing on "the interests of grantees not before the court." JA 196. Instead, its *own* core activities and finances have been "perceptibly impaired" by Defendants' actions. *See All. for Hippocratic Med.*, 602 U.S. at 395. The district court's analysis of third-party standing, then, JA 196, is irrelevant.

Further, quoting *Alliance for Hippocratic Medicine*, the district court described Oxfam's standing as based on a voluntary "diver[sion]" of

23

"resources in response to a defendant's actions." JA 197 (quoting *All. for Hippocratic Med.*, 602 U.S. at 395). Here, too, the court was mistaken. In *Alliance for Hippocratic Medicine*, medical associations opposed to the Food and Drug Administration's relaxation of regulations on mifepristone, an abortion drug, claimed that the agency "'caused' the associations to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks … [and] that [the agency] has 'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to [the Food and Drug Administration], as well as engaging in public advocacy and public education." *Id.* at 394. Concluding that the associations lacked standing, the Supreme Court reasoned that an organization cannot "manufacture" standing by "expending money to gather information and advocate against the defendant's action." *Id.*

By contrast, Oxfam does not assert standing based on expending resources voluntarily to advocate against Defendants' policy choices. Oxfam was in the midst of operating humanitarian assistance programs that relied on USAID support when Defendants shutdown the agency. JA 137. Accordingly, Oxfam was forced to "participat[e] in recalibration

24

exercises everywhere USAID funding ceased to be available, at substantial cost to [its] own operations." JA 97. In some cases, Oxfam was compelled to halt projects entirely, "forc[ing] [it] to incur budget deficits or divert funds from other essential, lifesaving activities to merely wind down such projects." JA 139. Those recalibration and wind-down costs are not voluntary resource allocation decisions—they are costs that Oxfam has borne, at the expense of its programming priorities, as a direct consequence of Defendants' actions. *See, e.g.*, *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 619 (D.C. Cir. 2020); *PETA*, 797 F.3d at 1095; *see Ctr. for Biological Diversity v. United States Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (distinguishing harm to programmatic activity, which supports standing, from harm to advocacy activity, which does not). That consequence is directly traceable to Defendants' conduct: Defendants froze (and later terminated) the vast majority of USAID funding as part of their efforts to close the agency. Those terminations directly impacted Oxfam projects that were funded in part by the frozen USAID funds. JA 138.

Beyond financial injury, Oxfam has also been injured from the vacuum of technical expertise and logistical resources left by the

cessation of USAID's operations. Oxfam relied on the agency's "technical know-how, research, and evidence," JA 99, and the risk-mitigation USAID provided through its general oversight of humanitarian projects, JA 140. *Cf. Drs. for Am. v. OPM*, 766 F. Supp. 3d 39, 48 (D.D.C. 2025) (holding that doctors had standing to challenge removal of online information that they relied on as part of their work).

The district court found that these injuries were "not sufficiently concrete or particularized" to support standing because Oxfam did not explain how "*it specifically*" relied on USAID. JA 198. But the court was wrong as a matter of empirical fact: Oxfam *did* specifically state how it relied on USAID. It "rel[ied] upon" agency staff expertise to engineer and implement "lifesaving ideas at scale." JA 99; *see* JA 140. It relied on the agency to honor its financial commitments to partner organizations and as a donor for projects funded by the United Nations. JA 98. It relied on the agency to continue funding projects in unstable countries—countries where, because of abrupt suspension of those projects, Oxfam now "faces direct physical harm and monetary injury." JA 139. Offering a specific example, Oxfam identified a project stalled by the shuttering of USAID— one in which Oxfam had provided drinking water to refugees in South

Sudan. JA 138. These injuries "actually exist" and are not "abstract"; they "affect [Oxfam] in a personal and individual way"; and they are sufficiently "particularized." *Spokeo,* 578 U.S. at 339, 340. Article III standing requires no more.

