**[ORAL ARGUMENT NOT YET SCHEDULED]**

No. 25-5290

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

Plaintiffs-Appellants,

v.

DONALD TRUMP, et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

## JOINT APPENDIX

———————————

Kaitlyn Golden                    Lauren E. Bateman
Kayla M. Kaufman                  Karla Gilbride
Robin F. Thurston                 Allison M. Zieve
Democracy Forward Foundation      Public Citizen Litigation Group
P.O. Box 34553                    1600 20th Street NW
Washington, DC 20043              Washington, DC 20009
(202) 448-9090                    (202) 588-1000
kgolden@democracyforward.org      lbateman@citizen.org

*Counsel for Appellants*

November 26, 2025

# TABLE OF CONTENTS

**Page**

Docket Sheet, *American Federation of Government Employees
v. Trump*, No. 1:25-cv-352 (D.D.C.)............................................ JA 1

Complaint for Declaratory and Injunctive Relief
(filed Feb. 6, 2025), ECF No. 1 ................................................ JA 19

Declaration of Ottis Johnson, Jr. (filed Feb. 2, 2025),
ECF No. 9-3 ........................................................................... JA 49

Declaration of Randall Chester (filed Feb. 7, 2025),
ECF No. 24-17 ....................................................................... JA 51

First Amended Complaint (filed Feb. 13, 2025),
ECF No. 30 ............................................................................ JA 58

Declaration of Abby Maxman (filed Feb. 13, 2025),
ECF No. 30-1 ......................................................................... JA 92

Memorandum Opinion (filed Feb. 21, 2025),
ECF No. 49 ............................................................................ JA 100

Further Declaration of Randall Chester (filed Mar. 10, 2025),
ECF No. 51-14 ....................................................................... JA 126

Second Declaration of Abby Maxman (filed Mar. 10, 2025),
ECF No. 51-23 ....................................................................... JA 137

Second Declaration of Ottis Johnson, Jr. (filed Mar. 10, 2025),
ECF No. 51-24 ....................................................................... JA 143

Excerpts from Joint Appendix Pursuant to Local Rule 7(n)
(filed May 16, 2025), ECF No. 85

Index ...................................................................................... JA 146

Declaration of Jeremy Lewin (dated Apr. 7, 2025)............... JA 147

Letter from Secretary Marco Rubio (dated Feb. 3, 2025)...... JA 158

"USAID's Final Mission" Email (dated Mar. 28, 2025)......... JA 161

Congressional Notification Transmittal Letter from the
United States Department of State (dated Mar. 28, 2025) ... JA 166

Spreadsheet Concerning the Status of USAID Programs,
page 1 (transmitted to Congress on Mar. 28, 2025) .............. JA 178

Order (filed July 25, 2025),
     ECF No. 90 ................................................................ JA 179

Memorandum Opinion (filed July 25, 2025),
     ECF No. 91 ................................................................ JA 180

Notice of Appeal (filed Aug. 5, 2025),
     ECF No. 92 ................................................................ JA 217

## U.S. District Court
### District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:25–cv–00352–CJN

AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES et al v. TRUMP et al
Assigned to: Judge Carl J. Nichols
Case in other court:  USCA, 25–05290
Cause: 05:551 Administrative Procedure Act

Date Filed: 02/06/2025
Date Terminated: 07/25/2025
Jury Demand: None
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of
Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES**

represented by **Karla A. Gilbride**
PUBLIC JUSTICE, P.C.
1620 L Street NW
Suite 630
Washington, DC 20036
202–797–8600
Fax: 202–232–7203
Email: kgilbride@citizen.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kayla Minton Kaufman**
DEMOCRACY FORWARD
P.O. Box 34553
Washington
Washington, DC 20043
202–448–9090
Email: kkaufman@democracyforward.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren Bateman**
PUBLIC CITIZEN
1600 20th St NW
Washington, DC 20009
202–588–7739
Email: lbateman@citizen.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
254–722–5745
Email: sperryman@democracyforward.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Allison Marcy Zieve**
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
(202) 588–1000
Fax: (202) 588–7795
Email: azieve@citizen.org

*ATTORNEY TO BE NOTICED*

**Kristen Paige Miller**
DEMOCRACY FORWARD
FOUNDATION
PO Box 34553
Washington, DC 20043
202–701–1782
Email: kmiller@democracyforward.org
*TERMINATED: 04/30/2025*
*ATTORNEY TO BE NOTICED*

**Rachel L. Fried**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: rfried@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–455–9060
Email: rthurston@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Kaitlyn Golden**
DEMOCRACY FORWARD
P.O. Box 34553
Washington
Washington, DC 20043
202–701–1789
Email: kgolden@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMERICAN FOREIGN SERVICE ASSOCIATION**          represented by

**Karla A. Gilbride**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kayla Minton Kaufman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren Bateman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Allison Marcy Zieve**
(See above for address)

JA 2

*ATTORNEY TO BE NOTICED*

**Kristen Paige Miller**
(See above for address)
*TERMINATED: 04/30/2025*
*ATTORNEY TO BE NOTICED*

**Rachel L. Fried**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kaitlyn Golden**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**OXFAM AMERICA, INC.**　　　　represented by　**Kayla Minton Kaufman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristen Paige Miller**
(See above for address)
*TERMINATED: 04/30/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lauren Bateman**
PUBLIC CITIZEN
Litigation Group
1600 20th St NW
Washington, DC 20009
202–588–7739
Email: lbateman@citizen.org
*ATTORNEY TO BE NOTICED*

**Kaitlyn Golden**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD J. TRUMP**　　　　represented by　**Christopher D. Edelman**
*President of the United States of America*　　　U.S. DEPARTMENT OF JUSTICE
1100 L Street, NW
Washington, DC 20530
202–305–8659
Email: christopher.edelman@usdoj.gov
*TERMINATED: 08/08/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA 3

**Eric Hamilton**
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530
202–514–2000
Email: eric.hamilton@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Indraneel Sur**
U.S. DEPARTMENT OF JUSTICE
1100 L St. NW
Washington, DC 20530
202–616–8488
Email: Indraneel.Sur@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Wetzler**
DOJ–CIV
1100 L St. NW
Ste 11,200
Washington, DC 20005
202–514–4782
Email: lwetzler@democracyforward.org
*TERMINATED: 05/22/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dorothy M. Canevari**
DEPARTMENT OF JUSTICE
1100 L St., N.W.
Washington, DC 20001
202–616–8040
Email: dorothy.m.canevari@usdoj.gov
*TERMINATED: 02/12/2025*
*ATTORNEY TO BE NOTICED*

**Michael Patrick Clendenen**
U.S. DEPARTMENT OF JUSTICE
1100 L Street NW
Washington, DC 20005
(202) 353–0693
Fax: (202) 616–8460
Email: michael.p.clendenen@usdoj.gov
*TERMINATED: 05/15/2025*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **UNITED STATES DEPARTMENT OF STATE** | represented by | **Christopher D. Edelman**<br>(See above for address)<br>*TERMINATED: 08/08/2025*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Eric Hamilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*

JA 4

*ATTORNEY TO BE NOTICED*

**Lauren Wetzler**
(See above for address)
*TERMINATED: 05/22/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dorothy M. Canevari**
(See above for address)
*TERMINATED: 02/12/2025*
*ATTORNEY TO BE NOTICED*

**Michael Patrick Clendenen**
(See above for address)
*TERMINATED: 05/15/2025*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT**

represented by **Christopher D. Edelman**
(See above for address)
*TERMINATED: 08/08/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Wetzler**
(See above for address)
*TERMINATED: 05/22/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dorothy M. Canevari**
(See above for address)
*TERMINATED: 02/12/2025*
*ATTORNEY TO BE NOTICED*

**Michael Patrick Clendenen**
(See above for address)
*TERMINATED: 05/15/2025*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES TREASURY
DEPARTMENT**

represented by **Christopher D. Edelman**
(See above for address)
*TERMINATED: 08/08/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Hamilton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Indraneel Sur**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Wetzler**
(See above for address)
*TERMINATED: 05/22/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dorothy M. Canevari**
(See above for address)
*TERMINATED: 02/12/2025*
*ATTORNEY TO BE NOTICED*

**Michael Patrick Clendenen**
(See above for address)
*TERMINATED: 05/15/2025*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARCO A. RUBIO**                represented by    **Christopher D. Edelman**
*Secretary of State, and Acting*                   (See above for address)
*Administrator of United States Agency for*        *TERMINATED: 08/08/2025*
*International Development*                         *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Eric Hamilton**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Indraneel Sur**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Lauren Wetzler**
                                                   (See above for address)
                                                   *TERMINATED: 05/22/2025*
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Dorothy M. Canevari**
                                                   (See above for address)
                                                   *TERMINATED: 02/12/2025*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Michael Patrick Clendenen**
                                                   (See above for address)
                                                   *TERMINATED: 05/15/2025*
                                                   *ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT BESSENT**                 represented by    **Christopher D. Edelman**
*Secretary of Treasury*                            (See above for address)
                                                   *TERMINATED: 08/08/2025*
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Eric Hamilton**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

JA 6

**Indraneel Sur**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lauren Wetzler**
(See above for address)
*TERMINATED: 05/22/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dorothy M. Canevari**
(See above for address)
*TERMINATED: 02/12/2025*
*ATTORNEY TO BE NOTICED*

**Michael Patrick Clendenen**
(See above for address)
*TERMINATED: 05/15/2025*
*ATTORNEY TO BE NOTICED*

**Movant**

**FORMER SENIOR NATIONAL**          represented by  **Alexis Jane Loeb**
**SECURITY OFFICIALS**                              FARELLA BRAUN & MARTEL LLP
                                                    One Bush Street
                                                    Suit 900
                                                    San Francisco, CA 94104
                                                    415–954–4400
                                                    Fax: 415–954–4480
                                                    Email: aloeb@fbm.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Kyle Andrew McLorg**
                                                    FARELLA BRAUN & MARTEL LLP
                                                    One Bush Street
                                                    Suit 900
                                                    San Francisco, CA 94104
                                                    415–954–4915
                                                    Fax: 415–954–4480
                                                    Email: kmclorg@fbm.com
                                                    *PRO HAC VICE*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Rebecca S. LeGrand**
                                                    LEGRAND LAW PLLC
                                                    1100 H Street NW
                                                    Suite 1220
                                                    Washington, DC 20005
                                                    202–587–5725
                                                    Email: rebecca@legrandpllc.com
                                                    *ATTORNEY TO BE NOTICED*

**Movant**

**RESULTS EDUCATIONAL FUND,**       represented by  **Brad C. Deutsch**
**INC.**                                            FOSTER GARVEY P.C.
                                                    3000 K St., NW
                                                    Suite 420
                                                    Washington, DC 20007
                                                    202–298–1793
                                                    Email: brad.deutsch@foster.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

JA 7

**Movant**

**ACTIONAID USA**                    represented by **Brad C. Deutsch**
                                     (See above for address)
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

**Movant**

**MEMBERS OF CONGRESS**              represented by **Hannah Meredith Kieschnick**
                                     PUBLIC JUSTICE, P.C.
                                     475 14th St.
                                     Suite Unit 610
                                     Oakland, CA 94612
                                     510–622–8150
                                     Fax: 202–232–7203
                                     Email: hkieschnick@publicjustice.net
                                     *LEAD ATTORNEY*
                                     *PRO HAC VICE*
                                     *ATTORNEY TO BE NOTICED*

                                     **Sharon McGowan**
                                     PUBLIC JUSTICE
                                     1620 L St NW
                                     Suite 630
                                     Washington, DC 20036
                                     202–725–8576
                                     Email: smcgowan@publicjustice.net
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

                                     **Leah Marie Nicholls**
                                     PUBLIC JUSTICE, P.C.
                                     1620 L Street NW
                                     Suite 630
                                     Washington, DC 20036
                                     202–797–8600
                                     Email: lnicholls@publicjustice.net
                                     *ATTORNEY TO BE NOTICED*

**Movant**

**CONSTITUTIONAL
ACCOUNTABILITY CENTER**              represented by **Brianne Jenna Gorod**
                                     CONSTITUTIONAL
                                     ACCOUNTABILITY CENTER
                                     1200 18th Street, NW
                                     Suite 501
                                     Washington, DC 20036
                                     (202) 296–6889 ext. 304
                                     Email: brianne@theusconstitution.org
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

                                     **Miriam Becker–Cohen**
                                     CONSTITUTIONAL
                                     ACCOUNTABILITY CENTER
                                     1730 Rhode Island Ave. NW
                                     Suite 1200
                                     Washington, DC 20005
                                     202–296–6889
                                     Email: miriam@theusconstitution.org
                                     *LEAD ATTORNEY*
                                     *ATTORNEY TO BE NOTICED*

**Amicus**

**UNITARIAN UNIVERSALIST**
**SERVICE COMMITTEE**

represented by  **Brad C. Deutsch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/06/2025 | 1 | COMPLAINT against SCOTT BESSENT, MARCO RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT ( Filing fee $ 405 receipt number ADCDC–11463059) filed by AMERICAN FOREIGN SERVICE ASSOCIATION, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES. (Attachments: # 1 Civil Cover Sheet, # 2 DCAO Summons, # 3 Department of State Summons, # 4 Donald J. Trump Summons, # 5 Marco Rubio (Secretary) Summons, # 6 Marco Rubio (USAID) Summons, # 7 Scott Bessent Summons, # 8 Treasury Summons, # 9 USAG Summons, # 10 USAID Summons)(Golden, Kaitlyn) (Entered: 02/06/2025) |
| 02/06/2025 | 2 | NOTICE of Appearance by Kaitlyn Golden on behalf of AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION (Golden, Kaitlyn) (Entered: 02/06/2025) |
| 02/06/2025 | 3 | NOTICE of Appearance by Kristen Paige Miller on behalf of AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION (Miller, Kristen) (Entered: 02/06/2025) |
| 02/06/2025 | 4 | NOTICE of Appearance by Robin F. Thurston on behalf of AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION (Thurston, Robin) (Entered: 02/06/2025) |
| 02/06/2025 | 5 | NOTICE of Appearance by Rachel L. Fried on behalf of AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION (Fried, Rachel) (Entered: 02/06/2025) |
| 02/06/2025 | 6 | NOTICE of Appearance by Allison Marcy Zieve on behalf of All Plaintiffs (Zieve, Allison) (Entered: 02/06/2025) |
| 02/07/2025 | | Case Assigned to Judge Carl J. Nichols. (znmw) (Entered: 02/07/2025) |
| 02/07/2025 | 7 | SUMMONS (9) Issued Electronically as to SCOTT BESSENT, MARCO RUBIO (2), DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 02/07/2025) |
| 02/07/2025 | 8 | ERRATA *to Complaint* by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Zieve, Allison) (Entered: 02/07/2025) |
| 02/07/2025 | 9 | MOTION for Temporary Restraining Order by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Memorandum of Law, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Proposed Order)(Miller, Kristen) (Entered: 02/07/2025) |
| 02/07/2025 | 10 | NOTICE of Appearance by Lauren Bateman on behalf of All Plaintiffs (Bateman, Lauren) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER. The parties are hereby ORDERED to appear for an in–person hearing on the 9 Motion for Temporary Restraining Order on February 7, 2025 at 3:00 PM in Courtroom 17. Plaintiffs shall notify counsel for defendants of the contents of this Minute Order and the time and place of the hearing. So ORDERED by Judge Carl J. Nichols on 2/7/25. (lccjn1) (Entered: 02/07/2025) |
| 02/07/2025 | | NOTICE: Members of the Public and Media are permitted to attend the TRO hearing scheduled this afternoon **in person**. There will **not** be a public telephone line |

| | | |
|---|---|---|
| | | connected; however, the courthouse media access room will be available. (zcam) (Entered: 02/07/2025) |
| 02/07/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Kayla M. Kaufman, Filing fee $ 100, receipt number ADCDC–11465386. Fee Status: Fee Paid. by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Exhibit Motion, # 2 Exhibit Certificate of Good Standing)(Golden, Kaitlyn) (Entered: 02/07/2025) |
| 02/07/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Skye Perryman, Filing fee $ 100, receipt number ADCDC–11465454. Fee Status: Fee Paid. by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Exhibit Motion, # 2 Exhibit Certificate of Good Standing)(Golden, Kaitlyn) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER. The Court having considered Plaintiffs' 11 Motion For Admission *Pro Hac Vice* of Kayla M. Kaufman, and it appearing to the Court that the attorney referenced therein meets the requirements for *pro hac vice* admission under Local Civil Rule 83.2(e), it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Kayla M. Kaufman is ADMITTED to practice before the Court *pro hac vice*. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. So ORDERED by Judge Carl J. Nichols on 2/7/25. (lccjn1) (Entered: 02/07/2025) |
| 02/07/2025 | | MINUTE ORDER. The Court having considered Plaintiffs' 12 Motion For Admission *Pro Hac Vice* of Skye Perryman, and it appearing to the Court that the attorney referenced therein meets the requirements for *pro hac vice* admission under Local Civil Rule 83.2(e), it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Skye Perryman is ADMITTED to practice before the Court *pro hac vice*. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. So ORDERED by Judge Carl J. Nichols on 2/7/25. (lccjn1) (Entered: 02/07/2025) |
| 02/07/2025 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Motion Hearing held on 2/7/2025 re 9 MOTION for Temporary Restraining Order filed by AMERICAN FOREIGN SERVICE ASSOCIATION, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES. Further Order to be issued by the Court. Court Reporter: Lorraine Herman. (zcam) (Entered: 02/07/2025) |
| 02/07/2025 | 13 | NOTICE of Appearance by Christopher D. Edelman on behalf of All Defendants (Edelman, Christopher) (Entered: 02/07/2025) |
| 02/07/2025 | 14 | NOTICE of Appearance by Dorothy M. Canevari on behalf of All Defendants (Canevari, Dorothy) (Entered: 02/07/2025) |
| 02/07/2025 | 15 | ORDER granting in part and denying in part 9 Motion for TRO. Signed by Judge Carl J. Nichols on 2/7/25. (lccjn1) (Entered: 02/07/2025) |
| 02/09/2025 | 16 | TRANSCRIPT OF TEMPORARY RESTRAINING ORDER PROCEEDINGS before Judge Carl J. Nichols, held on February 7, 2025. Page Numbers: 1–57. Date of Issuance: February 9, 2025. Court Reporter: Lorraine Herman. Email: Lorraine_Herman@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |

| | | Redaction Request due 3/2/2025. Redacted Transcript Deadline set for 3/12/2025. Release of Transcript Restriction set for 5/10/2025.(Herman, Lorraine) (Entered: 02/09/2025) |
|---|---|---|
| 02/10/2025 | 17 | TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS, before Judge Carl J. Nichols, held on February 13, 2025. Page Numbers: 1–57. Date of Issuance: March 5, 2025. Court Reporter: Lorraine Herman. Email: lorraine_herman@dcd.uscourts.gov.Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 3/3/2025. Redacted Transcript Deadline set for 3/13/2025. Release of Transcript Restriction set for 5/11/2025.(Herman, Lorraine) (Main Document 17 replaced on 3/5/2025) (zdp). Modified on 3/5/2025; to correct docket text (zdp). (Entered: 02/10/2025) |
| 02/10/2025 | 18 | NOTICE of Appearance by Karla A. Gilbride on behalf of All Plaintiffs (Gilbride, Karla) (Main Document 18 replaced on 2/10/2025) (zdp). (Entered: 02/10/2025) |
| 02/10/2025 | 19 | Emergency MOTION for Hearing *to Show Cause* by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Exhibit Declaration of Patricia Doe, # 2 Exhibit Declaration of Quinn Doe, # 3 Exhibit Declaration of Rebecca Doe, # 4 Exhibit Declaration of Ursula Doe, # 5 Exhibit Declaration of Mary Doe, # 6 Exhibit Declaration of Erica Doe, # 7 Text of Proposed Order Proposed Order)(Bateman, Lauren) (Entered: 02/10/2025) |
| 02/10/2025 | 20 | RESPONSE re 9 MOTION for Temporary Restraining Order filed by DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES TREASURY DEPARTMENT, MARCO RUBIO, SCOTT BESSENT. (Attachments: # 1 Declaration of Peter Marocco)(Edelman, Christopher) (Entered: 02/10/2025) |
| 02/10/2025 | 21 | NOTICE *of Correction* by DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES TREASURY DEPARTMENT, MARCO RUBIO, SCOTT BESSENT (Edelman, Christopher) (Entered: 02/10/2025) |
| 02/11/2025 | | NOTICE: Members of the Public and Media are permitted to attend the Preliminary Injunction hearing scheduled for Wednesday, February 12, 2025 **in person**. There will **not** be a public telephone line connected; however, the courthouse media access room will be available. (zcam) (Entered: 02/11/2025) |
| 02/11/2025 | 22 | RESPONSE re 19 Emergency MOTION for Hearing *to Show Cause* filed by DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES TREASURY DEPARTMENT, MARCO RUBIO, SCOTT BESSENT. (Attachments: # 1 Declaration of Jason Gray)(Edelman, Christopher) (Entered: 02/11/2025) |
| 02/11/2025 | 23 | Unopposed MOTION for Leave to File Excess Pages by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Golden, Kaitlyn) (Entered: 02/11/2025) |
| 02/11/2025 | | MINUTE ORDER. Plaintiffs' 23 Unopposed Motion for Leave to File in Excess of Page Limits is GRANTED. Plaintiffs' reply brief may contain up to 35 pages. So |

JA 11

| | | ORDERED by Judge Carl J. Nichols on 2/11/25. (lccjn1) (Entered: 02/11/2025) |
|---|---|---|
| 02/11/2025 | 24 | MOTION for Leave to File *Supplement to the Record* by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Marcus Doe, # 3 Declaration of Nancy Doe, # 4 Declaration of Nathan Doe, # 5 Declaration of Olivia Doe, # 6 Declaration of Ruth Doe, # 7 Declaration of Sarah Doe, # 8 Declaration of Thomasina Doe, # 9 Declaration of Ulysses Doe, # 10 Declaration of Virginia Doe, # 11 Declaration of Walter Doe, # 12 Declaration of Wanda Doe, # 13 Declaration of Xavier Doe, # 14 Declaration of Yolanda Doe, # 15 Declaration of Zeb Doe, # 16 Declaration of Jane Doe, # 17 Declaration of Randall Chester, # 18 Text of Proposed Order)(Golden, Kaitlyn) (Attachment 11 replaced on 2/13/2025) (zdp). (Attachment 12 replaced on 2/13/2025) (zdp). Modified on 2/13/2025; replaced at the request of counsel (zdp). (Attachment 6 replaced on 2/14/2025) (zdp). (Entered: 02/11/2025) |
| 02/11/2025 | 25 | REPLY to opposition to motion re 9 MOTION for Temporary Restraining Order *Reply in Support* filed by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Golden, Kaitlyn) Modified docket text on 2/12/2025 (zdp). (Entered: 02/11/2025) |
| 02/12/2025 | | Set/Reset Hearings: Preliminary Injunction Hearing RESET for 2/13/2025 at 11:00 AM in Courtroom 17– In Person before Judge Carl J. Nichols. NOTE: Members of the Public and Media are permitted to attend **in person**. There will **not** be a public telephone line connected; however, the courthouse media access room will be available. (zcam) (Entered: 02/12/2025) |
| 02/12/2025 | 26 | NOTICE of Appearance by Lauren Wetzler on behalf of All Defendants (Wetzler, Lauren) (Entered: 02/12/2025) |
| 02/12/2025 | 27 | NOTICE OF SUBSTITUTION OF COUNSEL by Indraneel Sur on behalf of All Defendants Substituting for attorney DOROTHY M. CANEVARI (Sur, Indraneel) (Entered: 02/12/2025) |
| 02/12/2025 | 28 | NOTICE OF RELATED CASE by All Defendants. Case related to Case No. 1:25–cv–400. (Edelman, Christopher) (Entered: 02/12/2025) |
| 02/12/2025 | 29 | NOTICE of Appearance by Eric Hamilton on behalf of All Defendants (Hamilton, Eric) (Entered: 02/12/2025) |
| 02/13/2025 | 30 | AMENDED COMPLAINT against All Defendants filed by AMERICAN FOREIGN SERVICE ASSOCIATION, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, OXFAM AMERICA, INC.. (Attachments: # 1 Exhibit A, # 2 Redline to Complaint)(Golden, Kaitlyn) (Entered: 02/13/2025) |
| 02/13/2025 | 31 | ORDER amending TRO. Signed by Judge Carl J. Nichols on 2/13/25. (lccjn1) (Entered: 02/13/2025) |
| 02/13/2025 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Preliminary Injunction held on 2/13/2025. Government Supplemental Facts due by 2/14/2025. Further Orders and Opinion to be issued by the Court. Court Reporter: Lorraine Herman. (zcam) (Entered: 02/13/2025) |
| 02/14/2025 | 32 | NOTICE. Signed by Judge Carl J. Nichols on 2/14/25. (lccjn1) (Entered: 02/14/2025) |
| 02/14/2025 | 33 | NOTICE of Appearance by Kayla Minton Kaufman on behalf of OXFAM AMERICA, INC., AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION (Minton Kaufman, Kayla) (Entered: 02/14/2025) |
| 02/14/2025 | 34 | NOTICE of Appearance by Skye Perryman on behalf of OXFAM AMERICA, INC., AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION (Perryman, Skye) (Entered: 02/14/2025) |
| 02/14/2025 | 35 | SUPPLEMENTAL MEMORANDUM to re 20 Response to motion, filed by DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES TREASURY DEPARTMENT, MARCO RUBIO, SCOTT BESSENT. (Attachments: |

| | | |
|---|---|---|
| | | # 1 Declaration of Pete Marocco)(Edelman, Christopher) (Entered: 02/14/2025) |
| 02/17/2025 | 36 | MOTION for Leave to File *Supplement to the Record* by OXFAM AMERICA, INC., AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Exhibit Third Declaration of Randall Chester, # 2 Exhibit Declaration of Terry Doe, # 3 Exhibit Declaration of Emilia Doe, # 4 Text of Proposed Order)(Miller, Kristen) (Entered: 02/17/2025) |
| 02/18/2025 | 37 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DONALD J. TRUMP served on 2/13/2025 (Golden, Kaitlyn) (Entered: 02/18/2025) |
| 02/18/2025 | 38 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARCO RUBIO served on 2/13/2025 (Golden, Kaitlyn) (Entered: 02/18/2025) |
| 02/18/2025 | 39 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. (Golden, Kaitlyn) (Entered: 02/18/2025) |
| 02/18/2025 | 40 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SCOTT BESSENT served on 2/13/2025 (Golden, Kaitlyn) (Entered: 02/18/2025) |
| 02/18/2025 | 41 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES DEPARTMENT OF STATE served on 2/13/2025 (Golden, Kaitlyn) (Entered: 02/18/2025) |
| 02/18/2025 | 42 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES TREASURY DEPARTMENT served on 2/13/2025 (Golden, Kaitlyn) (Entered: 02/18/2025) |
| 02/18/2025 | 43 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 2/13/2025. (Golden, Kaitlyn) (Entered: 02/18/2025) |
| 02/18/2025 | 44 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT served on 2/13/2025 (Golden, Kaitlyn) (Entered: 02/18/2025) |
| 02/18/2025 | 45 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/13/2025. Answer due for ALL FEDERAL DEFENDANTS by 4/14/2025. (Golden, Kaitlyn) (Entered: 02/18/2025) |
| 02/18/2025 | | NOTICE of Hearing: Telephone Conference set for 2/19/2025 at 11:30 AM before Judge Carl J. Nichols. (zglw) (Entered: 02/18/2025) |
| 02/19/2025 | | Minute Entry for proceedings held before Judge Carl J. Nichols: Telephone Conference held on 2/19/2025. Defendants' supplemental brief and declaration due by noon on 2/20/2025. (Court Reporter Lorraine Herman.) (zakb) (Entered: 02/19/2025) |
| 02/20/2025 | 46 | NOTICE *of Filing Declaration* by DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES TREASURY DEPARTMENT, MARCO RUBIO, SCOTT BESSENT re Telephone Conference, Set Deadlines/Hearings (Attachments: # 1 Declaration Pete Marocco)(Edelman, Christopher) (Entered: 02/20/2025) |
| 02/20/2025 | 47 | MOTION for Leave to File *Supplement to the Record* by OXFAM AMERICA, INC., AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Exhibit Fourth Declaration of Randall Chester, # 2 Text of Proposed Order)(Miller, Kristen) (Entered: 02/20/2025) |
| 02/21/2025 | 48 | ORDER denying 9 Motion for Preliminary Injunction. Signed by Judge Carl J. Nichols on 2/21/25. (lccjn1) (Entered: 02/21/2025) |
| 02/21/2025 | 49 | MEMORANDUM OPINION. Signed by Judge Carl J. Nichols on 2/21/25. (lccjn1) (Entered: 02/21/2025) |
| 03/05/2025 | 50 | TRANSCRIPT OF TELEPHONE STATUS HEARING, before Judge Carl J. Nichols, held on February 19, 2025. Page Numbers: 1–23. Date of Issuance: March 5, 2025. |

| | | Court Reporter: Lorraine Herman. Email: lorraine_herman@dcd.uscourts.gov. Transcripts may be ordered by submitting the Transcript Order Form |
|---|---|---|
| | | For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, CD or ASCII) may be purchased from the court reporter. |
| | | **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. |
| | | Redaction Request due 3/26/2025. Redacted Transcript Deadline set for 4/5/2025. Release of Transcript Restriction set for 6/3/2025.(Herman, Lorraine) (Entered: 03/05/2025) |
| 03/10/2025 | 51 | MOTION for Summary Judgment by OXFAM AMERICA, INC., AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Exhibit List, # 4 Exhibit 1, # 5 Exhibit 2, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Exhibit 14, # 18 Exhibit 15, # 19 Exhibit 16, # 20 Exhibit 17, # 21 Exhibit 18, # 22 Exhibit 19, # 23 Exhibit 20, # 24 Exhibit 21, # 25 Text of Proposed Order)(Golden, Kaitlyn) (Entered: 03/10/2025) |
| 03/10/2025 | 52 | MOTION to Expedite *Briefing on Summary Judgment* by OXFAM AMERICA, INC., AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Golden, Kaitlyn) (Entered: 03/10/2025) |
| 03/11/2025 | 53 | WITHDRAWN PURSUANT TO NOTICE FILED 3/13/2025..... MOTION for Temporary Restraining Order by OXFAM AMERICA, INC., AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Golden, Kaitlyn) Modified on 3/17/2025 (znmw). (Entered: 03/11/2025) |
| 03/11/2025 | | MINUTE ORDER. In light of Plaintiff's 53 Motion for Temporary Restraining Order, it is ORDERED that by 10:00am on March 12, 2025, the Parties shall meet, confer, and file a Joint Status Report addressing a proposed briefing schedule for the 53 Motion. The Parties may also address any other issues that they believe will be helpful to the Court. Any disagreements should be noted in the Joint Status Report. So ORDERED by Judge Carl J. Nichols on 3/11/25. (lccjn1) (Entered: 03/11/2025) |
| 03/11/2025 | 54 | NOTICE of Appearance by Michael Patrick Clendenen on behalf of DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES TREASURY DEPARTMENT, MARCO RUBIO, SCOTT BESSENT (Clendenen, Michael) (Entered: 03/11/2025) |
| 03/11/2025 | 55 | Memorandum in opposition to re 52 Motion to Expedite filed by DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES TREASURY DEPARTMENT, MARCO RUBIO, SCOTT BESSENT. (Clendenen, Michael) (Entered: 03/11/2025) |
| 03/11/2025 | 56 | Joint STATUS REPORT by DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES TREASURY DEPARTMENT, MARCO RUBIO, SCOTT BESSENT. (Clendenen, Michael) (Entered: 03/11/2025) |
| 03/11/2025 | | MINUTE ORDER. Upon consideration of the 56 Joint Status Report, it is hereby ORDERED that Defendants shall respond to Plaintiffs' 53 Motion by 4:00 p.m. on March 12, 2025, and that Plaintiff shall file any reply by 12:00 p.m. on March 13, |

| | | |
|---|---|---|
| | | 2025. So ORDERED by Judge Carl J. Nichols on 3/11/25. (lccjn1) (Entered: 03/11/2025) |
| 03/12/2025 | 57 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Alexis Loeb, Filing fee $ 100, receipt number ADCDC–11536806. Fee Status: Fee Paid. by Former Senior National Security Officials. (Attachments: # 1 Declaration of Alexis Loeb, # 2 Exhibit Certificate of Standing)(LeGrand, Rebecca) (Entered: 03/12/2025) |
| 03/12/2025 | 58 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Kyle McLorg, Filing fee $ 100, receipt number ADCDC–11536991. Fee Status: Fee Paid. by Former Senior National Security Officials. (Attachments: # 1 Declaration of Kyle McLorg, # 2 Exhibit Certificate of Standing)(LeGrand, Rebecca) (Entered: 03/12/2025) |
| 03/12/2025 | 59 | Memorandum in opposition to re 53 Motion for TRO filed by DONALD J. TRUMP, UNITED STATES DEPARTMENT OF STATE, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES TREASURY DEPARTMENT, MARCO RUBIO, SCOTT BESSENT. (Attachments: # 1 Declaration of Erica Carr, # 2 Text of Proposed Order)(Clendenen, Michael) (Entered: 03/12/2025) |
| 03/12/2025 | 60 | REPLY to opposition to motion re 52 Motion to Expedite filed by OXFAM AMERICA, INC., AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION. (Golden, Kaitlyn) (Entered: 03/12/2025) |
| 03/13/2025 | 61 | WITHDRAWAL of Motion by OXFAM AMERICA, INC., AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION re 53 MOTION for Temporary Restraining Order filed by OXFAM AMERICA, INC., AMERICAN FOREIGN SERVICE ASSOCIATION, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES . (Golden, Kaitlyn) (Entered: 03/13/2025) |
| 03/13/2025 | | MINUTE ORDER. Upon consideration of the 52 Motion to Expedite Briefing on Summary Judgment, it is hereby ORDERED that the Motion is GRANTED IN PART. It is further ORDERED that Defendants shall submit their combined motion to dismiss and opposition to Plaintiffs' motion for summary judgment on or before April 7, 2025; Plaintiffs shall submit their combined opposition to Defendants' motion to dismiss and reply in support of their motion for summary judgment on or before April 21, 2025; and Defendants shall submit a reply in support of their motion to dismiss on or before May 5, 2025. So ORDERED by Judge Carl J. Nichols on 3/13/25. (lccjn1) (Entered: 03/13/2025) |
| 03/14/2025 | | MINUTE ORDER. The Court having considered the 57 Motion For Admission Pro Hac Vice of Alexis Loeb, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(e), it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Alexis Loeb is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. So ORDERED by Judge Carl J. Nichols on 3/14/25. (lccjn1) (Entered: 03/14/2025) |
| 03/14/2025 | | MINUTE ORDER. The Court having considered the 58 Motion For Admission Pro Hac Vice of Kyle McLorg, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(e), it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Kyle McLorg is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. So ORDERED by Judge Carl J. Nichols on 3/14/25. (lccjn1) (Entered: 03/14/2025) |
| 03/17/2025 | 62 | NOTICE of Appearance by Alexis Jane Loeb on behalf of Former Senior National Security Officials (Loeb, Alexis) (Entered: 03/17/2025) |
| 03/17/2025 | 63 | NOTICE of Appearance by Kyle Andrew McLorg on behalf of Former Senior National Security Officials (McLorg, Kyle) (Entered: 03/17/2025) |

| 03/17/2025 | 64 | Unopposed MOTION for Leave to File *Amici Curiae Brief* by Former Senior National Security Officials. (Attachments: # 1 Exhibit A – Brief of Amici Curiae Former Senior National Security Officials In Support of Plaintiffs' Motion for Summary Judgment, # 2 Exhibit B – Proposed Order Granting Amici Former Senior National Security Officials' Unopposed Motion for Leave to File Amici Curiae Brief)(Loeb, Alexis) (Entered: 03/17/2025) |
| --- | --- | --- |
| 03/17/2025 | 65 | NOTICE of Appearance by Brad C. Deutsch on behalf of RESULTS Educational Fund, Inc., ActionAid USA, UNITARIAN UNIVERSALIST SERVICE COMMITTEE (Deutsch, Brad) (Entered: 03/17/2025) |
| 03/17/2025 | 66 | MOTION for Leave to File *Brief Amicus Curiae In Support of Plaintiffs Motion for Summary Judgment* by RESULTS Educational Fund, Inc., ActionAid USA, UNITARIAN UNIVERSALIST SERVICE COMMITTEE. (Attachments: # 1 Exhibit 1 (Amicus Brief), # 2 Exhibit 2 (Proposed Order))(Deutsch, Brad) (Entered: 03/17/2025) |
| 03/31/2025 | 67 | NOTICE of Appearance by Sharon McGowan on behalf of MEMBERS OF CONGRESS (McGowan, Sharon) (Entered: 03/31/2025) |
| 03/31/2025 | 68 | MOTION for Leave to File Amicus Brief by MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Exhibit Proposed Order)(McGowan, Sharon) (Entered: 03/31/2025) |
| 04/07/2025 | 69 | ADMINISTRATIVE RECORD *Certification* by SCOTT BESSENT, MARCO A. RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT. (Edelman, Christopher) (Entered: 04/07/2025) |
| 04/07/2025 | 70 | MOTION to Dismiss *or in the Alternative, Motion for Summary Judgment* by SCOTT BESSENT, MARCO A. RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Edelman, Christopher) (Entered: 04/07/2025) |
| 04/07/2025 | 71 | RESPONSE re 51 MOTION for Summary Judgment filed by SCOTT BESSENT, MARCO A. RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT. (Attachments: # 1 Response to Plaintiffs' Statement of Undisputed Material Facts)(Edelman, Christopher) (Entered: 04/07/2025) |
| 04/07/2025 | 72 | MOTION for Summary Judgment by SCOTT BESSENT, MARCO A. RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT. (See docket entry 70 to view document) (zdp) (Entered: 04/08/2025) |
| 04/15/2025 | 73 | NOTICE of Appearance by Leah Marie Nicholls on behalf of MEMBERS OF CONGRESS (Nicholls, Leah) (Entered: 04/15/2025) |
| 04/21/2025 | 74 | REPLY to opposition to motion re 51 Motion for Summary Judgment,, filed by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION, OXFAM AMERICA, INC.. (Golden, Kaitlyn) (Entered: 04/21/2025) |
| 04/21/2025 | 75 | RESPONSE re 72 MOTION for Summary Judgment, 70 MOTION to Dismiss *or in the Alternative, Motion for Summary Judgment* filed by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION, OXFAM AMERICA, INC.. (Golden, Kaitlyn) (Entered: 04/21/2025) |
| 04/24/2025 | 76 | NOTICE OF SUPPLEMENTAL AUTHORITY by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION, OXFAM AMERICA, INC. (Bateman, Lauren) (Entered: 04/24/2025) |

| 04/25/2025 | 77 | Consent MOTION for Leave to File Amicus Brief by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 04/25/2025) |
| --- | --- | --- |
| 04/25/2025 | 78 | NOTICE of Appearance by Miriam Becker–Cohen on behalf of CONSTITUTIONAL ACCOUNTABILITY CENTER (Becker–Cohen, Miriam) (Entered: 04/25/2025) |
| 04/28/2025 | 79 | MOTION for Extension of Time to File Response/Reply as to 72 MOTION for Summary Judgment, 70 MOTION to Dismiss *or in the Alternative, Motion for Summary Judgment* by SCOTT BESSENT, MARCO A. RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT. (Attachments: # 1 Text of Proposed Order)(Clendenen, Michael) (Entered: 04/28/2025) |
| 04/28/2025 | 80 | RESPONSE re 79 MOTION for Extension of Time to File Response/Reply as to 72 MOTION for Summary Judgment, 70 MOTION to Dismiss *or in the Alternative, Motion for Summary Judgment* filed by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION, OXFAM AMERICA, INC.. (Bateman, Lauren) (Entered: 04/28/2025) |
| 04/30/2025 | 81 | NOTICE OF WITHDRAWAL OF APPEARANCE as to AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION, OXFAM AMERICA, INC.. Attorney Kristen Paige Miller terminated. (Miller, Kristen) (Entered: 04/30/2025) |
| 05/05/2025 | | MINUTE ORDER. It is hereby ORDERED that the government's 79 Motion for Extension of Time is GRANTED. The government shall file its reply in support of its motion to dismiss, or in the alternative, motion for summary judgment, on or before May 12, 2025. So ORDERED by Judge Carl J. Nichols on 5/5/25. (lccjn1) (Entered: 05/05/2025) |
| 05/05/2025 | 82 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Hannah M. Kieschnick, Filing fee $ 100, receipt number ADCDC–11666847. Fee Status: Fee Paid. by MEMBERS OF CONGRESS. (Attachments: # 1 Exhibit Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Nicholls, Leah) (Attachment 1 replaced on 5/5/2025) (zdp). (Entered: 05/05/2025) |
| 05/08/2025 | | MINUTE ORDER. The Court having considered the 82 Motion for Admission Pro Hac Vice of Hannah M. Kieschnick, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(e), it is hereby ORDERED that the motion is GRANTED and that Hannah M. Kieschnick is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. So ORDERED by Judge Carl J. Nichols on 5/8/25. (lccjn1) (Entered: 05/08/2025) |
| 05/12/2025 | 83 | REPLY to opposition to motion re 72 Motion for Summary Judgment, 70 Motion to Dismiss, filed by SCOTT BESSENT, MARCO A. RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT. (Clendenen, Michael) (Entered: 05/12/2025) |
| 05/15/2025 | 84 | NOTICE OF WITHDRAWAL OF APPEARANCE as to SCOTT BESSENT, MARCO A. RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT. Attorney Michael Patrick Clendenen terminated. (Clendenen, Michael) (Entered: 05/15/2025) |
| 05/16/2025 | 85 | JOINT APPENDIX *Pursuant to Local Rule 7(n)* by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION, OXFAM AMERICA, INC.. (Bateman, Lauren) (Entered: 05/16/2025) |
| 05/22/2025 | 86 | NOTICE OF WITHDRAWAL OF APPEARANCE as to SCOTT BESSENT, MARCO RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF |

JA 17

| | | STATE, UNITED STATES TREASURY DEPARTMENT. Attorney Lauren Wetzler terminated. (Wetzler, Lauren) (Entered: 05/22/2025) |
|---|---|---|
| 05/30/2025 | | MINUTE ORDER. On May 3, 2025, a motions panel of the Court of Appeals issued an order in Case No. 25–5144, *Widakuswara et al. v. Lake*, which stayed in part several preliminary injunctions issued by the district court in litigation regarding the United States Agency for Global Media (USAGM). Among other things, the motions panel held that "the district court likely lacked subject–matter jurisdiction to enjoin USAGM's personnel actions." On May 22 and 28, 2025, the en banc Court of Appeals issued orders concerning the petition for en banc rehearing of the motions panel's order. It is therefore ORDERED that, on or before June 6, 2025, the parties shall file supplemental briefs, not to exceed 15 pages, regarding the import of those developments on this case. The parties' briefs should specifically address whether and to what extent the motions panel's decision is binding on the Court in light of its procedural posture and the pertinent factual differences, if any, between the claims in this case and those involving USAGM. So ORDERED by Judge Carl J. Nichols on 5/30/25. (lccjn1) (Entered: 05/30/2025) |
| 06/02/2025 | 87 | NOTICE of Appearance by Hannah Meredith Kieschnick on behalf of MEMBERS OF CONGRESS (Kieschnick, Hannah) (Main Document 87 replaced on 6/3/2025) (zdp). (Entered: 06/02/2025) |
| 06/06/2025 | 88 | RESPONSE TO ORDER OF THE COURT re Order,,,,, Set Deadlines,,,, re: Widakuswara Stay by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION, OXFAM AMERICA, INC.. (Attachments: # 1 Exhibit 1)(Golden, Kaitlyn) Modified docket text on 6/12/2025 (zdp). (Entered: 06/06/2025) |
| 06/06/2025 | 89 | RESPONSE TO ORDER OF THE COURT re Order,,,,, Set Deadlines,,,, *re: Widakuswara Stay* filed by SCOTT BESSENT, MARCO RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT. (Sur, Indraneel) (Entered: 06/06/2025) |
| 07/25/2025 | | MINUTE ORDER. It is hereby ORDERED that the 64 66 68 77 Motions for Leave to File Amicus Briefs are GRANTED. So ORDERED by Judge Carl J. Nichols on 7/25/25. (lccjn1) (Entered: 07/25/2025) |
| 07/25/2025 | 90 | ORDER denying 51 Motion for Summary Judgment; granting 70 Motion to Dismiss. Signed by Judge Carl J. Nichols on 7/25/25. (lccjn1) (Entered: 07/25/2025) |
| 07/25/2025 | 91 | MEMORANDUM OPINION. Signed by Judge Carl J. Nichols on 7/25/25. (lccjn1) (Entered: 07/25/2025) |
| 08/05/2025 | 92 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 91 Memorandum & Opinion, 90 Order on Motion for Summary Judgment, Order on Motion to Dismiss by AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AMERICAN FOREIGN SERVICE ASSOCIATION, OXFAM AMERICA, INC.. Filing fee $ 605, receipt number ADCDC–11867500. Fee Status: Fee Paid. Parties have been notified. (Bateman, Lauren) (Entered: 08/05/2025) |
| 08/06/2025 | 93 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 92 Notice of Appeal to DC Circuit Court,. (zdp) (Entered: 08/06/2025) |
| 08/08/2025 | 94 | NOTICE OF WITHDRAWAL OF APPEARANCE as to SCOTT BESSENT, MARCO A. RUBIO, DONALD J. TRUMP, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, UNITED STATES TREASURY DEPARTMENT. Attorney Christopher D. Edelman terminated. (Edelman, Christopher) (Entered: 08/08/2025) |
| 08/11/2025 | | USCA Case Number 25–5290 for 92 Notice of Appeal to DC Circuit Court, filed by OXFAM AMERICA, INC., AMERICAN FOREIGN SERVICE ASSOCIATION, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES. (mg) (Entered: 08/11/2025) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, 2101 E Street NW Washington, DC 20037, | ) ) ) ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

| | |
|---|---|
| and | ) ) |
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, 80 F Street NW Washington, DC 20001, | ) ) ) ) ) |
| *Plaintiffs,* | ) ) ) |
| v. | ) ) ) |
| DONALD TRUMP, President of the United States of America, 1600 Pennsylvania Avenue NW Washington, DC 20050, | ) ) ) ) ) |
| UNITED STATES DEPARTMENT OF STATE, 2201 C Street NW Washington, DC 20520, | ) ) ) ) ) |
| UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, 1300 Pennsylvania Avenue NW Washington, DC 20004, | ) ) ) ) ) |
| UNITED STATES TREASURY DEPARTMENT, 1500 Pennsylvania Avenue NW Washington, DC 20220, | ) ) ) ) ) |
| MARCO RUBIO, Secretary of State, and Acting Administrator of United States Agency for International Development, | ) ) ) ) ) |

Civil Action No. _____

1

United States Department of )
State, )
2201 C Street NW )
Washington, DC 20520, )
)
     and )
)
SCOTT BESSENT, Secretary of )
     Treasury, )
     1500 Pennsylvania Avenue NW )
     Washington, DC 20220, )
)
          *Defendants.* )
_____ )

## INTRODUCTION

This action seeks declaratory and injunctive relief with respect to a series of unconstitutional and illegal actions taken by President Donald Trump and his administration that have systematically dismantled the United States Agency for International Development (USAID). These actions have generated a global humanitarian crisis by abruptly halting the crucial work of USAID employees, grantees, and contractors. They have cost thousands of American jobs. And they have imperiled U.S. national security interests.

The first of these actions came on January 20, 2025, when Defendant Trump issued an Executive Order titled "Reevaluating and Realigning United States Foreign Aid," directing an immediate "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy."[1] Defendants State Department

---

[1] Exec. Order. No. 14169, 90 Fed. Reg. 8619.

and Rubio then directed the immediate issuance of stop-work orders on USAID foreign assistance awards. USAID grantees and contractors reeled as they were—without any notice or process—constrained from carrying out their work alleviating poverty, disease, and humanitarian crises. Defendant Rubio subsequently was named by Defendant Trump as Acting Director of USAID and announced that he would consult with Congress on "potential reorganization" of the agency.[2]

Shortly after assistance funding was frozen, over one thousand USAID institutional support contractors—and thousands more employees of USAID contractors or grantees—were laid off or furloughed. The humanitarian consequences of defendants' actions have already been catastrophic. USAID provides life-saving food, medicine, and support to hundreds of thousands of people across the world. Without agency partners to implement this mission, U.S.-led medical clinics, soup kitchens, refugee assistance programs, and countless other programs shuddered to an immediate halt.

Days ago, Elon Musk and other members of the so-called "Department of Government Efficiency" (DOGE) gutted what remained of the agency. Members of DOGE reportedly demanded access to classified USAID systems without requisite security clearances; USAID security officials who attempted to block

---

[2] Press Release, U.S. Dep't of State, Secretary Marco Rubio Appointed as Acting Administrator for the United States Agency for International Development (USAID) (Feb. 3, 2025) (https://tinyurl.com/znt34s64) ).

them were placed on administrative leave.[3] Musk posted on February 3 that he spent the previous weekend "feeding USAID into the wood chipper," and that same day, USAID headquarters shut down.[4] More than 1,000 employees—including some in war zones—were locked out of their computer accounts.[5] The usaid.gov website now indicates that "all USAID direct hire personnel will be placed on administrative leave globally" on Friday, February 7, 2025, at 11:59 PM.

Not a single one of defendants' actions to dismantle USAID were taken pursuant to congressional authorization. And pursuant to federal statute, Congress is the only entity that may lawfully dismantle the agency.

Given the severe ongoing harms suffered by plaintiffs and defendants' intent to inflict imminent future harm, plaintiffs now file this Complaint and will seek a temporary restraining order directing Defendants to reverse these unlawful actions and to halt any further steps to dissolve the agency until the Court has an opportunity to more fully consider the issues on the merits.

---

[3] Margaret Brennan, et al., *Two top security officials at USAID placed on leave, sources say*, CBS News (Feb. 3, 2025), https://tinyurl.com/54z6pnu2 .

[4] Elon Musk (@elonmusk), X (Feb. 4, 2025, 1:54 AM), https://tinyurl.com/mskvue6w .

[5] Hana Kiros, *America Can't Just Unpause USAID*, The Atlantic (Feb. 4, 2025), https://tinyurl.com/54w83yz4.

## PARTIES

1.    **Plaintiff American Foreign Service Association** (AFSA) is the professional association and exclusive representative for the U.S. Foreign Service. AFSA represents nearly 80 percent of active-duty members of the Foreign Service, including 1980 Foreign Service Officers (FSO) employed by USAID.

2.    **Plaintiff American Federation of Government Employees**, AFL-CIO (AFGE) is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington, D.C. 20001. AFGE, the largest federal union, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

3.    **Defendant Donald J. Trump** is the President of the United States and oversees the executive branch.

4.    **Defendant United States Department of State** is an executive department of the federal government that is responsible for the country's foreign policy and relations.

5.    **Defendant United States Agency for International Development** (USAID) is an independent agency of the United States government that is primarily responsible for administering civilian foreign aid and development assistance.

6.      **Defendant Department of Treasury** is an executive

department of the federal government that is responsible for managing federal

finances.

7.      **Defendant Marco Rubio** is the Acting Director of USAID and

the Secretary of State. He is sued in his official capacities.

8.      **Defendant Scott Bessent** is the Secretary of Treasury. He is

sued in his official capacity.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant

to 28 U.S.C. § 1331, because this action arises under federal law, specifically, the

United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 701,

*et seq.*, and pursuant to 28 U.S.C. § 1361.

10.      Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B)

and 28 U.S.C. § 1391(e), because at least one of Defendants is headquartered in

Washington, D.C., and a substantial part of the events or omissions giving rise

to Plaintiff's claims occurred here.

## LEGAL FRAMEWORK

11.      In 1961, President John F. Kennedy created USAID to aid

strategically important countries, lead American efforts to alleviate poverty and

disease, and assist the commercial interest of the United States by supporting

sustainable economic growth in developing countries to build capacity for global trade.[6]

12.     An act of Congress, the Foreign Affairs Reform and Restructuring Act of 1998, later established USAID as an independent agency outside of the Department of State. It explicitly provided that "there is within the Executive branch of Government the United States Agency for International Development." 22 U.S.C. § 6563 (1998).

13.     The 1988 act also afforded the president a time-limited opportunity to submit to Congress a "reorganization plan and report" for USAID. To that end, the president was empowered by Congress either to "provide for the abolition" of USAID or to transfer its functions to the Department of State. 22 U.S.C. § 6601(d). Alternatively, and "in lieu of abolition," the president could submit a plan to Congress providing for "the transfer to and consolidation" of certain USAID functions, and "additional consolidation, reorganization, and streamlining" of USAID.  *Id*. The president had 60 days following October 21, 1998, to submit the reorganization plan and report. 22 U.S.C. § 6601(a).

---

[6]     Cong. Rsch. Serv., U.S. Agency for International Development: An Overview (Jan. 6, 2025), https://tinyurl.com/4dc4wjhp*see also* The Am. Presidency Proj., *Executive Order 10973 - Administration of Foreign Assistance and Related Functions* (Nov. 3, 1961), https://tinyurl.com/3pwptwat (text of Executive Order 10973).

14.    On December 30, 1998, President Clinton submitted a report to Congress pursuant to Section 6601. That report determined that "USAID will remain a distinct agency with a separate appropriation."[7]

15.    Since the Foreign Affairs Reform and Restructuring Act of 1998, Congress has repeatedly appropriated funds for USAID as an independent agency. Congress most recently did so in the Further Consolidated Appropriations Act, 2024 ("Appropriations Act").

16.    The Appropriations Act also explicitly restricted the ability of the executive branch to reorganize USAID. The Act provided that "funds appropriated by this Act, prior Acts making appropriations for the Department of State, foreign operations, and related programs, or any other Act may not be used to implement a reorganization, redesign, or other plan . . . by the Department of State, the United States Agency for International Development, or any other Federal department, agency, or organization funded by this Act without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." Further Consolidated Appropriations Act, Pub. L. 118-47 § 7063(a), 138 Stat 460 (2024).

17.    The Appropriations Act defined "reorganization, redesign, or other plan" to include, *inter alia*, any action to "eliminate, consolidate, or downsize

---

[7] Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998, as Contained in Public Law 105-277. https://tinyurl.com/48kthcr8.

covered departments, agencies, or organizations," any action to "eliminate, consolidate, or downsize the United States official presence overseas," or "reduce the size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce" of USAID "from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024." *Id.* § 7063(b).

18.    The Appropriations Act also imposes notification requirements on the funds. Among other things, it provides that no funds shall be available for obligation to "suspend or eliminate a program, project, or activity," "close, suspend, open, or reopen a mission or post," or "create, close, reorganize, downsize, or rename bureaus, centers, or offices" unless "previously justified to the Committees on Appropriations or such Committees are notified 15 days in advance of such obligation." *Id.* § 7015(a).

## FACTUAL ALLEGATIONS

### USAID Foreign Assistance Funding is Frozen

19.    On January 20, 2025, President Trump issued an Executive Order titled "Reevaluating and Realigning United States Foreign Aid," Exec. Order. No. 14169, 90 Fed. Reg. 8619, directing a "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* The funding freeze applied "immediately" to all "obligations and disbursements of development assistance funds." *Id.* After that 90-day period, the Order directed "[t]he responsible

department and agency heads . . . [to] make determinations . . . whether to continue, modify, or cease each foreign assistance program . . . with the concurrence of the Secretary of State." *Id.*

20.     Four days later, on January 24, 2025, the Secretary of State directed his staff to halt "foreign assistance funded by or through" USAID and required the "immediate[ ]" issuance of "stop-work orders" for existing foreign assistance grants and contracts.[8]

21.     In the following days, USAID issued stop-work orders to contractor and grantee agency partners, requiring them to immediately stop work and to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage.

22.     Defendants simultaneously began purging agency employees and contractors. On January 26, at least fifty-six senior career agency staff were put on administrative leave.[9] By January 29, hundreds of institutional support contractors were laid off.[10] William Malyszka, USAID's top human resources

---

[8] Dep't of State, Memo. 25 STATE 6828 (attached as Exhibit A); *see also* Press Release, U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at A Time* (Jan. 29, 2025),  https://tinyurl.com/2n4zyp8f (confirming the existence of the January 24 order).

[9] Ellen Knickmeyer and Matthew Lee, *US places dozens of senior aid officials on leave, citing possible resistance to Trump orders*, AP (Jan. 27, 2025),https://tinyurl.com/37r6pb2y.

[10] Anna Gawel, *Furloughs hit hundreds of USAID contractors*, Devex (Jan. 29, 2025),https://tinyurl.com/ycxpb54h. .

official, reportedly refused defendants' directives to put thousands more staff on administrative leave, before he, too, was pushed out.[11]

23.    As a result of these actions, most functions of the agency immediately halted, with life-threatening consequences. Clinics stopped distributing HIV medication.[12] Staff who operate humanitarian operations at refugee camps in Syria were told to stop work, leaving thousands of people vulnerable to instability and violence at the hands of ISIS.[13] Soup kitchens that feed nearly a million people in famine-stricken Khartoum were shut down.[14] Toddlers in Zambia were deprived of rehydration salts to treat life-threatening diarrhea.[15] Doctors at U.S.-funded medical facilities in Sudan that treat severely malnourished children were forced to choose whether to obey Defendants' orders

---

[11] Elissa Miolene, *Top USAID HR officer pushed out after refusing to fire more staff*, Devex (Feb. 4, 2025),https://tinyurl.com/4pujyp5t.

[12] Melody Schreiber, *Trump's 'stop-work' order for PEPFAR cuts off anti-HIV drugs for patients*, NPR (Jan. 28, 2025), https://tinyurl.com/bdf52kas.

[13] Tom Bateman, *How a US freeze upended global aid in a matter of days*, BBC (Jan. 29, 2025), https://tinyurl.com/27k3mjue.

[14] Sui-Lee Wee, et al., *How the World is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025),  https://tinyurl.com/2fjm79nh.

[15] Stephanie Nolen, *Health Programs Shutter Around The World As Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025),  https://tinyurl.com/53j4mhw9.

and "immediately stop their operations or to let up to 100 babies and toddlers die."[16]

**The State Department Issues Limited Foreign Assistance Waivers**

24.    As chaos engulfed the agency and the humanitarian operations it serves, the State Department issued two waivers of its order to halt foreign assistance through USAID. First, on January 28, 2025, it issued a limited waiver of the pause on USAID funding for "life-saving humanitarian assistance," defined to mean "core life-saving medicine, medical services, food, shelter, and subsistence assistance."[17] The statement specified that that limited resumption was "temporary in nature."[18]

25.    Second, on February 1, 2025, the State Department announced a "limited waiver" for "[l]ife-saving HIV care and treatment services, inclusive of HIV testing and counseling, prevention and treatment of opportunistic infections including TB, laboratory services, and procurement and supply chain commodities/medicines" and "[p]revention of mother-to-child transmission

---

[16] Brett Murphy and Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said it Lifted its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025), https://tinyurl.com/y7stwsua.

[17] Press Release, U.S. Dep't of State, *Emergency Humanitarian Waiver to Foreign Assistance Pause* (Jan. 28, 2025), https://tinyurl.com/34wmfvu8.

[18] *Id.*

services, inclusive of commodities/test kits, medicines and PrEP for pregnant and breastfeeding women."[19]

26.     These waivers offered little –to no relief for USAID partners who suffered from defendants' freeze in funding. They were not "self-executing by virtue of the announcement,"[20] so contractors and grantees scrambled to reach USAID contacts to ascertain if they were covered by the waiver. But because agency staff had already suffered severe cuts, groups doing lifesaving work were unsure how to request a waiver and received little to no information about the status of such requests.[21]

**The Agency is Dissolved and Remaining Functions Halted**

27.     During the first weekend in February, Defendants swiftly moved to destroy what remained of the agency.

28.     On Saturday, February 1, Elon Musk and other members of the so-called "Department of Government Efficiency" (DOGE) reportedly demanded access to classified USAID systems without requisite security clearances. USAID

---

[19] @JohnHudson, X (Feb. 1, 2025) https://tinyurl.com/43mdff3p (posting an image of the first page of the order); Adva Saldinger, *Exclusive: Some PEPFAR programs get waiver to restart operations*, Devex (Feb. 1, 2025), https://tinyurl.com/28sk6xf5.

[20] Brett Murphy and Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said it Lifted its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025),https://tinyurl.com/y7stwsua .

[21] *Id.*

security officials who attempted to block them were placed on administrative leave.[22]

29.     That same day, USAID.gov was taken offline.[23]

30.     By Sunday, contract personnel at USAID began reporting that they were locked out of their email.[24] Eventually, more than 1,000 USAID employees—including some in war zones—were completely locked out of their computer accounts.[25] On information and belief, most, if not all, received no prior notice or communication that they would be losing access to USAID systems. Those agency staffers still receiving emails were told that, "[a]t the direction of Agency leadership, the USAID headquarters at the Ronald Reagan building in Washington, D.C. will be closed to Agency personnel on Monday, February 3, 2025."[26] The email directed that any replies be sent to Gavin Kliger, a special

---

[22] Margaret Brennan, et al., *Two top security officials at USAID placed on leave, sources say*, CBSNews (Feb. 3, 2025), https://tinyurl.com/54z6pnu2..

[23] Edward Helmore*, USAID website offline as Trump moves to put agency under State Department*, The Guardian (Feb. 1, 2025), https://tinyurl.com/25buz7mx. .

[24] Michael R. Gordon, et al., *Marco Rubio wants USAID to undergo overhaul, backs off sudden shutdown*, The Wall Street Journal (Feb. 3, 2025), https://tinyurl.com/39s7nw83.        https://www.wsj.com/politics/policy/trump-administration-shutters-usaid-headquarters-db3fac7e

[25] Hana Kiros, *America Can't Just Unpause USAID*, The Atlantic (Feb. 4, 2025), https://tinyurl.com/54w83yz4.

[26] Michael R. Gordon et al., *Marco Rubio Wants USAID to Undergo Overhaul, Backs Off Sudden Shutdown*, Wall St. J. (Feb. 3, 2025), https://tinyurl.com/39s7nw83.

advisor to the director of the Office of Personnel Management who appears to currently work for DOGE.[27]

31.    According to reports, members of DOGE also pressed the Treasury Department for access to the system through which aid payments are made. A top official reportedly wrote to the group, "I don't believe we have the legal authority to stop an authorized payment certified by an agency."[28] That official was reportedly terminated in the following days for refusal to give DOGE members access to the system.[29]

32.    By Monday, USAID—the world's premier humanitarian assistance and international development agency—was in complete disarray. Musk stated that he had spent the previous weekend "feeding USAID into the wood chipper."[30] He also claimed, "With regards to the USAID stuff, I went over it with [President Trump] in detail and he agreed that we should shut it down."[31]

33.    Consistent with defendants' efforts to shut down the agency, President Trump appointed Defendant Rubio to serve as Acting Administrator of

---

[27] *Id.*

[28] Andrew Duehren et al., *Treasury Sought to Freeze Foreign Aid Payments, Emails Show*, N.Y. Times (Feb. 6, 2025), https://tinyurl.com/yn27uumyhttps://.

[29] *Id.*
[30] Elon Musk (@elonmusk), X (Feb. 3, 2025. 1:54 AM), https://tinyurl.com/mskvue6w.

[31] Jennifer Hansler et al., *Rubio says he's acting director of USAID as humanitarian agency is taken over by the State Department*, CNN (Feb. 4, 2025), https://tinyurl.com/3dw3h7nj.

USAID.[32] Defendant Rubio then sent a letter to the Senate Foreign Relations Committee and House Foreign Affairs Committee providing "notice" and advising Congress of the State Department's "intent to initiate consultations . . . regarding the manner in which foreign aid is distributed around the world."[33] Rubio further indicated that he authorized Peter Marocco, State Department Director of Foreign Assistance, to "begin the process of engaging in a review and potential reorganization of USAID's activities."[34] Rubio further advised that "State and other pertinent entities will be consulting with Congress . . . to reorganize and absorb certain bureaus, offices, and missions of USAID. . . . USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law."[35]

34.    USAID has already been substantially dismantled. It has no independent leadership: Defendant Rubio has assumed the mantle of Acting Director, and U.S. lawmakers concerned about the dissolution of the agency were

---

[32] *Id.*

[33] Image of letter available at Brett Murphy (@BrettMurphy), X (Feb. 3, 2025, 3:41 PM), https://tinyurl.com/fnbxptpm.

[34] *Id.*
[35] *Id.*

reportedly blocked from meeting with USAID staff and told that it would be "best to contact" the State Department.[36]

35.    On Tuesday, February 4, 2025, President Trump told a reporter "I think so" when asked if he was going to wind down USAID.[37]

36.    On Tuesday, February 4, the State Department ordered the shutdown of all overseas USAID missions, ordering thousands of USAID employees to be recalled by Friday, February 7, 2025.[38] That same day, the State Department placed thousands of employees on administrative leave, directing them "not to enter USAID premises, access USAID systems, or attempt to use your position or authority with USAID in any way without [the] prior permission [of Peter Marocco] or prior permission of a supervisor in your chain of command."[39]

37.    Throughout the week, USAID workforce members reported that key portions of USAID's internal infrastructure were either inaccessible or offline. Such infrastructure includes Phoenix—which is USAID's core financial

---

[36] Elissa Miolene, *U.S. lawmakers blocked from USAID, told to go to State Department instead*, Devex (Feb. 3, 2025),https://tinyurl.com/m9hypwar.

[37] Jeff Mason & Daphne Psaledakis, *Trump says he thinks he will wind down US humanitarian agency*, Reuters (Feb. 4, 2025), https://tinyurl.com/k8swykw7.

[38] Humeyra Pamuk, *Trump administration puts on leave USAID staff globally in dramatic aid overhaul, Reuters* (Feb. 4, 2025),https://tinyurl.com/2hbvfvpm.

[39] Alex Marquardt et al., *USAID employees around the world will be placed on leave Friday and ordered to return to US*, CNN (Feb. 5, 2025), https://tinyurl.com/bdh4kaf5.

management system—as well as the Global Acquisition and Assistance System
(GLAAS).

38.    On Tuesday, February 4, 2025, the USAID.gov website came back
online, with the following notice:



On Friday, February 7, 2025, at 11:59 pm (EST) all USAID direct hire personnel will
be placed on administrative leave globally, with the exception of designated
personnel responsible for mission-critical functions, core leadership and specially
designated programs. Essential personnel expected to continue working will be
informed by Agency leadership by Thursday, February 6, at 3:00pm (EST).

For USAID personnel currently posted outside the United States, the Agency, in
coordination with missions and the Department of State, is currently preparing a plan,
in accordance with all applicable requirements and laws, under which the Agency
would arrange and pay for return travel to the United States within 30 days and
provide for the termination of PSC and ISC contracts that are not determined to be
essential. The Agency will consider case-by-case exceptions and return travel
extensions based on personal or family hardship, mobility or safety concerns, or other
reasons. For example, the Agency will consider exceptions based on the timing of
dependents' school term, personal or familial medical needs, pregnancy, and other
reasons. Further guidance on how to request an exception will be forthcoming.

Thank you for your service.

**Consequences of Defendants' Actions**

39.  The agency's collapse has had disastrous humanitarian consequences.
Among countless other consequences of defendants' reckless dissolution of the
agency, halting USAID work has shut down efforts to prevent children from

dying of malaria, stopped pharmaceutical clinical trials, and threatened a global
resurgence in HIV.[40] Deaths are inevitable. Already, 300 babies that would not
have had HIV, now do.[41] Thousands of girls and women will die from pregnancy
and childbirth.[42] Without judicial intervention, it will only get worse. The
actions defendants plan to take on Friday will "doom billions of dollars in
projects in some 120 countries, including security assistance for Ukraine and
other countries, as well as development work for clean water, job training and
education, including for schoolgirls under Taliban rule in Afghanistan."[43]

**Injuries to Plaintiffs**

40. Plaintiff AFSA exists to support the United States Foreign Service, which
deploys worldwide to protect and serve America's people, interests, and values.
AFSA is both the principal advocate for the long-term institutional wellbeing of
the professional career Foreign Service and responsible for safeguarding the
interests of AFSA members.

---

[40] Matthew Kavanaugh & Luis Gil Abinader, *Abolishing USAID is both Unconstitutional and Dangerous*, Foreign Policy (Feb. 4, 2025), https://tinyurl.com/mr2wfsbd. /.

[41] Kate Knibbs, *Elon Musk's DOGE Is Still Blocking HIV/AIDS Relief Exempted From Foreign Aid Cuts*, Wired (Feb. 3, 2025), https://tinyurl.com/5n65ehw8.

[42] Mark Townsend et al., *Deaths predicted amid the chaos of Elon Musk's shutdown of USAID*, Guardian (Feb. 4, 2025), https://tinyurl.com/4ke5kb8p.

[43] Ellen Knickmeyer & Matthew Lee, *Almost all USAID workers will be pulled off the job worldwide, Trump administration says*, AP (Feb. 5, 2025), https://tinyurl.com/287dnnk4.

41. AFSA represents 1,980 Foreign Service Officers (FSOs) who are currently employed by USAID. These members have already experienced extraordinary harms caused by the ongoing shutdown of USAID and are at imminent risk of further irreparable injury if the shutdown is allowed to continue.

42. Financial Harms: AFSA's member FSOs are experiencing myriad financial injuries and will experience more such injuries as the shutdown continues. Among other financial harms and risks:

    a. FSOs have reported to AFSA that they are unable to get reimbursed by USAID for incurred travel expenses, which can reach into the thousands and sometimes tens of thousands in any given month. Without reimbursement, FSOs will be on the hook for these expenses (which are carried on credit cards under the FSOs' names) and may also experience harm to their credit scores if the FSOs are unable to pay off their credit cards.

    b. The mandatory 30-day evacuation—which is being accomplished on an impracticable timeline and is a gross departure from standard processes for evacuating—threatens to cause financial harm in a myriad of ways. For example, some FSOs have spouses employed at the local embassy. Such spouses will be forced to give up their employment and evacuate alongside the FSOs. Those families will therefore lose a second source of income. Further, under the normal evacuation process, FSOs would receive a special evacuation

allowance (which would include lodging and meals) for up to 180 days

upon returning to the states. But FSOs have received no indication

that they will receive that per diem and may be forced to incur

thousands of dollars of expenses to secure short term housing (e.g.,

hotels or Airbnbs) for their families as they look for more permanent

accommodations. And FSOs may lose income themselves upon

repatriation. Many FSOs earn up to an additional 75% of their base

salary (for hardship) depending on which country they work in. These

FSOs will likely lose that additional income when they return to the

states. Moreover, FSOs will face tremendous logistical uncertainty,

from navigating the process of withdrawing their children from school

mid-year to contemplating the possibility of leaving pets behind. The

above impacts are just a sample of the harms that will flow from the

mandatory evacuation.

43.    Physical Safety and Legal Exposure: Some FSOs are located in

dangerous countries and have reported losing access to USAID's security

apparatus, putting their safety and well-being at risk. Additionally, AFSA has

heard reports that some FSOs have had their immunity status revoked by their

host countries at the direction of senior USAID officials. The revocation of this

status exposes FSOs to the law enforcement procedures of the host country and

strips the FSOs of access to the U.S. embassy for legal counsel and advice. The

revocation of immunity status also comes with financial harm and risk: without it, FSOs are subject to duties on their purchases, imports, and exports.

44.    Plaintiff AFGE is the largest federal union in the nation, representing approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

45.    Through its affiliate, AFGE Local 1534, AFGE has over 500 members at USAID.

46.    As a union, AFGE has already been severely harmed by defendants' actions and will suffer continued, irreparable harm if defendants' actions persist. It has had to devote considerable resources into advising its members about the consequences of defendants' arbitrary and reckless actions. Unless this court intervenes, AFGE will lose the ability to represent its members who were USAID employees and will lose hundreds of members.

47.    AFGE's members, too, have been severely and irreparably harmed. They are confused and frightened. Some have made choices with significant financial consequences—such as geographic location and family planning—in reliance on defendants' adherence to federal law.

48.    Because many members have been shut out of USAID computer systems, they have been unable to recoup reimbursements or to access health benefits to which they are entitled. Many members will be forced to incur substantial out-of-pocket costs that they would not have otherwise incurred.

# CAUSES OF ACTION

## Count One
## Violation of Separation of Powers
### (against all Defendants)

49. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

50. Plaintiffs have a non-statutory right of action to declare unlawful official action that is ultra vires.

51. The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

52. The President may not confer powers upon other federal Officers or Departments within the Executive Branch that he does not himself possess.

53. Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law.

54. The President does not have the power under the Constitution unilaterally to amend statutes.

55. The President may not confer powers upon other federal Officers or Departments within the Executive Branch that he does not himself possess.

56. USAID was established as an independent federal agency by Congress in 1998 through a duly enacted statute, the Foreign Affairs Reform and Restructuring Act, signed into law by President Clinton.

57.    Since 1998, Congress has passed numerous additional statutes regarding USAID appropriations and oversight, all the while preserving USAID's status as an independent federal agency.

58.    Because Congress created USAID as a separate agency by statute, only Congress may act to dissolve it or merge it with the Department of State. *See, e.g.*, *Myers v. United States*, 272 U.S. 52 (1926).

59.    President Trump's actions to dissolve USAID exceed presidential authority and usurp legislative authority conferred upon Congress by the Constitution, in violation of the separation of powers.

60.    The remaining defendants, acting as agents of Defendant Trump, aided President Trump in dissolving USAID  despite lacking the Constitutional authority to do so.

61.    Plaintiffs will suffer irreparable injury if the President's action is not declared unlawful, and Plaintiffs have no adequate remedy at law.

62.    The public interest favors issuance of a judicial declaration that the president's unilateral action in dissolving USAID is unlawful because that action has interrupted life-saving humanitarian work performed throughout the world by USAID and its contractors, undermined U.S. national security, and caused thousands of Americans to lose their jobs.

**Count Two
Violation of Take Care Clause
(against all Defendants)**

63.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

64.    Article II of the Constitution confers upon the President the duty to "take care that the Laws be faithfully executed." U.S. Const., Art. II, § 3.

65.    The Take Care Clause is judicially enforceable against presidential actions that violate or undermine statutes duly enacted by Congress. *See, e.g.*, *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch].").

66.    President Trump's actions in dissolving USAID violate the Take Care Clause because they violate duly enacted statutes establishing USAID as an independent agency.

67.    The Take Care Clause prohibits the President from directing federal officers to act in derogation of federal statute.

68.    President Trump's action in directing Secretary of State Rubio to take over USAID functions and absorb those functions into the State Department violates the Take Care Clause because such a restructuring would violate the Congressionally enacted arrangement under which USAID is an independent agency distinct from the State Department.

69.    The remaining defendants, as agents of Defendant Trump, acted contrary to duly enacted statute in violation of the Take Care Clause.

70.    Plaintiffs will suffer irreparable injury if the President's action is not declared unlawful, and Plaintiffs have no adequate remedy at law.

71.    The public interest favors issuance of a judicial declaration that the president's unilateral action in dissolving USAID is unlawful because that action has interrupted life-saving humanitarian work performed throughout the world by USAID and its contractors, undermined U.S. national security, and caused thousands of Americans to lose their jobs.

**Count Three**
**Administrative Procedure Act–706(2)(C)**
**In Excess of Statutory Authority**
**(against Defendants State Department, USAID, Department of Treasury, Rubio, and Bessent)**

72.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

73.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

74.    No defendant possesses the statutory authority to dissolve USAID. Defendants' actions to dissolve USAID exceed their respective statutory authorities.

75.    Defendants' unilateral dissolution of USAID also violates a statutory limitation: namely, the Further Consolidated Appropriations Act, which limits the use of appropriated funds only to reorganizing or redesigning USAID—not dissolving it entirely—and only after first consulting with the appropriate congressional committees.

**Count Four**
**Violation of the Administrative Procedure Act—706(2)(A)**
**Arbitrary and capricious**
**(against Defendants State Department, USAID, Department of**
**Treasury, Rubio, and Bessent)**

76.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

77.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

78.    The dissolution of USAID is arbitrary and capricious in multiple respects.

79.    First, defendants failed to acknowledge the catastrophic consequences of their actions, both as they pertain to American workers, to the lives of millions across the world, and to U.S. national interests.