In short, Defendants' unlawful and unreasoned decision to shutter USAID caused injury to Oxfam's finances and core activities. And because "[i]f at least one plaintiff has standing, the suit may proceed," *Biden v. Nebraska*, 600 U.S. 477, 489 (2023), the district court's order must be reversed.

### B. AFSA and AFGE have standing.

As for Plaintiffs AFSA and AFGE, the district court assumed that the unions "have standing to challenge the government's actions." Because, however, their standing relates to employment "and related working conditions of USAID's employees," JA 194, the court recast their legal claims as challenging Defendants' termination of staff. The question for standing is whether the plaintiffs have a "personal stake in the outcome of the controversy," *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007)—here, the decision to shut down USAID. They indisputably do. That decision caused members of AFSA and AFGE to lose employment

27

and related benefits, and disrupted their lives and the lives of their families. AFSA and AFGE thus have standing to challenge that decision.

**1.** The operative complaint asserts constitutional and Administrative Procedure Act claims challenging Defendants' decision to "dissolve USAID." JA 84; *see* JA 83–88. AFSA and AFGE have associational standing to assert their claims: Their members were harmed by Defendants' actions. "Those employees' interests in continued employment are plainly germane to [AFSA's and AFGE's] purpose as a labor union advocating on [their] members' behalf." *Harris Cnty. v. Kennedy*, 786 F. Supp. 3d 194, 204 (D.D.C. 2025). And their members are not required to participate in the lawsuit. *Id.*; *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 592–93 (D.C. Cir. 2022).

Finding that the unions' injuries concerned only their members' employment relationship with USAID, JA 193, the court held that the unions do not "have standing to challenge the government's *non*-personnel actions with respect to USAID, such as its grant terminations, website closures, and lease transfers," JA 194. The district court's approach ignored that Defendants made a singular decision to abolish

28

USAID. Their firing of USAID employees was done as "part of th[e] process" of implementing that decision. *See* JA 171. While AFSA, AFGE, and their members have standing because that decision impacts employment, the court erred in recasting the challenge to that decision as a challenge to "adverse employment events." JA 206.

Moreover, a wealth of case law establishes that a plaintiff has standing to challenge the whole of an agency action even when the plaintiff is injured by some, but not all, of the consequences of that action. *See, e.g.*, *Institutional S'holder Servs., Inc. v. SEC,* 142 F.4th 757, 765 (D.C. Cir. 2025) (holding that a plaintiff who benefited from a broadly applicable rule had standing to challenge vacatur of that rule); *In re Idaho Conservation League*, 811 F.3d 502, 508–09 (D.C. Cir. 2016) (holding that a membership organization had standing to seek promulgation of a broadly applicable regulation notwithstanding that its member-declarant was harmed only by the failure to regulate certain entities); *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596–97 (D.C. Cir. 2015) (holding that an organization with members who plan to use specific marine and coastal ecosystems for commercial and recreational purposes had standing to challenge an oil and gas leasing program,

29

notwithstanding that the program included geographies beyond those specific ecosystems); *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133–34 (D.C. Cir. 2006) (holding that an organization representing terminally ill patients had standing to challenge an agency policy barring the sale of new investigative drugs, notwithstanding that the policy also applied to drugs not sought by those patients).

**2.** AFSA and AFGE also have organizational standing. The unions' injuries—interference with their core activities supporting members and loss of membership, *see supra* pp. 14–16—are direct consequences of the challenged directive to close the agency down. Likewise, as a result of the decision to abolish USAID, AFSA and AFGE had to divert resources from other needs to assisting members employed by USAID. *See supra* p. 15. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (holding that an organization has standing where the challenged actions "unquestionably make it more difficult for [the plaintiffs] to accomplish their primary mission"). AFSA and AFGE therefore have standing to challenge the agency action at issue: the shutdown of USAID.