80.    Second, defendants fail to articulate a reasoned explanation for the dissolution of the agency.

81.    Third,  defendants failed to account for the substantial reliance interests in the continued existence of USAID. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).

82.    The dissolution of USAID is also contrary to law. The statutes defendants violated include, but are not limited to:

a. 5 U.S.C § 6329a(b)(1), which provides that "during any calendar year, an agency may place an employee in administrative leave for a period of not more than a total of 10 work days."

b. 31 U.S.C. § 3901 *et seq.*, which requires agencies to pay valid invoices by their contracted due date or within 30 days.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

a.    Declare unlawful and set aside the decision to shut down USAID as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

b.    Issue a temporary restraining order and preliminary injunction directing defendants to immediately cease actions to shut down USAID's operations in a manner not authorized by Congress and directing to them to take the following actions:

i.    Appoint an independent Acting Director of USAID;

ii.    Reopen USAID buildings;

iii.    Restore all USAID computer systems and webpages;

     iv. Restore funding pursuant to the terms of all grants, cooperative agreements, and contracts, consistent with the terms of the agreements and any relevant statutes and regulations;

     v. Refrain from placing any additional workers on administrative leave, or continuing the leave of those previously placed on administrative leave, unless such leave is authorized by this Court after giving legitimate, non-arbitrary, and particularized reasons;

     vi. Recall furlough notices to affected workers unless specifically authorized to do so by this Court after giving legitimate, non-arbitrary, and particularized reasons;

     vii. Recall mandatory evacuation orders.

c. Order Defendants to file a status report with the Court within 24 hours of entry of a temporary restraining order, and at regular intervals thereafter, confirming compliance with these orders.

d. Issue a permanent injunction barring executive agencies and agency heads from taking any action to dissolve USAID absent the authorization of Congress;

e. Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

f. Grant such other relief as the Court deems necessary, just, and proper.

Dated: February 6, 2025                    Respectfully submitted,

/s/ Lauren Bateman                         /s/ Kaitlyn Golden
Lauren Bateman                             Kaitlyn Golden
(DC Bar No. 1047285)                       (DC Bar No. 1034214)
Karla Gilbride                             Kristen Miller
(DC Bar No. 1005886)                       (DC Bar No. 229627)
Allison Zieve                              Kayla M. Kaufman*
(DC Bar No. 424786)                        (DC Bar No. 90029091)
Public Citizen Litigation Group            Robin F. Thurston
1600 20th Street NW                        (DC Bar No. 1531399)
Washington, DC 20009                       Skye L. Perryman*
(202) 588-1000                             (DC Bar No. 984573)
lbateman@citizen.org                       Rachel L. Fried
                                           (DC Bar No. 1029538)
                                           Democracy Forward Foundation
                                           P.O. Box 34553
                                           Washington, D.C. 20043
                                           (202) 448-9090
                                           kmiller@democracyforward.org
                                           (DC Bar No. 90029091)

                       *motion to appear *pro hac vice* forthcoming

                       *Counsel for Plaintiffs*

30

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, et al., | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Civil Action No. 1:25-CV-352 |
| v. | ) ) ) | |
| DONALD TRUMP, et al., | ) ) | |
| *Defendants*. | ) | |

## DECLARATION OF OTTIS JOHNSON, JR.

I, Ottis Johnson, Jr., declare the following under penalties of perjury:

1.     I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.     I am the 14th District National Vice President of the American Federation of Government Employees, AFL-CIO (AFGE), a labor organization and unincorporated association that represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

3.     AFGE advocates on behalf of its members and seeks to promote dignity, safety, and fairness for government employees.

4.     AFGE, through its affiliate AFGE Local 1534, represents over 900 employees, including 500 members, at USAID.

5.     AFGE Local 1534 is located within AFGE's 14th District.

6.      AFGE has devoted considerable resources in recent days responding to requests and providing guidance about the Trump administrations actions at USAID.

7.      If the vast majority of USAID direct-hire employees are placed on administrative leave or terminated at 11:59 PM on February 7, 2025, demand for AFGE's assistance will rise substantially, diverting resources from other AFGE members' needs and other AFGE priorities.

8.      If USAID is dissolved, AFGE will be unable to represent its members who are USAID employees, and AFGE will also lose hundreds of members.

9.      I have heard from and am aware of many AFGE members that have been frightened and confused by the administration's actions at USAID. Members have been required to make significant choices that may involve financial and familial consequences.

10.    The injuries suffered by AFGE and its members are ongoing or imminent and will persist unless this Court intervenes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2025.

/s/ Ottis Johnson, Jr.
Ottis Johnson, Jr.
National Vice President
District 14, AFGE
80 F. Street, NW
6th Floor
Washington, DC 20001

2

JA 50

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ———————————————— | ) | |
| AMERICAN FOREIGN SERVICE | ) | |
| ASSOCIATION, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | Civil Action No. 1:25-CV-352 |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD TRUMP, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| ———————————————— | ) | |

## <u>DECLARATION OF RANDALL CHESTER</u>

I, Randall Chester, declare the following under penalties of perjury:

1.      My name is Randall Chester.

2.       I am the Vice President of the American Foreign Service Association (AFSA) representing 1,980 Foreign Service Officer and 485 non-career Foreign Service Limited officers who work for the United States Agency for International Development (USAID).

3.      AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interests of AFSA members.

4.      AFSA also seeks to increase understanding among the American people about the vital role of the U.S. Foreign Service in sustaining American global

leadership. AFSA exists to support the United States Foreign Service, which deploys worldwide to protect and serve America's people, interests and values.

5.      AFSA provides support to its bargaining unit as the officially recognized union to represent the interests of the Foreign Service to USAID.  This role is codified in the AFSA-USAID Cooperative Framework.

6.      In this role, AFSA enters into negotiations with USAID on a wide range of personnel issues including:  appointments, promotion standards, assignment processes, disciplinary actions, and leave among others. AFSA assists its members when facing allegations of misconduct, investigations by the Office of Inspector General, Office of Civil Rights, and the Office of Security.  AFSA also supports its members in the event USAID fails to repay valid expenses, incorrectly applies or denies applicable benefits and allowances, or other discrepancies that arise between USAID and the officer.

7.      Earlier this week USAID sent a RECALL notice to 1,400+ USAID Foreign Service Officers (FSO) serving overseas.  The notice provided no reasons for the recall, no timeline for its duration, and no explanation of expectations for the returned FSOs.

8.      The notice directs all FSOs to return to the United States within 30 days.  The notice allows for extension requests to be granted under special circumstances.  However, it does not provide a process to initiate a request or suggest a method for how or who will approve each request.

9.      This notice is devasting to FSOs and their families who will suffer undue emotional stress, mental anguish, financial hardships, and for some FSOs professional liabilities.

10.     The emotional and mental anguish is already presenting itself.  Since this notice was issued, AFSA has received well over 500 emails and phone calls looking for details, explanations, and reasons for the recall.  Normally, USAID would have already answered and provided these details, but none have been given. FSOs have reported high stress levels, sleeplessness, and anxiety over the recall. Additionally, FSOs report that their children are experiencing the same stress and anxiety levels after being told that they were moving potentially mid-school year and with little or no time to adjust.

11.     Financially, this abrupt recall will devastate the bank accounts of many FSOs.  The Agency has yet to provide any details on which transfer allowances will be afforded to the returnees.  Assuming that the FSOs are returning under Permanent Change of Station (PCS) orders, FSOs would be entitled to the following, among other things:

- Allowances
  - 60-90 days housing and meal allowance (for an "Ordered Departure" this allowance goes up to six months (i.e., 180 days))
  - Home Service Transfer Allowance (between $5,000-$7,500) estimated
  - Rental Car reimbursement
- Other Expenses Paid by USAID
  - Shipping of Household Effects (HHE)
  - Unaccompanied Baggage Allowance (UAB)
  - Personal Vehicle Shipment (POV)

12.    At this time, FSOs are not certain if any of the above will be provided. The lack of information on what allowances will be afforded mean that FSOs could be out of pocket for tens of thousands of dollars for just the first few months. These expenses would normally be covered by USAID. Furthermore, at this time USAID has informed staff that travel reimbursements are halted. This exacerbates the problem for FSOs who may not know when or if they will ever be reimbursed for their expenses.

13.    Additionally, a normal transfer window for a FSO is six to nine months. A FSO is usually informed of their onward assignment well in advance from the actual departure. This affords them the opportunity to sell personal items they wish not to take to their next residence or sell items that can't be exported. For example, many countries restrict the importation of used vehicles which means that FSOs buy and sell cars rather than export them. The abrupt move may lead to FSOs being unable to sell their vehicles at market value or take a loss as they may not be eligible or inappropriate for export to the U.S. For example, many countries have right hand drive and/or engine and emission standards lower than the U.S. making them non-road worthy. The rapid departure may increase financial losses to FSO.

14.    While serving overseas, FSOs receive additional financial allowances. This includes Post Differential (5-25%), Hardship Pay (5-35%), Special Incentive Pay (15%), and host County Cost of Living Allowance (based on local currency cost of living and family size). These are percentages of a FSOs annual salary for a pay

period.  The total of these allowances varies dramatically across countries for zero to 90% additional/bonus.  Returning to the U.S. removes all these allowances and dramatic lowering of FSO salaries.

15.    Many FSOs, likely the majority, have families.  Often spouses work within the Embassy community as Eligible Family Members (EFM).  EFMs provide vital support and professional services but are paid a sub-standard wage. Nonetheless, this added annual income of $30,000-$60,000 (estimates) will disappear as the FSO recall will force spouses of FSOs to terminate their employment.  FSO families will be limited to that single income until the spouse is able to attain new employment in the US.

16.    Finally, it is important to consider that this uncertainty makes it difficult for any decision regarding long-term housing.  This raises the out-of-pocket costs for the FSO deciding to forgo purchasing a home versus remaining in a high-cost short term rental house.

17.    The recall notice will also leave some FSOs vulnerable to professional liability claims.  Some FSOs are "warranted" Contracting Officers (CO) and Financial Management Officers (FMO) are legally responsible for ensuring payments to providers are appropriate and accurate.  They rely on other FSOs and foreign national staff (FSN) to confirm and verify service delivery.  With no FSO or other staff working, the COs and FMOs have no way to legally approve payments for services prior to the stop work order issued two weeks ago.  USAID has a variety of different contracting and grant mechanisms and USAID is responsible for

payment of all goods and services prior to when the stop work order was issued. Demands of repayment often come one to six months after the service is completed. If a CO or FMO does not pay a submitted receipt/voucher they can be held liable by the provider (note the prompt payment act requires payment within 30 days). The catch 22 for the CO and FMO is that they also cannot approve payment without verifying the services were delivered (often by a FSO or FSN) or be subject to an investigation by the Inspector General. This is a liability passed onto the FSO.

18.    Finally, because of this recall notice, some embassy/posts have already removed USAID FSOs from their internal security warning/alert systems and informed relevant host country ministries that USAID staff are not credited diplomats with the U.S. government. This is added stress and legal jeopardy for FSOs. Without access to the embassy alert systems, FSOs and their families may miss critical weather, civil disobedience, or other safety notifications. Removing their diplomatic status may also result in the FSO having to pay "duty" on goods exported or sales of personal items adding to the above financial hardships.

19.    Finally, just yesterday, we learned of reports that the administration plans to reduce the number of workers at USAID from more than 10,000 positions to just 290.[1] If this occurs, FSOs will necessarily be among those terminated, with catastrophic consequences to their careers, families, and finances.

---

[1] Karoun Demirjian and Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, NEW YORK TIMES (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/usaid-job-cuts.html.

20.    In sum, if the USAID shutdown is allowed to continue, it will result in a tremendous amount of undue and unwarranted financial, mental, and emotional stress on FSOs and their families. The potential professional liability jeopardies (discussed above) are unjust as FSOs will be prevented from performing their jobs with no recourse to prevent potential fraud or legally approve submitted payment vouchers. The mandatory recall is likewise punitive in nature given the unnecessary pace of the withdrawal. The recall by design serves only to harm the FSO and provides no real justification or path for a potential future return.  On its own, the recall puts FSOs, American citizens, in financial jeopardy that could take years to overcome. FSOs will experience even more devastating financial consequences if the administration moves forward with the reported plan to slash the workforce to 290 employes total. The shutdown of USAID is at its core inhumane.

Executed on February 7, 2025

__/s/__*Randall Chester*__

Randall Chester

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

AMERICAN FOREIGN SERVICE )
ASSOCIATION, )
    2101 E Street NW )
    Washington, DC 20037, )

AMERICAN FEDERATION OF )
GOVERNMENT EMPLOYEES, )
    80 F Street NW )
    Washington, DC 20001, )
     )
    and, )
     )
OXFAM AMERICA, )
    77 North Washington Street )
    Suite 500 )
    Boston, MA 02114, )
     )
        *Plaintiffs*, )
     )
    v. )
     )
DONALD TRUMP, President of the )
United States of America, )
    1600 Pennsylvania Avenue NW )
    Washington, DC 20050, )
     )
UNITED STATES DEPARTMENT )
OF STATE, )
    2201 C Street NW )
    Washington, DC 20520, )
     )
UNITED STATES AGENCY FOR )
INTERNATIONAL DEVELOPMENT, )
    1300 Pennsylvania Avenue NW )
    Washington, DC 20004, )
     )
UNITED STATES TREASURY )
DEPARTMENT, )
    1500 Pennsylvania Avenue NW )
    Washington, DC 20220, )

**FIRST AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Civil Action No. 25-352 (CN)

1

|  | ) |
| MARCO RUBIO, Secretary of State, | ) |
| and Acting Administrator of | ) |
| United States Agency for | ) |
| International Development, | ) |
| United States Department of | ) |
| State, | ) |
| 2201 C Street NW | ) |
| Washington, DC 20520, | ) |
|  | ) |
| and | ) |
|  | ) |
| SCOTT BESSENT, Secretary of | ) |
| Treasury, | ) |
| 1500 Pennsylvania Avenue NW | ) |
| Washington, DC 20220, | ) |
|  | ) |
| *Defendants.* | ) |
| _____ | ) |

## INTRODUCTION

This action seeks declaratory and injunctive relief with respect to a series of unconstitutional and illegal actions taken by President Donald Trump and his administration that have systematically dismantled the United States Agency for International Development (USAID). These actions have generated a global humanitarian crisis by abruptly halting the crucial work of USAID employees, grantees, and contractors. They have cost thousands of American jobs. And they have imperiled U.S. national security interests.

The first of these actions came on January 20, 2025, when Defendant Trump issued an Executive Order titled "Reevaluating and Realigning United States Foreign Aid," directing an immediate "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and

consistency with United States foreign policy."[1] Defendants State Department and Rubio then directed the immediate issuance of stop-work orders on USAID foreign assistance awards. USAID grantees and contractors reeled as they were—without any notice or process—constrained from carrying out their work alleviating poverty, disease, and humanitarian crises. Defendant Rubio subsequently was named by Defendant Trump as Acting Administrator of USAID and announced that he would consult with Congress on "potential reorganization" of the agency.[2]

Shortly after assistance funding was frozen, over one thousand USAID institutional support contractors—and thousands more employees of USAID contractors or grantees—were laid off or furloughed. The humanitarian consequences of defendants' actions have already been catastrophic. USAID provides life-saving food, medicine, and support to hundreds of thousands of people across the world. Without agency partners to implement this mission, U.S.-led medical clinics, soup kitchens, refugee assistance programs, and countless other programs shuddered to an immediate halt.

Days ago, Elon Musk and other members of the so-called "Department of Government Efficiency" (DOGE) gutted what remained of the agency. Members of DOGE reportedly demanded access to classified USAID systems without

---

[1] Exec. Order. No. 14169, 90 Fed. Reg. 8619.

[2] Press Release, U.S. Dep't of State, Secretary Marco Rubio Appointed as Acting Administrator for the United States Agency for International Development (USAID) (Feb. 3, 2025) (https://tinyurl.com/znt34s64).

requisite security clearances; USAID security officials who attempted to block them were placed on administrative leave.[3] Musk posted on February 3 that he spent the previous weekend "feeding USAID into the wood chipper," and that same day, USAID headquarters shut down.[4] More than 1,000 employees— including some in war zones—were locked out of their computer accounts.[5]

Not a single one of defendants' actions to dismantle USAID were taken pursuant to congressional authorization. And pursuant to federal statute, Congress is the only entity that may lawfully dismantle the agency.

Given the severe ongoing harms suffered by plaintiffs and defendants' intent to inflict imminent future harm, plaintiffs now file this Complaint and will seek a temporary restraining order directing Defendants to reverse these unlawful actions and to halt any further steps to dissolve the agency until the Court has an opportunity to more fully consider the issues on the merits.

## PARTIES

1.  **Plaintiff American Foreign Service Association** (AFSA) is the professional association and exclusive representative for the U.S. Foreign Service. AFSA represents nearly 80 percent of active-duty members of the

---

[3] Margaret Brennan, et al., *Two top security officials at USAID placed on leave, sources say*, CBS News (Feb. 3, 2025), https://tinyurl.com/54z6pnu2 .

[4] Elon Musk (@elonmusk), X (Feb. 4, 2025, 1:54 AM), https://tinyurl.com/mskvue6w .

[5] Hana Kiros, *America Can't Just Unpause USAID*, The Atlantic (Feb. 4, 2025), https://tinyurl.com/54w83yz4.

Foreign Service, including 1980 Foreign Service Officers (FSO) employed by USAID.

2.     **Plaintiff American Federation of Government Employees**, AFL-CIO (AFGE) is a labor organization and unincorporated association headquartered at 80 F Street N.W., Washington, D.C. 20001. AFGE, the largest federal union, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

3.     **Plaintiff Oxfam America** is a global organization that fights inequality to end poverty and injustice. Oxfam offers lifesaving support in times of crisis and advocates for economic justice, gender equality, and climate action. It partners with a global network of organizations to address urgent humanitarian needs and protect lives.

4.     **Defendant Donald J. Trump** is the President of the United States and oversees the executive branch.

5.     **Defendant United States Department of State** is an executive department of the federal government that is responsible for the country's foreign policy and relations.

6.     **Defendant United States Agency for International Development** (USAID) is an independent agency of the United States government that is primarily responsible for administering civilian foreign aid and development assistance.

7.    **Defendant Department of Treasury** is an executive department of the federal government that is responsible for managing federal finances.

8.    **Defendant Marco Rubio** is the Acting Director of USAID and the Secretary of State. He is sued in his official capacities.

9.    **Defendant Scott Bessent** is the Secretary of Treasury. He is sued in his official capacity.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically, the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, and pursuant to 28 U.S.C. § 1361.

11.    Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e), because at least one of Defendants is headquartered in Washington, D.C., and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred here.

## LEGAL FRAMEWORK

12.    In 1961, President John F. Kennedy created USAID to aid strategically important countries, lead American efforts to alleviate poverty and disease, and assist the commercial interest of the United States by supporting

sustainable economic growth in developing countries to build capacity for global trade.[6]

13.    An act of Congress, the Foreign Affairs Reform and Restructuring Act of 1998, later established USAID as an independent agency outside of the Department of State. It explicitly provided that "there is within the Executive branch of Government the United States Agency for International Development." 22 U.S.C. § 6563 (1998).

14.    The 1998 act also afforded the president a time-limited opportunity to submit to Congress a "reorganization plan and report" for USAID. To that end, the president was empowered by Congress either to "provide for the abolition" of USAID or to transfer its functions to the Department of State. 22 U.S.C. § 6601(d). Alternatively, and "in lieu of abolition," the president could submit a plan to Congress providing for "the transfer to and consolidation" of certain USAID functions, and "additional consolidation, reorganization, and streamlining" of USAID. *Id*. The president had 60 days following October 21, 1998, to submit the reorganization plan and report. 22 U.S.C. § 6601(a).

---

[6]    Cong. Rsch. Serv., U.S. Agency for International Development: An Overview (Jan. 6, 2025), https://tinyurl.com/4dc4wjhp; *see also* The Am. Presidency Proj., *Executive Order 10973 - Administration of Foreign Assistance and Related Functions* (Nov. 3, 1961), https://tinyurl.com/3pwptwat (text of Executive Order 10973).

15.     On December 30, 1998, President Clinton submitted a report to Congress pursuant to Section 6601. That report determined that "USAID will remain a distinct agency with a separate appropriation."[7]

16.     Since the Foreign Affairs Reform and Restructuring Act of 1998, Congress has repeatedly appropriated funds for USAID as an independent agency. Congress most recently did so in the Further Consolidated Appropriations Act, 2024 ("Appropriations Act").

17.     The Appropriations Act also explicitly restricted the ability of the executive branch to reorganize USAID. The Act provided that "funds appropriated by this Act, prior Acts making appropriations for the Department of State, foreign operations, and related programs, or any other Act may not be used to implement a reorganization, redesign, or other plan . . . by the Department of State, the United States Agency for International Development, or any other Federal department, agency, or organization funded by this Act without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." Further Consolidated Appropriations Act, Pub. L. 118-47 § 7063(a), 138 Stat 460 (2024).

18.     The Appropriations Act defined "reorganization, redesign, or other plan" to include, *inter alia*, any action to "eliminate, consolidate, or downsize

---

[7] Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998, as Contained in Public Law 105-277. https://tinyurl.com/48kthcr8.

covered departments, agencies, or organizations," any action to "eliminate, consolidate, or downsize the United States official presence overseas," or "reduce the size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce" of USAID "from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024." *Id.* § 7063(b).

19.    The Appropriations Act also imposes notification requirements on the funds. Among other things, it provides that no funds shall be available for obligation to "suspend or eliminate a program, project, or activity," "close, suspend, open, or reopen a mission or post," or "create, close, reorganize, downsize, or rename bureaus, centers, or offices" unless "previously justified to the Committees on Appropriations or such Committees are notified 15 days in advance of such obligation." *Id.* § 7015(a).

## FACTUAL ALLEGATIONS

**USAID Foreign Assistance Funding is Frozen**

20.    On January 20, 2025, President Trump issued an Executive Order titled "Reevaluating and Realigning United States Foreign Aid," Exec. Order. No. 14169, 90 Fed. Reg. 8619, directing a "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy." *Id.* The funding freeze applied "immediately" to all "obligations and disbursements of development assistance funds." *Id.* After that 90-day period, the Order directed "[t]he responsible

department and agency heads . . . [to] make determinations . . . whether to continue, modify, or cease each foreign assistance program . . . with the concurrence of the Secretary of State." *Id.*

21.    Four days later, on January 24, 2025, the Secretary of State directed his staff to halt "foreign assistance funded by or through" USAID and required the "immediate[ ]" issuance of "stop-work orders" for existing foreign assistance grants and contracts.[8]

22.    In the following days, USAID issued stop-work orders to contractor and grantee agency partners, requiring them to immediately stop work and to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage.

23.    Defendants simultaneously began purging agency employees and contractors. On January 26, at least fifty-six senior career agency staff were put on administrative leave.[9] By January 29, hundreds of institutional support contractors were laid off.[10] William Malyszka, USAID's top human resources

---

[8] Dep't of State, Memo. 25 STATE 6828 (attached as Exhibit A); *see also* Press Release, U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at A Time* (Jan. 29, 2025),  https://tinyurl.com/2n4zyp8f (confirming the existence of the January 24 order).

[9] Ellen Knickmeyer and Matthew Lee, *US places dozens of senior aid officials on leave, citing possible resistance to Trump orders*, AP (Jan. 27, 2025),https://tinyurl.com/37r6pb2y.

[10] Anna Gawel, *Furloughs hit hundreds of USAID contractors*, Devex (Jan. 29, 2025),https://tinyurl.com/ycxpb54h.

official, reportedly refused defendants' directives to put thousands more staff on administrative leave, before he, too, was pushed out.[11]

24.    As a result of these actions, most functions of the agency immediately halted, with life-threatening consequences. Clinics stopped distributing HIV medication.[12] Staff who operate humanitarian operations at refugee camps in Syria were told to stop work, leaving thousands of people vulnerable to instability and violence at the hands of ISIS.[13] Soup kitchens that feed nearly a million people in famine-stricken Khartoum were shut down.[14] Toddlers in Zambia were deprived of rehydration salts to treat life-threatening diarrhea.[15] Doctors at U.S.-funded medical facilities in Sudan that treat severely malnourished children were forced to choose whether to obey Defendants' orders

---

[11] Elissa Miolene, *Top USAID HR officer pushed out after refusing to fire more staff*, Devex (Feb. 4, 2025),https://tinyurl.com/4pujyp5t.

[12] Melody Schreiber, *Trump's 'stop-work' order for PEPFAR cuts off anti-HIV drugs for patients*, NPR (Jan. 28, 2025), https://tinyurl.com/bdf52kas.

[13] Tom Bateman, *How a US freeze upended global aid in a matter of days*, BBC (Jan. 29, 2025), https://tinyurl.com/27k3mjue.

[14] Sui-Lee Wee, et al., *How the World is Reeling from Trump's Aid Freeze*, N.Y. Times (Jan. 31, 2025),  https://tinyurl.com/2fjm79nh.

[15] Stephanie Nolen, *Health Programs Shutter Around The World As Trump Pauses Foreign Aid*, N.Y. Times (Feb. 1, 2025), https://tinyurl.com/53j4mhw9.

and "immediately stop their operations or to let up to 100 babies and toddlers die."[16]

**The State Department Issues Limited Foreign Assistance Waivers**

25.    As chaos engulfed the agency and the humanitarian operations it serves, the State Department issued two waivers of its order to halt foreign assistance through USAID. First, on January 28, 2025, it issued a limited waiver of the pause on USAID funding for "life-saving humanitarian assistance," defined to mean "core life-saving medicine, medical services, food, shelter, and subsistence assistance."[17] The statement specified that that limited resumption was "temporary in nature."[18]

26.    Second, on February 1, 2025, the State Department announced a "limited waiver" for "[l]ife-saving HIV care and treatment services, inclusive of HIV testing and counseling, prevention and treatment of opportunistic infections including TB, laboratory services, and procurement and supply chain commodities/medicines" and "[p]revention of mother-to-child transmission

---

[16] Brett Murphy and Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said it Lifted its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025), https://tinyurl.com/y7stwsua.

[17] Press Release, U.S. Dep't of State, *Emergency Humanitarian Waiver to Foreign Assistance Pause* (Jan. 28, 2025), https://tinyurl.com/34wmfvu8.

[18] *Id.*

services, inclusive of commodities/test kits, medicines and PrEP for pregnant and breastfeeding women."[19]

27.    These waivers offered little –to no relief for USAID partners who suffered from defendants' freeze in funding. They were not "self-executing by virtue of the announcement,"[20] so contractors and grantees scrambled to reach USAID contacts to ascertain if they were covered by the waiver. But because agency staff had already suffered severe cuts, groups doing lifesaving work were unsure how to request a waiver and received little to no information about the status of such requests.[21]

**The Agency is Dissolved and Remaining Functions Halted**

28.    During the first weekend in February, Defendants swiftly moved to destroy what remained of the agency.

29.    On Saturday, February 1, Elon Musk and other members of the so-called "Department of Government Efficiency" (DOGE) reportedly demanded access to classified USAID systems without requisite security clearances. USAID

---

[19] @JohnHudson, X (Feb. 1, 2025) https://tinyurl.com/43mdff3p (posting an image of the first page of the order); Adva Saldinger, *Exclusive: Some PEPFAR programs get waiver to restart operations*, Devex (Feb. 1, 2025), https://tinyurl.com/28sk6xf5.

[20] Brett Murphy and Anna Maria Barry-Jester, *"People Will Die": The Trump Administration Said it Lifted its Ban on Lifesaving Humanitarian Aid. That's Not True*, ProPublica (Jan. 31, 2025),https://tinyurl.com/y7stwsua.

[21] *Id.*

security officials who attempted to block them were placed on administrative leave.[22]

30.    That same day, USAID.gov was taken offline.[23]

31.    By Sunday, contract personnel at USAID began reporting that they were locked out of their email.[24] Eventually, more than 1,000 USAID employees—including some in war zones—were completely locked out of their computer accounts.[25] On information and belief, most, if not all, received no prior notice or communication that they would be losing access to USAID systems. Those agency staffers still receiving emails were told that, "[a]t the direction of Agency leadership, the USAID headquarters at the Ronald Reagan building in Washington, D.C. will be closed to Agency personnel on Monday, February 3, 2025."[26] The email directed that any replies be sent to Gavin Kliger, a special

---

[22] Margaret Brennan, et al., *Two top security officials at USAID placed on leave, sources say*, CBSNews (Feb. 3, 2025), https://tinyurl.com/54z6pnu2.

[23] Edward Helmore*, USAID website offline as Trump moves to put agency under State Department*, The Guardian (Feb. 1, 2025), https://tinyurl.com/25buz7mx.

[24] Michael R. Gordon, et al., *Marco Rubio wants USAID to undergo overhaul, backs off sudden shutdown*, The Wall Street Journal (Feb. 3, 2025), https://tinyurl.com/39s7nw83.        https://www.wsj.com/politics/policy/trump-administration-shutters-usaid-headquarters-db3fac7e

[25] Hana Kiros, *America Can't Just Unpause USAID*, The Atlantic (Feb. 4, 2025), https://tinyurl.com/54w83yz4.

[26] Michael R. Gordon et al., *Marco Rubio Wants USAID to Undergo Overhaul, Backs Off Sudden Shutdown*, Wall St. J. (Feb. 3, 2025), https://tinyurl.com/39s7nw83.

advisor to the director of the Office of Personnel Management who appears to currently work for DOGE.[27]

32.     According to reports, members of DOGE also pressed the Treasury Department for access to the system through which aid payments are made. A top official reportedly wrote to the group, "I don't believe we have the legal authority to stop an authorized payment certified by an agency."[28] That official was reportedly terminated in the following days for refusal to give DOGE members access to the system.[29]

33.     By Monday, USAID—the world's premier humanitarian assistance and international development agency—was in complete disarray. Musk stated that he had spent the previous weekend "feeding USAID into the wood chipper."[30] He also claimed, "With regards to the USAID stuff, I went over it with [President Trump] in detail and he agreed that we should shut it down."[31]

34.     Consistent with defendants' efforts to shut down the agency, President Trump appointed Defendant Rubio to serve as Acting Administrator of

---

[27] *Id.*

[28] Andrew Duehren et al., *Treasury Sought to Freeze Foreign Aid Payments, Emails Show*, N.Y. Times (Feb. 6, 2025), https://tinyurl.com/yn27uumyhttps://.

[29] *Id.*

[30] Elon Musk (@elonmusk), X (Feb. 3, 2025. 1:54 AM), https://tinyurl.com/mskvue6w.

[31] Jennifer Hansler et al., *Rubio says he's acting director of USAID as humanitarian agency is taken over by the State Department*, CNN (Feb. 4, 2025), https://tinyurl.com/3dw3h7nj.

USAID.[32] Defendant Rubio then sent a letter to the Senate Foreign Relations Committee and House Foreign Affairs Committee providing "notice" and advising Congress of the State Department's "intent to initiate consultations . . . regarding the manner in which foreign aid is distributed around the world."[33] Rubio further indicated that he authorized Peter Marocco, State Department Director of Foreign Assistance, to "begin the process of engaging in a review and potential reorganization of USAID's activities."[34] Rubio further advised that "State and other pertinent entities will be consulting with Congress . . . to reorganize and absorb certain bureaus, offices, and missions of USAID. . . . USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law."[35]

35.    USAID has already been substantially dismantled. It has no independent leadership: Defendant Rubio has assumed the mantle of Acting Administrator, and U.S. lawmakers concerned about the dissolution of the agency

---

[32] *Id.*

[33] Image of letter available at Brett Murphy (@BrettMurphy), X (Feb. 3, 2025, 3:41 PM), https://tinyurl.com/fnbxptpm.

[34] *Id.*

[35] *Id.*

were reportedly blocked from meeting with USAID staff and told that it would be "best to contact" the State Department.[36]

36.     On Tuesday, February 4, 2025, President Trump told a reporter "I think so" when asked if he was going to wind down USAID.[37]

37.     On Tuesday, February 4, the State Department ordered the shutdown of all overseas USAID missions, ordering thousands of USAID employees to be recalled by Friday, February 7, 2025.[38] That same day, the State Department placed thousands of employees on administrative leave, directing them "not to enter USAID premises, access USAID systems, or attempt to use your position or authority with USAID in any way without [the] prior permission [of Peter Marocco] or prior permission of a supervisor in your chain of command."[39]

38.     Throughout the week, USAID workforce members reported that key portions of USAID's internal infrastructure were either inaccessible or offline. Such infrastructure includes Phoenix—which is USAID's core financial

_____

[36] Elissa Miolene, *U.S. lawmakers blocked from USAID, told to go to State Department instead*, Devex (Feb. 3, 2025),https://tinyurl.com/m9hypwar.

[37] Jeff Mason & Daphne Psaledakis, *Trump says he thinks he will wind down US humanitarian agency*, Reuters (Feb. 4, 2025), https://tinyurl.com/k8swykw7.

[38] Humeyra Pamuk, *Trump administration puts on leave USAID staff globally in dramatic aid overhaul, Reuters* (Feb. 4, 2025),https://tinyurl.com/2hbvfvpm.

[39] Alex Marquardt et al., *USAID employees around the world will be placed on leave Friday and ordered to return to US*, CNN (Feb. 5, 2025), https://tinyurl.com/bdh4kaf5.

management system—as well as the Global Acquisition and Assistance System (GLAAS).

    39.    On Tuesday, February 4, 2025, the USAID.gov website came back online, with the following notice:



On Friday, February 7, 2025, at 11:59 pm (EST) all USAID direct hire personnel will be placed on administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership and specially designated programs. Essential personnel expected to continue working will be informed by Agency leadership by Thursday, February 6, at 3:00pm (EST).

For USAID personnel currently posted outside the United States, the Agency, in coordination with missions and the Department of State, is currently preparing a plan, in accordance with all applicable requirements and laws, under which the Agency would arrange and pay for return travel to the United States within 30 days and provide for the termination of PSC and ISC contracts that are not determined to be essential. The Agency will consider case-by-case exceptions and return travel extensions based on personal or family hardship, mobility or safety concerns, or other reasons. For example, the Agency will consider exceptions based on the timing of dependents' school term, personal or familial medical needs, pregnancy, and other reasons. Further guidance on how to request an exception will be forthcoming.

Thank you for your service.

40.    At 9:31 am on Friday, February 7, Defendant Trump posted on Truth Social, "USAID IS DRIVING THE RADICAL LEFT CRAZY . . . CLOSE IT DOWN!"[40]

41.    USAID signage at the Ronald Reagan Building and International Trade Center—USAID's headquarters—has been taken down or covered in black tape.[41] United States Customs and Border Protection has reportedly taken over the space formerly occupied by the agency.[42] Defendants have continued to terminate contracts at a breakneck speed. A reported 800 contracts have been terminated,[43] with procurement teams reportedly subject to hourly checks on the speed of executing on these terminations.[44]

**Consequences of Defendants' Actions**

42.    The agency's collapse has had disastrous humanitarian consequences. Among countless other consequences of defendants' reckless

---

[40]    @realDonaldTrump, Truth Social (Feb. 7, 2025, 9:31 am), https://truthsocial.com/@realDonaldTrump/posts/113963085497636545.

[41]    Laura Barrón-López, et al., *PHOTOS: USAID signs covered with black tape or removed at Washington headquarters*, PBS (Feb. 7, 2025), https://www.pbs.org/newshour/nation/usaid-signs-covered-with-black-tape-or-removed-at-washington-headquarters.

[42]    @Garret Haake, X (Feb. 7, 2025, 6:20 pm) https://x.com/garretthaake/status/1888004979698376963.

[43]    Karoun Demirjian and Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, N.Y. Times (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/usaid-job-cuts.html.

[44]    @agawande.bsky.social, Bluesky (Feb. 10, 2025, 9:23 AM ET), https://bsky.app/profile/agawande.bsky.social/post/3lhtdubyjv22j.

dissolution of the agency, halting USAID work has shut down efforts to prevent children from dying of malaria, stopped pharmaceutical clinical trials, and threatened a global resurgence in HIV.[45] Deaths are inevitable. Already, 300 babies that would not have had HIV, now do.[46] Thousands of girls and women will die from pregnancy and childbirth.[47] Without judicial intervention, it will only get worse. The actions defendants plan to take on Friday will "doom billions of dollars in projects in some 120 countries, including security assistance for Ukraine and other countries, as well as development work for clean water, job training and education, including for schoolgirls under Taliban rule in Afghanistan."[48]

43.     Defendants' actions have also already imperiled American lives. USAID employees stationed abroad depend on USAID's United States-based intelligence apparatus to provide information to them on emerging threats and evacuation directives. By abruptly putting staff on administrative leave,

---

[45] Matthew Kavanaugh & Luis Gil Abinader, *Abolishing USAID is both Unconstitutional and Dangerous*, Foreign Policy (Feb. 4, 2025), https://tinyurl.com/mr2wfsbd.

[46] Kate Knibbs, *Elon Musk's DOGE Is Still Blocking HIV/AIDS Relief Exempted From Foreign Aid Cuts*, Wired (Feb. 3, 2025), https://tinyurl.com/5n65ehw8.

[47] Mark Townsend et al., *Deaths predicted amid the chaos of Elon Musk's shutdown of USAID*, Guardian (Feb. 4, 2025), https://tinyurl.com/4ke5kb8p.

[48] Ellen Knickmeyer & Matthew Lee, *Almost all USAID workers will be pulled off the job worldwide, Trump administration says*, AP (Feb. 5, 2025), https://tinyurl.com/287dnnk4.

Defendants left USAID workers in perilous situations stranded, without any information or funding to escape.

44.    This danger is not hypothetical. On Tuesday, January 28, the State Department advised U.S. nationals to leave the Democratic Republic of the Congo as protestors attacked U.S. government buildings in the country's capital, Kinshasa.[49] USAID staff were left alone as violence unfolded around them. They had no way of receiving intelligence information from their counterparts in the United States. They had no funding to leave.

45.    Pregnant USAID employees, too, were left in catastrophic situations. Some had medical evacuations cancelled due to Defendants' actions.

**Injuries to Plaintiffs**

46.    Plaintiff AFSA exists to support the United States Foreign Service, which deploys worldwide to protect and serve America's people, interests, and values. AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interests of AFSA members.