## II. Plaintiffs' claims are not properly channeled to an administrative forum.

Congress conferred jurisdiction on federal district courts to hear civil actions arising under the Constitution and laws of the United States. 28 U.S.C § 1331. In some circumstances, though, Congress may "substitute for that district court authority an alternative scheme of review … by specifying a different method to resolve claims about agency action." *Axon*, 598 U.S. at 185. One such circumstance concerns personnel actions: Congress has impliedly channeled challenges to certain adverse employment actions brought by certain categories of federal employees to specified administrative bodies. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012) (describing the authority of the Merit Systems Protection Board under the Civil Service Reform Act); *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993) (describing the authority of the Foreign Service Grievance Board under the Foreign Service Act); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) (describing the authority of the Federal Labor Relations Authority under the Federal Service Labor-Management Relations Statute).

With respect to the claims alleged in this case, though, Congress has not done so. The district court thus erred in holding that the

31

administrative adjudication schemes stemming from the Civil Service Reform Act, Foreign Service Act, and Federal Service Labor-Management Relations Statute divested it of jurisdiction to address AFSA's and AFGE's claims.

## A. Oxfam's claims cannot be channeled to an administrative forum.

It is undisputed that nothing in statute or precedent suggests that the claims of a non-employee, like plaintiff Oxfam, can be channeled to administrative fora. *Cf. Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 776 (D.C. Cir. 2025) (observing that non-union plaintiffs challenging the dissolution of a federal agency do not "seek redress for employment-related injuries"), *petition for reh'g en banc pending*. Oxfam's claims alone, then, establish that the district court has jurisdiction over this matter. *See id.* (noting that the claims of non-union plaintiffs "suffice to tee up the dispositive questions").

## B. AFSA's and AFGE's claims cannot be channeled to an administrative forum.

The claims of AFSA and AFGE—constitutional and APA claims that implicate fundamental questions as to the scope of Executive power—do not fall within the scope of claims that Congress intended to

32

channel to administrative agencies created to hear ordinary employment disputes. *See Axon*, 598 U.S. at 186 (observing that the operative question is "whether the particular claims brought were 'of the type Congress intended to be reviewed within this statutory structure'" (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994))).

In *Thunder Basin*, the Supreme Court identified three guideposts to aid in consideration of congressional intent: "First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim wholly collateral to the statute's review provisions? And last, is the claim outside the agency's expertise?" *Id.* (cleaned up; quoting *Thunder Basin*, 510 U.S. at 212–13). All three factors support the district court's exercise of jurisdiction here.

First, if district court jurisdiction were precluded and AFSA's and AFGE's claims were instead routed to the Merit Systems Protection Board, the Federal Labor Relations Authority, or the Foreign Service Grievance Board, it would indeed "foreclose all meaningful judicial review." *Axon*, 598 U.S. at 186. That is so because judicial review would come only after multiple layers of agency review, a process that could take years. *See* 5 U.S.C. § 7703 (judicial review provision in Civil Service

33

Reform Act); 22 U.S.C. § 4140 (judicial review provision in Foreign Service Act). This is not "mere 'expense and disruption'" of proceedings. JA 207 (citing *Axon*, 598 U.S. at 192). The relief sought here—an order that Defendants cannot unilaterally abolish a federal agency without congressional authorization—cannot be obtained years from now, when the agency has long since ceased to exist. The consequences of shuttering USAID will become more and more difficult to undo over time.

Indeed, because Defendants have already shut down the agency, the administrative bodies—even if they otherwise would have been appropriate fora—likely would not be able to hear Plaintiffs' claims and grant meaningful relief. *See Bullock v. Dep't of Air Force*, 80 M.S.P.R. 361, 368–69 (M.S.P.B 1998) ("[T]he Board generally considers the abolishment of the position as a compelling reason for not reinstating the appellant[.]"); *Cmty. Servs. Admin.*, 7 F.L.R.A. 762, 763 (1982) (holding that the termination of an agency moots an unfair labor practice proceeding pending before it).