47.    AFSA represents 1,980 Foreign Service Officers (FSOs) who are currently employed by USAID. Defendants' actions have harmed AFSA's ability to serve its members and, if they persist, will continue to harm AFSA. As a

---

[49] Elian Peltier and Justin Makangara, *U.S. Citizens Advised to Evacuate Congo Amid Attacks on Embassies* (N.Y. Times, Jan. 28, 2025), https://www.nytimes.com/2025/01/28/world/africa/congo-protesters-embassies-rebels-rwanda.html.

result of Defendants' actions, AFSA has diverted significant time and resources to addressing its members' questions and concerns and processing hundreds of changes to members' accounts. AFSA has needed to divert resources away from other priorities to respond to the USAID shutdown.

48.    AFSA's members have already experienced extraordinary harms caused by the ongoing shutdown of USAID and are at imminent risk of further irreparable injury if the shutdown is allowed to continue.

49.    Financial Harms: AFSA's member FSOs are experiencing myriad financial injuries and will experience more such injuries as the shutdown continues. Among other financial harms and risks:

   a.    FSOs have reported to AFSA that they are unable to get reimbursed by USAID for incurred travel expenses, which can reach into the thousands and sometimes tens of thousands in any given month. Without reimbursement, FSOs will be on the hook for these expenses (which are carried on credit cards under the FSOs' names) and may also experience harm to their credit scores if the FSOs are unable to pay off their credit cards.

   b.    The mandatory 30-day evacuation—which is being accomplished on an impracticable timeline and is a gross departure from standard processes for evacuating—threatens to cause financial harm in a myriad of ways. For example, some FSOs have spouses employed at the local embassy. Such spouses will be forced to give up their

employment and evacuate alongside the FSOs. Those families will therefore lose a second source of income. Further, under the normal evacuation process, FSOs would receive a special evacuation allowance (which would include lodging and meals) for up to 180 days upon returning to the states. But FSOs have received no indication that they will receive that per diem and may be forced to incur thousands of dollars of expenses to secure short term housing (e.g., hotels or Airbnbs) for their families as they look for more permanent accommodations. And FSOs may lose income themselves upon repatriation. Many FSOs earn up to an additional 75% of their base salary (for hardship) depending on which country they work in. These FSOs will likely lose that additional income when they return to the states. Moreover, FSOs will face tremendous logistical uncertainty, from navigating the process of withdrawing their children from school mid-year to contemplating the possibility of leaving pets behind. The above impacts are just a sample of the harms that will flow from the mandatory evacuation.

50.     Physical Safety and Legal Exposure: Some FSOs are located in dangerous countries and have reported losing access to USAID's security apparatus, putting their safety and well-being at risk. Additionally, AFSA has heard reports that some FSOs have had their immunity status revoked by their host countries at the direction of senior USAID officials. The revocation of this

status exposes FSOs to the law enforcement procedures of the host country and strips the FSOs of access to the U.S. embassy for legal counsel and advice. The revocation of immunity status also comes with financial harm and risk: without it, FSOs are subject to duties on their purchases, imports, and exports.

51.    Plaintiff AFGE is the largest federal union in the nation, representing approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

52.    Through its affiliate, AFGE Local 1534, AFGE has over 500 members at USAID.

53.    As a union, AFGE has already been severely harmed by defendants' actions and will suffer continued, irreparable harm if defendants' actions persist. It has had to devote considerable resources into advising its members about the consequences of defendants' arbitrary and reckless actions. Unless this court intervenes, AFGE will lose the ability to represent its members who were USAID employees and will lose hundreds of members.

54.    AFGE's members, too, have been severely and irreparably harmed. They are confused and frightened. Some have made choices with significant financial consequences—such as geographic location and family planning—in reliance on defendants' adherence to federal law.

55.    Because many members have been shut out of USAID computer systems, they have been unable to recoup reimbursements or to access health

benefits to which they are entitled. Many members will be forced to incur substantial out-of-pocket costs that they would not have otherwise incurred.

56.    Plaintiff Oxfam America is also injured by the disruption and halting of USAID's work, which is creating an inordinate burden on remaining humanitarian organizations, including Oxfam, whose resources will be significantly overstretched in an attempt to fill the $63 billion void left by USAID. *See* Ex. A. The agency's pending closure leaves a massive shortfall that will force Oxfam and other organizations to reallocate funds away from critical programs, allowing it to cover only the most extreme humanitarian disasters. The halt in USAID's work thus immediately thwarts Oxfam's mission—and leave scores of children, women, and men living in the world's most precarious areas without food, water, medicine, education, economic opportunities, or emergency relief from natural disasters and conflicts

57.    In addition, Oxfam implements programs in close collaboration with partners, including other government entities, international non-governmental organizations (INGOs), local and national NGOs, many of which receive USAID funding and are the beneficiaries of USAID's technical expertise. The freeze on USAID foreign aid is impeding Oxfam's work on those programs, jeopardizes its projects, and generates pressure on Oxfam to incur additional financial responsibility. Indeed, Oxfam has already been directed to stop work on several projects that rely on USAID as a back donor, including projects for which Oxfam has completed work but has not been compensated.

## CAUSES OF ACTION

### Count One
### Violation of Separation of Powers
### (against all Defendants)

58.     Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

59.     Plaintiffs have a non-statutory right of action to declare unlawful official action that is ultra vires.

60.     The President of the United States has only those powers conferred on him by the Constitution and federal statutes.

61.     The President may not confer powers upon other federal Officers or Departments within the Executive Branch that he does not himself possess.

62.     Federal legislation must be passed by both chambers of Congress before it may be presented to the President, and, if signed, become law.

63.     The President does not have the power under the Constitution unilaterally to amend statutes.

64.     USAID was established as an independent federal agency by Congress in 1998 through a duly enacted statute, the Foreign Affairs Reform and Restructuring Act, signed into law by President Clinton.

65.     Since 1998, Congress has passed numerous additional statutes regarding USAID appropriations and oversight, all the while preserving USAID's status as an independent federal agency.

66.     Because Congress created USAID as a separate agency by statute, only Congress may act to dissolve it or merge it with the Department of State. *See, e.g.*, *Myers v. United States*, 272 U.S. 52 (1926).

67.     President Trump's actions to dissolve USAID exceed presidential authority and usurp legislative authority conferred upon Congress by the Constitution, in violation of the separation of powers.

68.     The remaining defendants, acting as agents of Defendant Trump, aided President Trump in dissolving USAID despite lacking the Constitutional authority to do so.

69.     Plaintiffs will suffer irreparable injury if the President's action is not declared unlawful, and Plaintiffs have no adequate remedy at law.

70.     The public interest favors issuance of a judicial declaration that the president's unilateral action in dissolving USAID is unlawful because that action has interrupted life-saving humanitarian work performed throughout the world by USAID and its contractors, undermined U.S. national security, and caused thousands of Americans to lose their jobs.

**Count Two**
**Violation of Take Care Clause**
**(against all Defendants)**

71.     Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

72.    Article II of the Constitution confers upon the President the duty to "take care that the Laws be faithfully executed." U.S. Const., Art. II, § 3.

73.    The Take Care Clause is judicially enforceable against presidential actions that violate or undermine statutes duly enacted by Congress. *See, e.g.*, *Angelus Milling Co. v. Comm'r of Internal Revenue*, 325 U.S. 293, 296 (1945) ("Insofar as Congress has made explicit statutory requirements, they must be observed and are beyond the dispensing power of [the Executive Branch].").

74.    President Trump's actions in dissolving USAID violate the Take Care Clause because they violate duly enacted statutes establishing USAID as an independent agency.

75.    The Take Care Clause prohibits the President from directing federal officers to act in derogation of federal statute.

76.    President Trump's action in directing Secretary of State Rubio to take over USAID functions and absorb those functions into the State Department violates the Take Care Clause because such a restructuring would violate the Congressionally enacted arrangement under which USAID is an independent agency distinct from the State Department.

77.    The remaining defendants, as agents of Defendant Trump, acted contrary to duly enacted statute in violation of the Take Care Clause.

78.    Plaintiffs will suffer irreparable injury if the President's action is not declared unlawful, and Plaintiffs have no adequate remedy at law.

79.    The public interest favors issuance of a judicial declaration that the president's unilateral action in dissolving USAID is unlawful because that action has interrupted life-saving humanitarian work performed throughout the world by USAID and its contractors, undermined U.S. national security, and caused thousands of Americans to lose their jobs.

## Count Three
### Ultra Vires
### (against Defendants State Department, USAID, Department of Treasury, Rubio, and Bessent)

80.    Plaintiffs restate and reallege all paragraphs above as if set forth here.

81.    There is no statute, Constitutional provision, or other source of law that authorizes Defendants' actions to unilaterally dismantle USAID.

82.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' ultra vires actions.

## Count Four
### Administrative Procedure Act–706(2)(C)
### In Excess of Statutory Authority
### (against Defendants State Department, USAID, Department of Treasury, Rubio, and Bessent)

83.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

84.    Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

85. No defendant possesses the statutory authority to dissolve USAID. Defendants' actions to dissolve USAID exceed their respective statutory authorities.

86. Defendants' unilateral dissolution of USAID also violates a statutory limitation: namely, the Further Consolidated Appropriations Act, which limits the use of appropriated funds only to reorganizing or redesigning USAID—not dissolving it entirely—and only after first consulting with the appropriate congressional committees.

### Count Five
### Violation of the Administrative Procedure Act—706(2)(A)
### Arbitrary and capricious
### (against Defendants State Department, USAID, Department of Treasury, Rubio, and Bessent)

87. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

88. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

89. The dissolution of USAID is arbitrary and capricious in multiple respects.

90. First, defendants failed to acknowledge the catastrophic consequences of their actions, both as they pertain to American workers, to the lives of millions across the world, and to U.S. national interests.

91.    Second, defendants fail to articulate a reasoned explanation for the dissolution of the agency.

92.    Third,  defendants failed to account for the substantial reliance interests in the continued existence of USAID. "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account," and the failure to do so is arbitrary and capricious. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted).

93.    The dissolution of USAID is also contrary to law. The statutes defendants violated include, but are not limited to:

a.  5 U.S.C § 6329a(b)(1), which provides that "during any calendar year, an agency may place an employee in administrative leave for a period of not more than a total of 10 work days."

b.  31 U.S.C. § 3901 *et seq.*, which requires agencies to pay valid invoices by their contracted due date or within 30 days.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

a.    Declare unlawful and set aside the decision to shut down USAID as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. §

706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

b.  Issue a temporary restraining order and preliminary injunction directing defendants to immediately cease actions to shut down USAID's operations in a manner not authorized by Congress and directing to them to take the following actions:

    i.  Appoint an independent Acting Administrator of USAID;

    ii.  Reopen USAID buildings;

    iii.  Restore all USAID computer systems and webpages;

    iv.  Restore funding pursuant to the terms of all grants, cooperative agreements, and contracts, consistent with the terms of the agreements and any relevant statutes and regulations;

    v.  Refrain from placing any additional workers on administrative leave, or continuing the leave of those previously placed on administrative leave, unless such leave is authorized by this Court after giving legitimate, non-arbitrary, and particularized reasons;

    vi.  Recall furlough notices to affected workers unless such furloughs are specifically authorized by this Court after giving legitimate, non-arbitrary, and particularized reasons;

    vii.  Recall mandatory evacuation orders.

c.  Order Defendants to file a status report with the Court within 24 hours of entry of a temporary restraining order, and at regular intervals thereafter, confirming compliance with these orders.

d.  Issue a permanent injunction barring executive agencies and agency heads from taking any action to dissolve USAID absent the authorization of Congress;

e.  Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

f.  Grant such other relief as the Court deems necessary, just, and proper.

Dated: February 13, 2025                Respectfully submitted,

/s/ Lauren Bateman                      /s/ Kaitlyn Golden
Lauren Bateman                          Kaitlyn Golden
(DC Bar No. 1047285)                    (DC Bar No. 1034214)
Karla Gilbride                          Kristen Miller
(DC Bar No. 1005886)                    (DC Bar No. 229627)
Allison Zieve                           Kayla M. Kaufman
(DC Bar No. 424786)                     (DC Bar No. 90029091)
Public Citizen Litigation Group         Robin F. Thurston
1600 20th Street NW                     (DC Bar No. 1531399)
Washington, DC 20009                    Skye L. Perryman
(202) 588-1000                          (DC Bar No. 984573)
lbateman@citizen.org                    Rachel L. Fried
                                        (DC Bar No. 1029538)
                                        Democracy Forward Foundation
                                        P.O. Box 34553
                                        Washington, D.C. 20043
                                        (202) 448-9090
                                        kmiller@democracyforward.org
                                        (DC Bar No. 90029091)

*Counsel for Plaintiffs*

33

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| AMERICAN FOREIGN SERVICE | ) | |
| ASSOCIATION, et al., | ) | |
|  | ) | |
| *Plaintiffs*, | ) | Civil Action No. 1:25-CV-352 |
|  | ) | |
| v. | ) | |
|  | ) | |
| DONALD TRUMP, et al., | ) | |
|  | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

## DECLARATION OF ABBY MAXMAN

I, Abby Maxman, declare the following under penalties of perjury:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I am the President and CEO of Oxfam America, which I have led since 2017. I have over thirty-five years of experience in the humanitarian field, having held leadership roles including Deputy Secretary General and Vice President of two major international humanitarian agencies; board chair of the leading alliance of nonprofits in the U.S., and of the Steering Committee for Humanitarian Response; and as an NGO principal on the UN Inter-Agency Standing Committee.  I serve as a Trustee on the board of Frontline AIDS, on the advisory boards of the Global Executive Leadership Initiative and on the Classy Leadership Council, and am a member of the Council on Foreign Relations. I previously served as a U.S. Peace Corps Volunteer, and worked in the USDA's Office of International Cooperation and

Development. My work has taken me to over seventy countries. I have lived and worked in Lesotho, Zimbabwe, Rwanda, the Occupied Palestinian Territory & Israel, the Republic of Georgia, Haiti, Ethiopia, Switzerland, and the United States.

3.    Over the course of my career I have implemented large U.S. government funded programs in country leadership roles in Haiti, Ethiopia, and the Republic of Georgia. As the Vice President of International Programs and Operations for a large international humanitarian agency, I was responsible for the oversight of a $400million/year portfolio of work, 40% of which was U.S. government funded, including the other multilateral agencies that U.S. funding supports. For over thirty-five years, I have devoted my professional career and expertise working in the aid sector.

4.    Oxfam America is an affiliate member of Oxfam International, a global organization that fights inequality to end poverty and injustice. We offer lifesaving support in times of crisis, and advocate for economic justice, gender equality, and climate action. In 2023, we worked with 2,248 local organizations and international allies, in 80 countries, and reached 15.5 million people with our programs.

5.    Oxfam collaborates with a worldwide network of humanitarian organizations, including USAID, that provides relief for communities affected by the world's most serious disasters. Like other professional humanitarian organizations, Oxfam participates in coordination mechanisms led by the United Nations to ensure that assistance is provided to address the most pressing needs in a manner that is efficient and avoids duplication. The efficacy and appropriateness of each lifesaving

activity is directly dependent on the complementary activities being carried out by other organizations in the humanitarian ecosystem. While it is typical for organizations to adjust their programs to account for changes in the external context, the erasure of any large aid organization–particularly one of USAID's magnitude– undermines the humanitarian sector as a whole.

6. Oxfam is currently conducting humanitarian action in over 30 countries, including the Democratic Republic of Congo, Venezuela, Colombia, Bangladesh, and the Philippines. This also includes programs in:

a. **South Sudan:** Conflict in Sudan, and the recent declaration of famine, forced over 3 million people to seek refuge in South Sudan, Chad, and neighboring countries. In South Sudan and Chad, Oxfam and partners are delivering food; providing clean water; installing emergency drinking water systems, toilets, and bathing facilities; and distributing cash so that displaced families can acquire the additional items they need.

b. **Ukraine**: Since the escalation of the war in 2022, Oxfam has provided humanitarian assistance to over 2.4 million people, including refugees who fled to Poland, Moldova, and Romania. Today, as the fighting in Ukraine continues to create extremely challenging conditions for civilians, Oxfam works closely with Ukrainian civil society to support people in need.

c. **Ethiopia, Kenya, Somalia and South Sudan:** Oxfam is

3

JA 94

responding to the East Africa hunger crisis by partnering with organizations to reach 1.24 million people across the four countries. Together, we are providing clean water and rapid flexible cash assistance matched with longer-term support to help communities be more resilient to the changing climate. We are also advocating for governments and others to respond to the immediate crisis with humanitarian assistance.

7.    Funds appropriated by Congress and administered by USAID save lives and helps to build strong and resilient societies. To my knowledge, there is not a single area of development and humanitarian assistance – including food, education, economic development, public health, democracy and governance, climate change adaptation, advancing the rights of girls and women, and disaster relief – that USAID is not involved in.

8.    Following President Trump's Executive Order mandating a 90-day pause in *new* foreign assistance disbursements, USAID and the State Department imposed a blanket freeze on *all* foreign assistance, including on activities pursuant to existing contracts and awards. Ships carrying medicine refrained from unloading their cargoes; and food bound for countries experiencing extreme hunger were held at port to spoil and rot, notwithstanding the Executive Order's exemption on emergency food assistance.

9.    On January 28, Secretary Rubio approved an "emergency humanitarian waiver" purportedly exempting certain forms of life-saving humanitarian assistance

4

JA 95

from the funding freeze. However, the effective shutdown of USAID has dramatically limited the effect of the waiver in a variety of ways. First, USAID has not been making payments to many of its implementing partners, even to reimburse them for work completed before the funding freeze, leaving many with severe liquidity challenges. Second, USAID staff, including agreement officers who are the primary contact for implementing partners, have been either placed on leave or prohibited from external communications. As a result, USAID grantees and employees alike are not receiving actionable guidance on the scope or operation of the humanitarian waiver. Given USAID's non-payment even for earlier expenses, many humanitarian organizations are declining to bear the risk of incurring new ones on the basis of a vague waiver without specific guidance.

10.    The immediate departure of USAID from the humanitarian sector creates an inordinate burden on other humanitarian organizations, including Oxfam, whose resources have already been diverted to account for the foreign assistance funding pause currently in place, and which would be fundamentally challenged and overstretched in an attempt to fill the $63 billion void left by USAID's abrupt dissolution.

11.    Like other humanitarian agencies, Oxfam is committed to meeting industry-agreed minimum standards in our response activities in order to ensure that people benefiting from Oxfam assistance survive and recover with dignity. Unless Oxfam accounts for the dramatic changes in the humanitarian landscape caused by the discontinuation of USAID-funded programs, Oxfam will fail to meet minimum

standards in its own programs, fail to address the most urgent needs, and may exacerbate tensions within communities over the distribution of resources and accessibility of services. Instead, Oxfam will be forced to participate in recalibration exercises everywhere USAID funding has ceased to be available, at substantial cost to our own operations.

12.     The agency's abrupt closure is leaving a massive shortfall that will force Oxfam and other agencies to reallocate funds away from critical programs. Even in the best-case scenario, this recalibration of humanitarian assistance will leave millions of children, women and men living without food, water, sanitation services, medicine, education, shelter, protection, or other essential emergency relief in disaster and conflict areas around the world.

13.     Oxfam implements programs in close collaboration with partners, including other government entities, international non-governmental organizations (INGOs), and local and national NGOs, many of which receive USAID funding. As a result, impacts of the USAID foreign assistance pause on other INGOs and local/national NGOs will jeopardize our projects, generating pressure on Oxfam to incur additional financial responsibility, as well as to make life-or-death decisions about which communities we will and will not serve.

14.     In many cases, Oxfam and other INGOs coordinate so that we work in different communities, in which case some communities will now be supported by Oxfam, while neighboring communities will be left without support. Alternatively, in situations where Oxfam and allies complement each other's work, there will now be

tremendous gaps.

15.    Closing USAID without notice also disrupts lifesaving programs midstream. Local and national organizations that receive USAID funding and partner with Oxfam may have little in reserves, and many of our close local and national partners have told us they will not be able to survive the 3-month pause. Their closure will significantly impede our ability to carry out our humanitarian work.

16.    Oxfam has already been instructed to halt several projects undertaken with UN agency funding because they rely on U.S. government as a back donor. In sum, there are over $800,000 in standing commitments that are now at risk, including three humanitarian projects providing water, sanitation, and other humanitarian assistance in which work has been conducted and we have not received payment. This includes programs serving refugees and other communities in Africa, Latin America, and the Middle East.[1]

17.    Oxfam collaborates with other UN agencies funded by the U.S. government, meaning the adverse impacts to our work are likely to spread. Oxfam has thirty-one contracts with UN agencies valued at $42.9 million; this includes $12.7 million in pending payments. As of February 5, nineteen UN agencies received stop-work orders from the U.S. government, and six had not. This throws significant uncertainty into Oxfam's ability to continue carrying out the work we have

---

[1] Please note that teams located in these three countries requested not to be identified for fear that their programs or staff could face retribution.

7

undertaken alongside the United Nations, and introduces uncertainty as to whether we will receive the $12.7 million in pending payments.

18.    USAID is also home to thought leaders in the development industry. Their staff engineer and implement cutting edge, lifesaving ideas at scale. There is no major area of the development system in which USAID did not bring its technical know-how, research, and evidence. Dissolving the agency will therefore have significant negative ramifications Oxfam and other humanitarian agencies that rely upon the agency's ingenuity to continue our work of saving lives and improving livelihoods across the globe.

19.    In addition, USAID plays a unique role by offering services to other humanitarian organizations that only USAID can offer. Oxfam and other organizations have come to rely upon this partnership. For example, USAID charters flights to several remote or dangerous regions of the world that other organizations cannot enter alone, and invites humanitarian workers from other organizations to join these flights. USAID thus plays a unique role in supporting Oxfam and other humanitarian organizations that would otherwise be unable to provide this lifeline to otherwise unreachable communities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 12, 2025.

_____
Name

8

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN FOREIGN SERVICE
ASSOCIATION, et al.,

          *Plaintiffs*,

      v.

DONALD TRUMP, et al.,

          *Defendants*.

Civil Action No. 1:25-cv-352 (CJN)

<u>**MEMORANDUM OPINION**</u>

The original plaintiffs in this lawsuit are two unions that represent employees of USAID; they challenge a "series" of executive branch actions that they allege will "systematically dismantle[]" that agency.  ECF No. 1 (Compl.) at 2.  Those plaintiffs initially moved for a temporary restraining order on February 7, 2025, ECF No. 9-1 (Mot), which the Court granted in part that day, ECF No. 15 (TRO).  Following full briefing on that Motion, the submission of various supplemental declarations, and multiple hearings, the Court concludes that plaintiffs have not demonstrated that further preliminary injunctive relief is warranted.

**I.**    **Background**

    **A.**    **Statutory Background**

In the Foreign Assistance Act of 1961, Congress "declare[d] that a principal objective of the foreign policy of the United States is the encouragement and sustained support of the people of developing countries in their efforts to acquire the knowledge and resources essential to development and to build the economic, political, and social institutions which will improve the quality of their lives."  22 U.S.C. § 2151(a).  To implement that objective, President Kennedy the

same year issued an Executive Order directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development," or USAID. Exec. Order 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). From 1961 until today, USAID has been tasked by statute with "assist[ing] [] strategically important countries and countries in conflict; lead[ing] U.S. efforts to alleviate poverty, disease, and humanitarian need; and assist[ing] U.S. commercial interests by supporting developing countries' economic growth and building [their] capacity to participate in world trade." Cong. Rsch. Serv., *U.S. Agency for International Development: An Overview* (Jan. 6, 2025).

More than 35 years after USAID was first established as an arm of the State Department, Congress passed the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), which recognized USAID as an "independent establishment" *outside* of that Department. *See* 22 U.S.C. § 6563; 5 U.S.C. § 104. The FARRA gave the President 60 days within which to submit to Congress a "report" that could provide for the "consolidation and streamlining" of USAID, the "transfer" of certain USAID functions back to the State Department, or even the wholesale "abolition" of the agency. 22 U.S.C. §§ 6601(a)(1), (d)(1). But President Clinton's report took none of those steps, and instead determined that "USAID will remain a distinct agency with a separate appropriation." *See* Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the FARRA, *as contained in* Public Law 105–277, 112 Stat 2681 (1998).

To be sure, the FARRA (together with President Clinton's determination) did not make USAID wholly independent of the State Department. For example, the FARRA places the USAID Administrator "under the direct authority and foreign policy guidance of the Secretary of State," 22 U.S.C. § 6592, and some kinds of foreign aid are jointly administered by the State Department

and USAID.  *See, e.g.*, 22 U.S.C. § 2346(b) ("economic support programs").  But USAID nevertheless is considered an "independent establishment" and receives its own appropriations. The Further Consolidated Appropriations Act of 2024, for example, appropriates funds specifically for USAID (and for specific USAID programs), and provides that appropriated funds cannot be used to "implement a reorganization [or] redesign" of the agency without "prior consultation by the head of [the agency] with the appropriate congressional committees."  Pub. L. 118–47 § 7063(a), 138 Stat 460 (2024); *see also id.* § 7015(a).  By statute, that consultation must also include the provision of a "detailed justification for any proposed action."  Pub. L. 118–47 § 7063(a), 138 Stat 460 (2024).

### B.    Factual Background

The day he took office, President Trump issued an Executive Order entitled "Reevaluating and Realigning United States Foreign Aid."  Exec. Order. 14,168, 90 Fed. Reg. 8619 (Jan. 20, 2025).  That Executive Order provides that "[t]he United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases [are] antithetical to American values," and accordingly mandates an "immediate[]" "90-day pause" on "new obligations and disbursements of development assistance funds . . . pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy."  *Id.* §§ 1, 3(a).  At the end of that period, "responsible department and agency heads" are to "make determinations . . . on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations."  *Id.* § 3(c).  But the Executive Order also allows obligations and disbursements to resume "prior to the end of the 90-day period" "if a review is conducted and the Secretary of State . . . decide[s] to continue the program in the same or modified form."  And

it permits the Secretary of State to completely "waive" the 90-day pause for "specific programs." *Id.* §§ 3(d), (e).

Four days later, on January 24, 2025, Secretary of State Rubio issued a memorandum pausing "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." Dep't of State, Mem. 25 STATE 6828 ¶ 1 (Jan. 24, 2025). The memorandum also directs that, "[f]or existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review." *Id.* ¶ 7. But Secretary Rubio approved "waivers of the pause under the Executive Order" for "foreign military financing for Israel and Egypt"; "emergency food assistance"; "legitimate expenses incurred prior to the date of [the memorandum]"; and "salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff." *Id.* ¶¶ 12(a)–(e). And Secretary Rubio later also waived the pause as to "life-saving humanitarian assistance during the period of review." *See* Sec'y of State, Emergency Humanitarian Waiver to Foreign Assistance Pause (Jan. 28, 2025); *see also* ECF No. 20-1 (Marocco Decl.) ¶ 10.

On January 30, 2025, Present Trump appointed Secretary Rubio as the Acting Administrator of USAID. Marocco Decl. ¶ 8. Four days later, the Secretary sent a letter to members of the Congressional Committees on Foreign Relations, Foreign Affairs, and Appropriations informing them, "[c]onsistent with applicable law, including sections 7063 and 7015 of the [Consolidated Appropriations Act of 2024]," of his "intent to initiate consultations with you regarding the manner in which foreign aid is distributed around the world through [USAID]." ECF No. 20-1 Ex. C at 1–2. In Secretary Rubio's view, "USAID's foreign assistance

processes reflected signs of severe inefficiency," and "a substantial number of the programs funded by USAID neither substantially benefited the American people, nor reflected the priorities of the President and [himself]." *Id.* ¶ 7; *see also* ECF No. 20-1 Ex. C at 2. Secretary Rubio also stated that he was delegating the duties of Deputy Administrator of USAID to Peter Marocco, who would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* at 2.

In order to carry out that review process, and also to prevent alleged noncompliance by USAID employees with the President's and Secretary's "pencils down" directives, agency leadership began placing employees on paid administrative leave. Marocco Decl. ¶¶ 6, 9, 12, 14. Of the approximately 4,800 direct hire employees of USAID—who are stationed across both foreign and domestic posts—58 were initially placed on paid administrative leave. *Id.* ¶ 11. By February 7, 2025, USAID had placed 2,140 employees on administrative leave. *Id.* ¶ 12. The agency ultimately determined that approximately 611 staff were essential to carry out its statutory functions, and had planned to place the remaining approximately 2,014 employees on paid administrative leave by 11:59 p.m. on February 7, 2025. *Id.* ¶¶ 16–17.

USAID represents that it has "a careful plan" for any overseas employees who are placed on administrative leave. *Id.* ¶ 22; *see also* ECF No. 46-1 (Third Marocco Decl.) ¶ 4. Namely, those employees will be required to decide within thirty days whether they wish to return to the United States or remain at their foreign posts. Marocco Decl. ¶¶ 23, 25. Employees who choose to remain abroad "will be entitled to all of the benefits previously available, so long as [they] remain[] on paid administrative leave." *Id.* ¶ 23. As USAID informed its employees when announcing its administrative leave policy in early February, "[o]verseas USAID personnel retain the option to remain at their posts, even while placed on administrative leave and not working."

ECF No. 20-1 Ex. D.  Although employees on administrative leave "may lose access to certain USAID systems" in an effort to maintain internal security and "ensure that the 'pause' on Agency operations can truly go into effect," Deputy USAID Administrator Peter Marocco attests that USAID "has no plan or proposal that an employee would be shut out from access to overseas security resources at a high-risk post."  Marocco Decl. ¶ 27.

Overseas employees who choose to return to the United States within thirty days will have their travel "coordinate[d]" and "financially cover[ed]" by USAID, which has "a team of 257 employees . . . receiving and processing [return] requests and standing by to assist."  *Id.* ¶ 23; Third Marocco Decl. ¶ 4.  Those who choose to stay abroad on administrative leave beyond that time period will not receive travel compensation, unless they obtain an "individualized exception."  Third Marocco Decl. ¶ 4.  "For example, the Agency will consider exceptions based on the timing of dependents' school term[s], personal or familial medical needs, pregnancy, and other reasons."  Marocco Decl. ¶ 26.  According to Deputy Administrator Marocco, "there have been no forced or attempted evacuations of any USAID employee[s]" from their foreign postings, nor has USAID issued any mandate that all overseas employees placed on administrative "must return to the United States."  *Id.* ¶ 25.

The government has, however, made it clear that it separately reserves the right to "direct" USAID employees stationed overseas "to depart their post[s]," such as if they are terminated or are "needed elsewhere based on an agency reorganization."  Third Marocco Decl. ¶ 5.  In the event that an employee receives such direction and does not depart post within the required time frame, he or she "would no longer be 'officially stationed overseas' and would not meet the definition of employee under the Department of State Standardized Regulations."  *Id.*  In that case, the employee "would no longer qualify for allowances applicable to the assignment in a foreign location"—like

housing, personal expenses coverage, tuition payments, a diplomatic visa, and security resources. *Id.*; *see also* ECF No. 35-1 (Second Marocco Decl.) ¶ 11. (There might, however, "be some flexibility to allow children to continue in a school" if tuition had already been paid.) Third Marocco Decl. ¶ 5. Regardless, Deputy Administrator Marocco attests that, "[i]n the case of any future . . . directed departures, [USAID] will allow a reasonable amount of time for the departure consistent with [USAID] policies and will maintain adequate communications and systems to ensure [employees'] safe return." *Id.* ¶ 7.

### C.    Procedural History

Plaintiffs filed their first complaint on February 6, 2025, alleging that defendants were violating the Constitution and the APA by "dismantl[ing]" USAID. Compl. at 2, ¶¶ 49–82. Just before noon the following day—the day on which USAID had intended to place 2,014 additional employees on administrative leave by 11:59 p.m.—plaintiffs moved for a TRO that would enjoin defendants from "taking any further actions to shut down USAID operations." Mot. at 1, 23. In light of the midnight deadline, the Court scheduled a hearing on the motion for later that afternoon. *See* Min. Order of February 7, 2025.

After argument, the Court entered a "limited" TRO. TRO at 1. It explained that, while plaintiffs' TRO request was styled as pertaining to the alleged wholesale dissolution of USAID, plaintiffs' allegations of irreparable injury actually "flow[ed] principally" from three subsidiary government actions: (1) the placement of USAID employees on administrative leave; (2) the expedited evacuation of USAID employees from their overseas posts; and (3) the 90-day pause on foreign assistance funding. *Id.* at 2. The Court concluded based on the limited record before it (and the looming midnight deadline, which the government expressly declined to extend) that plaintiffs had demonstrated entitlement to temporary injunctive relief with respect to the first and

second actions, in light of their "strong" arguments that their members would face irreparable harm

from losing access to government security systems while abroad and being prematurely recalled

to the United States, their "colorable" arguments that the government's actions were unlawful, and

the government's failure to explain how it would be harmed by briefly abstaining from making

any personnel changes. *Id.* at 3–5. But the Court reached the opposite conclusion as to the third

action, explaining that plaintiffs' allegations that the funding freeze would inflict emotional harm

on their members and expose them to personal financial liability were too "hypothetical" to support

a finding of irreparable harm. *Id.* at 6–7. The Court accordingly ordered the government to

reinstate all USAID employees who had already been placed on administrative leave, and to

withhold from placing any additional employees on administrative leave or evacuating them from

their overseas posts until February 14, 2025. *Id.* at 7. But it did not enjoin the funding pause in

any way. *Id.*

The same order converted plaintiffs' TRO motion into a motion for a preliminary

injunction, set a briefing schedule, and scheduled a hearing on February 13, 2025. *Id.* At the

conclusion of that hearing, and as reflected in an Order amending the TRO, the Court explained

that it intended to issue an Opinion on the motion for preliminary injunction and so extended the

TRO by one week, until February 21, 2025, to permit itself time to do so. ECF No. 31. The Court

also clarified that the TRO's restraint on evacuating USAID employees stationed abroad applied

only to involuntary recalls, and that USAID was of course free to evacuate any employee who

wished to return to the United States. *Id.* And the Court ordered the government to submit an

additional declaration on factual questions that arose during the February 13 hearing—which the government did at ECF No. 35.[1]

## II.    Legal Standard

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981).  Accordingly, a preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton,* 391 F.3d 251, 258 (D.C. Cir. 2004).  "To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  When the movant seeks an injunction against the government, the final two factors are analyzed as one.  *See*, *e.g.*, *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## III.    Analysis

It is well-established that injunctions issued in "[g]overnment personnel cases" are not "orthodox stays."  *Sampson v. Murray*, 415 U.S. 61, 83–84 (1974) (quotation marks omitted).  The

---

[1] After their motion for a preliminary injunction was fully briefed, plaintiffs filed an amended complaint joining as a plaintiff Oxfam America, "a global organization that fights inequality to end poverty and justice."  ECF No. 30 (Am. Compl.) ¶ 3.  Plaintiffs allege that the executive branch's actions with respect to USAID have "thwart[ed] Oxfam's mission" because USAID's "pending closure leaves a massive shortfall that will force Oxfam and other organizations to reallocate funds away from critical programs."  *Id.* ¶ 56.  Claims involving Oxfam are not before the Court on the present Motion, however, because plaintiffs do not allege that Oxfam is at risk of any irreparable injury.  *See* Mot. at 17–21.

government "has traditionally been granted the widest latitude in the dispatch of its own internal affairs," *id.* (quotation marks omitted), because "[i]nterference by the judicial department in such cases [regarding personnel matters] [c]ould lead to the utmost confusion in the management of executive affairs." *White v. Berry*, 171 U.S. 366, 378 (1898). The Supreme Court has thus been clear that, in considering whether to issue enjoin actions that bear on federal employment matters, courts may not "routinely apply" the "traditional [preliminary injunction] standards." *Sampson*, 415 U.S. at 83–84. Instead, they may issue relief only upon a far more rigorous showing of entitlement. *See id.*

### A.    Irreparable Harm

Because "the basis of injunctive relief in the federal courts has always been irreparable harm," *Full Gospel Churches*, 454 F.3d at 297, it is helpful to begin the analysis there. Plaintiffs assert that the executive branch's challenged conduct has harmed (and will harm) them and their members in multiple ways. *See* Mot. at 18–21; Reply at 23–26. But to qualify as irreparable harm, the injury alleged "must be both certain and great; it must be actual and not theoretical." *Full Gospel Churches*, 454 F.3d at 297. It must also, as the "key word . . . *irreparable*" indicates, "be beyond remediation." *Id.* Upon scrutiny, the employment-related injuries that plaintiffs assert here are not irreparable ones warranting the "extraordinary remedy" of a preliminary injunction. *Cobell*, 391 F.3d at 258. Nor are they "sufficient in kind and degree" to "override the factors cutting against the general availability of preliminary injunctions" in personnel cases like this one. *Sampson*, 415 U.S. at 85.

*First*, plaintiffs argue that their members will face irreparable harm from being placed on paid administrative leave because that status means they will lack access to agency email and security systems, posing "serious safety risks to employees overseas." Reply at 24. As reflected

during the TRO stage of this case, the Court was very concerned about this potential harm, and its

TRO as to the administrative leave issue was significantly motivated by that concern. *See* TRO at

3–4. But several subsequent submissions by the government persuade the Court that the risk posed

to USAID employees who are placed on administrative leave while stationed abroad—if there is

any—is far more minimal than it initially appeared.

In particular, in opposing plaintiffs' motion, the government submitted a declaration from

the Deputy Administrator of USAID, Peter Marocco. Deputy Administrator Marocco represents

that, although employees on administrative leave may "lose access to certain USAID systems" in

order "to ensure that the 'pause' on Agency operations can truly go into effect," USAID "has no

plan or proposal that an employee would be shut out from access to overseas security resources at

a high-risk post." Marocco Decl. ¶ 27; *see also* Third Marocco Decl. ¶ 4. In a supplemental

declaration filed as required by the Court, Deputy Administrator Marocco further attests that all

overseas employees placed on administrative leave will "continue to fall under the authority of the

Chief of Mission" of their diplomatic posting—i.e., the individual at that posting who is statutorily

"responsible for the security of the executive branch employees [stationed there] and their eligible

family members." Second Marocco Decl. ¶¶ 3–4; *see also* 22 U.S.C. § 3927(a) (outlining the

duties of a chief of mission). As a result, those employees will continue to be protected through

standard "residential, personal, and physical security programs" in place at their mission posts.

Second Marocco Decl. ¶ 6. For instance, they will retain access to "two-way radios" that enable

"24/7 communications in the event of an emergency" and the "SAFE Alert system which provides

electronic messaging to staff with security and safety alerts," including on their personal devices.