Second, the nature of the claims supports district court jurisdiction. While the district court recast AFSA's and AFGE's claims as challenges concerning the employer-employee relationship, JA 193; *see supra* p. 29,

34

Plaintiffs do not bring employment-focused claims. Rather, their claims are "fundamental, even existential" claims about the agency's survival and the power of the Executive branch. *Axon*, 598 U.S at 180. Such claims are far afield from the employment and labor claims that make up the bread and butter of administrative adjudications. *Axon* and *Free Enterprise Fund v. Public Company Accounting Oversight Board* are illustrative: In both cases, the plaintiffs challenged the "structure or very existence of an agency" by charging that "an agency is wielding authority unconstitutionally in all or a broad swath of its work." *Axon*, 598 U.S. at 189; *see Free Enter. Fund*, 561 U.S. 477, 490 (2010) ("[P]etitioners object to the Board's existence, not to any of its auditing standards."). Similarly, here, Plaintiffs do not challenge a particular employment action; they challenge Defendants' decision to close an agency created and maintained by statute.

The district court extensively relied on the unpublished panel opinion in *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), for its conclusion that AFSA and AFGE "must pursue their personnel-related claims" through administrative agencies. JA 201–05. But AFSA and AFGE allege no "personnel-related" claims.

35

Again, it is their injury, not their claims, that relates to personnel matters. *See also Widakuswara v. Lake,* No. 25-5144, 2025 WL 2787974, at *1 (D.C. Cir. May 28, 2025) (statement of Chief Judge Srinivasan, joined by six other judges, respecting denial of reconsideration en banc, stating that the denial should "not be understood to accept" the government's assertion that district courts may not issue personnel-related relief beyond that which the government itself deems necessary to carry out its statutory mandate). Moreover, the decision in *Widakuswara* did not address the portion of the preliminary injunction that ordered the government to restore programming "such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news.'" *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, at *18 (D.D.C. Apr. 22, 2025) (quoting 22 U.S.C. § 6202(c)). Plaintiffs here sought similar relief, which was not constrained by the *Widakuswara* panel's decision.

Third, Plaintiffs' claims "have nothing to do with the" federal employment-related and labor-related "matters [the agencies] regularly adjudicate." *Axon*, 598 U.S. at 193. Plaintiffs do not seek reinstatement of specific employees or alterations in the terms and conditions of

36

employment. *Cf. Nat'l Treasury Empl. Union*, 149 F.4th at 774–75 (holding that claims seeking reinstatement should be channeled to an administrative body). They seek an order holding Defendants' shutdown of the agency to be unlawful and enjoining Defendants to reverse the actions taken to effectuate that unconstitutional and unlawful decision. *See* JA 88–90. That those actions included mass terminations does not transform this challenge to the unlawful shutdown into a challenge to personnel actions.

As the Supreme Court has observed, "agency adjudications are generally ill suited to address structural constitutional challenges." *Carr v. Saul*, 593 U.S. 83, 92 (2021). And here, no threshold employment questions within the agencies' expertise are mixed in with those challenges. *See Elgin*, 567 U.S. at 22–23.

Thus, the answer to all three *Thunder Basin* questions is "yes," making the outcome straightforward: In this circumstance, courts will "'presume that Congress does not intend to limit jurisdiction.'" *Axon*, 598 U.S. at 186 (quoting *Free Enter. Fund*, 561 U.S. at 489); *see id.* (stating that even if the answer to one *Thunder Basin* question is no, a court

might properly conclude that the case is not subject to administrative channeling).

## CONCLUSION

The district court's order granting Defendants' motion to dismiss should be reversed.

Respectfully submitted,

/s/ *Allison M. Zieve*

Kaitlyn Golden
Pooja A. Boisture
Kayla M. Kaufman
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kgolden@democracyforward.org

Lauren E. Bateman
Karla Gilbride
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
lbateman@citizen.org

*Counsel for Appellants*

November 26, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,982 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ Allison M. Zieve
Allison M. Zieve

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

/s/ *Allison M. Zieve*
Allison M. Zieve