*Id.* They will also retain access (where available) via USAID-issued devices to "SCRY Panic," a

"situational awareness application" that enables users to hit a "panic button" which "activate[s]

geospatial tracking and initiate[s] a Diplomatic Security response," and will remain subject to all other applicable security mandates at their posts, like travel restrictions, armored vehicle requirements, and curfews. *Id.* ¶¶ 7, 11.

Based on this record, the Court concludes that the prospect of plaintiffs' members suffering physical harm from being placed on administrative leave while abroad is highly unlikely. And to the extent that plaintiffs allege that paid administrative leave will harm their members in ways other than via the supposed removal of security protections—such as by tarnishing their members' reputations or by preventing them from performing their standard duties, *see, e.g.*, ECF No. 24-17 (AFSA Decl.) ¶ 27; ECF No. 36-3 ¶ 17—those types of standard employment harms "fall[] far short of the type of irreparable injury which is a necessary predicate to the issuance of a [preliminary] injunction." *Sampson*, 415 U.S. at 91–92.

*Second*, plaintiffs argue that their members will be irreparably harmed by what they initially described as a "mandatory recall notice" requiring more than 1,400 USAID employees stationed overseas to "repatriate within 30 days." Mot. at 18. Again, the Court was concerned by this alleged harm when issuing the TRO: it observed that recalling employees on such short notice could subject them to non-financial injuries—like harms to the continuity of their healthcare and their children's education—that no future lawsuit could redress. *See* TRO at 4–5. But again, the government's subsequent submissions have convinced the Court that plaintiffs' initial assertions of harm were overstated.

The record now reflects that no USAID employee stationed abroad has been or imminently will be *required* to return to the United States within thirty days. Marocco Decl. ¶ 23; *see also* Third Marocco Decl ¶ 4. Rather, as matters presently stand, USAID employees stationed abroad have been given a choice. If they wish to return to the United States within thirty days, they may

do so, and will be eligible for agency-funded and arranged return travel.  Marocco Decl. ¶ 25; ECF
No. 20-1 Ex. D.  Indeed, USAID has established a 200+ person team dedicated to coordinating
those return trips.  Third Marocco Decl. ¶ 4.  And if employees wish to "remain at their posts"
beyond that thirty-day period, they may also do so—even "while placed on administrative leave
and not working."  ECF No. 20-1 Ex. D.  In that case, as long as an employee "remains on paid
administrative leave," "he or she will be entitled to all of the benefits previously available."
Marocco Decl. ¶ 25.  However, USAID will not pay for the employee's eventual return travel
unless he or she obtains "an individualized exception," such as one based on "the timing of
dependents' school term[s], personal or familial medical needs, pregnancy, [or] other reasons."
ECF No. 20-1 Ex. D; *see also* Marocco Decl. ¶ 26.

        This recall scheme of course does not eliminate the possibility of *financial* harm to USAID
employees.  As plaintiffs point out, some employees may not receive exemptions, and thus may
be required to pay for their own travel back to the United States (if they choose to stay at post) or
to incur costs related to relocating to the United States earlier than expected (if they choose to
leave post).  *See* Reply at 23; *but see* 5 U.S.C. § 5924(2)(B) (foreign service workers are statutorily
eligible for otherwise uncompensated "transfer allowance[s] for extraordinary, necessary, and
reasonable subsistence and other relocation expenses" if they "agree[] in writing to remain in
Government service for 12 months after transfer, unless separated for reasons beyond the control
of the employee"); Second Marocco Decl. ¶ 16 (USAID can pay statutory transfer allowances).
But monetary harm is typically not irreparable; and here, in the event that certain of plaintiffs'
members are not reimbursed for expenses to which they believe they are entitled, they could seek
"adequate compensatory . . . relief . . . at a later date."  *Full Gospel Churches*, 454 F.3d at 297.  To
the extent that plaintiffs are also concerned that their members could in the future be "directed to

depart their posts," in which case they would be stripped of their employee-status and accompanying benefits if they did not depart within the applicable time frame, the record does not reflect that such a direction is imminent.  Third Marocco Decl. ¶¶ 5–6.  Instead, as noted above, USAID has expressly informed employees that they "retain the option to retain at their posts," "even while placed on administrative leave and not working."  ECF No. 20-1 Ex. D.  And in any event, the government has committed that any "directed departures" would be conducted on a "reasonable" timeline and "consistent with [USAID] policies," mitigating any theoretical future risk of irreparable harm.[2]  Third Marocco Decl. ¶ 7.

*Third*, plaintiffs argue that, in various ways, their members will be irreparably harmed by the funding pause and stop-work orders.  The Court previously explained in its TRO why plaintiffs' initial allegations that USAID's default on foreign aid contracts would financially and emotionally harm individual USAID employees were too "hypothetical" to warrant relief.  TRO at 6–7.  In their reply brief, plaintiffs switch tacks to argue that, because modification or termination of certain existing contracts "may be unlawful," employees directed to make such changes will face irreparable harm as a result of losing "goodwill" with partner agencies.  Reply at 25.  But this new argument does not lead to a new result.  Without any clarity about the terms of the contracts at issue, plaintiffs' allegations of illegality remain too speculative to support a finding of irreparable harm.  Nor, in any event, does the Court find it likely that a partner agency would attribute a contract modification, whether unlawful or not, to any USAID employee in his or her personal capacity.

---

[2] Of course, plaintiffs remain free to renew their motion for a TRO or a preliminary injunction should an imminent risk of irreparable harm from "directed departures" arise, such as if any individual were directed to leave post on a timeline that would pose the choice between disrupting familial or medical arrangements or remaining abroad without critical government protections.

At the February 12 hearing, plaintiffs also contended that the funding freeze has prevented USAID from paying for the living expenses of its overseas employees, such as their utility bills and the tuition bills of their dependents. *See, e.g.*, ECF No. 24-11 ¶ 14 (overseas USAID controller attesting that he has "pending administrative payments of $0.2 million"). But as plaintiffs' declarant himself notes, Secretary Rubio waived the funding pause for the "living and operating expenses" of USAID employees. *Id.* ¶ 5; *see also* Dep't of State, Mem. 25 STATE 6828 ¶ 12(c) (Jan. 24, 2025). And while Deputy USAID Administrator Marocco has acknowledged that the widespread changes at the agency have caused "delays" in processing "certain allowance payments to USAID employees," he represents that "USAID is working diligently to address these delays" and that all overseas employees remain eligible to receive timely living expenses reimbursements notwithstanding their "leave status." Second Marocco Decl. ¶ 17. It thus appears that any nonpayment to date was unintentional and will soon be resolved. *See, e.g.*, ECF No. 36-3 ¶ 15 (plaintiffs' declarant describing recently updated payment process for operational expenses designed to allow USAID to "catch up on the payments already in the queue"); ECF No. 36-3 ¶ 12 (plaintiffs' declarant describing how "rewiring maintain[ed] electricity to security services at [her] home"). In fact, with respect to specific instances of delayed payments, the government attested at the February 19 hearing that those bills would be settled within "3 to 5 business days."

*Finally*, plaintiffs assert a number of harms premised on the notion that, beyond being placed on paid administrative leave, their members will ultimately lose their jobs. *See, e.g.*, Mot. at 19 (asserting that "members will [] lose their source of income and the benefits that come with employment"). But many of the harms that would result from such an action (such as the allegedly unlawful non-payment of salary or other benefits) would be financial and therefore not irreparable. *See Full Gospel Churches*, 454 F.3d at 297; *see also Sampson*, 415 U.S. at 91–92 (loss of income

cannot establish irreparable injury in a government personnel case).  Nor are those harms obviously imminent, posing "a clear and present need for equitable relief." *Id.*  The government has reiterated that its intent in placing USAID employees on administrative leave is to conduct a thorough "audit" of the agency's spending.[3]  Marocco Decl. ¶¶ 12, 14, 17.

For these reasons, plaintiffs have not established that their members would suffer imminent irreparable harm as a result of the government's challenged actions absent a preliminary injunction.

### B.    Likelihood of Success on the Merits

Turning to likelihood of success on the merits, it may be the case that, at a high level of generality and in the long run, plaintiffs' assertions of harm could flow from their constitutional and APA claims regarding the alleged unlawful "dismantl[ing]" of USAID.  Compl. at 2.  But at present, the agency is still standing, and so the alleged injuries on which plaintiffs rely in seeking injunctive relief flow essentially from their members' existing employment relationships with USAID.  As reflected above, plaintiffs' complaints about the effects on their members of being placed on administrative leave and of being asked to return to the United States on an expedited basis are, at bottom, archetypal complaints about changed employment conditions and their follow-on effects—which at this point appear to be largely financial.  Indeed, even plaintiffs' allegations of harm from the broader funding pause and stop-work orders pertain primarily to how those actions will affect their members in their capacities as USAID employees, such as by

_____

[3] The Court recognizes that the plaintiff unions also assert standing on their own behalf in this case, based on their allegation that they are "diverting significant resources from other members and priorities" to address the concerns of their USAID members.  *See* Reply at 25–26.  Setting aside whether that allegation is sufficient to support Article III standing, Plaintiffs have not demonstrated that any hindrance to their mission as a result of those challenged actions belongs to the category of "great" harms that could warrant a preliminary injunction in a case like this.  *See Full Gospel Churches*, 454 F.3d at 297; *Sampson*, 415 U.S. at 84.

supposedly requiring them to pay their own living expenses while abroad or by damaging their professional goodwill.

This matters because Congress has established "comprehensive" statutory schemes governing the review of employment disputes arising between the federal government and its civil and foreign service officers. *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993). For civil servants, the applicable scheme is set forth in the Federal Service Labor-Management Relations Statute (FSLMRS) and the Civil Service Reform Act (CSRA) (of which the FSLMRS is a part). *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump (AFGE)*, 929 F.3d 748, 752 (D.C. Cir. 2019); *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004). Under those statutes, "labor disputes" involving civil servants—i.e., disputes in which unions are involved—are generally adjudicated by an agency called the Federal Labor Relations Authority (FLRA)—while "personnel" disputes—i.e., disputes about adverse "personnel action[s]" taken against individual civil servants—are generally adjudicated by an agency called the Merit Systems Protection Board (MSPB). *AFGE*, 929 F.3d at 752; *United States v. Fausto*, 484 U.S. 439, 445–47 (1988). FLRA decisions "are subject to direct review in the courts of appeals," *AFGE*, 929 F.3d at 752, and MSPB decisions can be reviewed specifically by the Court of Appeals for the Federal Circuit. *Graham*, 358 F.3d at 934.

For foreign service officers, the Foreign Service Act of 1980 (FSA) was passed as a "companion measure" to the CSRA and provides an analogous system for reviewing allegedly adverse actions taken against those employees. *Krc*, 989 F.2d at 1217. In that system, the Foreign Service Grievance Board (FSGB) (which hears individual complaints) and the Foreign Service Labor Relations Board (FSLRB) (which hears union complaints) are the "administrative bodi[es] charged with resolving grievances brought under the Act." *Hunter v. United States*, 36 Fed. Cl.

257, 259 (1996); 22 U.S.C. §§ 4106–07.  "Grievance" is defined broadly under the FSA, and includes "any act, omission, or condition subject to the control of the Secretary [of State] which is alleged to deprive a member of the [Foreign] Service. . . of a right or benefit authorized by law or regulation or which is otherwise a source of concern or dissatisfaction to the member."  22 U.S.C. § 4131(a)(1).  FSGB decisions are reviewable in federal district court, *id.* 4140(a), while FSLRB decisions are reviewable in the D.C. Circuit.  *Id.* §4109(a).

District courts, of course, generally have jurisdiction over civil actions arising under the Constitution and laws of the United States.  *See* 28 U.S.C. § 1331.  But it is well established that "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review."  *AFGE*, 929 F.3d at 754.  "[C]ourts determine that Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review when (i) 'such intent is fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'"  *Jarkesy v. S.E.C.*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)).  Here, both considerations indicate that Congress likely intended for plaintiffs' current claims of employment-based harm—whether brought by individual civil servants, individual foreign service officers, or unions representing either category of worker—to proceed exclusively through the three statutory schemes just discussed.

As for the first step in the inquiry, the Court of Appeals has held that the remedial schemes laid out in both the FSLMRS and CSRA are "exclusive" with respect to claims within their scope. *AFGE*, 929 F.3d at 755 (FSLMRS); *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (CSRA).  And by analogy to those schemes, the Court of Appeals has said the same about the FSA.  *See Krc*, 989 F.2d at 1217.  As the Court of Appeals has explained, "[l]ike

the CSRA, the [FSA] provides 'a comprehensive system for reviewing personnel action[s] taken against federal employees.'" *Id.* (quoting *Fausto*, 484 U.S. at 455). Thus, where the FSA prohibits a certain category of administrative grievance, a foreign service officer may not "demand judicial review" for that same harm. *Id.*

The first step of the inquiry also goes part way to deciding the second, because "[c]laims will be found to fall outside of the scope of a special statutory scheme [like the FSLMRS, CSRA, or FSA] in only limited circumstances." *AFGE*, 929 F.3d at 755 (quotation marks omitted). Those are when: "(1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim[s] [are] wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency." *Id.* None appears likely to apply to the claims that plaintiffs raise here.

*First*, plaintiffs would not be deprived of "meaningful judicial review" if their claims are channeled out of this court and into the applicable administrative body. With respect to domestic employees, under the CSRA, the MSPB's Office of Special Counsel may review any claim that an employee has suffered a "significant change in duties, responsibilities, or working conditions" in a manner that "violates any law, rule, or regulation implementing . . . the merit system principles." 5 U.S.C. §§ 2302(a)(1), (a)(2)(A)(xii), (b)(12); *Carducci*, 714 F.2d at 175. Those principles, in turn, "include protection against arbitrary action, [5 U.S.C.] § 2301(b)(8)(A), and 'fair and equitable treatment in all aspects of personnel management . . . ,' [*id.*] § 2301(b)(2)." *Carducci*, 714 F.2d at 175. Similarly, the collective bargaining agreement in place between USAID and plaintiff American Federation of Government Employees (AFGE)—the union that represents civilian USAID employees—contains a "negotiated grievance procedure" that permits arbitration, subject to FLRA review, of whether USAID violated or misapplied any "law, rule, regulation, or

Agency policy related to conditions of employment." *Negotiated Collective Bargaining Agreement Between USAID and AFGE Local 1534 (AFL-CIO)*, Arts. 21, 22, Dec. 22, 2016; *see also* 5 U.S.C. §§ 7121–22.

It thus appears likely that a domestic USAID employee or union representative could object to the agency's administrative leave placements under either the CSRA or FSLMRS. *See, e.g.*, *Chiang v. Gonzales*, 2006 WL 8449284, at *7 (C.D. Cal. 2006), *aff'd*, 278 F. App'x 728 (9th Cir. 2008) (plaintiff's claim regarding her placement on paid administrative leave "f[e]ll within the ambit of the CSRA" and could not be adjudicated in district court); *Ghaly v. U.S. Dep't of Agric.*, 228 F. Supp. 2d 283, 290 (S.D.N.Y. 2002) (plaintiff challenging paid administrative leave alleged a "prohibited personnel practice" under CSRA, depriving district court of jurisdiction). To be sure, plaintiffs argue that those schemes are insufficient to address their claims regarding their civil servant members because they cannot pursue claims of "organizational harm" through the CSRA, and may ultimately be unable to do so through the FSMLRS if USAID—the only defendant with which plaintiffs collectively bargained—ceases to "exist as an independent entity." Reply at 7. But even if that did occur in the future, it is far from clear that the FLRA would lack jurisdiction to hear a retrospective claim that agency defendants had engaged in an unfair labor practice by shuttering the agency. *See generally* 5 U.S.C. § 7118.

The FSA's administrative scheme is even broader than that established by the FSLMRS and CSRA. Its sweeping definition of "grievance"—again, "any act, omission, or condition" that is "a source of concern or dissatisfaction" to the foreign service officer—would permit a foreign USAID employee or union representative to challenge before the FSGB or FSLRB the whole range of actions to which plaintiffs now object. 22 U.S.C. § 4131(a)(1). As the government puts it, "[p]laintiffs' concerns alleged here, whether related to administrative leave, financial benefits,

repatriation, or [otherwise], all fall within t[hat] broad scope." Opp. at 17. And plaintiffs' objection that the FSA's grievance procedures are too "individualized" to address "mass placements on administrative leave" fails to grapple with the fact that the FSLRB is expressly designed to handle union complaints of the sort that plaintiffs have brought here. Reply at 8; *see* 22 U.S.C. § 4107.

Nor, in any event, would the administrative bodies have the last word as to any of these claims. As noted above, judicial review is available from decisions of all the relevant agencies. *See AFGE*, 929 F.3d at 752; *Graham*, 358 F.3d at 934; 22 U.S.C. §§ 4109(a), 4140(a). Plaintiffs argue that no judicial review could be effectual here because "the administrative forums cannot act with the needed dispatch" in order to "halt[] the dissolution of USAID before it becomes irreversible." Reply at 9. But plaintiffs have presented no irreparable harm they or their members are *imminently* likely to suffer from the hypothetical future dissolution of USAID. And it is not clear why the speed of proceedings in the relevant agencies would be insufficient to address the only actions that *have* already happened and are presently ripe for review: administrative leave placements, expedited evacuations, and other changes to working conditions of the sort those bodies routinely confront. *See, e.g.*, *Nat'l Treasury Emps. Union v. Trump (NTEU)*, Civ. A. No. 25-cv-420, ECF No. 28 at 14 (explaining that union plaintiffs objecting to "sweeping executive actions" regarding federal employees could "seek relief from the FLRA on behalf of a class," mitigating efficiency concerns).

*Second*, and for similar reasons, plaintiffs' challenges to the government's actions are not "wholly collateral" to the statutory review provisions at issue. "This consideration is related to whether meaningful judicial review is available," but focuses on "whether the plaintiffs aim[] to seek the same relief they could obtain in the agency proceeding." *AFGE*, 929 F.3d at 759–60 (quotation marks omitted). Surely they do—based on their allegations of imminent irreparable

harm, plaintiffs at this point seek the cessation of certain employment conditions presently affecting their members, such as their placement on administrative leave, their expedited repatriation, and their inability to perform certain job duties they previously held. Proceedings before the MSPB, FLRA, FSGB, or FSLRB could culminate in some or all of that relief. *See, e.g.*, *Payne v. Biden*, 62 F.4th 598, 607 (D.C. Cir.), *judgment vacated as moot*, 144 S. Ct. 480 (2023) (MSPB can resolve "challenges to adverse employment actions"); 22 U.S.C. § 4137(b)(2) (FSGB can order any "perquisite of employment" previously denied). Plaintiffs make the conclusory assertion that their claims here are not the "vehicle by which [they] seek[] to reverse th[ose] adverse employment action[s]," *Payne*, 62 F. 4th at 606 (quotation marks omitted), because their members "would be harmed by Defendants' illegal actions in moving to shut down USAID [] even if th[o]se actions had no effect on their employment." Reply at 9–10. But that assertion simply cannot be squared with plaintiffs' motion, which, as discussed, alleges injury to their members distinctly—and indeed, solely—in their capacities as USAID workers. *See Payne*, 62 F.4th at 606–07 (constitutional challenge to vaccine mandate was not collateral to CSRA where "one of [the plaintiff's] interests" was "to avoid an impending adverse employment action" as a result of his noncompliance).

*Third*, plaintiffs' claims fall within the scope of "expertise" of the applicable agencies. This factor, like the first two, is to be "interpreted broadly": it will be satisfied so long as the agency's expertise is applicable to the "threshold questions that may accompany" otherwise broader claims. *Id.* at 607. Here, even if the farthest reaches of plaintiffs' lawsuit involve "separation-of-powers issues" and "whether a statute or the Constitution has authorized the President to act in a particular way," the "preliminary" questions the lawsuit poses are plainly employment-related—such as the lawfulness of the government's changes to plaintiffs' members' employment conditions. *Id.*;

*AFGE*, 929 F.3d at 760–61 (reversing district court's decision that the presence of constitutional claims removed plaintiffs' challenges to executive orders from the ambit of FLRA's expertise).

Indeed, agency adjudicators could moot plaintiffs' constitutional and APA claims entirely by ruling in their favor, *see Payne*, 62 F.4th at 607, or, at a minimum, could "alleviate" or "shed light on" the concerns those claims implicate by "offer[ing] an interpretation of the [relevant statutes] in the course of the proceeding[s]." *AFGE*, 929 F.3d at 761. Where plaintiffs *are* entitled to review before the MSPB, FLRA, FSGB, or FSLRB and subsequent judicial review, there is no reason to fear that plaintiffs' constitutional claims could wholly evade consideration.[4] *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 20–21 (2012) (explaining that, even if the MSPB "determine[s] that it lacks authority to decide" a constitutional issue, "[t]he Federal Circuit can then review the MSPB decision, including any factual record developed by the MSPB in the course of its decision on the merits"); *cf. Lamb v. Holder*, 82 F. Supp. 3d 416, 422–23 (D.D.C. 2015) (exercising subject matter jurisdiction over plaintiff's constitutional claims regarding termination where plaintiff was not entitled to review under CSRA).

In sum, it appears likely that the claims made by plaintiffs in seeking preliminary injunctive relief "fall within the exclusive statutory scheme[s]" of the FSLRMRS, CSRA, and FSA, which plaintiffs "may not bypass by filing suit in the district court." *AFGE*, 929 F.3d at 761; *see also, e.g.*, *NTEU*, Civ. A. No. 25-cv-420, ECF No. 28 (finding that plaintiffs' claims regarding anticipated implementation of large-scale reductions in force at federal agency were precluded by the FSLMRS and CSRA). That is almost certainly true of plaintiffs' claims regarding the

---

[4] Plaintiffs note that the agencies lack jurisdiction to hear the claims of "personal services contractors" of USAID, who plaintiffs contend are "identically situated to direct hires in the harms they face from Defendants' actions." Reply at 10. But plaintiffs have not alleged that any of their members are contractors rather than employees of USAID, so this nuance is irrelevant here.

placement of their members on administrative leave and their members' possibly expedited recall from post, because, for all the reasons just discussed, those claims concern changes in employment conditions and are thus "of the type" that Congress intended to be redressed through the applicable remedial frameworks. *Jarkesy*, 803 F.3d at 15. And it may well also be true of plaintiffs' claims regarding the funding freeze itself, because plaintiffs' present allegations of injury from that action again turn on its effects on their members in their capacities as employees—like its supposed infliction of additional financial liability for the cost of contracts or unpaid living expenses. As much as plaintiffs assert that they "challenge a sweeping scheme to dismantle an entire agency," Reply at 6, their only ripe theories of harm fundamentally rely on their members' employment relationship with USAID.

In sum, because the Court likely lacks jurisdiction over plaintiffs' claims, they have not established a likelihood of success on the merits.

### C. Balance of the Hardships and the Public Interest

When, as here, a plaintiff fails to demonstrate irreparable harm or a likelihood of success on the merits, there is no requirement that the Court consider the remaining two preliminary injunction factors. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *Ark. Dairy Coop Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009). But it is worth noting that, in any event, the record now indicates that those factors at the very least "do not decidedly tip in [plaintiffs'] favor." *Fort Myer Constr. Corp. v. Shrensky*, 2024 WL 181075, at *5 n.1 (D.D.C. 2024).

Plaintiffs identify numerous "harsh consequences" that they contend will ensue if the 90-day foreign-assistance pause and related USAID personnel changes are permitted to resume. Mot. at 22. Abroad, plaintiffs suggest that there will be "catastrophic" "humanitarian consequences" if

USAID—either due to the funding freeze or a lack of staff—cannot continue to administer its standard foreign aid programs. *Id.* at 21–22. And at home, plaintiffs point to the already-discussed harms to USAID employees, harms to USAID's "status as a globally critical agency," and harms to the United States' "political and contractual relationships" with other nations and organizational partners. *Id.* at 23.

The Court certainly recognizes these potential effects of the government's actions. But the government has also identified plausible harms that could ensue if its actions with respect to USAID are *not* permitted to resume. In the President's view, "the United States foreign aid industry" is "not aligned with American interests and in many cases [is] antithetical to American values" and indeed, "world peace." Exec. Order. 14,168 § 1, 90 Fed. Reg. 8619 (Jan. 20, 2025). The government is thus undertaking a "thorough review of USAID's operations" in order to determine "which [aid] programs continue[] to make sense for the American people, and which d[o] not." Marocco Decl. ¶ 9. And it has determined that the best way to conduct that review is by first "pausing a substantial portion of [USAID's] ongoing work," so as to fully "examine USAID's processes and the manner by which [it] funds its programs" while also "gain[ing] control of an organization that included some employees who had refused to comply with lawful directives by the President and Secretary." *Id.* According to the government, interfering with this "'pencils down' approach" would prevent it from auditing USAID's operations in the manner necessary to ensure the agency is acting in the national (and perhaps global) interest. *Id.* ¶¶ 8, 21.

Weighing plaintiffs' assertions on these questions against the government's is like comparing apples to oranges. Where one side claims that USAID's operations are essential to human flourishing and the other side claims they are presently at odds with it, it simply is not possible for the Court to conclude, as a matter of law or equity, that the public interest favors or

disfavors an injunction.  But because plaintiffs have not carried their burden as to the other preliminary injunction factors, and because the government has made a colorable case that the actions challenged in this case are essential to its policy goals, the final two factors are at least not in tension with the denial of preliminary injunctive relief.

**IV.    Conclusion**

    For the reasons explained above, the Court concludes that plaintiffs have not demonstrated that they or their members will suffer irreparable injury absent an injunction; that their claims are likely to succeed on the merits; or that the balance of the hardships or the public interest strongly favors an injunction.  The Court will accordingly deny plaintiffs' motion for a preliminary injunction, ECF No. 9, and will dissolve its previously issued temporary restraining order, ECF No. 15.  An Order will accompany this Opinion.


DATE: February 21, 2025

                                             _____
                                             CARL J. NICHOLS
                                           United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| AMERICAN FOREIGN SERVICE | ) | |
| ASSOCIATION, et al., | ) | |
|  | ) | |
| *Plaintiffs*, | ) | Civil Action No. 1:25-CV-352 |
|  | ) | |
| v. | ) | |
|  | ) | |
| DONALD TRUMP, et al., | ) | |
|  | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

## FURTHER DECLARATION OF RANDALL CHESTER

I, Randall Chester, declare the following under penalties of perjury:

1.      My name is Randall Chester.

2.      I am the Vice President of the American Foreign Service Association (AFSA) representing 1,980 Foreign Service Officer and 485 non-career Foreign Service Limited officers who work for the United States Agency for International Development (USAID).

3.      AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interests of AFSA members.

4.      AFSA also seeks to increase understanding among the American people about the vital role of the U.S. Foreign Service in sustaining American global

JA 126

leadership. AFSA exists to support the United States Foreign Service, which deploys worldwide to protect and serve America's people, interests and values.

5.     AFSA provides support to its bargaining unit as the officially recognized union to represent the interests of the Foreign Service to USAID. This role is codified in the AFSA-USAID Cooperative Framework.

6.     In this role, AFSA enters into negotiations with USAID on a wide range of personnel issues including: appointments, promotion standards, assignment processes, disciplinary actions, and leave among others. AFSA assists its members when facing allegations of misconduct, investigations by the Office of Inspector General, Office of Civil Rights, and the Office of Security. AFSA also supports its members in the event USAID fails to repay valid expenses, incorrectly applies or denies applicable benefits and allowances, or other discrepancies that arise between USAID and the officer.

7.     Last week USAID sent a RECALL notice to 1,400+ USAID Foreign Service Officers (FSO) serving overseas. The notice provided no reasons for the recall, no timeline for its duration, and no explanation of expectations for the returned FSOs.

8.     The notice directs all FSOs to return to the United States within 30 days. The notice allows for extension requests to be granted under special circumstances. However, it does not provide a process to initiate a request or suggest a method for how or who will approve each request.

9.     This notice is devasting to FSOs and their families who will suffer undue emotional stress, mental anguish, financial hardships, and for some FSOs professional liabilities.

10.     The emotional and mental anguish is already presenting itself.  Since this notice was issued, AFSA has received well over 500 emails and phone calls looking for details, explanations, and reasons for the recall.  Normally, USAID would have already answered and provided these details, but none have been given. FSOs have reported high stress levels, sleeplessness, and anxiety over the recall. Additionally, FSOs report that their children are experiencing the same stress and anxiety levels after being told that they were moving potentially mid-school year and with little or no time to adjust.

11.     Financially, this abrupt recall will devastate the bank accounts of many FSOs.  The Agency has yet to provide any details on which transfer allowances will be afforded to the returnees.  Assuming that the FSOs are returning under Permanent Change of Station (PCS) orders, FSOs would be entitled to the following, among other things:

- Allowances
  - 60-90 days housing and meal allowance (for an "Ordered Departure" this allowance goes up to six months (i.e., 180 days))
  - Home Service Transfer Allowance (between $5,000-$7,500) estimated
  - Rental Car reimbursement
- Other Expenses Paid by USAID
  - Shipping of Household Effects (HHE)
  - Unaccompanied Baggage Allowance (UAB)
  - Personal Vehicle Shipment (POV)

12.     At this time, FSOs are not certain if any of the above will be provided. The lack of information on what allowances will be afforded mean that FSOs could be out of pocket for tens of thousands of dollars for just the first few months.  These expenses would normally be covered by USAID.  Furthermore, at this time USAID has informed staff that travel reimbursements are halted.  This exacerbates the problem for FSOs who may not know when or if they will ever be reimbursed for their expenses.

13.     Additionally, a normal transfer window for a FSO is six to nine months.  A FSO is usually informed of their onward assignment well in advance from the actual departure.  This affords them the opportunity to sell personal items they wish not to take to their next residence or sell items that can't be exported. For example, many countries restrict the importation of used vehicles which means that FSOs buy and sell cars rather than export them.  The abrupt move may lead to FSOs being unable to sell their vehicles at market value or take a loss as they may not be eligible or inappropriate for export to the U.S.  For example, many countries have right hand drive and/or engine and emission standards lower than the U.S. making them non-road worthy.  The rapid departure may increase financial losses to FSO.

14.     While serving overseas, FSOs receive additional financial allowances. This includes Post Differential (5-25%), Hardship Pay (5-35%), Special Incentive Pay (15%), and host County Cost of Living Allowance (based on local currency cost of living and family size).  These are percentages of a FSOs annual salary for a pay

period. The total of these allowances varies dramatically across countries for zero to 90% additional/bonus. Returning to the U.S. removes all these allowances and dramatic lowering of FSO salaries.

15.    Many FSOs, likely the majority, have families. Often spouses work within the Embassy community as Eligible Family Members (EFM). EFMs provide vital support and professional services but are paid a sub-standard wage. Nonetheless, this added annual income of $30,000-$60,000 (estimates) will disappear as the FSO recall will force spouses of FSOs to terminate their employment. FSO families will be limited to that single income until the spouse is able to attain new employment in the US.

16.    Finally, it is important to consider that this uncertainty makes it difficult for any decision regarding long-term housing. This raises the out-of-pocket costs for the FSO deciding to forgo purchasing a home versus remaining in a high-cost short term rental house.

17.    The recall notice will also leave some FSOs vulnerable to professional liability claims. Some FSOs are "warranted" Contracting Officers (CO) and Financial Management Officers (FMO) are legally responsible for ensuring payments to providers are appropriate and accurate. They rely on other FSOs and foreign national staff (FSN) to confirm and verify service delivery. With no FSO or other staff working, the COs and FMOs have no way to legally approve payments for services prior to the stop work order issued two weeks ago. USAID has a variety of different contracting and grant mechanisms and USAID is responsible for

payment of all goods and services prior to when the stop work order was issued.

Demands of repayment often come one to six months after the service is completed.

If a CO or FMO does not pay a submitted receipt/voucher they can be held liable by

the provider (note the prompt payment act requires payment within 30 days).  The

catch 22 for the CO and FMO is that they also cannot approve payment without

verifying the services were delivered (often by a FSO or Foreign Service National) or

be subject to an investigation by the Inspector General.  This is a liability passed

onto the FSO.

18.    Because of this recall notice, some embassy/posts have already

removed USAID FSOs from their internal security warning/alert systems and

informed relevant host country ministries that USAID staff are not accredited

diplomats with the U.S. government.  This is added stress and legal jeopardy for

FSOs.  Without access to the embassy alert systems, FSOs and their families may

miss critical weather, civil disobedience, or other safety notifications.  Removing

their diplomatic status may also result in the FSO having to pay "duty" on goods

exported or sales of personal items adding to the above financial hardships.

19.    Finally, we learned of reports that the administration plans to reduce

the number of workers at USAID from more than 10,000 positions to just 290.[1] If

this occurs, FSOs will necessarily be among those terminated, with catastrophic

consequences to their careers, families, and finances.

---

[1] Karoun Demirjian and Aishvarya Kavi, *Trump Administration to Lay Off Nearly All of U.S. Aid Agency's Staff*, NEW YORK TIMES (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/usaid-job-cuts.html.

20.    In sum, if the USAID shutdown is allowed to continue, it will result in a tremendous amount of undue and unwarranted financial, mental, and emotional stress on FSOs and their families. The potential professional liability jeopardies (discussed above) are unjust as FSOs will be prevented from performing their jobs with no recourse to prevent potential fraud or legally approve submitted payment vouchers. The mandatory recall is likewise punitive in nature given the unnecessary pace of the withdrawal. The recall by design serves only to harm the FSO and provides no real justification or path for a potential future return.  On its own, the recall puts FSOs, American citizens, in financial jeopardy that could take years to overcome. FSOs will experience even more devastating financial consequences if the administration moves forward with the reported plan to slash the workforce to 290 employes total. The shutdown of USAID is at its core inhumane.

21.    The Recall Notice and placement or threatened placement of FSOs on administrative leave has also negatively impacted AFSA's ability to provide timely, accurate information to our members. AFSA normally receives approximately 50 emails a day from our members asking for assistance with a wide variety of employment-related issues. In the last two weeks, the volume of requests for assistance or information has exploded to 200 to 300 emails a day. Many of these emails ask very specific questions that we are simply not able to answer, due to both the sheer volume of emails and the lack of clear information provided by USAID.

22.    AFSA has also had to spend a considerable amount of time updating its membership records to input private email addresses. AFSA estimates that, to date, it has had to update 500-600 member accounts in two different databases. Had we not done this, our members would not be able to receive the messages we have been sending out on a nearly daily basis.

23.    AFSA also held two townhall meetings with over 1,000 participants where we explained existing legal protections should USAID attempt to summarily terminate their employment. Prior to the meetings, members submitted over 350 individual questions. Unfortunately, due to the volume of questions and the absence of clear guidance or information from USAID, we were not able to answer many of these questions.

24.    The resources AFSA has had to expend in response to the Administration's actions have been diverted from AFSA's other activities. AFSA is the exclusive bargaining agent at five other foreign affairs agencies, with the Department of State being our largest bargaining unit. We represent over 17,000 members. Because so many resources have been diverted to addressing urgent issues at USAID, AFSA has not been able to devote adequate time to assist members at these other agencies or to deal with general labor management issues at these agencies.

25.    AFSA strives to provide accurate and timely support to all of our members.  We normally have been able to get back to members with clear answers to their questions within one or two days. The Administration's actions within the

past two weeks have made it impossible for AFSA to do this, which not only

threatens our good reputation but leaves our members with little guidance during

this incredibly stressful period.

26.    To the best of my knowledge, none of the Agency leadership removed

January 27 interfered with implementation of the pause (SWO) or other EOs. The

assumption is that the multiple requests for clarification regarding the structure

and information needed for the "review" process; or for clarity on the waiver process

and status of any requests were seen as "obstructionist" when we (Agency career

leadership) simply needed direction, definition, and guidance so we could properly

implement the EOs.  This term again will hurt FSOs seeking future work and

having to justify years of employment at the Agency.

27.    Individual reputational damage is already happening.  Our members

fear that the word "criminal" ascribed to USAID's work and workforce will taint

association or prior employment with the Agency and make it extraordinarily

difficult to find work (particularly if an individual served with USAID for

years/decades) - every interview (if you even make it that far) will have to be opened

with a defense of past work history, actions, and experience. Essentially these

claims (by the Administration) will create a broad "blacklist" for any employees or

others associated with the Agency as they seek new employment.

28.    Further, the term "Insubordination" and similar assertions by

Secretary of State Rubio are unfounded. None of the Agency leadership removed

January 27 interfered with implementation of the pause (SWO) or other EOs. The

assumption is that the multiple requests for clarification regarding the structure and information needed for the "review" process; or for clarity on the waiver process and status of any requests were seen as "obstructionist" when we (Agency career leadership) simply needed direction, definition, and guidance so we could properly implement the EOs.

29.    Many FSOs and FSLs fear that seeking new employment will now have to justify their careers with USAID.  This will make finding new work difficult if not impossible for many long-term officials.

30.    On Sunday, February 9 at 11:28 PM USAID personnel received the following message from the Office of the Administrator:  "The former USAID headquarters at the Ronald Reagan Building in Washington, D.C., the USAID properties at the USAID Annex, 400 C Street, SW (formerly SA-44), the SEC Warehouse in Springfield, the Alternate Operating Facility in Leesburg, as well as 555 12th Street, NW, will remain closed until further notice. Agency personnel normally assigned to work at these USAID properties should telework, unless otherwise notified with a specific reporting time and location…."

31.    AFSA has heard from several of its members whose work often involves classified information that can only be viewed or discussed in a Sensitive Compartmented Information Facility, known as a SCIF. The closure of all USAID facilities in the area means that these individuals do not have access to a SCIF and cannot perform their duties. This remains true regardless of whether their USAID network access is restored.

32.    Per the Framework Agreement between USAID and AFSA, AFSA has a physical office at USAID headquarters in the Ronald Reagan Building in Washington, D.C. AFSA maintains sensitive files and data, to include documents protected by attorney-client privilege and union privilege. AFSA has not been afforded the opportunity to enter into the building, and its office, to retrieve these files. AFSA also has legitimate and reasonable concerns that non-authorized individuals may have accessed our office and our files.

33.    At approximately 2:45 pm on Monday, February 10, 2025, I was notified, by USAID's Bureau for Management, Office of Management Services (M/MS), that they no longer have the lease for the Ronald Reagan Building and that all staff who were there on the morning of February 10th were moved. I was also informed that none of USAID's domestic leases are listed as USAID leased property in General Service Administration's systems.

34.    In addition, on February 11, we received firsthand accounts from our members posted overseas advising that, despite the Temporary Restraining Order, they were being encouraged to fill out paperwork to evacuate to the United States, and "departure rooms" were being set up to facilitate departures.

35.    We also learned on February 11 that all USAID staff who were enrolled in various types of training, including language training, at the National Foreign Affairs Training Center in Arlington, Virginia, had been disenrolled.

Executed on February 11, 2025

/s/  _Randall Chester_
Randall Chester

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| AMERICAN FOREIGN SERVICE | ) | |
| ASSOCIATION, et al., | ) | |
|  | ) | |
| *Plaintiffs*, | ) | Civil Action No. 1:25-CV-352 |
|  | ) | |
| v. | ) | |
|  | ) | |
| DONALD TRUMP, et al., | ) | |
|  | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

### SECOND DECLARATION OF Abby Maxman

I, Abby Maxman, declare the following under penalties of perjury:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge and information that has been shared with me by Oxfam affiliates and country teams in my capacity as President and CEO of Oxfam America.

2.      I have served as President and CEO of Oxfam America since 2017. I submit this declaration to share new information I have learned, as well as new developments that have occurred, since I submitted my first declaration in this case on February 12.

3.      In humanitarian responses around the world, Oxfam is implementing programs funded by United Nations agencies, which are in turn funded by the U.S. government. The abrupt suspension of U.S. government funding has had significant

impacts on Oxfam's operations, finances, and fulfillment of its mission.

4.     For example, in east Africa Oxfam is providing clean and safe drinking water and building latrines for around 400,000 people from South Sudan who are living as refugees. This project is partly funded by a UN agency, which is in turn funded by the US government. Because of the US government funding freeze, the portion of the project budget coming from the UN has turned out to be much smaller than anticipated. As a result, the project is currently on hold, and if alternative funding is not secured, we may have to discontinue it completely.

5.     The impacts of Oxfam's discontinuation of water and sanitation support to the affected communities are substantial and cascading. A funding pause would disrupt direct water supply, halt latrines construction and maintenance, and drastically reduce sanitation practices, forcing refugees and host communities to use unsafe sources of water.  Lack of portable water could endanger community health, thereby increasing the risk of disease outbreaks. This would also lead to a worsening of living conditions, with open defecation, and the risk of waterborne disease outbreaks. . There is no strong health system in the camp, and the health services are dependent on public health promotion activities and provision of sanitation facilities to the refugee communities. While the program has made great strides, there is a lot more that remains to be done. A pause in funding would not only derail the water, sanitation and hygiene activities but also dismantle the important gains and progresses that have been accrued so far around localization, peacebuilding, protection, and women empowerment.

2

6.     The same abrupt and unplanned cessation of work is taking place in humanitarian responses all around the world. In many countries where U.S. funding has been abruptly suspended, Oxfam faces direct physical harm and monetary injury. Most members of the affected communities do not follow international politics closely, and are likely to hold Oxfam responsible for an abrupt and inhumane discontinuation of lifesaving support. Additionally, Oxfam will be unable to fulfill contractual obligations to vendors. Based on Oxfam's history and my own professional experience managing humanitarian responses for more than 20 years, I know that this will put Oxfam staff in direct physical danger.

7.     Amidst a decade-long decline in global humanitarian funding, Oxfam will almost certainly be unable to identify an alternate source of funding for any of its UN agency-funded projects where US funding is not restored. As a result, Oxfam will be forced to incur budget deficits or divert funds from other essential, lifesaving activities to merely wind down such projects.

8.     Humanitarian responses in crises across the world are similarly affected. One Oxfam country team in the Middle East reports that 15.4 million people in that country are currently food insecure. Having a large donor like the US pull back its funding will make an already difficult humanitarian situation even worse. Given ongoing violence in some parts of the country, it may be difficult or impossible to reach millions of people who need food and other types of aid.

9.     An Oxfam country team in Africa reports that many partner NGOs that receive US government funding are laying off staff and scaling back operations.

3

Oxfam is trying to assess gaps and fill in where needed. We are focusing on meeting the needs of victims of sexual and gender-based violence, as many of the women's rights groups in the area are small and have fewer financial reserves.

10.     The United States also played a large role in the drought response in the same country last year, and with USAID no longer on the scene, the response to the next drought will be inadequate to meet the community's needs. This is particularly alarming given the current state of food insecurity in the country, with 2.15 million people currently facing crisis level food security outcomes, and 800,000 children under five requiring treatment for acute malnutrition. These figures will get worse throughout the year.

11.     I understand that USAID plans to drastically reduce its staff presence in Africa. USAID staff have technical expertise that helps them understand how to effectively target communities with assistance on the basis of need and without doing harm in volatile environments. Even if projects in Africa resume, there will already have been a loss of institutional know-how and it will take a long time to rebuild that capacity. In the meantime, without more of a presence on the ground to oversee projects, there is an elevated risk of funds being misused.

12.     In Asia, one country team tells us that the pause has had a severe impact on HIV response. Key programs funded by the U.S. government and managed by USAID, including the President's Emergency Plan for AIDS Relief (PEPFAR), have been integral to the country's efforts in combating the HIV epidemic. The sudden halt in U.S. funding disrupts the delivery of HIV medicines and preventive services.

13.     The recent freeze has also caused significant disruptions in funding for gender and sexual reproductive health and rights programs, particularly in access to maternal care and contraception. These programs are crucial for safeguarding the health and rights of women, especially in underserved communities. With this freeze, essential health and psychosocial interventions, which have long been vital in empowering women, are at risk of being lost.

14.     Finally, our NGO partners who received USAID funding have reported a great deal of confusion regarding the waiver process. After being told that waivers are available for certain life-saving activities, they have inquired with USAID contacts about how to obtain a waiver, only to receive an out-of-office response because the USAID contacts are on administrative leave and not allowed to work. Affected projects were providing essential services like access to water and food distribution. With the funding source gone, these NGOs will need to lay off staff and may go out of business entirely.

15.     Recently this situation has gotten even worse as local partners who had been told their projects were suspended have now had those projects canceled altogether. Some organizations that have had their projects terminated received notices rescinding termination, but those notices have contained basic errors, such as incorrect organization or project names, that have prevented the resumption of activities.

I declare under penalty of perjury that the foregoing is true and correct.

5

Executed on March 10, 2025.

_____

Abby Maxman

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| AMERICAN FOREIGN SERVICE ) | |
| ASSOCIATION, et al., ) | |
| ) | |
| *Plaintiffs,* ) | Civil Action No. 1:25-CV-352 |
| ) | |
| v. ) | |
| ) | |
| DONALD TRUMP, et al., ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

## SECOND DECLARATION OF OTTIS JOHNSON, JR.

I, Ottis Johnson, Jr, declare the following under penalties of perjury:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the 14th District National Vice President of the American Federation of Government Employees, AFL-CIO (AFGE), a labor organization and unincorporated association that represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States.

3. AFGE advocates on behalf of its members and seeks to promote dignity, safety, and fairness for government employees.

4. AFGE, through its affiliate AFGE Local 1534, represents over 900 employees, including 800 members, at USAID.

5. AFGE Local 1534 is located within AFGE's 14th District.

JA 143

6.    AFGE has devoted considerable resources over the last month responding to requests and providing guidance about the Trump administrations actions at USAID.

7.    For example, AFGE has held weekly townhall meetings for USAID members. To sufficiently staff these meetings, AFGE has assigned three or more employees to attend all or part of the meetings. The staff time used for the meetings is diverted from other important AFGE needs.

8.    AFGE has also assigned an attorney to spend most of her time responding to USAID inquiries and working on USAID issues. Due to her work with USAID members, her ability to handle other matters has been limited. This has diverted AFGE resources from other important matters involving our members, such as arbitration hearings and review.

9.    AFGE has been receiving hundreds of emails from USAID employees affected by the administration's actions. Responding to these emails and other inquiries have required AFGE to divert time and resources from assisting members at other AFGE represented agencies.

10.    AFGE is also concerned about the reputational harm that the chaotic dissolution of USAID presents. Members have sought guidance from AFGE with respect to the actions involving USAID and have been dissatisfied due to the difficulty AFGE has encountered providing guidance with this matter due to the administration's actions.

2

11.    I believe most USAID employees represented by AFGE have received reduction-in-force notices.

12.    If USAID is dissolved, AFGE will be unable to represent USAID employees, and AFGE will also lose hundreds of members.

13.    I have heard from and am aware of many AFGE members that have been frightened and confused by the administration's actions at USAID. Members have been required to make significant choices that may involve financial and familial consequences.

14.    The injuries suffered by AFGE and its members are ongoing or imminent and will persist unless this Court intervenes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 10, 2025.

/s/ Ottis Johnson, Jr.
Ottis Johnson, Jr.
National Vice President
District 14, AFGE
80 F. Street, NW
6th Floor
Washington, DC 20001

3

## JOINT APPENDIX INDEX

| Document | Bates Number |
|---|---|
| Declaration of Jeremy Lewin, April 7, 2025 | AR_0001 to AR_0011 |
| Exhibit A, Declaration of Pete Marocco, with attachments, February 10, 2025, Case No. 25-352 | AR_0012 to AR_0039 |
| Exhibit C, Declaration of Pete Marocco, with attachments, February 18, 2025, Case Nos. 25-400 and 25-402 | AR_0049 to AR_0071 |
| Exhibit E, Declaration of Pete Marocco, February 24, 2025, Case No. 25-469 | AR_0076 to AR_0078 |
| Exhibit F, Declaration of Pete Marocco, with attachments, February 25, 2025, Case Nos. 25-400 and 25-402 | AR_0079 to AR_0113 |
| Exhibit H, Declaration of Pete Marocco, with attachments, February 22, 2025, *Doe v. Trump*, Case No. 8:25-462 (D. Md.) | AR_0118 to AR_0138 |
| Exhibit I, Declaration of Pete Marocco, with attachments, March 3, 2025, Case Nos. 25-400 and 25-402 | AR_0139 to AR_0141 |
| Exhibit K, "USAID's Final Mission" E-Mail, March 28, 2025 | AR_0146 to AR_0151 |
| Exhibit N, Letter from Paul D. Guaglianone, Senior Bureau Official, Office of Legislative Affairs, U.S. Department of State to Congress, March 24, 2025 | AR_0158 to AR_0159 |
| Exhibit R, Congressional Notification Transmittal Letter from the United States Department of State, March 28, 2025 | AR_0259 to AR_0271 |
| Exhibit S, Spreadsheet Concerning the Status of USAID Programs, transmitted to Congress on March 28, 2025 | AR_0272 to AR_0553 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

AMERICAN FOREIGN SERVICE
ASSOCIATION, *et al.*,

     Plaintiffs,

v.

PRESIDENT DONALD J. TRUMP, *et al.*,

     Defendants.

Civil Action No. 1:25-cv-352-CJN

---

## <u>DECLARATION OF JEREMY LEWIN</u>

I, Jeremy Lewin, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2.  I am currently performing the duties and functions of Deputy Administrator for Policy and Programming and Chief Operating Officer of the United States Agency for International Development ("USAID" or the "Agency"). In my current role, I manage the day-to-day operations at USAID across strategy, programming, personnel, and management matters. I have served as a policymaker at USAID since January 2025, in various roles including Director of Strategy & Programs and Senior Advisor to the Administrator. Likewise, at the Department of State, I currently serve as Senior Advisor to the Deputy Secretary for Management and Resources and previously held a similar role in the Secretary's Policy Planning Office.

1

AR_0001

3. In this and related cases, USAID and State have previously filed several sworn declarations from Pete Marocco describing the agencies' conduct between January 20, 2024, and March 3, 2024, and bearing on Plaintiffs' claims.[1] In particular:

4. Attached as Exhibit A to this declaration is a true and correct copy of the February 10, 2025 declaration of Pete Marocco, with attachments, in case no. 25-352.

5. Attached as Exhibit B to this declaration is a true and correct copy of the February 14, 2025 declaration of Pete Marocco in case no. 25-352.

6. Attached as Exhibit C to this declaration is a true and correct copy of the February 18, 2025 declaration of Pete Marocco, with attachments, in case nos. 25-400 and 25-402.

7. Attached as Exhibit D to this declaration is a true and correct copy of the February 20, 2025 declaration of Pete Marocco in case no. 25-352.

8. Attached as Exhibit E to this declaration is a true and correct copy of the February 24, 2025 declaration of Pete Marocco in case no. 25-469.

9. Attached as Exhibit F to this declaration is a true and correct copy of the February 25, 2025 declaration of Pete Marocco, with attachments, in case nos. 25-400 and 25-402.

10. Attached as Exhibit G to this declaration is a true and correct copy of the February 26, 2025 declaration of Pete Marocco in case nos. 25-400 and 25-402.

11. Attached as Exhibit H to this declaration is a true and correct copy of the March 3, 2025 declaration of Pete Marocco, with attachments, in *Doe v. Trump*, case no. 8:25-462 (D. Md.).

---

[1] Since January 20, 2025, Mr. Marocco has served as the Director of the Office of Foreign Assistance at the Department of State and, between January 30, 2025, and March 18, 2025, performed the duties and functions of Deputy Administrator of USAID.

2

AR_0002

12. Attached as Exhibit I to this declaration is a true and correct copy of the March 3, 2025 declaration of Pete Marocco in case nos. 25-400 and 25-402.

13. To the best of my knowledge, the information contained in Mr. Marocco's declarations remains true and accurately reflects the events and facts at issue.

14. As discussed in the various Marocco declarations, at the direction of both President Trump and Secretary Rubio, since January 20, 2025, USAID and the State Department have conducted a rigorous review of foreign assistance programming to ensure alignment with U.S. foreign policy objectives. Secretary Rubio announced the conclusion of the first phase of this full-scope review at USAID on March 10, 2025. As a result of that review, numerous USAID foreign assistance programs were discontinued. As of March 28, 2025, 898 foreign assistance grants, cooperative agreements, and contracts remained active. The total amount for these ongoing activities is approximately $78 billion in total vehicle value, with approximately $8.3 billion in unobligated remaining value. Separately, as of March 28, 2025, USAID retained 421 operational and critical service contracts and other agreements. While the full-scope review has now concluded, consistent with its statutory and constitutional duties, USAID continues to evaluate its ongoing programming to ensure that its foreign assistance activities align with and support the United States' dynamic foreign policy interests and priorities.

**REORGANIZATION OF USAID**

15. On March 28, 2025, the Department of State and USAID notified Congress of their intent to undertake a reorganization that would realign certain USAID functions to the Department of State by July 1, 2025, and discontinue other residual USAID functions inconsistent with Administration priorities. As discussed in the notification, it is anticipated that, by July 1, 2025, the Department will assume responsibility for the administration of ongoing USAID

3

programming[2] and that, by September 2, 2025, USAID's operations can be substantially transferred to State or otherwise wound down. Accordingly, within the current fiscal year, the Department intends to propose legislation to authorize abolishing USAID as an independent establishment and to request future appropriations for the relevant programming be provided directly to the Department.

16. As part of the reorganization and transfer of functions process, substantially all non-statutory positions at USAID will be eliminated. Consistent with applicable laws and regulations, beginning on March 28, 2025, USAID personnel globally, across the civil and foreign services, were notified of a consolidated agency-wide Reduction-In-Force ("RIF") action. Mirroring the transfer of functions and draw down plan, Agency personnel received RIF notices specifying one of two final separation dates: either July 1, 2025, or September 2, 2025.

17. In the interest of fairness, USAID personnel who had previously received first wave RIF notices with separation dates in April or May 2025 received superseding notices extending their final separation dates to July or September 2025. RIF notices and Agency-wide communications also indicated that personnel with July dates could seek, for good cause, a discretionary extension of their separation date until September, or other applicable modifications to their separation plan.

18. All USAID personnel received notice periods greater than those required by law – many substantially longer. For the September RIF cohort, the terms of their separation from service will be substantially similar to the government-wide "Deferred Resignation Program," which offered up to eight months of paid vacation or severance. In every case, USAID personnel will continue

---

[2] In this first phase, the Department intends to take on the management of USAID's financial and administrative systems and management of USAID's remaining operations and ongoing foreign assistance programs via interagency agreement, in order to ensure that USAID programs can be safely and effectively administered by the Department during the transition period. For example, payment processing systems would be integrated into the Department to ensure a streamlined approach to managing life-saving humanitarian aid and national security programs, and the State Department would integrate USAID's partner vetting systems.

AR_0004

to receive the benefits to which they are entitled throughout the RIF process. No USAID personnel will lose benefits to which they are entitled as a result of the RIF action.

19. USAID's top priority during the RIF and draw down process is the safety and wellbeing of USAID personnel, and the orderly repatriation of staff posted overseas. As noted in the RIF communications, all overseas personnel will receive a USAID-funded return Permanent Change of Station ("PCS"), with a departure date that will be considered as the employee's end-of-tour date. Those with an end-of-tour date beyond summer 2025 will be involuntarily curtailed from their assignment. As noted, personnel with specific circumstances justifying a deviation from this procedure (*e.g.* a child's school calendar or personal/familial health considerations) continue to have clearly indicated opportunities to seek modifications to their individual arrangements. While overseas, USAID personnel will remain under Chief of Mission authority, and will retain full access to the Medical Unit, DPO/Pouch, and Post-provided housing until their official departure date. The State Department has also committed itself to offer additional resources and benefits to ensure the safety and security of USAID employees transitioning from service.

20. Finally, in preparation for the reorganization plan, at my direction, USAID returned substantially all employees previously on involuntarily paid administrative leave to active duty. Relatedly, USAID restored digital systems access to substantially all of its employees. As noted in RIF communications, in the coming weeks and months, USAID does not intend to either place a significant number of employees back on involuntary administrative leave or to restrict their access to Agency digital systems.[3] Instead, in connection with the global RIF action, USAID is offering personnel the option to select one of two preferred statuses: active duty or voluntary paid administrative leave. Those personnel who select administrative leave will retain full pay and other

---

[3] Digital systems access, of course, depends on compliance with Agency policies and instructions. Personnel who violate Agency policies, directives, or other requirements may lose the privilege of digital systems access.

benefits. While efficiently allocating personnel to assist with the draw down and transfer of responsibilities to State, USAID will use best efforts to honor employees' expressed status (either paid leave or active duty).

21. The RIF action is tightly connected to the overall strategic plan for the reorganization. Between March and July, USAID and the Department of State will continue to responsibly manage USAID's ongoing life-saving and strategic aid programming. During that period, the Department will separately build its capacities to administer an expanded set of foreign assistance programs and operations. In connection with that process, the State Department intends to conduct an independent hiring process to grow its foreign assistance competencies. In addition to other candidates, USAID personnel are expected to be eligible to participate in this hiring process.

22. By July 1, 2025, the State Department intends to have assumed primary responsibility for the administration of USAID's remaining programming. At that point, a majority of USAID's staff will either have been hired by the State Department, retired or been separated from federal service, or otherwise left the Agency. From July to September, remaining USAID personnel are expected to supervise the responsible decommissioning of USAID assets and the wind-down of the Agency's independent operations. By September 2, 2025, USAID operations are anticipated to have been substantially transferred to State or otherwise wound down.

23. USAID had 270 probationary employees, who were terminated in February 2025. Subsequently, in March 2025, those employees were fully reinstated, in compliance with a court order issued in case no. 3:25-cv-1780. In connection with their reinstatement, those probationary employees were immediately placed on paid administrative leave. Like other USAID personnel, on March 28, 2025, they received RIF notices specifying a separation from federal service on either July 1, 2025, or September 2, 2025. In connection with the global RIF, these probationary

6

AR_0006

employees received all of the protections, notice period, severance, and other benefits to which they would be entitled under the statutory and regulatory frameworks for the RIF process.

24. On January 20, 2025, USAID had 1,239 personal services contractors (PSCs). In February 2025, USAID authorized the termination of 791 of these PSC contracts, focusing on those PSCs whose contracts specified a place of performance in the United States or other high-income or upper middle-income countries. PSC contracts were terminated consistent with all contractual and other notice periods. In connection with the reorganization and global RIF, USAID has authorized the termination USAID's remaining PSC contracts, effective July 1, 2025, or September 2, 2025. PSC contracts will be terminated consistent with all contractual and other notice periods, and PSCs will receive any travel and other repatriation accommodations to which they are generally entitled. As discussed in the Congressional notification, as part of its capacity-building efforts, the Department of State intends to contractually engage or employ certain current or former USAID PSC contractors.

25. USAID has continuously monitored its direct hire workforce. As of February 8, 2025, the day after the TRO in case no. 1:25-cv-352 was issued, USAID had 4,746 U.S. Direct Hire (USDH) employees. It had 4,738 USDH employees as of February 22, 2025. As of March 28, 2025, USAID had 4,672 USDH employees. As noted, in preparation for the reorganization, USAID returned to active duty substantially all its global personnel and restored their access to Agency systems; as of March 28, 2025, only 39 USDH personnel are on administrative or investigative leave. During the period it was offered, 263 USAID USDH employees opted into the Agency's Deferred Resignation Program; the Agency is committed to offering them full pay and benefits through September 30, 2025, consistent with the stated terms of that agreement.

26. The Department believes that the proposed reorganization aligns with the Administration's broader efforts to streamline government functions, eliminate redundancy, and enhance accountability. Most critically, it will ensure that foreign assistance operations are fully aligned with U.S. diplomatic and national security objectives. By integrating these functions into the Department, the Administration aims to improve efficiencies while maintaining critical humanitarian assistance and national security programs.

27. Put simply, the independent establishment of USAID has grown inefficient and unwieldy, too often contradicting rather than reinforcing the foreign policy of the President and nation. By bringing USAID's core life-saving and strategic aid programs under the umbrella of the State Department, this Administration seeks to significantly enhance the efficiency, accountability, uniformity, and strategic impact of foreign assistance programs – and ensure that our nation and President speaks with one voice in foreign affairs. Critically, the Department does not seek to end foreign aid but rather reorient its delivery to maximize impact, adopt a returns-oriented mindset, and center American strategic interests. As articulated by Secretary Rubio, the Administration's review of USAID's foreign assistance processes, programs, and operations revealed severe signs of inefficiency and a fundamental lack of accountability in the Agency's operations.

28. USAID has long struggled with poor financial stewardship, controls, and accountability. Its decentralized payments system has few workable controls and payments staff have been consistently unable to isolate payments that present policy, legal, or national security concerns. As a result of these systemic failures, USAID has demonstrated a consistent inability to follow Presidential or other foreign policy directives to start, pause, or terminate funding to specific regions or groups.

8

29. Likewise, the Agency's decentralized programming and acquisitions model has led to substantial concerns about the accountability and prudence of its obligations. As one example, after more than two months of rigorous program review, the Agency continues to discover *billions* in hereto unknown "secret" contracts and grants – not recorded in the Agency's centralized procurement and financial systems – that were independently entered into by the Agency's local missions and numerous functional or regional bureaus. These pervasive and structural governance gaps have, for decades, led to grave concerns about USAID funds being directed to sanctioned groups, U.S. adversaries, and criminal groups, or otherwise being rife with waste, fraud, and abuse.

30. USAID programs have historically been undertaken and administered with virtually wanton disregard of the foreign policy priorities of the President, Secretary of State, or Department of State. Senior State Department officials around the world have reported that USAID programs have long been administered with little consideration given to the foreign policy priorities of Ambassadors or the State Department generally, and that, in the field, USAID Mission Directors routinely refuse to meaningfully engage with State Department diplomats and officials responsible for advancing foreign policy on the ground.

31. More broadly, USAID's programming reveals an Agency that long ago strayed from its raison d'être of deliver life-saving humanitarian aid and to strategically invest in the strength and prosperity of American partners and allies. Instead, USAID's programs reveal substantial spending to fund or advance the interests of adversarial foreign governments, to prop up bloated and corrupt international organizations, to advance divisive social causes and global propaganda and censorship operations abroad, to undermine the legitimacy of friendly governments, to fuel the profits of the global aid complex, and to otherwise squander taxpayer funds on wasteful and low value-add activities.

**ATTACHMENTS**

32. Attached as Exhibit J to this declaration is a true and correct copy of a March 19, 2025 email entitled "The Next Phase of USAID" sent by myself to all USAID personnel.

33. Attached as Exhibit K to this declaration is a true and correct copy of a March 28, 2025 email entitled "USAID's Final Mission" sent by myself to all USAID personnel.

34. Attached as Exhibit L to this declaration is a true and correct copy of a March 29, 2025 email entitled "UPDATE for FSOs and FSLs: PCS Portal & RIF Data" sent to all USAID personnel.

35. Attached as Exhibit M to this declaration is a true and correct copy of a March 29, 2025 email entitled "Indicate Your Preferred Status During the Transition" sent to all USAID personnel.

36. Attached as Exhibit N to this declaration is a true and correct copy of the March 24, 2025 Letter from Paul D. Guaglianone, Senior Bureau Official, Office of Legislative Affairs, U.S. Department of State to Congress.

37. Attached as Exhibit O to this declaration is a true and correct copy of a spreadsheet concerning the status of USAID programs that was submitted to Congress along with the Letter provided in Exhibit N.

38. Attached as Exhibit P to this declaration is a true and correct copy of a summary of payments concerning State Department foreign assistance contracts and grants that was submitted to Congress along with the Letter provided in Exhibit N.

39. Attached as Exhibit Q to this declaration is a true and correct copy of the March 24, 2025 Letter from Ryan Shrum, Senior Advisor for Legislative and Congressional Affairs, USAID to Congress.

40. Attached as Exhibit R to this declaration is a true and correct copy of the March 28, 2025 Congressional Notification Transmittal Letter from the U.S. Department of State.

41. Attached as Exhibit S to this declaration is a true and correct copy of a spreadsheet concerning the status of USAID programs that was submitted to Congress along with the Letter provided in Exhibit R.

I declare that the foregoing is true and correct to the best of my knowledge.

Dated: April 7, 2025

_____
Jeremy Lewin
PTDO Deputy Administrator, USAID
Senior Advisor, D-MR, Dept. of State

11

AR_0011

THE SECRETARY OF STATE

WASHINGTON

February 3, 2025

The Honorable James Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Jeanne Shaheen, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Brian Mast, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Gregory Meeks, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Tom Cole, Chairman
Committee on Appropriations
House of Representatives
Washington, DC 20515

AR_0035

The Honorable Rosa DeLauro, Ranking Member
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Susan Collins, Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

The Honorable Patty Murray, Vice Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Chairman Risch, Mast, Cole, Collins, Ranking Members
Shaheen, Meeks, DeLauro, and Vice Chairwoman Murray:

Consistent with applicable law, including sections 7063 and 7015 of the
Department of State, Foreign Operations, and Related Programs
Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the
Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), this letter provides
notice and advises you of our intent to initiate consultations with you
regarding the manner in which foreign aid is distributed around the world
through the United States Agency for International Development ("USAID").
Current foreign assistance processes are severely inefficient and do not
substantially benefit the American people.  USAID has numerous conflicting,
overlapping, and duplicative functions that it shares with the Department of
State.  Additionally, USAID's systems and processes are not well synthesized,
integrated, or coordinated, and often result in discord in the foreign policy
and foreign relations of the United States.  This undermines the President's
ability to carry out foreign relations.

AR_0036

I have authorized Peter W. Marocco, the Director of Foreign Assistance, and the individual to whom I have delegated authority to perform the duties of the Deputy Administrator of USAID, to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest.  This review and potential reorganization will substantially further the foreign relations of the United States, and may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees.

The Department of State and other pertinent entities will be consulting with Congress and the appropriate committees to reorganize and absorb certain bureaus, offices, and missions of USAID.  Such consultation shall occur on behalf of the heads of such entities, as directed by the President.
In consultation with Congress, USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law.

Sincerely,

Marco Rubio
Secretary of State

AR_0037



Bruce McPherson <bmcpherson@usaid.gov>

## USAID's Final Mission

**USAID Office of the Administrator** <usaid_fo@subscribe.usaid.gov>          Fri, Mar 28, 2025 at 12:11 PM
To: bmcpherson@usaid.gov

# SENSITIVE BUT UNCLASSIFIED



AR_0147

### MEMORANDUM TO ALL USAID PERSONNEL

DATE:            March 28, 2025

SUBJECT:            USAID's Transition to the State Department

Dear USAID Colleagues,

I am writing to share important updates about the future of USAID. Our leadership team is committed to providing as much information as possible in an open, conscientious, and thoughtful manner.

As Secretary Rubio has said, following congressional consultations, the State Department intends to assume responsibility for many of USAID's functions and its ongoing programming. This transfer will significantly enhance efficiency, accountability, uniformity, and strategic impact in delivering foreign assistance programs – allowing our nation and President to speak with one voice in foreign affairs. It will also obviate the need for USAID to continue operating as an independent establishment. Accordingly, the Department will seek to retire USAID's independent operation, consistent with applicable law.

As part of that process, substantially all non-statutory positions at USAID will be eliminated. As a result, USAID personnel globally will be subject to a consolidated Reduction-In-Force ("RIF") action. Within the next few minutes, USAID personnel will begin receiving RIF notices via email. These notices will specify one of two final separation dates: July 1, 2025, or September 2, 2025.

This RIF action is part of a multi-step process for the merger with State:

- In the next three months, we will work closely with the State Department to build their capacities to assume the responsible administration of USAID's remaining life-saving and strategic aid programming.
- During this period, the State Department will assess its needs and conduct a separate and independent hiring process, which will be available for eligible USAID employees. Overseas personnel will be offered safe and fully compensated return travel and other arrangements.
- By July 1, 2025, the State Department will have assumed responsibility for USAID's remaining programming, and many of our colleagues will depart for State or other opportunities.
- The remaining USAID personnel will then supervise the responsible decommissioning of USAID assets and the wind-down of the Agency's independent operations. By September 2, 2025, the Agency's operations will have been substantially transferred to State or otherwise wound down.

We will follow up with additional guidance but please find below some preliminary key information:

- **State Department Hiring Process:** A separate process will be established for hiring personnel into available roles at the State Department. While the details

https://mail.google.com/mail/u/0/?ik=5d1c7e9087&view=pt&search=all&permmsgid=msg-f:1827854930052565824&simpl=msg-f:1827854930052565658…        2/5

AR_0148

are still being finalized, we are committed to sharing additional information as soon as it becomes available, likely in April or May.

- **Support for Overseas Personnel:** Our top priority is ensuring the continued safety and wellness of our personnel, and the orderly repatriation of colleagues posted overseas. All overseas personnel will receive a USAID-funded return PCS, with a departure date that will be considered as the employee's end-of-tour date. Those with an end-of-tour date beyond summer 2025 are involuntarily curtailed from their assignment.

    ○ Employees with a RIF date of July 1, will be expected to complete PCS travel NLT June 15, and those with a RIF date of September 2, will be expected to complete PCS travel NLT August 15. For those with an end-of-tour date beyond summer 2025, this is considered an involuntary curtailment from their assignment. If you have specific circumstances that you believe justify a deviation from this procedure (e.g. a child's school calendar or personal/familial health considerations), please reach out to HCTM to request an exception.

    ○ *As previously stated with the PCS Portal Data call, there will be the opportunity to resubmit your PCS request. Please update your information within the next 72 hours.*

    ○ While overseas, USAID personnel will remain under Chief of Mission authority, and will retain full access to the Medical Unit, DPO/Pouch, and Post-provided housing until their official departure date. The State Department is committed to offering additional resources and benefits to ensure the safety and security of USAID employees transitioning from service.

- **Continuation of Benefits:** All employees will continue to receive the benefits to which they are entitled. No one will lose earned benefits as a result of this RIF action.

- **Previously RIF'd Personnel:** All personnel who received a first wave RIF notice dated February 23, 2025, will receive a new superseding RIF notice today, along with the rest of the Agency. That notice will specify a new longer-dated notice period, with final separation of either July 1, 2025, or September 2, 2025.

    ○ These new superseding notices will ensure that those in the first RIF wave have the same notice, severance, and return travel periods as the rest of the Agency's workforce and retain the same eligibility for any potential State Department hiring. Consistent with applicable law, we are committed to treating all USAID personnel fairly and equally.

- **Administrative Leave & Go Forward Options:** We do not intend to place a significant number of employees on involuntary administrative leave. As you can imagine, there will be lots of work to responsibly migrate operations and responsibility to the State Department. We would like to offer every USAID employee the opportunity to participate in that important work, if you so choose. At the same time, we understand that many of you may prefer to take time to focus on your families and future. As we assess the Agency's draw-

down staffing needs, we are providing the optional opportunity to indicate your preferred staffing status going forward. A form will be provided tomorrow which will allow you to select one of the following options:

- **Active Duty:** A substantial portion of the Agency will be required to remain on duty to support the successful drawdown of operations and the transfer of programs to the State Department. If you are interested in remaining on active duty in this capacity, we would be grateful for your continued service.
- **Administrative Leave:** If you prefer to step away and focus on next steps, voluntary administrative leave will be available. Unless otherwise instructed, all staff with RIF notices who are not already on administrative leave may opt to cease work activities and request leave.

- **Email and Digital Access:** Email accounts have been reactivated for substantially all personnel on administrative leave and/or those part of the first wave RIF. Personnel should check their USAID email accounts for their Specific Notice of RIF and other important information.
  - We are committed to ensuring personnel, especially in the field, retain access to important employment and security information. We do not anticipate cutting access for a substantial number of USAID personnel.
  - Of course, access to government resources is a privilege, and personnel must continue to follow Agency guidance and applicable rules regarding the use of government systems and handling/dissemination of government information. Violations of Agency guidance and policies may result in disciplinary actions and loss of digital access permissions.

We remain committed to ensuring this process is as smooth, respectful, and transparent as possible keeping our mission and people at the forefront. We know questions will remain and we will soon share a live FAQ document to provide ongoing updates and guidance.

Secretary Rubio, myself, and the rest of the front office are grateful for your continued service to our great nation. I would like to offer a special thank you to those of you who, even amid considerable personal and professional uncertainty, have remained steadfastly committed to serving the Agency and its important mission. You exemplify the very best ideals for public service and will not be forgotten or overlooked in this transition process.

Sincerely,

Jeremy Lewin

PTDO Deputy Administrator & Chief Operating Officer

Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in. If you have questions or problems with the subscription service, please visit subscriberhelp.govdelivery.com.

4/4/25, 1:34 PM

Case 1:25-cv-00352-CJN    Document 85    Filed 05/16/25    Page 133 of 430
USCA Case #25-5290    Document #2147401    Filed: 11/26/2025    Page 168 of 220

Gmail - USAID Global Update

This service is provided to you at no charge by United States Agency for International Development.

This email was sent to bmcpherson@usaid.gov using govDelivery Communications Cloud on behalf of: United States Agency for
International Development · 1300 Pennsylvania Avenue NW · Washington, DC · 20004



AR_0151



**United States Department of State**

*Washington, D.C.   20520*

March 28, 2025

### CONGRESSIONAL NOTIFICATION TRANSMITTAL LETTER

Consistent with sections 7015 and 7063(a) of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (Div. F, P.L. 118-47), as carried forward by the Further Continuing Appropriations Act, 2025 (Div. A, P.L. 118-158), and section 34 of the State Department Basic Authorities Act of 1956 (22 U.S.C. 2706), the Department of State (the Department) and the U.S. Agency for International Development (USAID) are notifying their intent to undertake a reorganization that would involve realigning certain USAID functions to the Department by July 1, 2025, and discontinuing the remaining USAID functions that do not align with Administration priorities.

In order to support this reorganization, the Department intends to restructure certain Department bureaus and offices that would implement programs and functions realigned from USAID. In connection with this transition, substantially all USAID personnel will be separated from federal service pursuant to Reduction-In-Force procedures. Consistent with applicable law, the Department intends to conduct a separate and independent hiring process to build foreign assistance capacity; the Department intends for this process to be available to eligible USAID personnel. During the transition period until such legislation is enacted, some funds from the Operating Expenses and Capital Investment Fund accounts in title II of the SFOAA may be made available to support these functions at the Department of State as outlined below.

The planned changes are explained further in the attached enclosure.

**Recipients**:
House Foreign Affairs Committee
Senate Foreign Relations Committee
House Appropriations Committee
House Subcommittee on National Security, Department of State, and Related Programs
Senate Appropriations Committee
Senate Appropriations Subcommittee on State, Foreign Operations, and Related Programs

We hope this information is helpful.  Please do not hesitate to contact us with questions.

Sincerely,

Paul Guaglianone
Senior Bureau Official
Bureau of Legislative Affairs

Enclosure:
　　　As stated.

## CONGRESSIONAL NOTIFICATION

**Introduction**

Following Secretary Rubio's February 3, 2025, letter initiating consultations regarding USAID, the Department of State is notifying Congress of its intent to realign select USAID functions to the Department and to phase out others. This decision aligns with the Administration's broader efforts to streamline government functions, eliminate redundancy, and enhance accountability. The transition will ensure that foreign assistance operations are fully aligned with U.S. diplomatic and national security objectives. By integrating these functions into the Department, the Administration aims to improve efficiencies while maintaining critical humanitarian assistance and national security programs.

**Background**

USAID conducted a comprehensive review of its existing programs and awards to assess their alignment with U.S. foreign policy objectives. As a result of this review, numerous programs were discontinued, while 898 active grants, cooperative agreements, and contracts remain in place. The total amount for these activities is approximately $78 billion in total vehicle value, with approximately $8.3 billion in unobligated remaining value. Separately, USAID retains 421 operational and critical service contracts and other agreements.

In the initial phase of the transition, the Department would take on the management of USAID's financial and administrative systems and management of USAID's remaining operations and ongoing foreign assistance programs. These functions would, in the first instance, be provided as a service via interagency agreement in order to ensure that USAID programs can be safely and effectively administered by the Department during the transition period. Payment processing systems will be integrated into the Department to ensure a streamlined approach to managing life-saving humanitarian aid and national security programs. The State Department would also integrate USAID's partner vetting systems and is working to create a more efficient vetting system in the future. The Department intends for this first phase of the transition to be completed by July 1, 2025.

The Department anticipates requesting, in its fiscal year 2026 budget request, funding in the relevant Department appropriations to support the programs previously implemented by USAID, and proposing legislation to abolish USAID as an independent establishment.

**Key Functions**

The Department has carefully considered which USAID programs could continue to advance the Administration's foreign policy objectives. Those have been determined to be humanitarian assistance, global health functions, strategic investment, and limited national security programs. The Bureau for Humanitarian Assistance (BHA) provides lifesaving humanitarian

assistance—including food, water, shelter, emergency health care, sanitation and hygiene, and essential nutrition services—to the world's most vulnerable and hardest-to-reach people. The Bureau for Global Health helps reduce health disparities, delivers lifesaving vaccines, promotes child and maternal health, and works toward control and elimination of malaria, tuberculosis, and other diseases. These functions would be realigned to relevant bureaus and offices in the Department to ensure continuity of critical operations and that the United States continues to effectively administer life-saving and strategic aid across the globe. Other functions are likely to be substantially duplicative of existing functions and capabilities at the Department, and would be eliminated in the restructuring plan.

**Reorganization**

The Department would streamline its organizational structure to best accommodate the new humanitarian assistance and global health functions being absorbed from USAID. (See Organizational Chart in Tab #1). The Department has engaged both senior political and career staff to evaluate the most efficient and effective way to implement these USAID programs and activities.

*Regional Bureaus*
The Department's robust regional bureaus would assume primary responsibility for the administration and coordination of bilateral and regional USAID programming. An office of foreign assistance would be established in each of the Department's regional bureaus that do not already have such an office. The functions of USAID's regional bureaus would be realigned to a corresponding State regional bureau. In addition, appropriate procurement and program management functions from USAID's pillar and management bureaus would be realigned to the relevant Department bureaus. Management of assistance programs by regional bureaus would ensure that aid programs are delivered based on regional and local priorities, and consistent with applicable U.S. foreign policy interests in those locations.

USAID has the following five regional bureaus: (1) Latin America and the Caribbean (LAC); (2) Europe & Eurasia (E&E); (3) Middle East (ME); (4) Africa (AFR); and (5) Asia (ASIA). Their functions would be realigned to Department's regional bureaus as follows: AFR functions would be realigned to the Bureau of African Affairs; ASIA functions would be realigned to the Bureaus of South and Central Asian Affairs and East Asian and Pacific Affairs; E&E functions would be realigned to the Bureau of European and Eurasian Affairs; ME functions would be realigned to the Bureau of Near Eastern Affairs; and LAC functions would be realigned to the Bureau of Western Hemisphere Affairs.

*State Department Office of Global Food Security (GFS)*
The life-saving food and agriculture assistance programs from USAID's Bureau for Humanitarian Assistance would be implemented by an expanded Office of Global Food Security reporting to the Department's Under Secretary for Economic Growth, Energy, and Environment (E). Focusing these efforts within the E family reflects the central role that commerce and supply chain infrastructure – both domestic and overseas – plays in USAID's food assistance programming.

The Department remains committed to ensuring that its food assistance programs continue to support American agricultural interests in efficiently delivering food to populations in need across the globe.

*State Department Bureau of Global Health Security and Diplomacy (GHSD)*
The functions of USAID's Global Health (GH) bureau would be realigned to the State Department's Bureau of Global Health Security and Diplomacy. The Department's existing GHSD bureau is already responsible for the administration of intergovernmental health programming and leads, manages, and oversees the U.S. President's Emergency Plan for AIDS Relief (PEPFAR) program. USAID's GH programs are already closely coordinated with GHSD, which possesses relevant expertise to responsibly and efficiently manage USAID's life-saving programs. The Department anticipates making significant investments to ensure that GHSD is able to effectively support USAID's substantial PEPFAR and other life-saving health programs. Likewise, GHSD would be able to effectively manage USAID's critical health supply chain network with greater interdepartmental and intergovernmental coordination.

Merging USAID's flagship global health programs into GHSD would result in considerable synergies, including for PEPFAR. For example, currently, GHSD plans and coordinates all appropriated funds for PEPFAR, and provides funds to USAID for program administration. Consolidating these functions into a single bureau would result in efficiencies in the planning and delivery of essential PEPFAR aid, allowing the Department's programs to achieve greater impact with fewer dollars, with fewer wasted dollars on indirect and administrative costs.

*Other Functional Bureaus*
In limited cases, certain programs may be managed by appropriate subject matter or functional bureaus at the Department. For example, the Department's Educational and Cultural Affairs (ECA) office manages exchange programs and could potentially implement some education assistance programs. Additionally, economic growth, trade, and energy-related programming could be administered by the Department's Bureau of Economic & Business Affairs (EB).

*Other Bureaus*
The remaining USAID bureaus and offices would be substantially abolished. Certain contracting, administrative, management, and executive functions would be realigned to analogous functions at the Department. For example, certain contracting functions and personnel in USAID's Office of Acquisitions and Assistance (OAA) may be integrated into the Department's Office of Global Acquisition to support expanded foreign assistance procurement activity. Legal, human resources, records management, and financial functions would also be integrated into appropriate offices at the Department.

The Department would also administer certain statutorily required functions, as required by law. For those statutory functions that are expressly assigned to USAID or its personnel under the law, the State Department will propose legislative changes to allow the State Department to perform any ongoing functions.

**USAID Personnel**

Substantially all USAID personnel will be separated from federal service within the current fiscal year via Reduction-In-Force procedures, consistent with applicable law. As part of this process, USAID missions overseas would be closed, U.S. direct hire personnel overseas would be returned to the United States, and most USAID locally employed staff would be separated from U.S. government service in accordance with local law. USAID and the Department of State would dedicate significant resources to ensuring that affected U.S. direct hire personnel posted overseas would receive safe, timely, and accessible repatriation travel and other arrangements.

The Department intends to commence, consistent with applicable law, appropriate hiring processes to bring in relevant Civil Service and Foreign Service personnel with the relevant skills and expertise to build foreign assistance capacity and administer USAID programs and activities. The Department anticipates making these processes available for eligible USAID personnel and external candidates after the USAID Reduction-In-Force process has been completed, consistent with applicable law.

The Department is not currently in a position to accurately project its needs or the exact numbers of USAID personnel to be hired in connection with the realignment of USAID's programs and activities. The Department also anticipates assigning or assuming the contracts of certain former USAID domestic and foreign Personal Services Contractors (PSC) that possess relevant expertise and/or are located in strategic areas.

**Financial Plan**

The Department of State would manage USAID operational accounts and activities as required, ensuring that operations are closed out in a smooth and orderly transition. More specifically, the Contracting and Agreement Officer authorities and personnel would move to the Department. The Operating Expense (OE) and Capital Investment Fund (CIF) Accounts, which are appropriated to carry out section 667 of the Foreign Assistance Act (FAA) would be administered by the Department for activities associated with administering foreign assistance. During the first phase of the transition, USAID would transfer or allocate OE funds to the State Department under section 632 of the FAA. Consistent with section 667 of the FAA, the President designated USAID as the agency responsible for administering part I of the FAA. In a subsequent phase of the transition, the Department would request the President to designate the Department as that agency instead, once the Department is prepared to take on that responsibility.

The Department of State would assume responsibility for humanitarian assistance programming, ensuring that these programs are integrated with broader diplomatic efforts and national security goals. BHA would be abolished and its functions realigned to the Department. Funding associated with Title II of P.L. 480 (also known as Food for Peace) is appropriated to the U.S. Department of Agriculture, in accordance with the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2024 (P.L. 118-42), as

carried forward by the FY 2025 Continuing Appropriations Act (P.L. 118-83). Under the Food Security Act of 1985 (P.L. 99-198), the donation of agricultural commodities to foreign countries is implemented by the USAID Administrator. Secretary Rubio, as current acting Administrator of USAID, will continue to oversee the implementation of this program going forward until appropriate legislation is enacted authorizing the Department to assume this function.

Separately, USAID anticipates standing up a claims settlement process to ensure that any applicable claims of contractors, vendors, personnel or others are timely and adequately addressed by USAID. USAID would continue to operate this process until appropriate legislation is enacted to facilitate the transfer to the Department.

**Resources**

The table below reflects unobligated balances of accounts at USAID as of March 23, 2025.

| USAID Fully and Partially-Managed Foreign Assistance Accounts | | |
|---|---|---|
| Account | Account Symbol | USAID Unobligated Balance as of March 23, 2025 (in dollars) |
| **Title II - USAID** | | |
| Operating Expenses (OE) | 72 [] 1000 | $229,441,200 |
| Capital Investment Fund (CIF) | 72 [] 0300 | $133,008,903 |
| Office of Inspector General (OIG) | 72 [] 1007 | $30,938,711 |
| | | |
| **Title III - Bilateral Economic Assistance** | | |
| Global Health Programs** [1] | 72 19 [] 1031 | $7,082,476,856 |
| Development Assistance (DA)* | 72 [] 1021 | $7,378,979,411 |
| International Disaster Assistance (IDA) | 72 [] 1035 | $6,756,558,435 |
| Transition Initiatives (TI) | 72 [] 1027 | $81,408,484 |
| Complex Crises Fund (CCF) | 72 [] 1015 | $46,818,713 |
| Economic Support Fund (ESF)* | 72 [] 1037 | $5,647,197,058 |
| Democracy Fund (DF)** | 72 19 [] 1121 | $272,341,319 |
| Assistance for Europe, Eurasia and Central Asia (AEECA)* | 72 [] 0306 | $847,228,217 |
| **Additional USAID accounts with unexpired unobligated balances** | | |
| Commodity Credit Corporation Title II and III (CT) *** | 72 12 [] 2278 | $347,509,109 |
| Commodity Credit Corporation (CC) *** | 72 12 [] 4336 | $5,208,662 |
| Central America and Caribbean Emergency Disaster Recovery Fund | 72 [] 1096 | $4,545,538 |
| Special Assistance Initiative (AI) | 72 [] 1010 | $463,664 |
| Assistance For The New Independent States of The Former Soviet Union (NI) | 72 [] 1093 | $712,011 |
| Sahel Development Program | 72 [] 1012 | $474,512 |
| Sub-Saharan Africa Disaster Assistance | 72 [] 1040 | $81,818 |
| Development Fund for Africa | 72 [] 1014 | $0 |

| | | |
|---|---|---|
| Global HIV/AIDS Initiative (GA) | 72 [] 1030 | $277,708 |
| Global Fund to Fight HIV/AIDS (GF) | 72 [][ 1028 | $0 |
| HIV / AIDS Working Capital Fund | 72 [] 1033 | $309,505,354 |
| Civilian Stabilization Initiative (CS) | 72 [] 0305 | $1,151,530 |
| Child Survival and Health Programs (CD) | 72 [] 1095 | $16,507,818 |
| Andean Counterdrug Program (formerly ACI) (ACP) | 72 19  []  1154 | $132,722 |
| Food and Nutrition (Legacy) | 72 [] 1023 | $2,767,500 |
| Population Planning and Health (Legacy) | 72 [] 1024 | $272,442 |
| Education and Human Resources Development (Legacy) | 72 [] 1025 | $2,649,022 |
| Property Management Fund | 72 [] 4175 | $13,865,818 |
| Working Capital Fund | 72 [] 4513 | $45,119,463 |
| Advance Acquisition of Property- Revolving Fund | 72 [] 4590 | $46,299 |
| Foreign Service National Separation Liability Trust Fund | 72 [] 8342 | $4,504,654 |
| Technical Assistance (TA) | 72 [] 8502 | $3,435,454 |
| Gift and Donations | 72 [] 8824 | $64,573,468 |
| Ukraine Loan Guarantees Program Account | 72 [] 0402 | $0 |
| Loan Guarantees to Israel Financing Account | 72 [] 4119 | $599,688,323 |
| MENA Loan Guarantee Financing Account | 72 [] 4493 | $172,388,873 |
| Sovereign Guarantee Program Account | 72 [] 1560 | $0 |
| Guaranteed Loan Financing Account | 72 [] 4464 | $0 |
| Direct Loan Financing Account | 72 [] 4463 | $535,245,137 |
| Other Legacy Accounts | | |
| *USAID is the parent for these accounts, but funds are implemented by State and USAID.* | | |
| ** State is the parent for these accounts, but funds are implemented by State and USAID.* | | |
| *** USDA is the parent for these accounts.* | | |
| [1] This includes GHP-USAID and GHP-State allocated to USAID | | |

UNCLASSIFIED
-9-

**Organizational Structure**

*Proposed Organization for State – USAID Merger*



UNCLASSIFIED

SENSITIVE BUT UNCLASSIFIED

AR_0268

AR_0269



UNCLASSIFIED
-11-

*Current USAID Organization Chart*



UNCLASSIFIED
SENSITIVE BUT UNCLASSIFIED

AR_0270

UNCLASSIFIED
-12-

*Current Department of State Organization Chart*



AR_0271

| Summary of USAID Program Status | | | | |
|---|---|---|---|---|
| | Number of Awards | Total Estimated Cost | Obligated Amount | Un-Obligated Remaining Value |
| Active Programs | 898 | $78,002,419,392.80 | $69,703,222,760.42 | $8,299,196,632.38 |
| Terminated Awards | 5341 | $75,891,532,254.39 | $48,154,136,961.86 | $27,737,395,292.53 |

AR_0273

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:25-cv-352 (CJN) |
| DONALD TRUMP, et al., | |
| *Defendants*. | |

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF No. 51, is **DENIED**; and it is further

**ORDERED** that Defendants' Motion to Dismiss, ECF No. 70, is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' Amended Complaint, ECF No. 30, is **DISMISSED**.

This is a final and appealable Order.

The Clerk of Court is directed to terminate this case.

DATE: July 25, 2025

_____
CARL J. NICHOLS
United States District Judge

JA 179

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN FOREIGN SERVICE
ASSOCIATION, et al.,

       *Plaintiffs*,

    v.

DONALD TRUMP, et al.,

       *Defendants*.

Civil Action No. 1:25-cv-352 (CJN)

PERSONAL SERVICES CONTRACTOR
ASSOCIATION,

       *Plaintiff*,

    v.

DONALD TRUMP, et al.,

       *Defendants*.

Civil Action No. 1:25-cv-469 (CJN)

## <u>MEMORANDUM OPINION</u>

Across these two cases, four organizations challenge what they describe as the unlawful

dismantling of USAID.  Three represent employees or contractors at USAID:  the American

Foreign Service Association (AFSA) represents USAID foreign service officers, the American

Federation of Government Employees (AFGE) represents USAID civil servants, and the Personal

Services Contractor Association (PSCA) represents USAID personal services contractors, who

perform standard government work for the agency without having been "directly hired" by it.  The

fourth organization, Oxfam America, is a humanitarian group that sees its mission as combatting

global poverty, inequality, and injustice. Each organization alleges that the government's actions taken with respect to USAID, as detailed below, violate the Constitution, the APA, and are ultra vires.

The Court ultimately cannot reach the merits of any plaintiff's allegations, however, because it concludes that it lacks jurisdiction over the claims of AFSA, AFGE, and Oxfam (which have moved for summary judgment after the Court denied their earlier motion for a preliminary injunction), and that it likely lacks jurisdiction over the claims of the PSCA (which has moved for a preliminary injunction). The Court will accordingly grant the government's motion to dismiss the *AFSA* case and will deny the PSCA's motion for a preliminary injunction.

## I.    Background

### A.    Factual Background

The Court previously recounted many of the facts underlying these cases. *See Am. Foreign Serv. Ass'n v. Trump (AFSA I)*, 768 F. Supp. 3d 6, 11–14 (D.D.C. 2025). But there have been some further developments since that juncture, so a brief recap is in order before breaking new ground.

USAID is "the lead international humanitarian and development arm of the U.S. government." Cong. Rsch. Serv., *U.S. Agency for International Development: An Overview* (Jan. 6, 2025). President Kennedy initially created USAID via Executive Order, as an arm of the State Department. *See* Exec. Order 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). But in 1998, Congress passed a statute that installed the agency as an "independent establishment," outside of State. 22 U.S.C. § 6563(a); 5 U.S.C. § 104(1); *but see* 22 U.S.C. § 6592 (specifying that the USAID Administrator "shall report to and be under the direct authority and foreign policy guidance of the Secretary of State"). Since then, Congress has consistently appropriated funds for

USAID, including in the Further Consolidated Appropriations Act of 2024.  *See* Pub. L. 118–47,

138 Stat 460 (2024).  Relevant here, that Act provides that appropriated funds may not be used to

"implement a reorganization [or] redesign" of the agency without "prior consultation" by the

agency head with appropriate congressional committees.  *Id.* § 7063(a); *see also id.* § 7063(b)

(defining "reorganization" and "redesign" to include actions to "downsize the United States

official presence overseas," "reduce the size of the permanent Civil . . . [or] Foreign Service," and

"eliminate, consolidate, or downsize covered departments, agencies, or organizations").

        Until recently, USAID used its appropriated funds to support humanitarian and

development projects in approximately 120 foreign countries—both via its independent work and

via grants awarded to partner organizations and governments.  *AFSA*, ECF No. 51-2 (SOMF) ¶¶ 3–

5.  On January 20, 2025, however, President Trump issued an Executive Order directing "a 90-day

pause in United States foreign development assistance," pending an "assessment of [its]

programmatic efficiencies and consistency with United States foreign policy."  Exec. Order.

14,168, 90 Fed. Reg. 8619 § 3(a) (Jan. 20, 2025).  The Order further instructed that, at the end of

90 days, "responsible department and agency heads" would determine "whether to continue,

modify, or cease each foreign assistance program based upon the review recommendations."  *Id.*

§ 3(c).

        Secretary of State Rubio implemented that Executive Order in a January 24 memorandum

that paused "all new obligations of funding, pending a review, for foreign assistance programs

funded by or through the [State] Department and USAID."  Dep't of State, Mem. 25 STATE 6828

¶ 1 (Jan. 24, 2025).  The memorandum also directed that, "[f]or existing foreign assistance awards,

contracting officers and grant officers shall immediately issue stop work orders, consistent with

the terms of the relevant award, until such time as the Secretary shall determine, following a

review." *Id.* ¶ 7.  According to the government, a "blanket pause" on foreign aid "was the more efficient and effective path," since, given the scale of programming, "an ad hoc review would [have] unduly burden[ed] the execution of the President's other foreign policy priorities." *AFSA*, ECF No. 85 (AR) at 121–22.  Still, Secretary Rubio did exempt from the pause several categories of expenditures:  foreign military financing for Israel and Egypt; emergency food assistance; legitimate expenses incurred prior to the date of the memorandum; and salaries and related administrative expenses for certain direct hire employees, personal services contractors, and locally employed staff.  *See* Mem. 25 STATE 6828 ¶¶ 12(a)–(e).  And Secretary Rubio later also waived the pause as to spending on "life-saving humanitarian assistance" and "[l]ife-saving HIV care and treatment services."[1]  SOMF ¶¶ 28–30.

Six days later, President Trump appointed Secretary Rubio as the Acting Administrator of USAID.  AR at 16.  On February 3, 2025, Secretary Rubio sent a letter to Congress stating that Peter Marocco was delegated the duties of Deputy Administrator of USAID and would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize [its] efficiency and align [its] operations with the national interest."  *Id.*

To effectuate that review and potential reorganization, and in light of alleged "noncompliance" with those efforts by former agency leadership, Deputy Administrator Marocco began placing USAID employees on administrative leave and terminating contracts with USAID personal services contractors (PSCs).  *See id.* at 7, 17–20.  By February 7, 2025, USAID had placed 2,140 of its 4,746 direct-hire employees on administrative leave, and had approved the termination

---

[1] Plaintiffs maintain that these waivers were largely ineffectual, due to newly imposed restrictions on who could access payment systems and heightened approval processes before payments could be disbursed, among other changes at the agency.  *See*, *e.g.*, *AFSA*, ECF No. 51 (MSJ) at 5.

of 791 of its 1,239 PSCs. *Id.* at 7, 19. However, pursuant to a TRO issued in *AIDS Vaccine Advocacy Coalition (AVAC) v. United States Department of State*, D.D.C. Case No. 25-cv-400, and *Global Health Council v. Trump*, D.D.C. Case No. 25-cv-402, USAID ceased the "generalized stop work, suspension, or pause of Agency contracts, grants, or other federal assistance awards" under the Executive Order and Secretary Rubio's memorandum. *Id.* at 51; *see AVAC v. United States Dep't of State*, 770 F. Supp. 3d 121, 130 (D.D.C. 2025) (summarizing the scope of the TRO). Nonetheless, consistent with the *AVAC* TRO, USAID continued to "exercise Agency discretion to individually examine outgoing payments pursuant to a new Payment Integrity Review Process, and, as appropriate, to enforce the terms and conditions, including provisions allowing the Agency to issue stop work or termination notices, contained in USAID awards and contracts." AR at 51.

On March 10, 2025, Secretary Rubio announced the conclusion of the "first phase" of the government's "full-scope review" at USAID. *Id.* at 3. Then, on March 28, 2025, "the Department of State and USAID notified Congress of their intent to undertake a reorganization that would realign certain USAID functions to the Department of State . . . and discontinue other residual USAID functions inconsistent with Administration priorities." *Id.* State's and USAID's notification specifically proposed that the State Department would "assume responsibility for the administration of ongoing USAID programming" by July 1, 2025, and that, "by September 2, 2025, USAID's operations [would] be substantially transferred to State or otherwise wound down." *Id.* at 3–4. The State Department has accordingly expressed its intention to "propose legislation to authorize abolishing USAID as an independent establishment and to request [that] future appropriations for the relevant programming be provided directly to the Department." *Id.* at 4.

Also on March 28, 2025, USAID notified its civil and foreign service personnel of a "consolidated agency-wide Reduction-In-Force" (RIF) action, occasioned by the anticipated elimination of "substantially all non-statutory positions" at the agency. *Id.* USAID employees "received RIF notices specifying one of two final separation dates: either July 1, 2025, or September 2, 2025." *Id.* The government represents that, in advance of those dates, it "returned to active duty"—i.e., removed from administrative leave—"substantially all its global personnel," though employees may still *elect* to be placed on paid administrative leave. *Id.* at 5, 7. Employees who have remained in active status after July 1 are "expected to supervise the responsible decommissioning of USAID assets and the wind-down of the Agency's independent operations." *Id.* at 6.

Remaining PSCs' contracts are likewise being terminated effective July 1, 2025, or September 2, 2025. *Id.* at 7. According to the government, throughout the reorganization and RIF, all PSC contracts have been "terminated consistent with all contractual and other notice periods, and PSCs will receive any travel and other repatriation accommodations to which they are generally entitled." *Id.* And, the government says, both terminated employees and PSCs will be eligible for new positions and/or contracts at the State Department, which is "build[ing] its capacities to administer an expanded set of foreign assistance programs and operations." *Id.* at 6–7.

At the time of the March 28 reorganization and RIF announcement, USAID retained 898 of its 6,239 foreign assistance grants—a remainder that totaled $78 billion in value—as well as 421 "operational and critical service contracts and other agreements." *Id.* at 3, 273. The government attests that stop-work orders on retained awards have now been lifted, and the State Department has "directed Contracting Officers and Grants Officers to expeditiously process

payment requests for both awards where work has now resumed and for terminated awards, including for legitimate expenses incurred in connection with stop work orders and suspensions." *Id.* at 141 (quotation marks omitted). As to terminated awards, USAID and the State Department are also making payments for legitimate expenses incurred prior to January 24, 2025, where counterparties provide sufficient documentation of "verifiable work that the Government [] committed to fund." *Id.* at 83.

**B.    Procedural History**

This matter first came before the Court on February 7, 2025, when plaintiffs AFSA and AFGE—which had the day before filed a complaint alleging that defendants were violating the Constitution and the APA by "dismantl[ing]" USAID through their funding pause, administrative leave placements, and related actions—sought a temporary restraining order that would require the government to "immediately cease actions to shut down USAID's operations." *AFSA*, ECF No. 1 at 2, 23–28; *AFSA*, ECF No. 9 at 1. After a hearing that same afternoon, the Court entered a limited TRO that required the government until February 14 to reinstate USAID direct-hire employees who had been placed on administrative leave and to withhold from placing any additional employees on administrative leave or evacuating them from their overseas posts. *AFSA*, ECF No. 15 at 1, 7. As the Court explained, there was a risk that such employees might suffer imminent and irreparable harm if they were stripped of standard employment benefits while abroad or were required to repatriate on an expedited basis, in disruption of long-settled expectations. *Id.* at 2–5. But the Court did not restrain the government from implementing the 90-day freeze on foreign assistance funding because, by contrast, plaintiffs had not demonstrated that action would inflict irreparable harm. *Id.* at 6–7.

The Court's February 7 Order also converted plaintiffs' TRO motion into a motion for a preliminary injunction and scheduled a hearing on that motion for February 13, 2025.  *Id.* at 7.  At that hearing, and as reflected in an Order issued the same day, the Court extended the TRO for another week to permit itself time to issue an opinion on the motion for preliminary injunction, and also modified the February 7 Order to clarify that it prohibited only the *involuntary* evacuation of USAID employees from their overseas posts.  *AFSA*, ECF No. 31.  Also on February 13, 2025, AFSA and AFGE filed an amended complaint that joined OxFam as a plaintiff and added an ultra vires claim—albeit not for purposes of the already-filed preliminary injunction motion.  *See AFSA*, ECF No. 30.

On February 21, 2025, the Court denied AFSA's and AFGE's motion for a preliminary injunction.  *AFSA I*, 768 F. Supp. 3d at 25.  The Court concluded, with the benefit of the governments' sworn declarations, that plaintiffs and their members did not in fact face a risk of irreparable harm from the essentially "employment-related injuries" that they alleged their members were facing:  placement on administrative leave, expedited recall from their host countries, asserted financial and emotional burdens as a result of the freeze on foreign aid, and possible job loss.  *Id.* at 16–21.  As for likelihood of success on the merits, the Court held that it likely lacked jurisdiction to adjudicate AFSA's and AFGE's claims, which were "archetypal complaints about changed employment conditions and their follow-on effects" that belonged before statutorily-designated administrative review boards.  *Id.* at 20, 24.  Finally, the Court observed that both plaintiffs and the government had identified plausible harms as a result of the progression/cessation of the government's actions with respect to USAID, meaning that the final two preliminary injunction factors also did not tip in plaintiffs' favor.  *Id.* at 25.

During this period, the PSCA filed its own action, which similarly alleged that defendants had violated the Constitution and the APA by "dismantl[ing]" USAID. *PSCA*, ECF No. 1 at 2, 13–16. The PSCA then moved for a TRO that sought essentially the same relief as AFSA and AFGE had requested in their motion, but as to its members (PSCs) rather than direct-hire employees. *PSCA*, ECF No. 6; ECF No. 6-1 at 1–4. The Court conducted a telephonic hearing on the PSCA's motion on March 5, 2025, and the next day held a follow-up telephonic hearing at which it denied that motion orally. *See PSCA*, ECF No. 23. The Court explained that none of the alleged harms to the PSCA's members—which the PSCA had characterized as "identical to those impacting direct-hires"—met the "high standard needed to warrant preliminary relief." *Id.* at 7–11; *see also PSCA*, ECF No. 6-1 at 18. The Court also explained that the PSCA was unlikely to succeed on the merits of its claims because the case "present[ed] as essentially a federal contract dispute" over which the Court likely lacked jurisdiction. *PSCA*, ECF No. 23 at 11–15. Finally, as in *AFSA*, the balance of the equities was "at a minimum [] in equipoise and perhaps favor[ed] the government." *Id.* at 15.

All of this brings us to the motions now before the Court. On March 10, 2025, the *AFSA* plaintiffs moved for summary judgment on all of their claims. *AFSA*, ECF No. 51 (MSJ). The government for its part moved to dismiss, and in the alternative, cross-moved for summary judgment. *AFSA*, ECF No. 70 (MTD). The PSCA (after filing an amended complaint that added new defendants and an ultra vires claim), in turn, moved for a preliminary injunction that, like its previously-sought TRO, would "stop the [allegedly] illegal dismantling and destruction of USAID." *PSCA*, ECF No. 39 at 2 (Mot.). The government opposed that motion. *PSCA*, ECF No. 45 (Opp.).

While all of those motions were being briefed, a motions panel of the Court of Appeals issued an order in *Widakuswara v. Lake (Widakuswara II)*, 2025 WL 1288817, at *1 (D.C. Cir. 2025), that stayed in part several preliminary injunctions issued in litigation regarding the alleged dismantling of a different federal agency, the United States Agency for Global Media, on the basis that the district court lacked jurisdiction over the plaintiffs' personnel-termination and grant termination-related claims. *Id.* at *2–3. Thereafter, the en banc Court of Appeals denied a motion for reconsideration and vacatur of that portion of the motions panel's order concerning the government's "personnel actions," but granted the motion for reconsideration and vacatur as to that portion respecting the government's grant-related actions. *See Widakuswara v. Lake (Widakuswara III)*, 2025 WL 1556440, at *1 (D.C. Cir. 2025); *Widakuswara v. Lake (Widakuswara IV)*, 2025 WL 1521355, at *1 (D.C. Cir. 2025).

## II.    Legal Standard

On a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing the Court's jurisdiction. *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). In evaluating such a motion, "[t]he Court is not limited to the allegations of the complaint; instead, the Court may consider such materials outside the pleadings as it deems appropriate." *Transportation Trades Dep't, AFL-CIO v. Nat'l Mediation Bd.*, 530 F. Supp. 3d 64, 69 (D.D.C. 2021) (quotation marks and citations omitted). "Where both standing and subject matter jurisdiction are at issue," the "court may inquire into either and, finding it lacking, dismiss the matter without reaching the other." *Moms Against Mercury v. FDA*, 483 F.3d 824, 826 (D.C. Cir. 2007).

"A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton,*

391 F.3d 251, 258 (D.C. Cir. 2004). "To warrant preliminary injunctive relief, the moving party

must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable

injury if the injunction were not granted, (3) that an injunction would not substantially injure other

interested parties, and (4) that the public interest would be furthered by the injunction."

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). When the

movant seeks an injunction against the government, the final two factors are analyzed as one. *See*,

*e.g.*, *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## III.    Analysis

The central question in these cases is whether the Court possesses subject-matter

jurisdiction over plaintiffs' claims. As the Court will explain in more detail below, it has concluded

that it does not in *AFSA*, and that it likely does not in *PSCA*. Each of the employee organizations

seeks relief from quintessentially personnel-related injuries that, as a motions panel of the Court

of Appeals recently confirmed, must be redressed through various administrative review schemes

that Congress has specified by statute.[2]  As for OxFam, while it does assert injuries that are

theoretically traceable to *non*-personnel actions the government has taken with respect to

USAID—namely, termination of USAID grants—it lacks standing to seek relief with respect to

---

[2] The government also contends that AFSA's and AFGE's claims of employment-related
harm are moot because, whereas plaintiffs' complaint "primarily challenges the simultaneous mass
placement of all USAID workers on administrative leave," USAID has now restored "substantially
all" of its employees to active status—in anticipation of their July or September RIF dates. MTD
at 8–9, 12,17. This argument, which the government does not reprise in its reply brief, is too clever
by half. Plaintiffs' complaint squarely challenges what it characterizes as the "dissolution of
USAID," and cites the agency's placement of its employees on administrative leave as evidence
of—rather than the extent of—that purported effort. *AFSA*, ECF No. 30 at 2–4, 16. While, as
discussed below, plaintiffs' invocation of the word "dissolution" is not a talisman that permits
them to circumvent established limits on this Court's jurisdiction, it *does* broaden the aperture of
plaintiffs' claims to include *current* personnel actions at USAID rather than just those taken
previously. *Cf.* MTD at 17 (recognizing that plaintiffs allege "'mass' employment-related
harms").

them.  The *AFSA* complaint must therefore be dismissed for lack of subject-matter jurisdiction, and the PSCA has failed to demonstrate it is likely to succeed on the merits of its claims.  And regarding the remaining injunctive relief factors, the PSCA has not demonstrated that it or its members will suffer irreparable harm before a judgment on the merits as a result of the government's actions, or that the equities favor preliminary relief.

### A.    Jurisdiction

Each plaintiff in these cases strenuously argues that it is challenging the "wholesale dissolution" of USAID, rather than any more granular action taken by defendants.  *See, e.g.*, MSJ at 15; Mot. at 22.  But those contentions are undermined by the nature of the relief plaintiffs seek: injunctions that would, among other things, recall furlough notices to affected workers, and declaratory judgments that those actions were unlawful.  *See AFSA*, ECF No. 51-25; *PSCA*, ECF No. 39-26.  Because plaintiffs must demonstrate standing for each form of relief sought, *see Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017), the Court cannot just take plaintiffs at their word and analyze this case as if there were indeed just one, expansive agency action—the dismantling of USAID—from which plaintiffs seek relief.  *Cf. Widakuswara II*, 2025 WL 1288817, at *3 ("The 'dismantling' that plaintiffs allege is a collection of many individual actions that cannot be packaged together and laid before the courts for wholesale correction under the APA.") (quotation marks omitted).  Instead, the Court must look at plaintiffs' claims and requested remedies separately and ask, for each, whether it would redress an injury-in-fact that is fairly traceable to the government's challenged conduct.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  If it would, the Court must next consider whether it has jurisdiction to order that relief.  Here, as the Court will explain, the only relief that plaintiffs have standing to seek is beyond its capacity to award.

### 1.    Standing

Organizational plaintiffs can establish standing in two ways.  First, they can demonstrate that they have suffered "actual or threatened injury in fact" to their *own* interests that is "fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  For this form of standing, known as "organizational standing," a "mere setback to [the organization's] abstract social interests is not sufficient."  *People for the Ethical Treatment of Animals (PETA) v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  Instead, an organization must allege a "concrete and demonstrable injury" to its "core business activities," as distinct from its mere "issue-advocacy."  *Id.*; *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024).  Second, if an organization has members, it can also sue based on the cognizable injuries of its members so long as "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024).  This latter form of standing is called "associational standing."  *Id.*

Start with AFSA, AFGE, and PSCA, which all assert similar theories of injury, and do so under the rubrics of both organizational and associational standing.  As to the former, they allege that defendants' actions have interfered with their "strong interest in representing and protecting their members," and have as a result "stretched" their resources.  MSJ at 12; Mot. at 16–17.  Specifically, the associations point to time and money spent responding to their members' concerns and inquiries regarding their employment or contract status, as well as to the risk of membership loss if such relationships are indeed permanently dissolved.  *See AFSA,* ECF No. 9-3

¶¶ 6–8; *AFSA*, ECF No. 24-17 ¶¶ 21–25; *AFSA*, ECF No. 51-24 ¶ 12; *PSCA*, ECF No. 39-4 at 90 ¶¶ 16–17.  As to associational standing, the associations point to various "emotional, reputational, and financial harms" that they allege their members have suffered as a result of the government's actions with respect to USAID.  MSJ at 13; Mot. at 25.  In addition to loss of employment and related monetary injuries, those alleged harms include stress and anguish as a result of returning to the United States and separating from family abroad, "trauma" due to the closure of USAID facilities, and anxiety due to "violent anti-USAID rhetoric."  *See AFSA*, ECF No. 9-9 ¶¶ 5–7; *AFSA*, ECF No. 9-12 ¶¶ 4, 7–8; *PSCA*, ECF No. 37 ¶¶ 53–54.

The government strongly objects to both theories.  As for organizational standing, it argues that AFSA, AFGE, and PSCA have alleged merely a "decision to reallocate their resources," rather than the necessary "direct[] . . . interfere[nce]" with their "core business activities."  MTD at 32–33; *see* Opp. at 17.  And as for associational standing, the government argues, the organizations' asserted injuries to USAID employees and PSCs turn on "individual [employment] circumstances" that cannot be assessed union-wide.  MTD at 34; *see* Opp. at 15–16.

The Court need not decide here, however, whether AFSA, AFGE, and PSCA lack standing entirely.  Instead, it is sufficient to observe that, on either theory, the only cognizable harms the associations assert depend entirely on their members' employment or contractual relationships with USAID.  Even their alleged intangible injuries—like concerns about family separation, stigma, and post closures—fall into that category, because those harms affect the associations' members distinctly "in their capacities as USAID employees" or PSCs.  *AFSA I*, 768 F. Supp. 3d at 20.  Put another way, the associations' alleged injuries are traceable to the government's personnel actions regarding USAID, and would be redressed by relief that addressed those actions.

They would not be redressed at all, meanwhile, by an injunction or declaratory judgment that did something else.

The Court will therefore assume without deciding that AFSA, AFGE, and PSCA have standing to challenge the government's actions with respect to the employment or contract status and related working conditions of USAID's employees and PSCs, and to seek relief from those discrete personnel actions. But AFSA and AFSA do not, and PSCA likely does not, have standing to challenge the government's *non*-personnel actions with respect to USAID, such as its grant terminations, website closures, and lease transfers, *see* MSJ at 16–17, where the associations have alleged no concrete and particularized injuries flowing from those actions specifically.[3]  *See Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). Indeed, although the government made these points in its motion to dismiss, *see* MTD at 34, AFSA and AFGE offered no clear rejoinder—beyond reiterating their view that, because their complaint purports to challenge the wholesale "shutdown of the agency," the Court need not look behind the curtain and assess their standing to seek the specific relief they request. *AFSA*, ECF No. 74 (Pl.'s Reply) at 12.

The PSCA makes a similar if more involved argument, attempting to analogize its claims to those at issue in cases like *INS v. Chadha*, 462 U.S. 919 (1983) and *Seila Law, LLC v. CFPB*, 591 U.S. 197 (2020). Mot. at 26–28. In the PSCA's view, the logic of those "structural challenge" cases indicates that it would be a "serious category error" to conclude that the PSCA has standing to challenge only the personnel-related changes at USAID, as opposed to USAID's reorganization

---

[3] Plaintiffs' suggestion that these changes have caused their members to fear a "global humanitarian crisis," *see* MSJ at 13, is insufficient to support standing absent an account of why that concern is more than an undifferentiated "generalized grievance" that is "common to all members of the public." *Lujan*, 504 U.S. at 575. Plaintiffs offer no such account.

(or allegedly, "dismantling") writ large. *Id.* at 28. Like AFSA and AFGE, however, the PSCA gives unduly short shrift to the concept of redressability. The plaintiffs in *Chadha*, *Seila Law*, and the other cases on which the PSCA relies did *not* have standing based merely on the "constitutional violations themselves." *Id.* Instead, those plaintiffs sought (and won) the cessation, on constitutional grounds, of specific government actions against them, which unquestionably redressed their particular injuries. *See, e.g.*, *Chadha*, 462 U.S. at 936 ("If the veto provision violates the Constitution, and is severable, the deportation order against Chadha will be cancelled."); *Seila Law*, 591 U.S. at 210–11 (explaining that petitioner's success on separation of powers claim would excuse it from "comply[ing] with the civil investigative demand" and "provid[ing] documents it would prefer to withhold"); *Andrade v. Lauer*, 729 F.2d 1475, 1494–95 (D.C. Cir. 1984) (plaintiffs injured by RIF had standing to challenge it on the grounds that they were "fired by government officials who were constitutionally disqualified from exercising power over them"). Here, by contrast, AFSA, AFGE, and PSCA seek declaratory and injunctive relief that spans far beyond, and thus would *not* redress, the personnel-related injuries they have alleged. That is what limits their standing to sue.

Oxfam, for its part, *does* allege injuries as a result of the cancellation of USAID's grants.[4] Although Oxfam does not itself receive grant money from USAID, it alleges that the withdrawal of USAID funding from humanitarian projects abroad has placed an "inordinate burden" on Oxfam, which has had to reallocate funds and expend additional resources to "account[] for [that] dramatic change[] in the humanitarian landscape." *AFSA*, ECF No. 30-1 (Maxman Decl.) ¶¶ 10–12. Oxfam further attests that it "implements programs in close collaboration with partner[]"

---

[4] Oxfam is not a membership organization, so it can only demonstrate organizational, not associational, standing.

organizations that receive funding from USAID, meaning that grant cuts at USAID will "jeopardize" Oxfam's ongoing projects and "generat[e] pressure on Oxfam to incur additional financial liability." *Id.* ¶ 13. According to Oxfam, it "has already been instructed to halt several projects undertaken with UN agency funding because they rely on [the] U.S. government as a back donor," and "adverse impacts to [its] work are likely to spread." *Id.* ¶¶ 16–17; *see also AFSA*, ECF No. 51-23 (Second Maxman Decl.) ¶ 4.

In making these arguments, which reduce to the theory that Oxfam will be harmed as a result of harms that USAID's spending cuts have inflicted on other organizations, Oxfam runs headlong into the third-party standing doctrine. Parties "generally . . . cannot rest [their] claim[s] to relief on the legal rights or interests of third parties," because only "the party with the right has the appropriate incentive to challenge (or not challenge) governmental action." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Oxfam, however, is attempting to vindicate the monetary interests of USAID grantees not before the Court, on the grounds that restoring *their* funding would permit certain joint projects to proceed and obviate the need for Oxfam to spend more money on humanitarian projects in their stead. That requires Oxfam to make "two additional showings" to demonstrate standing: that it has a "close relationship" with the entity that "possesses the right" and that "there is a hindrance to the possessor's ability to protect [it]s own interests." *Id.* at 130 (quotation marks omitted). Here, even assuming Oxfam has the requisite "close relationship" with third-party recipients of USAID funds, it has not identified any reason that those recipients could not bring their own action to restore funding—as some indeed have. *See AVAC*, 770 F. Supp. 3d at 129.

Instead, Oxfam contends that the third-party standing doctrine does not apply because the government's conduct has, in the manner described above, "injured Oxfam directly." Pl's Reply

at 10.  But even if that were the correct way to frame things, Oxfam's asserted injuries either are not fairly traceable to the government's actions regarding USAID or do not reflect interference with Oxfam's "core business activities" sufficient to meet the threshold for organizational standing.  *Alliance*, 602 U.S. at 395; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) ("When the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is . . . ordinarily substantially more difficult to establish.") (alteration and quotation marks omitted).  Insofar as Oxfam alleges injury because its projects are funded by other entities that receive funding from USAID, like the U.N., that harm turns on an "independent variable":  the decision (or lack thereof) by those entities to discontinue the particular programs in which Oxfam participates.  *Nw. Airlines, Inc. v. F.A.A.*, 795 F.2d 195, 204 (D.C. Cir. 1986).  The same is true of the (wholly hypothetical) possibility that unidentified foreign persons would "hold Oxfam responsible for [other organizations'] abrupt and inhumane discontinuation of lifesaving support."  Second Maxman Decl. ¶ 6.  In such circumstances, "causation [is] sufficiently tenuous that standing should be denied."  *Mideast Sys. & China Civ. Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1174, 1178 (D.C. Cir. 1986) (unsuccessful sub-bidder could not sue government grantor on the theory that it "failed to follow the applicable regulations in administering the grant" because the final award decisions were made by the grant recipient).

Insofar as Oxfam alleges injury based on its own perceived need to reallocate its resources to fill gaps previously occupied by USAID, that harm is precisely the sort of "mere setback" to an organization's mission that falls below the showing required for organizational standing.  *PETA*, 797 F.3d at 1093.  As the Supreme Court recently explained, it is "incorrect" that "standing exists when an organization diverts its resources in response to a defendant's actions."  *Alliance*, 602 U.S. at 395; *cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (housing counseling

organization could sue landlord for racial steering because it "perceptibly impaired [the organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers"). "An organization cannot manufacture its own standing in that way." *Alliance*, 602 U.S. at 394.

Although its motion for summary judgment focuses on its alleged injuries as a result of grant terminations by USAID, Oxfam asserts in its reply that it is also injured by the personnel actions taken at the agency because it "relies on the expertise and logistical assistance of USAID personnel to perform its work." Pl's Reply at 7. As support, it cites to three paragraphs across two declarations by its President, Abby Maxman. *Id.* In one, Maxman states that, because USAID is "home to thought leaders in the development industry," "[d]issolving the agency will [] have signification negative ramifications [for] Oxfam and other humanitarian agencies that rely upon [USAID's] ingenuity." Maxman Decl. ¶ 18. In the others, Maxman references USAID-chartered flights that humanitarian workers from other organizations (presumably including Oxfam) are invited to join, and expresses concern about the humanitarian consequences of USAID reducing its staff presence in Africa. *Id.* ¶ 19; Second Maxman Decl. ¶ 11.

These alleged injuries are not sufficiently concrete or particularized to confer on Oxfam standing to challenge broader, non-funding related aspects of the government's conduct with respect to USAID. *See, e.g.*, MTD at 21 ("Article III would *not* countenance granting Oxfam relief as to USAID employment conditions . . . ."). Oxfam does not explain how *it specifically* will suffer "negative ramifications" as a result of the government's proposed reorganization of USAID—or even how it specifically has come to rely on USAID's ingenuity—beyond the already-discussed relationships between Oxfam and USAID grantees. Nor does Oxfam allege that USAID charter flights are indeed no longer operative, and, if so, that Oxfam, as opposed to a different

organization, has suffered resulting harm. *See Lujan*, 504 U.S. at 563 ("To survive the Secretary's summary judgment motion, respondents had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by funded activities abroad, but also that one or more of respondents' members would thereby be directly affected apart from their special interest in the subject.") (quotation marks and alterations omitted). To the extent that Oxfam's concerns about USAID's overseas staff reductions are meant to imply that Oxfam may be prompted to expend additional resources in support of its humanitarian objectives, that assertion reduces to the same "manufactured" standing argument the Court rejected above.

\*\*\*

In sum, AFSA and AFGE have standing only to object to the government's personnel-related actions at USAID, which is the only challenged conduct that has caused them particularized injury. The same is likely true of the PSCA. And Oxfam lacks standing entirely.

### 2.    Channeling

As noted above, in denying preliminary relief in both *AFSA* and *PSCA*, the Court concluded that it likely lacked jurisdiction over plaintiffs' personnel-related claims because Congress intended them to proceed exclusively through various statutory schemes of administrative and judicial review. *See AFSA I*, 768 F. Supp. 3d at 24; *PSCA*, ECF No. 23 at 15. As to AFSA and AFGE, which represent USAID employees, the Court explained at length when denying the preliminary injunction that the Civil Service Reform Act (CSRA), Federal Service Labor Management Relations Statute (FSLMRS), and Foreign Service Act (FSA) likely channel their members' claims to various agencies and provide for subsequent review in specific Article III courts. *See AFSA I*, 768 F. Supp. 3. at 20–21 (discussing 5 U.S.C. § 1101 *et seq.* and 22 U.S.C. § 4101 *et seq.*).

As to the PSCA, which represents USAID PSCs, the Court similarly held when orally denying the TRO that the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–09, likely channels its members' claims to either the Board of Contract Appeals or the Court of Federal Claims.  *See PSCA*, ECF No. 23 at 12, 15.  The CDA "applies to any express or implied contract . . . made by an executive agency for" "the procurement of services," 41 U.S.C. § 7102(a)(2), and, where applicable, provides the exclusive procedure for resolving any "claim by a contractor . . . relating to a contract." *Id.* § 7103(a)(1); *see also Menominee Indian Tribe of Wisconsin v. United States*, 614 F.3d 519, 521 (D.C. Cir. 2010) ("The [CDA] . . . established a comprehensive framework for resolving contract disputes between executive branch agencies and government contractors.").  In particular, the CDA "pre-empts whatever jurisdiction this Court" generally has in contract disputes to which it applies, and mandates that such disputes be heard "only [in] the appropriate agency board of contract appeals or directly [in] the Court of Claims," with the "next appeal l[ying] only to the Federal Circuit."  *Nat'l Star Route Mail Contractors Ass'n, Inc. v. United States Postal Serv.*, 223 F. Supp. 3d 14, 30–31 (D.D.C. 2016).  Moreover, "[a]ll claims by a contractor against the government relating to a contract covered by the CDA must be submitted first to the contracting officer for a decision," before they are presented to any adjudicative body.  *Id.*

Services contracts like those between the PSCA's members and USAID generally fall within the CDA's ambit.  *See, e.g.*, *id.* at 21, 30 (applying CDA to claims by association of Postal Service delivery contractors); *Sys. Application & Techs., Inc. v. United States*, 26 F.4th 163, 170 (4th Cir. 2022) (applying CDA to claims by Navy services contractor).  To be sure, as the Court noted when denying the TRO, whether the PSCs' contracts are indeed covered by the CDA hinges on their precise terms, which the PSCA has never produced in this litigation.  *PSCA*, ECF No. 23 at 13; *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997) ("[A]ny

agreement can be a contract . . . provided that it meets the requirements for a contract with the Government . . . .").  But the PSCA also has never *rebutted* the notion that its members have CDA-covered contracts, as is its burden to do.  *See Khadr*, 529 F.3d at 1115.  Rather, it has focused its arguments throughout this litigation on the substance of its *claims*, which it argues are not "essentially contractual" as required for CDA channeling.  *PSCA*, ECF No. 14 at 9; Mot. at. 19–20.  The Court previously rejected those arguments, explaining that where the PSCA "ha[s] Article III standing to sue only because of [its members'] contractual relationships with USAID" and "expressly seek[s] reinstatement of their contracts," "it appears likely that [the PSCA's] claims are at bottom contractual ones to which the CDA will apply."  *PSCA*, ECF No. 23 at 13; *see also* Mot. at 1–2 (requested relief).

Since the Court reached its respective preliminary determinations about the mandatory channeling of these organizations' claims, nothing has changed to persuade it that either of those determinations was incorrect.  To the contrary, subsequent decisions by the Court of Appeals align with the Court's initial view.  The Court will thus begin with those decisions, and will then turn to why plaintiffs' arguments in their summary judgment and preliminary injunction briefing do not warrant departing from the previous conclusions of this Court or the Court of Appeals.

In *Widakuswara v. Lake*, a motions panel of the Court of Appeals issued a stay pending appeal of several injunctions issued in litigation concerning operational changes at the United States Agency for Global Media (USAGM).  *See Widakuswara II*, 2025 WL 1288817, at *1–2.  Not unlike USAID, USAGM is statutorily tasked with overseeing and disbursing grants to federally-funded broadcasting networks, including some that operate abroad.  *Id.* at *1.  In March 2025, however, President Trump issued an Executive Order that "directed USAGM leadership to reduce the agency to the minimum level of operations required by statute."  *Id.*  To implement that

Executive Order, USAGM leadership—also not unlike USAID leadership—placed employees on administrative leave, cancelled contracts with PSCs, and terminated funding to grantees. *Id.* After "[v]arious plaintiffs, including USAGM employees, contractors, and grantees, filed lawsuits to challenge these actions," which they characterized as the "wholesale shuttering of [the agency]" in violation of the Constitution and the APA, the district court "granted a preliminary injunction requiring USAGM to (1) restore its employees and contractors to their pre-March 14 status, (2) restore its FY 2025 grants with [the plaintiff networks], and (3) restore [the Voice of America network] as 'a consistently reliable and authoritative source of news,'" in keeping with the agency's statutory mandate. *Id.* at *1, *3; *see also Widakuswara v. Lake*, 2025 WL 1166400, at *5, *18 (D.D.C. 2025).

The government sought, and the motions panel granted, a stay pending appeal as to the first two provisions of the injunction. *Widakuswara II*, 2025 WL 1288817 at *2. The motions panel concluded that the district court likely lacked subject-matter jurisdiction to issue either form of challenged injunctive relief—that regarding USAGM's personnel actions and that regarding its grant terminations. *Id.* As to the former, the panel explained, citing the CSRA, FSLMRS, FSA, and CDA, that "[t]hese remedial schemes provide the exclusive procedures by which federal employees may pursue employment- and contractor-related claims." *Id.* (quotation marks and alterations omitted). The panel rejected plaintiffs' (and the district court's) view that the USAGM litigation fell outside those schemes because it concerned "broad government actions to dismantle an entire federal agency" rather than "simply a collection of employment disputes." *Id.* at *3 (quotation marks and alterations omitted). As the panel explained, the principle that "[f]ederal employees may not circumvent these statutes' requirements and limitations by resorting to the catchall APA to challenge agency employment actions" "applies to a systemwide challenge to

agency policy just as it does to the implementation of such a policy in a particular case." *Id.* at *2 (quotation marks, alterations, and ellipses omitted). And as to the district court's grant-related injunctive relief, the panel similarly concluded that it likely exceeded the district court's jurisdiction pursuant to the Tucker Act, which "vests the Court of Federal Claims with jurisdiction over claims against the United States 'founded . . . upon any express or implied contract with the United States.'" *Id.* at *3 (quoting 28 U.S.C. § 1491(a)(1)).

Plaintiffs moved for en banc reconsideration of the motions panel's stay, which the en banc Court granted in part—only as to the panel's stay of the district court's grant-related injunction, and only as to the plaintiffs that had demonstrated resulting irreparable harm. *See Widakuswara III*, 2025 WL 1521355, at *1–2 (D.C. Cir. 2025) (en banc). The Court concluded that the government had "not made the requisite 'strong showing' of a likelihood of success on the merits" of its Tucker Act channeling argument. *Id.* at *1 (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Yet—and most relevant here—the Court *denied* reconsideration of the panel's stay of the district court's personnel-related injunction, which, again, embraced claims by both USAGM employees and contractors, leaving intact the panel's reasoning on that score. *See Widakuswara IV*, 2025 WL 1556440 (D.C. Cir. 2025) (en banc).

To be sure, the government does not argue that the motions panel's reasoning is *binding* on the Court, *see, e.g.*, *AFSA*, ECF No. 89 at 5–6, and the Court will not treat it as such. *See, e.g.*, *S. Educ. Found. v. United States Dep't of Educ.*, 2025 WL 1453047, at *10 & n.4 (D.D.C. 2025) ("*Widakuswara II* is an unpublished opinion that may not be binding on this Court."). But the motions panel's decision on that question remains in force, and at a minimum it offers highly persuasive authority for the proposition that plaintiffs here must pursue their personnel-related

claims—whether brought on behalf of USAID employees or PSCs—through the statutory schemes the Court previously identified.

Plaintiffs resist that proposition by pointing to the provision of the district court's injunction that the panel did *not* address, which, again, ordered the government to "restore [Voice of America] programming such that USAGM fulfills its statutory mandate." *Widakuswara*, 2025 WL 1166400, at *18. Plaintiffs' argument is twofold. First, they analogize the relief they request to that unchallenged provision of the injunction, insofar as they similarly seek an order "prohibiting Defendants from shutting down USAID's operations in a manner not authorized by" statute. *AFSA*, ECF No. 88 at 7; *see also PSCA*, ECF No. 50 at 12–13. As explained above, however, that argument overlooks that the only relief plaintiffs have standing to seek is the restoration of USAID employees and PSCs to their pre-Executive Order status, including any working-conditions adjustments. That personnel-related relief is precisely what the motions panel held exceeds a district court's jurisdiction under the applicable channeling statutes.

Plaintiffs also point to statements that members of the en banc Court made about the unchallenged provision of the injunction when denying reconsideration of the panel's order on personnel-related relief. Namely, Chief Judge Srinivasan joined by six judges wrote that "[t]he court's denial of en banc reconsideration . . . should not be understood to accept or treat with the government's assertion" that the district court lacks authority under the third provision of its injunction to order "personnel actions" beyond those the government deems "necessary or appropriate to carry out its statutory mandate." *Widakuswara v. Lake*, No. 25-5144 (Order of May 28, 2025) (Srinivasan, C.J., respecting the denial of reconsideration en banc); *see also id.* (Pillard, J., respecting the denial of reconsideration en banc) (disagreeing with the merits of the motions panel's stay but deeming the "standard for the full court's intervention [] unmet because nothing

in the [] stay order prevents the district court from enforcing the unchallenged prong 3 of the injunction"). In plaintiffs' view, these statements "reflect[] that a majority of D.C. Circuit judges were not persuaded by the motions panel's conclusion that the district court likely lacked jurisdiction to enjoin USAGM's personnel actions in any way whatsoever." *AFSA*, ECF No. 88 at 8 (quotation marks omitted); *see also PSCA*, ECF No. 50 at 13. But there is significant daylight between what the district court's personnel-related injunction initially required and what certain members of the en banc Court appear to have suggested might be appropriate. In any event, the motions panel's stay order remains binding in that case on this question, and at the very least it supports the Court's initial jurisdictional analysis in both of these cases.

Plainitiffs also resist that analysis on its own terms, *Widakuswara II* notwithstanding. But plaintiffs' renewed objections—which differ little from their arguments in earlier briefing—are unpersuasive.

### 1.    AFSA and AFGE

AFSA and AFGE first try to resuscitate the premise the Court (like the *Widakuswara II* motions panel) dismissed at the outset: that this is not a channel-able employment dispute because plaintiffs are instead challenging the "dismantling of a federal agency, of which the en masse termination of employees is but one part." MSJ at 15. But as the Court has already explained, plaintiffs' only Article III injuries stem wholly from the government's actions with respect to their members' employment status. Because AFSA and AFGE lack standing to challenge any other "part" of USAID's dismantling (and Oxfam lacks standing entirely), the breadth of plaintiffs' complaint alone does not take this case outside the personnel-related review schema at issue.

Of course, as the Court recognized in *AFSA I*, a comprehensive statutory scheme only precludes district court jurisdiction if the specific "claims at issue are of the type Congress intended

to be reviewed within the statutory structure." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quotation marks and alteration omitted). The Supreme Court has identified three factors relevant to that inquiry: (1) whether denying district court jurisdiction could "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral" to the statute's review provisions; and (3) whether the claim is "outside the agency's expertise." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994). The Court remains convinced that none of these considerations pushes AFSA's and AFGE's claims outside of the relevant statutes.

AFSA and AFGE focus their efforts primarily on the second *Thunder Basin* factor, arguing that their claims are "collateral" to the relevant statutory schema because they challenge more than just "personnel actions." MSJ at 18, 20. But the cases on which AFSA and AFGE rely undermine rather than bolster their point. Indeed, warrantless searches, property conversion, the installation of hidden cameras, and rape are not mere adverse employment events that must be challenged in other fora. *See Stewart v. Evans*, 275 F.3d 1126, 1130 (D.C. Cir. 2002); *Manivannan v. Dep't of Energy*, 42 F.4th 163, 174 (3d Cir. 2022); *Gustavson v. Adkins*, 803 F.3d 883, 888–90 (7th Cir. 2015); *Brock v. United States*, 64 F.3d 1421, 1424–25 (9th Cir. 1995). But termination of employees via a RIF and related changes to employee working conditions surely are. *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 5, 22 (2012) (declining jurisdiction over constitutional claims against federal statute conditioning employment on Selective Service registry because "[a] challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme"); *AFSA I*, 768 F. Supp. 3d at 22 (explaining that review under CSRA is available for "any claim that an employee has suffered a 'significant change in duties, responsibilities, or working conditions' in a manner that 'violates any law, rule, or

regulation implementing . . . the merit system principles'") (quoting 5 U.S.C. §§ 2302(a)(1), (a)(2)(A)(xii), and (b)(12)); *id.* (explaining that the FSLMRS permits adjudication of union claims over employment conditions) (citing 5 U.S.C. §§ 7121–22); *id.* (noting that the FSA contains a "sweeping definition of 'grievance'" that "would permit a foreign USAID employee or union representative to challenge before the FSGB or FSLRB the whole range of actions to which plaintiffs [] object") (citing 22 U.S.C. § 4131(a)(1)).

AFSA and AFGE also argue that, in the context of this case, channeling their claims would wholly foreclose judicial review (violating the first *Thunder Basin* factor), because such review might not be available for some years—by which time USAID would "long since [have] ceased to exist." MSJ at 19. To start, it is not clear that the relief plaintiffs have standing to seek, i.e., their members' reinstatement, would indeed be out of reach after USAID's operations are wound down or assimilated into the State Department. Although the FLRA has held that the termination of an agency by legislation moots a pending unfair labor practice proceeding, *see Cmty. Servs. Admin.*, 7 F.L.R.A. 762, 763 (1982), it is currently speculative when or whether such legislation will in fact be passed as to USAID. And in any event, the Supreme Court has "made clear" that the mere "expense and disruption of protracted adjudicatory proceedings on a claim do not justify immediate review." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 192 (2023) (quotation marks omitted). Where plaintiffs simply "claim[] that the relief [they] seek[] would be harder to get if [they] proceed[] first before" the relevant administrative bodies, not that proceeding before those bodies would *itself* inflict harm, the judicial review factor does not tip in their favor. *Nat'l Treasury Emps. Union (NTEU) v. Trump*, 770 F. Supp. 3d 1, 9 (D.D.C. 2025); *cf. Axon*, 592 U.S. at 180, 191 (claims challenging the constitutionality of ALJ appointments could not be channeled to ALJs).

Finally, these plaintiffs reprise their argument that their claims are not within the competency of the relevant agency adjudicators, who "are generally ill suited to address structural constitutional challenges." *Carr v. Saul*, 593 U.S. 83, 92 (2021). But *Thunder Basin*'s "expertise" factor "will be satisfied so long as the agency's expertise is applicable to the 'threshold questions that may accompany' otherwise broader claims," and plaintiffs' suit plainly poses at least "preliminary" employment-related questions where such issues are the only ones they have standing to raise. *AFSA I*, 768 F. Supp. 3d at 23 (quoting *Payne v. Biden*, 62 F.4th 598, 607 (D.C. Cir.), *judgment vacated as moot*, 144 S. Ct. 480 (2023) (mem.)); *cf. Axon*, 598 U.S. at 195 (noting that *Elgin* relied on agency "expertise on a raft of ordinary employment issues surrounding the employee's contention that the Equal Protection Clause barred his discharge"). Plaintiffs' conclusory assertion that they seek review only of "agency action and constitutional abuses," MSJ at 20, does not persuade the Court otherwise. *See, e.g.*, *NTEU*, 770 F. Supp. 3d at 11 ("[A]lthough the FLRA may lack expertise on the constitutional claims, the agency could moot the need to resolve the unions' constitutional claims by finding that the President's actions violated the RIF statute.") (quotation marks omitted). Moreover, "[w]here plaintiffs *are* entitled to review before the MSPB, FLRA, FSGB, or FSLRB and subsequent judicial review, there is no reason to fear that plaintiffs' constitutional claims could wholly evade consideration." *AFSA I*, 768 F. Supp. 3d at 24. For instance, even if the MSPB "determine[s] that it lacks authority to decide" a constitutional issue, "[t]he Federal Circuit can then review the MSPB decision, including any factual record developed by the MSPB in the course of its decision on the merits." *Elgin*, 567 U.S. at 20.

### 2.     PSCA

The PSCA begins essentially where AFSA and AFGE started, by arguing that its claims are not "at their essence" contractual because they are styled as constitutional, APA, and ultra vires

challenges to the government's actions regarding USAID.  Mot. at 19.  But "[w]hether a claim is

at its essence contractual . . . depends both on the source of the rights upon which the plaintiff

bases its claims, and upon the type of relief sought (or appropriate)."  *Crowley Gov't Servs., Inc.*

*v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quotation marks omitted).  Here, the only rights that

the PSCA likely has standing to press are the contract rights of its members, which thereby define

the universe of relief that the Court could order in this case.

Of course, "the mere fact that a court may have to rule on a contract issue does not, by

triggering some mystical metamorphosis, automatically transform an action . . . into one on the

contract and deprive the court of jurisdiction it might otherwise have."  *Id.* at 1107.  Even when

claims "depend on the existence and terms of a contract with the government," they may still be

heard in district court if they "turn[] on more than just contractual terms."  *Cemex Inc. v. Dep't of*

*the Interior*, 560 F. Supp. 3d 268, 276 (D.D.C. 2021).  But when, similar to *AFSA*, the

fundamentally contract-based issue is seemingly the only issue the Court *could* rule on, the logic

necessarily runs the other way.  *Cf. Crowley*, 38 F.4th at 1104–05, 1108–09 (APA and ultra vires

claims for improper auditing of contract performance were not rooted in contract rights);

*Megapulse, Inc. v. Lewis,* 672 F.2d 959, 962, 969 (D.C. Cir. 1982) (suit to enjoin under Trade

Secrets Act the release of data contractually acquired by the government was not a contract action);

*Cemex*, 560 F. Supp. 3d at 274, 276 & n.4 (D.D.C. 2021) (acknowledging that plaintiffs "may not

elude the Court of Federal Claims' exclusive jurisdictional purview by 'disguising' contract claims

as something else" but holding that claims seeking vacatur of agency adjudication of contract

dispute on APA and due process grounds were not "essentially contractual") (quoting *Megapulse*,

672 F.2d at 969).

Here, unlike in *Crowley*, *Megapulse*, and *Cemex*, it appears "possible to conceive of [the PSCA's] dispute [with the government] as entirely contained within the terms of [its members'] contract[s]," because "[t]he question presented by the complaint could be phrased as whether the contract forbids termination under these conditions." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985); *see PSCA*, ECF No. 37 at 21–22 (seeking the reinstatement of contracts and the obligation of contract funds). That is especially true where the PSCs' contracts include "termination-for-convenience clause[s]," permitting the PSCA to "challenge the termination"—which, again, is the only source of its injuries—"based solely on contract principles."[5] *Ingersoll-Rand*, 780 F.2d at 78; *see PSCA*, ECF No. 39-16 ¶ 1. Accordingly, "[t]hat the termination also arguably violates certain other [provisions of law] does not transform the action into one based solely on those [provisions]." *Ingersoll-Rand*, 780 F.2d at 78. And "the fact that [the PSCA] here alleges both statutory and constitutional violations," rather than straight contract claims, also "does not change the [CDA] analysis." *Nat'l Star Route Mail Contractors*, 223 F. Supp. 3d at 34; *see also Ingersoll-Rand*, 780 F.2d at 78 (collecting cases for the proposition that "where plaintiff was awarded contract and government terminated for convenience, cause of action is on the contract despite plaintiff's allegations of statutory and constitutional violations").

Nor does it mean that the PSCA's claims fall outside the "unique expertise of the Court of Federal Claims." *Nat'l Star Route Mail Contractors*, 223 F. Supp. 3d at 34 (alteration omitted). Like AFSA and AFGE, the PSCA argues that its claims "do not belong before a specialized tribunal" because they turn on "questions of administrative and constitutional law" rather than

---

[5] The PSCA's original complaint specifically averred that the PSCs' contracts include "convenience to the agency" clauses, and complained that USAID failed to provide the "minimum notice" required for termination under those clauses. *PSCA*, ECF No. 1 ¶ 32. The amended complaint omits but does not disavow those allegations. *See generally PSCA*, ECF No. 37.

questions about "the merits of PSCs' terminations." Mot. at 22. As discussed, though, the likely "substance of Plaintiff's claims is that the [government] [has] improperly terminate[d] [PSC] contracts," which indeed "calls for knowledge of the government contracting process." *Nat'l Star Route Mail Contractors*, 223 F. Supp. 3d at 32–34 (Court of Federal Claims had sufficient expertise regarding association's due process and statutory claims over proposed termination of postal route contracts).

Turning to the remedy prong of the *Crowley* analysis, the PSCA argues that channeling its claims through the procedures set by the CDA would be inappropriate because, according to the PSCA, neither the Court of Federal Claims nor the Board of Contract Appeals can provide the declaratory and injunctive relief that it seeks. Mot. at 21. Yet, while it is true that "[t]he Claims Court does not have the general equitable powers of a district court to grant prospective relief," *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988), it does have authority to award equitable relief in certain "statutorily defined circumstances," including (1) when an order "directing restoration to office or position" is necessary "[t]o provide an entire remedy" and (2) when a claimant presents for adjudication a "nonmonetary dispute[]" "concerning termination of a contract." *H&M Assocs., LLC v. United States*, 165 Fed. Cl. 174, 184 (2023); 28 U.S.C. § 1491(a)(2); *see also Bowen*, 487 U.S. at 905 n.40 (noting that "Congress has . . . given the Claims Court certain equitable powers in specific kinds of litigation") (citing 28 U.S.C. § 1491(a)(2)). The PSCA asserts without further explanation that neither context is "present here," Mot. at 21 n.12, but it is not clear to the Court why that is.

More importantly, though, a "plaintiff may not sidestep the restrictions of the CDA merely by avoiding a request for damages." *Ingersoll–Rand*, 780 F.2d at 79. Here, it is likely that the only the relief the PSCA has standing to seek is the reinstatement of its members' contracts with

USAID or a declaration that they were wrongfully terminated. The "practical result" of granting

that "request for declaratory and injunctive relief would be [the] reinstatement of [their] terminated

contracts." *Id.* at 80. Thus, "the essence of [the PSCA's] claim is a request for specific

performance." *Id.* at 79–80 (request for order "reinstating" contract "amount[ed] to a request for

specific performance"). And even assuming that the Court of Federal Claims could not order that

relief, the Court of Appeals has nonetheless "indicated that a complaint involving a request for

specific performance must be resolved" by that Court, where, at minimum, plaintiffs will "have

available . . . a damages remedy for wrongful termination of the contract." *Id.* at 80 (citing

*Spectrum Leasing Corp. v. United States,* 764 F.2d 891, 894–95 (D.C. Cir. 1985); *Megapulse,* 672

F.2d at 969). "To hold that the CDA does not apply merely because, under that scheme, plaintiff

cannot receive all its requested [relief], would intolerably upset the congressional purpose

underlying the Act"—which is to establish "a scheme for the resolution of contract disputes" that

"includes a deliberate limitation on certain types of remedies." *Id.*

***

For the reasons above, the Court concludes that it lacks jurisdiction over AFSA's and

AFGE's claims. The Court further concludes that it likely lacks jurisdiction over the PSCA's

claims, and thus that the PSCA has not established a likelihood of success on the merits.

### B.    Remaining Preliminary Injunction Factors

The Court's jurisdictional conclusions do not end the matter as to the PSCA. Because the

PSCA seeks a preliminary injunction, the Court must also consider whether it has demonstrated

that it or its members will suffer irreparable harm absent an injunction, as well as whether the

equities and the public interest favor an injunction. *See Chaplaincy of Full Gospel Churches*, 454

F.3d at 297 (D.C. Cir. 2006); *Pursuing Am.'s Greatness*, 831 F.3d at 511.  The PSCA has not met

its burden on either score.

### 1.    Irreparable Harm

The standard for irreparable injury is "high":  it requires injuries that are "certain, great,

actual, and imminent," as well as "beyond remediation."  *Hi-Tech Pharmacal Co. v. FDA*, 587 F.

Supp. 2d 1, 11 (D.D.C. 2008); *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  The PSCA

cannot satisfy that standard, especially when considering the heightened showing required for

injunctive relief in government personnel matters—as this case ultimately is.  *See Sampson v.

Murray*, 415 U.S. 61, 83–84 (1974).

The PSCA points first to the termination notices that all PSCs have received.  Mot. at 38

(citing *PSCA*, ECF No. 39-4 at 90 ¶ 16).  Although the PSCA acknowledges that "job loss is not

normally an irreparable harm," it contends that "this is not a normal situation" because USAID is

"by far the biggest employer in the humanitarian aid sector," and provides essential funding for

"almost all other employers in the sector."  *Id.*  Thus, in the PSCA's estimation, and on its

assumption that decreased United States' foreign aid spending will cause the sector to

"disintegrate[]," "for the vast majority of PSCs, the loss of employment [at USAID] means the

loss of an entire career."  *Id.*  To be sure, in some circumstances, "massive economic disruption"

like that alleged by the PSCA "can be irreparable harm."  *Id.*; *see TikTok Inc. v. Trump*, 507 F.

Supp. 3d 92, 113 (D.D.C. 2020) (finding that TikTok was irreparably harmed by government

actions "[f]unctionally shutting [it] down").  But it is the plaintiff's burden to "substantiate the

claim that [such] irreparable injury is likely to occur" and "provide proof . . . indicating that the

harm is certain to occur in the near future," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir.

1985) (quotation marks omitted), and the PSCA has not done so here.  It has not provided, for

instance, any declarations from terminated PSCs unable to find new work, or from other humanitarian aid organizations attesting to hiring freezes. Without that kind of concrete evidence, it is wholly speculative whether the complete professional lockout that the PSCA presages could eventually befall its members.[6]

The PSCA next makes various arguments about irreparable harm that it alleges will accrue to USAID and the world writ large absent a preliminary injunction. It predicts that, without relief before judgment, USAID will permanently lose "institutional capacity," since "[o]nce USAID's infrastructure—its workforce, systems, contracts, and global partnerships—is dismantled, it cannot easily be restored." Mot. at 39. And the PSCA further alleges that this injury will culminate in injuries to USAID's implementing partners, who have had to "lay off employees, stop or limit operations, or even close their doors" as a result of the changes at USAID, and to humankind, which will face "[i]mmiseration, instability, hunger, disease, and death . . . if USAID does not do the work that Congress has mandated it to do." *Id.* at 41–42. Whatever the validity of these concerns, they are not concerns about irreparable harm to the PSCA or its members specifically. The Court noted when denying the TRO that such generalized allegations of irreparable injury are insufficient for preliminary relief, and the same is true today. *See PSCA*, ECF No. 23 at 7; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (noting that "the applicant" must be "likely to suffer irreparable harm before a decision on the merits").

---

[6] In a single line, the PSCA notes that "PSCs' personal information is being published on the widely publicized DOGE website," seemingly suggesting that this also inflicts irreparable harm. Mot. at 39 (citing *PSCA*, ECF No. 6-13 ¶¶ 3, 8; ECF No. 6-15 ¶¶ 3–4; ECF No. 39-4 at 102 ¶ 21). But despite including a provision in its proposed order that would require defendants to "[c]ease disclosing [PSCs'] personal identifying information on and remove that information from all DOGE websites," *PSCA*, ECF No. 39-26 ¶ (h), the PSCA never attempts to link this requested relief with the substance of its claims, which it maintains challenge the "dismantling and destruction of USAID." Mot. at 2. It is thus unclear how this theory of irreparable harm could support a preliminary injunction.

### 2.    Balance of the Equities and Public Interest

As the Court explained when denying the PSCA's TRO motion and in *AFSA I*, plaintiffs and the government have each identified plausible interests on either side of the equities ledger in these cases. *See PSCA*, ECF No. 23 at 15–16; *AFSA I*, 768 F. Supp. 3d at 25.  Although the facts on the ground have shifted somewhat since then, those asserted interests generally have not.  On one hand, the PSCA claims that without injunctive relief USAID will cease to exist, decades of "efforts to project U.S. 'soft power'" will be wasted, and drastic humanitarian consequences will ensue. Mot. at 43.  On the other hand, the government claims that enjoining its "reorganization of USAID" would prevent it from aligning the United States' foreign aid programs with American values—including by quashing objectionable projects that "serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries."  Opp. at 41 (quoting Exec. Order No. 14, 169, 90 Fed. Reg. 8619 § 1).

As the Court has said before, it is difficult to weigh these assertions against each other, seeing as they differ not only directionally but also in kind.  *See AFSA I*, 768 F. Supp. 3d at 25. What the Court is ultimately most moved by, then, are the same jurisdictional principles that form the core of these cases.  It is likely that the only harms as to which the PSCA has standing to seek relief are those regarding the termination of its members' voluntarily entered contractual agreements with USAID, and it is also likely that such terminations must and be addressed (and, if unlawful, will be redressed) under the CDA.  *See Widakuswara II*, 2025 WL 1288817, at *5. On the other hand, issuing preliminary relief requiring the reinstatement of PSCs would intrude into Executive Branch personnel matters and expand the judicial role.  *See id.* at *5–6 ("[T]he Executive Branch has a significant interest in maintaining control over personnel matters" and

"[t]he public has an interest in the Judicial Branch's respect for the jurisdictional boundaries laid down by Congress."). Where the PSCA has not demonstrated any irremediable injury and where Congress meanwhile has "limited the resolution of . . . potentially costly [personnel] claims" implicating the public fisc to "specialized tribunals" like the Court of Federal Claims, *id.* at *6, the Court concludes that neither the equities nor the public interest favor a preliminary injunction.

## IV.    Conclusion

For the foregoing reasons, the Court will deny the *AFSA* plaintiffs' motion for summary judgment, *AFSA*, ECF No. 51, and will grant the government's motion to dismiss, *AFSA*, ECF No. 70. The Court will deny the PSCA's motion for a preliminary injunction, *PSCA*, ECF No. 39. Orders in both cases will accompany this Opinion.

DATE: July 25, 2025

_____
CARL J. NICHOLS
United States District Judge

JA 216

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| American Foreign Service Association, et al., | |
| *Plaintiffs*, | |
| v. | Case No. 1:25-cv-00352 |
| President Donald J. Trump, et al., | |
| *Defendants*. | |

**PLAINTIFFS' NOTICE OF APPEAL**

Plaintiffs American Foreign Service Association, American Federation of Government Employees, and Oxfam America hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Order issued on July 25, 2025 (ECF No. 90) and the Memorandum Opinion (ECF No. 91), granting Defendants' motion to dismiss and denying summary judgment, and from all orders antecedent to such order and opinion.

Dated: August 5, 2025              Respectfully submitted,

*/s/ Lauren Bateman*
Lauren Bateman (DC Bar No. 1047285)
Karla Gilbride (DC Bar No. 1005586)
Allison Zieve (DC Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
lbateman@citizen.org

Kaitlyn Golden (DC Bar No. 1034214)
Kayla M. Kaufman (DC Bar No. 90029091)
Robin F. Thurston (DC Bar No. 1531399)
Skye L. Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kgolden@democracyforward.org