**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-5290**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES; AMERICAN FOREIGN SERVICE ASSOCIATION; OXFAM AMERICA,

Plaintiffs-Appellants,

v.

DONALD J. TRUMP, President of the United States of America; UNITED STATES DEPARTMENT OF STATE; UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT; UNITED STATES TREASURY; MARCO RUBIO, Secretary of State, and Acting Administrator of United States Agency for International Development; SCOTT BESSENT, Secretary of Treasury,

Defendants-Appellees.

---

On Appeal from the United States District Court
for the District of Columbia

---

### BRIEF FOR APPELLEES

---

BRETT A. SHUMATE
  *Assistant Attorney General*

JEANINE PIRRO
  *United States Attorney*

SARAH WELCH
TIBERIUS DAVIS
  *Counsel to the Assistant Attorney General*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202)-514-4357*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.     Parties and Amici

Defendants-Appellees are Donald J. Trump, President of the United States of America; United States Department of State; United States Agency for International Development; United States Department of the Treasury; Marco Rubio, Secretary of State, and Acting Administrator of United States Agency for International Development; and Scott Bessent, Secretary of Treasury.

Plaintiffs-Appellants are American Federation of Government Employees; American Foreign Service Association; and Oxfam America.

Amici in the district court include Former Senior National Security Officials (Charles Hagel, William Perry, Michael Hayden, Howard Berman, Eric Edelman, Brian McKeon, Wendy Sherman, Alexander Vershbow, Gayle Smith, Richard Boucher, A. Peter Burleigh, Ruth Davis, Robert Goldberg, Gordon Gray, Richard Greene, Robert Hutchings, Chris Kojm, Nancy McEldowney, Daniel Shapiro, Todd Stern, Harry Thomas Jr., and Pamela White); RESULTS Educational Fund, Inc.; ActionAid USA; Unitarian Universalist Service Committee; Members of Congress (202 individuals); and Constitutional Accountability Center. There were no intervenors in district court.

Amici in this Court include ActionAid USA and Unitarian Universalist Service Committee. There have been no intervenors in this Court to date.

**B.    Rulings Under Review**

The rulings under review (issued by Judge Carl J. Nichols) are the memorandum opinion and order filed on July 25, 2025. The memorandum opinion is available at 792 F. Supp. 3d 116.

**C.    Related Cases**

The case on review has not previously been before this Court or any other court. There are several related pending cases within the meaning of D.C. Circuit Rule 28(a)(1)(C):

*Personal Services Contractor Ass'n v. Trump*, No. 25-5291 (D.C. Cir.);

*Does 1-26 v. Musk*, No. 25-1273 (4th Cir.).


 */s/ Tiberius Davis*
Tiberius Davis
*Counsel to the Assistant Attorney General*

ii

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ................................................................................. 1

STATEMENT OF JURISDICTION........................................................ 3

STATEMENT OF THE ISSUE.............................................................. 3

STATEMENT OF THE CASE................................................................ 3

    A.    Statutory Frameworks For Federal Employee Disputes. .....................3

    B.    The Statutory Framework For Foreign Aid .................................6

    C.    Factual Background................................................................8

    C.    Prior Proceedings .................................................................9

SUMMARY OF ARGUMENT ............................................................. 16

STANDARD OF REVIEW ................................................................... 22

ARGUMENT ...................................................................................... 22

I.    Plaintiff Unions' Claims Are Not Justiciable................................. 23

    A.    Plaintiffs Unions' Employment-Related Claims Are Subject To Mandatory Statutory Frameworks.......................................23

    B.    Plaintiff Unions Lack Standing To Assert Any Other Claims............37

II.    Plaintiff Oxfam Lacks Article III Standing.................................. 47

CONCLUSION .................................................................................. 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

*AFGE v. Trump,*
   (*AFGE II*), 929 F.3d 748 (D.C. Cir. 2019) .......................... 4, 5, 25, 28, 30, 32, 34

*AFSA v. Baker*,
   895 F.2d 1460 (D.C. Cir. 1990) .......................................... 5, 18, 25, 28

*Alder v. Tennessee Valley Authority*,
   43 F. App'x 952 (6th Cir. 2002) ....................................................... 26

*American Anti-Vivisection Soc'y v. USDA*,
   946 F.3d 615 (D.C. Cir. 2020) ..................................................... 48, 51

*American Fed. of Gov't Emps. v. Secretary of Air Force*,
   (*AFGE I*), 716 F.3d 633 (D.C. Cir. 2013) ...................... 6, 22, 25, 28, 29, 30, 34

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ................................................. 21, 23, 54

*Ashgar v. United States*,
   23 Fed. Cl. 226 (1990) ........................................................... 27

*Axon Enter., Inc. v. Federal Trade Comm'n*,
   598 U.S. 175, (2023) ....................................................... 30, 31, 37

*Ayuda, Inc. v. Thornburgh*,
   880 F.2d 1325 (D.C. Cir. 1989) .................................................. 25

*Biden v. Texas*,
   597 U.S. 785 (2022) ............................................................ 45

*Block v. Community Nutrition Institute*,
   467 U.S. 340 (1984) ............................................................ 29

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ............................................................ 47

*Carr v. Saul,*
   593 U.S. 83 (2021) ...........................................................................36

*Center for Biological Diversity v. United States Dep't of the Interior,*
   144 F.4th 296 (D.C. Cir. 2025) ............................ 19, 21, 38, 47, 48, 51

*Center for L. & Educ. v. Department of Educ.,*
   396 F.3d 1152 (D.C. Cir. 2005)........................................................54

*Cooper v. Tennessee Valley Authority,*
   723 F.2d 1560 (Fed. Cir. 1983) ................................................. 18, 26

*Council. See Sustainability Inst. v. Trump,*
   -- F.4th --, 2026 WL 157120 (4th Cir. Jan. 21, 2026).......................36

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ................................................................ 19, 38, 43

*Dalton v. Specter,*
   511 U.S. 462 (1994) .........................................................................35

*Doe v. Virginia Dep't of State Police,*
   713 F.3d 745 (4th Cir. 2013) ...........................................................53

*Drs. For Am. v. OPM,*
   766 F. Supp. 3d 39 (D.D.C. 2025)...................................................56

*E.T. v. Paxton,*
   41 F.4th 709 (5th Cir. 2022) ............................................................44

*Elgin v. Department of the Treasury,*
   567 U.S. 1 (2012) ...............................18, 19, 24, 25, 27, 28, 31-34, 36

*Federal Law Enforcement Officers Ass'n v. Ahuja,*
   62 F.4th 551 (D.C. Cir. 2023) .......................3, 17, 18, 24-28, 33-34, 37

*Filebark v. U.S. Dep't of Transp.,*
   555 F.3d 1009 (D.C. Cir. 2009)........................................................24

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................ 14, 21, 43, 46-49, 51

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005)............................................................... 6, 35

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ...............................................................................31

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016)..............................................................55

*Ghaly v. USDA*,
  228 F. Supp. 2d 283 (S.D.N.Y. 2002) ..................................................26

*Gill v. Whitford*,
  585 U.S. 48 (2018) ......................................................................... 38, 46

*Global Health Council v. Trump*,
  2025 WL 2480618 (D.C. Cir. Aug. 28, 2025)......................... 8, 29, 35

*Hekel v. Hunter Warfield, Inc.*,
  118 F.4th 938 (8th Cir. 2024).................................................................55

*Hunter v. United States*,
  36 Fed. Cl. 257 (1996)............................................................................27

*Indep. Equip. Dealers Ass'n v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004)..............................................................45

*Indep. Mkt. Monitor for PJM v. FERC*,
  2025 WL 3760365 (D.C. Cir. Dec. 30, 2025)............................... 52, 56

*Institutional S'holder Servs., Inc. v. SEC*,
  142 F.4th 757 (D.C. Cir. 2025) .............................................................20

*John Doe v. Metro. Police Dep't of D.C.*,
  445 F.3d 460 (D.C. Cir. 2006)..............................................................22

*Lewis v. Casey*,
  518 U.S. 343 (1996) .........................................................................47

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .......................................................... 21, 39, 42, 53

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ...................................................................... 40, 45

*Mideast Sys. & China Civ. Const. Saipan Joint Venture, Inc. v. Hodel*,
  792 F.2d 1172 (D.C. Cir. 1986)........................................................54

*Missouri v. Jenkins*,
  515 U.S. 70 (1995) .........................................................................43

*Nat'l Treasury Emps. Union v. Trump*,
  770 F. Supp. 3d 1 (D.D.C. 2025) ....................................................32

*New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*,
  208 F. Supp. 3d 142 (D.D.C. 2016) .................................................55

*NTEU v. Trump*,
  770 F. Supp. 3d (D.D.C. 2025)........................................................37

*Nw. Airlines, Inc. v. FAA*,
  795 F.2d 195 (D.C. Cir. 1986).........................................................54

*Nyunt v. Chairman, Broad. Bd. of Governors*,
  589 F.3d 445 (D.C. Cir. 2009)............................................... 18, 24, 34

*Persinger v. Southwest Credit Sys., L.P.*,
  20 F.4th 1184 (7th Cir. 2021)..........................................................42

*PETA v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015)........................... 21, 40, 43, 48, 50, 53

*Porter v. England*,
  35 Fed. App'x 660 (9th Cir. 2002)...................................................26

*Raines v. Byrd*,
    521 U.S. 811 (1997) ................................................................. 38, 40

*Schlesinger v. Reservists Comm. to Stop the War*,
    418 U.S. 208 (1974) ................................................................. 20, 43

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................. 48, 49

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ......................................................................53

*Tanner-Brown v. Haaland*,
    105 F.4th 437 (D.C. Cir. 2024) ..........................................................41

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ................................................................. 17, 24

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017) ............................................................. 13, 14, 45

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ....................................................... 20, 39, 42, 48

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ................................................................. 46, 47

*U.S. Inf. Agency v. Krc*,
    989 F.2d 1211 (D.C. Cir. 1993) ......................................... 4, 18, 25, 27

*United States v. Fausto*,
    484 U.S. 439 (1988) ....................................................... 3, 24-26, 29

*United States v. Texas*,
    599 U.S. 670 (2023) ......................................................................38

*Valley Forge Christian Coll. v. Americans United for Separation of Church &
    State, Inc.*,
    454 U.S. 464 (1982) ................................................................. 38, 43

*Weaver v. U.S. Information Agency*,
  87 F.3d 1429 (D.C. Cir. 1996)..................................................................32

*Widakuswara v. Lake*,
  2025 WL 1556440 (D.C. Cir. May 22, 2025) .....................................16

*Widakuswara v. Lake*,
  *(Widakuswara II)*, 2025 WL 1288817 (D.C. Cir. May 3, 2025)............ 15, 16, 45

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................................35

## STATUTES

5 U.S.C. § 1204(a)(2)..................................................................................4

5 U.S.C. § 7101-35......................................................................................4

5 U.S.C. § 7105(a)(2)..................................................................................4

5 U.S.C. § 7121..........................................................................................26

5 U.S.C. § 7502..........................................................................................26

5 U.S.C. § 7512............................................................................................4

5 U.S.C. § 7701(a) ............................................................................... 18, 26

5 U.S.C. § 7703(b)(1)................................................................................28

22 U.S.C. § 2381..........................................................................................6

22 U.S.C. § 4010a(c)................................................................................27

22 U.S.C. § 4106..........................................................................................5

22 U.S.C. § 4107..........................................................................................5

22 U.S.C. § 4109(a) .....................................................................................5

22 U.S.C. § 4116 ...........................................................................................5

22 U.S.C. § 4131(a)(1) ........................................................................ 5, 19, 27

22 U.S.C. § 4140 .........................................................................................28

22 U.S.C. § 6563 ...........................................................................................7

28 U.S.C. § 1291 ...........................................................................................3

28 U.S.C. § 1331 ...........................................................................................3

## REGULATIONS

5 C.F.R. § 351.901 ............................................................................ 4, 18, 26

## Other Authorities

*Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999*,
    Pub. L. No. 105-277, 112 Stat. 2681 (1998) .................................................7

*Further Consolidated Appropriations Act, 2024*,
    Pub. L. No. 118-47, 138 Stat. 480 (2024) ..................................................7

*Administration of Foreign Assistance and Related Functions*,
    Exec. Order No. 10,973, §§ 101, 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961) .........7

*Reevaluating and Realigning United States Foreign Aid*,
    Exec. Order No. 14,169, 90 Fed. Reg. 1,000 (Jan. 22, 2025). ...............................8

*Foreign Assistance Act of 1961*,
    Pub. L. 87-195 ......................................................................................6

# GLOSSARY

| | |
|---|---|
| AFGE | American Federation of Government Employees |
| AFSA | American Foreign Service Association |
| APA | Administrative Procedure Act |
| CSRA | Civil Service Reform Act |
| FLRA | Federal Labor Relations Authority |
| FSA | Foreign Service Act |
| FSLMRS | Federal Service Labor-Management Relations Statute |
| FSLRB | Foreign Service Labor Relations Board |
| MSPB | Merit Systems Protection Board |
| RIF | Reduction-in-Force |
| USAID | U.S. Agency for International Development |

## INTRODUCTION

In this case, unions representing former employees of the U.S. Agency for International Development (USAID) seek to transform their personnel-related claims into a programmatic broadside against the Executive Branch's lawful efforts to restructure the Nation's foreign aid programs to better align with American interests. Plaintiffs argue they are vindicating core separation of powers interests, but they ignore basic Article III standing principles and Congress's choice to channel personnel claims through exhaustive and exclusive statutory frameworks. Those doctrines reflect equally important separation of powers interests as limits on the judiciary stemming from the Constitution and Congress. The district court was correct to dismiss plaintiffs' suit for lack of jurisdiction. This Court should affirm.

Plaintiffs include two unions that represent USAID employees and a non-profit organization (Oxfam America) that seek to enjoin the so-called "dismantling" of USAID, claiming that such action violates various constitutional and statutory provisions. The district court denied their motion for a preliminary injunction and subsequently granted the government's motion to dismiss. As the district court held, plaintiffs lack Article III standing to bring their broadest claims, and the remainder are subject to mandatory statutory frameworks that deprive the district court of subject-matter jurisdiction.

The district court's jurisdictional holdings properly respect the limits that both Article III and Congress have placed on suits of this kind. It is axiomatic that plaintiffs may seek redress only for actions that injure them and that their remedy may be no broader than necessary to redress those injuries. But apart from concrete personnel actions, plaintiffs have not identified any part of USAID's alleged dissolution that injures them or their members. For example, they do not explain how they are injured by the cancellation of building leases, the decommissioning of agency assets, or even the transfer of USAID functions to the State Department. In short, without an injury-in-fact caused by the agency's organizational changes, plaintiffs lack standing to challenge those actions or to seek a remedy that sweeps so broadly. For its part, plaintiff Oxfam lacks standing entirely; while Oxfam operates in the humanitarian sector, Oxfam does not receive grant funding from USAID, and it is not injured by the termination of grant funding to other organizations.

Plaintiffs' only plausibly cognizable claims, therefore, are related to personnel actions, which are subject to mandatory statutory frameworks that Congress created to govern federal personnel disputes. Plaintiff unions may not bypass those frameworks by heading straight to district court; they first must present their challenges to the relevant administrative forum, following the procedures established by Congress. The district court thus lacks subject-matter jurisdiction over the only claims that plaintiffs plausibly have standing to bring.

2

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1361. On July 25, 2025, the district court granted the government's motion to dismiss for lack of jurisdiction and denied plaintiffs' motion for summary judgment. JA179. Plaintiffs filed a timely notice of appeal on August 5, 2025. JA217. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court properly dismissed the complaint for lack of jurisdiction, because plaintiffs' only potentially cognizable claims are subject to mandatory statutory frameworks that govern federal personnel disputes.

## STATEMENT OF THE CASE

### A.    Statutory Frameworks For Federal Employee Disputes.

Plaintiffs include two unions that represent USAID civil servants and foreign service officers. Different statutory frameworks govern the claims of civil servants, foreign service officers, and their unions against the federal government.

Civil service. The Civil Service Reform Act (CSRA) "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 443, 455 (1988); *see generally Federal Law Enforcement Officers Ass'n v. Ahuja*, 62 F.4th 551, 555 (D.C. Cir. 2023). Under the CSRA, most civilian employees can appeal a major adverse

3

personnel action to the Merit Systems Protection Board (MSPB). 5 U.S.C. §§ 7512, 7513(d), 7701. As relevant here, employees subject to a reduction-in-force (RIF) may pursue MSPB challenges, *see* 5 C.F.R. § 351.901, and seek relief including reinstatement with backpay, 5 U.S.C. §§ 1204(a)(2), 7701(b)(1)(B). An employee aggrieved by a final decision of the MSPB may obtain judicial review, usually in the Federal Circuit. *Id.* § 7703(a)(1), (b)(1)(A).

The CSRA also includes the Federal Service Labor-Management Relations Statute (FSLMRS), which governs labor relations between the Executive Branch and its civil-service employees. 5 U.S.C. §§ 7101-35; *see AFGE v. Trump* (*AFGE II*), 929 F.3d 748, 752 (D.C. Cir. 2019). The Federal Labor Relations Authority (FLRA) decides federal labor disputes. 5 U.S.C. § 7105(a)(2). Under this framework, a union may bring an unfair labor practice charge to the General Counsel of the FLRA, who may issue a complaint, leading to final action by the FLRA. *Id.* § 7118(a). The FLRA's decisions generally are reviewable in the courts of appeals. *Id.* § 7123(a).

Foreign service. The Foreign Service Act of 1980 (FSA) is a "companion measure" to the CSRA that provides "a comprehensive system for reviewing personnel action[s] taken against" foreign service employees. *U.S. Inf. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993) (citations omitted). The FSA governs employee "grievances," defined as "any act, omission, or condition subject to the control of the Secretary which is alleged to deprive a member of the Service ... of a

4

right or benefit authorized by law or regulation or which is otherwise a source of concern or dissatisfaction to the member." 22 U.S.C. § 4131(a)(1). A foreign service employee first must file a grievance with the State Department, *see id.* § 4134(a); if a grievance is not resolved within ninety days, the employee then may file a grievance with the Foreign Service Grievance Board, *id.* § 4134(b), and its decisions are reviewable in district court, *id.* § 4140. Employees subject to a RIF may challenge their terminations either by using these grievance procedures (before the termination takes effect) or by appealing to the MSPB (afterward). *Id.* § 4010a(c).

The FSA also created the Foreign Service Labor Relations Board (FSLRB) within the FLRA. *See AFSA v. Baker*, 895 F.2d 1460, 1461 (D.C. Cir. 1990); 22 U.S.C. § 4106. The FSLRB adjudicates federal labor disputes, 22 U.S.C. § 4107, and "has enforcement authority that mirrors the authority Congress gave to the FLRA in the [CSRA]," *AFSA*, 895 F.2d at 1461. A union may bring an unfair labor practice charge to the General Counsel of the FSLRB, who may issue a complaint leading to final action by the FSLRB. 22 U.S.C. § 4116. The FSLRB's decisions are reviewable in this Court. 22 U.S.C. § 4109(a).

These statutory frameworks are all "exclusive," meaning that for claims falling within their scope, plaintiffs may seek relief *only* through the procedures provided therein. *See, e.g.*, *AFGE II*, 929 F.3d at 755 (CSRA and FSLMRS); *AFSA*, 895 F.2d at 1461-62 (FSA). Plaintiffs with covered claims therefore must bring their

5

claims to the appropriate administrative agency, as required by the relevant statutory framework, before seeking further review in federal court. Plaintiffs may not seek relief beyond what Congress provided through those channels. *See, e.g.*, *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.) ("[S]o far as review of determinations under the CSRA is concerned, what you get under the CSRA is what you get."); *American Fed. of Gov't Emps. v. Secretary of Air Force* (*AFGE I*), 716 F.3d 633, 636 (D.C. Cir. 2013) ("Even if the plaintiff 'cannot prevail in a claim under the CSRA,' no other relief is available." (citation omitted)).

## B.    The Statutory Framework For Foreign Aid.

Congress enacted the Foreign Assistance Act of 1961, Pub. L. 87-195, 75 Stat. 424, to "organize and implement U.S. foreign assistance programs." CRS, *Foreign Assistance Act of 1961: Authorizations and Corresponding Appropriations* 1 (2023). The Act provides that "[t]he President may exercise any functions conferred upon him by [the Act] through such agency or officer of the United States Government as he shall direct." 22 U.S.C. § 2381; *see also, e.g.*, *id.* § 2151b(c)(1) (authorizing the administration of programs "on such terms and conditions as [the President] may determine"); *id.* § 2392(a) (authorizing the President to transfer funding "to any agency … for carrying out the purposes of [the Act]").

In 1961, President Kennedy exercised his authority under the Act and Article II to create USAID by executive order. That order established USAID as "an agency

in the Department of State" and delegated "to the Secretary of State … all functions conferred upon the President by" the Act. USAID Exec. Order 10,973, §§ 101, 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). In 1998, Congress revised USAID's structure by making the agency an "independent establishment," 22 U.S.C. § 6563, with the USAID Administrator "under the direct authority and foreign policy guidance of the Secretary of State," *id.* § 6592. The 1998 statute directed President Clinton to weigh in on these and other organizational decisions within 60 days, *id.* § 6601(a)(1), (d)(1), and he chose to keep USAID a "distinct agency" subject to State Department control, *see* Pub. L. No. 105-277, 112 Stat. 2681 (1998). Subsequent Presidents made additional changes to USAID's structure, including to transfer certain functions and employees to the State Department. *See, e.g.*, GAO, *Foreign Aid Reform: Comprehensive Strategy, Interagency Coordination, and Operational Improvements Would Bolster Current Effort* 26-27 (2009).

More recently, Congress has relied on annual appropriations acts to influence foreign aid policy. *See* CRS, *Foreign Assistance: An Introduction to U.S. Programs and Policy* 29 (2022). For example, in the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, Congress appropriated funds "to the President" in order "to carry out" Foreign Assistance Act programs and reaffirmed that the Secretary "may … transfer funds" under that Act. *Id.* at 739. Congress also therein provided that appropriated funds may not be used to "implement a

reorganization [or] redesign" of USAID without "prior consultation" with Congress, including actions to "eliminate" or "consolidate" USAID or "transfer" its authorities "to other agencies." *See id.* at 843-44, § 7063(a), (b); *id.* at 766, § 7015(a).

### C.    Factual Background.

On January 20, 2025, President Trump issued an executive order to pause foreign aid and review those programs for compliance with U.S. interests. Exec. Order 14,169, 90 Fed. Reg. 8619 (Jan. 30, 2025); *see Global Health Council v. Trump*, 2025 WL 2480618, *2 (D.C. Cir. Aug. 28, 2025). On January 24, Secretary of State Marco Rubio paused most new funding obligations for USAID programs, subject to certain waivers. *Global Health Council*, 2025 WL 2480618, at *3. Over the following weeks, actions were taken to reduce USAID's presence while the Secretary commenced his review. For example, the agency's website was shut down on February 1, the headquarters building was closed on February 3, and many USAID employees were placed on paid administrative leave. JA74-75.

Secretary Rubio has served as USAID Acting Administrator since January 30. On February 3, Secretary Rubio notified Congress of his review of USAID's activities. He had designated Peter Marocco, an official at the State Department, to serve as Deputy Administrator of USAID. JA159-60. Secretary Rubio indicated that Marocco would "begin the process of engaging in a review and potential reorganization of USAID's activities," which "may include, among other things, the

suspension or elimination of programs," the "closing" or "reorganizing" of "establishments, organizations, bureaus, centers or offices," and "reducing the size of the workforce at such entities." *Id.*

Following the Secretary's notice to Congress, additional actions were taken at USAID. For example, on February 23, USAID employees were notified that almost all direct-hire employees would be placed on administrative leave, "with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs," and that USAID was "beginning to implement" a RIF "that will affect approximately 2,000 USAID personnel." JA36. On March 28, 2025, Congress was notified of the results of the Secretary's review and advised of the State Department's "intent to realign select USAID functions to the Department and to phase out others." JA168. Similarly, USAID personnel were notified by email that they would receive RIF notices with a separation date of July 1 or September 2, 2025. JA184.

## C.    Prior Proceedings.

**1.** On February 6, 2025, plaintiffs American Federation of Government Employees (AFGE) and American Foreign Service Association (AFSA) filed this action. JA19. AFGE and AFSA (together, plaintiff unions) represent USAID civil service and foreign service employees. JA23. They sought declaratory and injunctive relief, claiming that "actions to shut down USAID's operations" violated the

9

separation of powers, the Take Care Clause, and the Administrative Procedure Act (APA). JA46-47.

The next day, the district court entered a limited temporary restraining order aimed at preventing physical harm to USAID employees stationed abroad, "requir[ing] the government until February 14 to reinstate USAID direct-hire employees who had been placed on administrative leave and to withhold from placing any additional employees on administrative leave or evacuating them from their overseas posts." JA186. In the meantime, on February 13, 2025, plaintiffs amended the complaint to add a plaintiff, Oxfam America, Inc., update their assertions of injury, and add a claim that the government's "actions to unilaterally dismantle USAID" were ultra vires. *Id.*

Plaintiffs' amended complaint set forth several theories of injury. First, they alleged harm to their own interests, asserting that the government's actions caused them to lose membership and divert resources to assist employee members. *See* JA81 (alleging that AFGE had "to devote considerable resources into advising its members about the consequences of defendants' arbitrary and reckless actions" and "will lose the ability to represent its members who were USAID employees and will lose hundreds of members."); JA79 (alleging that AFSA "has diverted significant time and resources to addressing its members' questions and concerns and processing hundreds of changes to members' accounts," such that AFSA "has

needed to divert resources away from other priorities to respond to the USAID shutdown.").

Next, plaintiff unions alleged harm to their members. AFGE asserted that its members "are confused and frightened" and "have made choices with significant financial consequences—such as geographic location and family planning—in reliance on defendants' adherence to federal law." JA81. AFGE further alleged that some members "have been shut out of USAID computer systems" and thus "have been unable to recoup reimbursements or to access health benefits" and "will be forced to incur substantial out-of-pocket costs." JA81-82. AFSA asserted that foreign service officers "are experiencing myriad financial injuries," including unpaid travel reimbursements, relocation costs, and lost income. JA79-89. AFSA also asserted risks faced by some foreign service officers located abroad related to "losing access to USAID's security apparatus" and changes to their immunity status. JA80-81.

Finally, plaintiff Oxfam, a humanitarian organization engaged in foreign aid work, alleged that it was injured "by the disruption and halting of USAID's work." JA82. Although not a USAID grant recipient, Oxfam asserted that its "resources will be significantly overstretched in an attempt to fill the $63 billion void left by USAID," which "will force Oxfam and other organizations to reallocate funds away from critical programs" and thus undermine "Oxfam's mission." *Id.* Oxfam also

alleged that it "implements programs in close collaboration" with organizations that "receive USAID funding," such that the "freeze on USAID foreign aid is impeding Oxfam's work on those programs," including several projects for which "Oxfam has already been directed to stop work" and others "for which Oxfam has completed work but has not been compensated." *Id.*

**2.** On February 21, 2025, the district court denied the preliminary injunction. JA100. On the merits, the court recognized that plaintiff unions' alleged injuries were all "archetypal complaints about changed employment conditions and their follow-on effects," which were "largely financial." JA115. "Indeed, even plaintiffs' allegations of harm from the broader funding pause and stop-work orders pertain primarily to how those actions will affect their members in their capacities as USAID employees." JA115-16. The court concluded that it likely lacked subject-matter jurisdiction over these employment-related claims. JA116-23. "Congress has established 'comprehensive' statutory schemes governing the review of employment disputes arising between the federal government and its civil and foreign service officers," including the CSRA, FSLMRS, and FSA. JA116. "Congress likely intended for plaintiffs' current claims of employment-based harm … to proceed exclusively through the three statutory schemes just discussed." JA117. Plaintiffs did not appeal the denial of the preliminary injunction.

12

**3.** On July 25, 2025, the district court granted the government's motion to dismiss for lack of jurisdiction and denied plaintiffs' motion for summary judgment. JA180.

The district court began with Article III standing. The court recognized that "plaintiffs must demonstrate standing for each form of relief sought," such that it "must look at plaintiffs' claims and requested remedies separately and ask, for each, whether it would redress an injury-in-fact that is fairly traceable to the government's conduct." JA191 (citing *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)). The court "assume[d] without deciding" that plaintiff unions "have standing to challenge the government's actions with respect to the employment … status and related working conditions of USAID's employees … , and to seek relief from those discrete personnel actions." JA194. But they lack standing "to challenge the government's *non*-personnel actions with respect to USAID, such as its grant terminations, website closures, and lease transfers, where the associations have alleged no concrete and particularized injuries flowing from those actions specifically." *Id.* Critically, the requested relief "spans far beyond, and thus would *not* redress, the personnel-related injuries they have alleged." JA195. And while plaintiffs suggested the government's actions "have caused their members to fear a 'global humanitarian crisis,'" that was "an undifferentiated 'generalized grievance' that is 'common to all members of the public.'" JA194.

13

Turning to Oxfam, the district court held that it "lacks standing entirely." JA199. Oxfam "does not itself receive grant money from USAID," but claimed that it "will be harmed as a result of harms that USAID's spending cuts have inflicted on other organizations." JA195-96. This theory of standing "runs headlong into the third-party standing doctrine" because Oxfam "has not identified any reason that those recipients [of USAID grants] could not bring their own action to restore funding—as some indeed have." *Id.* And even if Oxfam claimed a direct injury to its own interests, "Oxfam's asserted injuries either are not fairly traceable to the government's actions regarding USAID or do not reflect interference with Oxfam's 'core business activities' sufficient to meet the threshold for organizational standing." JA197 (quoting *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024)). "Insofar as Oxfam alleges injury based on its own perceived need to reallocate its resources to fill gaps previously occupied by USAID," "[a]n organization cannot manufacture its own standing" by "divert[ing] its resources in response to a defendant's actions." JA197-98 (quoting *Alliance*, 602 U.S. at 395). And to the extent Oxfam's alleged injury is based on its reliance on USAID's "expertise and logistical assistance," Oxfam failed to offer specific allegations to establish a "sufficiently concrete or particularized" injury. JA198-99.

The court next held that it lacked subject-matter jurisdiction over plaintiff unions' personnel-related claims. Even assuming they had Article III standing to

raise those claims, "Congress intended them to proceed exclusively through various statutory schemes of administrative and judicial review." JA199. The court noted that it had "explained at length when denying the preliminary injunction" that the CSRA, FSLMRS, and FSA "likely channel their members' claims to various agencies and provide for subsequent review in specific Article III courts." JA199. Critically, "the only cognizable harms the associations assert depend entirely on their members' employment … relationships with USAID." JA193. "Even their alleged intangible injuries—like concerns about family separation, stigma, and post closures—fall into that category, because those harms affect the associations' members distinctly in their capacities as USAID employees." *Id.* (citation omitted). "Put another way, the associations' alleged injuries are traceable to the government's personnel actions regarding USAID, and would be redressed by relief that addressed those actions." *Id.* The court rejected plaintiffs' contrary arguments as "unpersuasive," concluding that "the breadth of plaintiffs' complaint" is irrelevant because "plaintiffs' only Article III injuries stem wholly from the government's actions with respect to their members' employment status." JA205-06.

The court noted that "nothing has changed" to indicate that its initial view of these statutory frameworks was incorrect, finding "highly persuasive" a recent supportive decision by a motions panel of this Court related to the United States Agency for Global Media. JA201-03; *see Widakuswara v. Lake (Widakuswara II)*,

2025 WL 1288817 (D.C. Cir. May 3, 2025) (per curiam). A district court had required the agency to reinstate employees, in response to claims that the agency was being unlawfully dismantled. The panel stayed that order in relevant part, concluding that "the district court likely lacked subject-matter jurisdiction" to enjoin the agency's personnel actions, "citing the CSRA, FSLMRS, [and] FSA" as "the exclusive procedures by which federal employees may pursue [employment-related] claims.'" JA202 (quoting *Widakuswara II*, 2025 WL 1288817, at *2). The panel rejected arguments that the litigation "fell outside those schemes because it concerned 'broad government actions to dismantle an entire federal agency' rather than 'simply a collection of employment disputes,'" because federal employees cannot "circumvent" the schemes by raising "a systemwide challenge to agency policy" instead of "the implementation of such policy in a particular case." JA203-04 (quoting *Widakuswara II*, 2025 WL 1288817, at *2). While the en banc Court granted reconsideration of other aspects of the panel's order, it "*denied* reconsideration of the panel's stay of the district court's personnel-related injunction." JA203 (citing *Widakuswara v. Lake*, 2025 WL 1556440 (D.C. Cir. May 22, 2025) (en banc)).

## SUMMARY OF ARGUMENT

The district court correctly ruled that plaintiffs lacked jurisdiction to pursue their sweeping programmatic remedies. The only plausible injury plaintiffs may

have suffered stems from employment related harms. Congress created an exclusive and detailed statutory scheme to channel those claims away from ordinary district court litigation. It is plaintiffs, not defendants, who ignore Congress's will here. Plaintiffs lack standing to bring any other claims or seek broader relief, and they do not suffer a concrete injury related to other aspects of USAID's realignment. Standing is not dispensed in gross. And redress must be tied to concrete injuries. Oxfam, for its part, does not receive USAID grants and has not otherwise been harmed by any of defendants' actions. This Court should affirm the district court's dismissal for lack of jurisdiction.

**I. A.** This Court, like the district court, may assume without deciding that plaintiff unions have standing to challenge concrete personnel actions, such as their members' terminations pursuant to a RIF. Those claims are subject to mandatory statutory frameworks that deprive the district court of subject-matter jurisdiction. The CSRA and FSLMRS apply to plaintiff AFGE's claims, while the FSA applies to plaintiff AFSA's claims. Frameworks like these preclude district court jurisdiction where (1) Congress intended the framework to be "exclusive," and (2) the litigant's claims are "of the type" that Congress intended to be covered. *Ahuja*, 62 F.4th at 558 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). Both elements are met here.

17

It is firmly established that for civil-service employment disputes, Congress intended for litigants to proceed "exclusively" through the CSRA and FSLMRS. *Ahuja*, 62 F.4th at 558. "Given the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Elgin v. Department of the Treasury*, 567 U.S. 1, 11-12 (2012). The same is true for foreign-service employment disputes under the FSA. *See AFSA*, 895 F.2d at 1461-62.

Plaintiff unions' claims also are "of the type" that Congress intended to fall within these statutory frameworks. *Ahuja*, 62 F.4th at 558. The CSRA, FSLMRS, and FSA comprehensively "regulate[] virtually every aspect of federal employment." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009); *Krc*, 989 F.2d at 1217. The only actions that AFGE plausibly has standing to challenge—employee terminations and other concrete personnel actions—are squarely covered by the CSRA and FSLMRS. *See, e.g.*, 5 U.S.C. § 7701(a) (authorizing MSPB review of "any action which is appealable to the Board under any law, rule, or regulation"); 5 C.F.R. § 351.901 (permitting MSPB challenges to a RIF); *Cooper v. Tennessee Valley Authority*, 723 F.2d 1560, 1562 (Fed. Cir. 1983). Similarly, the only actions that AFSA plausibly has standing to

18

challenge are "grievances" squarely covered by the FSA. *See, e.g.*, 22 U.S.C.
§§ 4131(a)(1), 4010a(c).

Plaintiffs argue (at 33-38) that the three *Thunder Basin* factors show that their
claims are not "of the type" covered by these frameworks, but those factors all point
in the other direction. *First*, channeling plaintiff unions' claims would not foreclose
"all meaningful judicial review," because their claims can eventually be reviewed
by an Article III court. *Second*, their claims are not "wholly collateral" to the
statutory frameworks, because the relief they could obtain for their employment-
related injuries is precisely the relief afforded through the CSRA and FSA. While
they purport to bring broad constitutional challenges to the agency's alleged closure,
those claims are merely "the vehicle" by which they seek to challenge employee
terminations and other personnel actions. *See Elgin*, 567 U.S. at 21-22. *Finally*, their
claims do not fall outside the "agency's expertise," because they challenge actions
in the heartland of CSRA coverage.

**B.** Plaintiff unions lack Article III standing to assert any other claims. It is
axiomatic that a plaintiff "must demonstrate standing for each claim" brought and
"for each form of relief" sought. *Center for Biological Diversity v. United States
Dep't of the Interior*, 144 F.4th 296, 304 (D.C. Cir. 2025) (quoting *DaimlerChrysler
Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Plaintiffs have not identified a cognizable
injury that would enable them to challenge anything besides their members' concrete

19

personnel actions. They cannot broadly challenge the agency's alleged closure based on their "generalized interest" in vindicating the separation of powers, because all citizens share that interest. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220, 226-27 (1974). Nor can they do so based on their alleged intangible injuries, which are not cognizable because they have no "relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). They similarly cannot challenge many of the steps alleged to be part of the agency's closure, such as the transfer of leases, removal of webpages, and reorganization of lines of authority, having failed to identify any way in which those actions injured them. Relatedly, plaintiffs cannot obtain remedies that redress such actions, when those remedies are far broader than necessary to redress their actual alleged injuries.

Plaintiff unions argue (at 29-30) that if a plaintiff has standing to challenge part of a rule, it can challenge the entire rule. *See Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 765 (D.C. Cir. 2025). But plaintiffs are not challenging a single, discrete agency action like the plaintiffs in those cases. Instead, they attempt to challenge a conglomeration of many discrete actions, and they have standing at most to challenge the employment-related agency actions.

20

**II.** Plaintiff Oxfam, for its part, lacks standing entirely. While Oxfam does not receive USAID grant funding, it asserts that the termination of funding to other organizations indirectly injures Oxfam in three ways, but none establishes standing.

*First*, Oxfam provides humanitarian services, and it asserts that it has "diverted resources" to fill the void created by USAID's closure. This is not a cognizable injury: An increase in demand for Oxfam's services does not interfere with its "core business activities." *Center for Biological Diversity*, 144 F.4th at 315 (quoting *Alliance*, 602 U.S. at 395-96). Any resulting harm is to Oxfam's "issue-advocacy" and "social interests" alone, which is insufficient to establish organizational standing. *See People for the Ethical Treatment of Animals (PETA) v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015). Regardless, Oxfam's reallocation of resources is not attributable to the government's grant decisions regarding other organizations. *See Alliance*, 602 U.S. at 390, 394-95.

*Second*, Oxfam alleges that partner organizations responded to their loss of USAID grant funding by ending contracts with Oxfam, but such harms are too attenuated from the actions that Oxfam seeks to challenge. Any financial harm to Oxfam is due to "the independent action of some third party not before the court." *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

21

*Third*, Oxfam more directly alleges that it has suffered an informational injury as it relied on USAID's "technical know-how, research, and evidence" for "engineer[ing] and implement[ing] 'lifesaving ideas at scale.'" Br. 26. This lacks the level of detail necessary for an informational injury and is hardly concrete.

## STANDARD OF REVIEW

This Court reviews "de novo the dismissal of a complaint for lack of subject matter jurisdiction," accepting "as true the facts alleged in the complaint." *AFGE I*, 716 F.3d at 636 (quoting *John Doe v. Metro. Police Dep't of D.C.*, 445 F.3d 460, 465 (D.C. Cir. 2006)).

## ARGUMENT

The district court lacks jurisdiction over plaintiffs' sweeping challenge to USAID's overall operation. Plaintiff unions' alleged injuries all flow from changes to their members' employment, and those claims must be adjudicated through the comprehensive schemes that Congress established for the resolution of federal-employment disputes. Plaintiff unions lack Article III standing to bring any other claims or seek any other remedies, having failed to allege any other cognizable injuries. Oxfam, for its part, lacks standing entirely.

## I.    Plaintiff Unions' Claims Are Not Justiciable.

### A.    Plaintiffs Unions' Employment-Related Claims Are Subject To Mandatory Statutory Frameworks.

This Court, like the district court, may assume without deciding that plaintiff unions have standing to challenge concrete personnel actions, including their members' placement on administrative leave, termination pursuant to a reduction-in-force, unpaid work-related expenses, and similar alleged injuries arising out of their employment. Such claims are subject to mandatory statutory frameworks that deprive the district court of subject-matter jurisdiction.

Plaintiff unions assert several theories of injury-in-fact, all of which flow from their members' concrete personnel actions. As they straightforwardly admit, "their standing relates to employment and related working conditions of USAID's employees." Br. 27. They observe that "members of AFSA and AFGE" lost "employment and related benefits," which "disrupted their lives and the lives of their families." Br. 27-28 (internal quotation marks omitted). And they assert their members' "interests in continued employment." *Id.* at 28 (internal quotation marks omitted). They also assert harms to themselves as organizations, and these harms again stem solely from their members' alleged employment-related injuries. As they put it, they "had to divert resources from other needs to assisting members employed by USAID." Br. 30.

This Court has long recognized "that federal employees may not use the [APA] to challenge agency employment actions" like these. *See Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009). Instead, Congress "established a comprehensive system" that provides the "exclusive means" for vindicating injuries related to federal employment. *Elgin*, 567 U.S. at 5, 8. Congress thereby "regulates virtually every aspect of federal employment and 'prescribes in great detail the protections and remedies' applicable to adverse personnel actions, 'including the availability of administrative and judicial review.'" *Nyunt*, 589 F.3d at 448 (quoting *Fausto*, 484 U.S. at 443).

As summarized above, the CSRA and FSLMRS apply to civil servants and their unions, while the FSA applies to foreign service employees and their unions. *See supra* pp. 3-6. Statutory frameworks like these foreclose district court jurisdiction where (1) it is "fairly discernible in the statutory scheme" that Congress intended "to allocate initial review exclusively to an administrative body"; and (2) the litigant's claims are "of the type Congress intended to be reviewed within" that structure. *Ahuja*, 62 F.4th at 558 (quoting *Thunder Basin*, 510 U.S. at 207, 212). Both elements are met here.

**1.** The CSRA, FSLMRS, and FSA are "exclusive." For civil-service employment disputes, it is firmly established that Congress intended for litigants to proceed "exclusively" through the CSRA and FSLMRS for claims within their

24

scope. *Ahuja*, 62 F.4th at 558. The CSRA, together with the FSLMRS, "creates an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *AFGE I*, 716 F.3d at 636 (cleaned up). "Given the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Elgin*, 567 U.S. at 11-12.

The same is true for foreign-service employment disputes under the FSA. "Like the CSRA, the [FSA] provides 'a comprehensive scheme for reviewing personnel action[s] taken against federal employees.'" *Krc*, 989 F.2d at 1217 (quoting *Fausto*, 484 U.S. at 455). The FSA thus provides "an exclusive procedure for judicial review" that precludes "broad-based challenges to agency practice in the district courts." *AFSA*, 895 F.2d at 1462 (quoting *Ayuda, Inc. v. Thornburgh*, 880 F.2d 1325, 1338 (D.C. Cir. 1989), *vacated*, 111 S. Ct. 1068 (1991)).

**2.** Plaintiffs' claims are also "of the type" that Congress intended to fall within these statutory frameworks. *Ahuja*, 62 F.4th at 558. Plaintiffs present a dispute about "employee relations in the federal sector" and "federal labor-management relations," the subjects that Congress enacted the CSRA, FSLMRS, and FSA to govern. *See AFGE II*, 929 F.3d 748, 755 (D.C. Cir. 2019).

25

Specifically, plaintiff AFGE's claims are "of the type" covered by the CSRA and FSLMRS. *See, e.g.*, 5 U.S.C. §§ 7502, 7512 (identifying various personnel actions subject to specified CSRA review procedures); *id.* § 7701(a) (authorizing MSPB review of "any action which is appealable to the Board under any law, rule, or regulation"); 5 C.F.R. § 351.901 (permitting MSPB challenges to a RIF); 5 U.S.C. §§ 7121, 7117(c), 7116(a)(7), 7118(a)(1) (providing various mechanisms to raise labor disputes). The only actions that AFGE plausibly has standing to challenge— employee terminations and other concrete personnel actions—are squarely covered by the CSRA and FSLMRS. *See, e.g.*, *Fausto*, 484 U.S. at 445-47 (CSRA applies to claims challenging removal, suspension, reduction in grade or pay, or furlough); *Ahuja*, 62 F.4th at 561 ("benefits determinations," whether individualized or policy based); *Cooper*, 723 F.2d at 1562 (termination pursuant to RIF); *Porter v. England*, 35 Fed. App'x 660 (9th Cir. 2002) (same); *Alder v. Tennessee Valley Authority*, 43 F. App'x 952, 956 (6th Cir. 2002) ("the [RIF] decision itself" in addition to resulting personnel actions); *Ghaly v. USDA*, 228 F. Supp. 2d 283, 289-90 (S.D.N.Y. 2002) (placement on administrative leave).

Similarly, plaintiff AFSA's claims are "of the type" covered by the FSA. Congress intended the FSA "to be a companion measure" to the CSRA, *Krc*, 989 F.2d at 1217, and to "be interpreted in the same way," *Ashgar v. United States*, 23 Fed. Cl. 226, 232 (1990). In the language of the FSA, AFSA's claims are subject to

26

that framework because they all concern "grievances," *i.e.*, "act[s]" that allegedly deprive their members of a "right or benefit authorized by law" or that are "otherwise a source of concern or dissatisfaction" to them. 22 U.S.C. § 4131(a)(1); *see, e.g.*, *Hunter v. United States*, 36 Fed. Cl. 257 (1996) (highlighting the FSA's application to claims arising out of employee's termination). The FSA also specifically covers challenges to RIFs, permitting such claims to be brought through the general grievance process or in an appeal to the MSPB. 22 U.S.C. § 4010a(c).

Plaintiffs argue (at 32-38) that the three *Thunder Basin* factors show that their claims are not "of the type" covered by these frameworks, but as the district court held, those factors all point in the other direction. JA205-08.

**a. Meaningful judicial review.** *First*, channeling plaintiffs' claims to the proper administrative forum would not foreclose "all meaningful judicial review." *Elgin*, 567 U.S. at 16. "[A]n opportunity for meaningful judicial review remains available within a special statutory scheme so long as the claims at issue 'can eventually reach an Article III court fully competent to adjudicate them.'" *Ahuja*, 62 F.4th at 562 (citation omitted). Here, there are multiple avenues for judicial review.

The most straightforward path is for plaintiffs' members to bring their claims individually. For example, employees who were terminated or otherwise experienced reviewable personnel actions can bring their claims to the relevant agency and then appeal any adverse decision. *See* 5 U.S.C. § 7703(b)(1) (CSRA);

22 U.S.C. § 4140 (FSA). On appeal, that court would be able to decide those claims and issue a remedy, including damages, to make employees whole for lost pay, benefits, or other cognizable financial harms. *See, e.g.*, *Elgin*, 567 U.S. at 20 (noting that the Federal Circuit may provide relief even for constitutional claims beyond the MSPB's "authority to decide"); *Ahuja*, 62 F.4th at 560-61 (highlighting that "individual claimants" had an opportunity for meaningful judicial review "of the types of substantive claims" brought by a union in district court).

Alternatively, plaintiff unions may be able to pursue their claims as unfair labor practices. *See AFGE II*, 929 F.3d at 757 (highlighting administrative options for certain unions, including plaintiff AFGE, to "challeng[e] the executive orders before the FLRA, followed by judicial review," "in the context of concrete bargaining disputes"); *AFSA*, 895 F.2d at 1461 ("AFSA has recourse to court only *if* and *after* the [FSLRB] considers and rules on AFSA's charges.").[1] On appeal, an Article III court would be able to decide the unions' claims, just as it would be able to decide such claims brought by individual employees. *See AFGE II*, 929 F.3d at 758-59 (recognizing the court's ability to decide "the union's constitutional or

---

[1] This Court previously recognized some limits under the FSLMRS on national AFGE's ability to pursue certain claims. *See AFGE I*, 716 F.3d at 637-38 (highlighting avenues of administrative review open only to AFGE's local chapters). Plaintiffs do not argue that such limits apply to their claims. *See Ahuja*, 62 F.4th at 560-61 (declining to address this issue where not raised by the union and where individual claimants could seek review).

statutory challenges" to executive orders, regardless of the FLRA's "authority to adjudicate" those claims).

At the same time, the applicable statutory frameworks may prevent at least one plaintiff from pursuing its claims—but that is a feature, not a bug, of those very frameworks. Oxfam (which lacks Article III standing regardless) plainly cannot bring claims under the procedures set forth in the CSRA, FSLMRS, or FSA on behalf of USAID employees. But any "exclusion" from "the provisions establishing administrative and judicial review for personnel action" ultimately prevents Oxfam from seeking review under other provisions in district court. *See Fausto*, 484 U.S. at 455. When a comprehensive remedial scheme permits review by some types of plaintiffs but not others, the proper inference is that the excluded parties cannot bring claims at all. *See, e.g.*, *Fausto*, 484 U.S. at 455 (CSRA precluded employee's suit for backpay despite unavailability of CSRA review); *Global Health Council*, 2025 WL 2480618, at *10 (explaining that, in *Block v. Community Nutrition Institute*, 467 U.S. 340 (1984), a plaintiff's "'omission' from such a 'complex scheme' provided 'reason to believe that Congress intended to foreclose' review for [that plaintiff] despite their interests being 'implicated'"); *AFGE I*, 716 F.3d at 638 ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts. Rather, it means that National AFGE may not raise the claim at all.").

Plaintiffs argue (at 33) that obtaining judicial review "could take years," but such delay would not render review meaningless. "[T]he Supreme Court has 'made clear' that the mere 'expense and disruption of protracted adjudicatory proceedings on a claim do not justify immediate review.'" JA207 (quoting *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 192 (2023)). While plaintiffs assert that it would be difficult to unwind various changes to the agency, they do not explain why it would be any more difficult to do so in several years versus today; the employee terminations and other actions that plaintiffs challenge have already taken place. Furthermore, as the district court recognized, plaintiffs have not shown that their members' reinstatement "would indeed be out of reach after USAID's operations are wound down or assimilated into the State Department." JA207.

More fundamentally, judicial review is still "meaningful" even if plaintiffs ultimately prove unable to "obtain their preferred form of relief," such as reinstatement rather than financial compensation. *See AFGE II*, 929 F.3d at 756. "[I]t is the comprehensiveness of the statutory scheme involved, not the adequacy of specific remedies thereunder," that precludes district court jurisdiction. *Id.* at 757 (quoting *AFGE I*, 716 F.3d at 638). The CSRA, FSLMRS, and FSA "create[] an integrated scheme of administrative and judicial review, wherein the Congress intentionally provided—and intentionally chose not to provide—particular forms and procedures for particular kinds of claims." *AFGE I*, 716 F.3d at 636 (cleaned

up). These frameworks thus cover *all* plaintiffs' claims challenging federal personnel actions, regardless of the limits Congress placed on their review. *See id.* ("Even if the plaintiff 'cannot prevail in a claim under the CSRA,' no other relief is available."). It would upend these carefully reticulated frameworks to allow plaintiffs to proceed to district court simply because Congress limited their ability to obtain relief under the governing statutes. *See id.* at 639.

Plaintiffs' claims also are unlike others that the Supreme Court has held could not be meaningfully reviewed in the administrative forum. For example, in *Axon*, the Court found a lack of meaningful review where the administrative proceeding was itself constitutionally defective. 598 U.S. at 191; *see also Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 (2010). Here, in contrast, plaintiffs do not claim that the administrative proceeding is inherently invalid. "Where plaintiffs simply 'claim[] that the relief [they] seek[] would be harder to get if [they] proceed[] first before' the relevant administrative bodies, not that proceeding before those bodies would *itself* inflict harm, the judicial review factor does not tip in their favor." JA207 (quoting *Nat'l Treasury Emps. Union v. Trump*, 770 F. Supp. 3d 1, 9 (D.D.C. 2025)).

**b. Not wholly collateral.** *Second*, plaintiffs' challenges are not "wholly collateral" to the statutory frameworks. *Elgin*, 567 U.S. at 15. As the Supreme Court has held, a "challenge to removal is precisely the type of personnel action regularly

adjudicated by the MSPB and the Federal Circuit within the CSRA scheme." *Elgin*, 567 U.S. at 22. Where, as here, plaintiff unions seek reinstatement of their members, they challenge a "CSRA-covered employment action" and request "relief that the CSRA routinely affords." *Id.*

Plaintiffs attempt (at 34-36) to frame their claims as collateral challenges to the "dismantling of a federal agency, of which the en masse termination of employees is but one part." JA205. But "plaintiffs' only Article III injuries stem wholly from the government's actions with respect to their members' employment." JA205. The remedies that they could seek for those injuries are "the same relief they could obtain in the agency proceeding." *AFGE II*, 929 F.3d at 759-60. Plaintiffs thus "would have no claim that [they] could file directly in federal court if isolated from [their] claims for relief from a personnel action against [them]." *Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1434 (D.C. Cir. 1996). For that reason, plaintiffs "lack standing to challenge any other 'part' of USAID's dismantling," and "the breadth of plaintiffs' complaint alone does not take this case outside the personnel-related review schema at issue." JA205.

The Supreme Court and this Court have long rejected similar attempts to evade the CSRA. For example, in *Elgin*, the plaintiffs sought to challenge "adverse employment action" in district court by arguing that a federal statute [was] unconstitutional." 567 U.S. at 5. The Court held that their constitutional claims were

32

not collateral to the CSRA because those claims were merely "the vehicle" by which they sought to reverse their adverse employment actions. *Id.* at 21-22. "Far from a suit wholly collateral to the CSRA scheme," *Elgin* involved "a challenge to CSRA-covered employment action brought by CSRA-covered employees requesting relief that the CSRA routinely affords." *Id.* at 22. Similarly, in *Ahuja*, this Court asked "whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." 62 F.4th at 563. The plaintiff union had done just that in seeking "a substantive declaration and injunction requiring the agency to change its" policies, because the requested relief "goes directly to the substance of" those policies "and is 'precisely the kind[] of relief that the CSRA empowers the MSPB and the Federal Circuit to provide.'" *Id.* at 564 (quoting *Elgin*, 567 U.S. at 22).

The same is true here. Plaintiffs' claims are the "vehicle" by which they challenge employee terminations and other personnel actions. *Elgin*, 567 U.S. at 21-22. The only relief that they plausibly have standing to seek—redress for those personnel actions—is "precisely the kind[] of relief" that the CSRA and FSA address. *Ahuja*, 62 F.4th at 564. Plaintiffs do not identify any case in which claims were held to be collateral to the CSRA or FSA when the plaintiff's only cognizable injuries were personnel actions. The cases they cite involve "warrantless searches, property conversion, the installation of hidden cameras, and rape." JA206. As the

district court recognized, such injuries extend beyond "mere adverse employment events," whereas here, plaintiffs' alleged injuries are limited to "termination of employees via a RIF and related changes to employee working conditions." JA206.

Plaintiffs also emphasize (at 37) that they seek to bring constitutional claims, but it is firmly established that these statutory frameworks apply even where claims present constitutional or "systemwide" challenges to covered actions. *See, e.g.*, *Elgin*, 567 U.S. at 5, 12 (refusing to "carve out an exception to CSRA exclusivity for facial or as-applied constitutional challenges to federal statutes"); *AFGE II*, 929 F.3d at 755-59 (CSRA applies to constitutional and statutory challenges to executive orders); *AFGE I*, 716 F.3d at 639 (CSRA applies to systemwide challenge to agency policy); *Ahuja*, 62 F.4th at 561-62 (similar); *Nyunt*, 589 F.3d at 448-49 (similar). "Allowing an alternative route to relief in district court because plaintiffs frame their suit as a systemwide challenge" to government action "would substitute an entirely different remedial regime for the one Congress intended to be exclusive." *Ahuja*, 62 F.4th at 561 (quoting *Fornaro*, 416 F.3d at 68). Similarly, carving out constitutional claims would upend these statutory frameworks: When the federal government is the employer, practically any employment claim can be dressed up in constitutional garb.

In any event, plaintiffs' claims are all purely statutory. This Court recently rejected two similar attempts to "transform a statutory claim into a constitutional one

to avoid limits on judicial review." *Global Health Council*, 2025 WL 2480618, at *8. In *Global Health Council*, the plaintiffs invoked *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), to claim that the government violated the separation of powers by allegedly impounding funds contrary to the Impoundment Control Act. This Court rejected that framing and held that the dispute was "fundamentally statutory because the alleged constitutional violation is predicated on the underlying alleged statutory violations." 2025 WL 2480618, at *7 n.11. This Court reasoned that *Youngstown* was "inapposite," explaining that "the 'only basis of authority asserted' in *Youngstown* 'was the President's inherent constitutional power as the Executive and the Commander in Chief of the Armed Forces.'" *Id.* at *7 (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). "*Youngstown* thus involved the conceded *absence* of *any* statutory authority, not a claim that the President acted in excess of such authority.'" *Id.* (quoting *Dalton*, 511 U.S. at 473). The Fourth Circuit recently reached the same conclusion, approvingly citing *Global Health Council*. *See Sustainability Inst. v. Trump*, -- F.4th --, 2026 WL 157120, at *8-10 (4th Cir. Jan. 21, 2026) (explaining why plaintiffs' "attempt to cast their" similar "claims as constitutional, and not statutory, fails under Supreme Court precedent").

The same is true here. Plaintiffs claim that the alleged closure of USAID violates the separation of powers because of alleged constraints found in various statutory provisions. Any claims that allegedly closing USAID violates "the statutes

35

that create the agency and require it to perform various mandatory tasks," or otherwise exceeds the authority given to the President in the Foreign Assistance Act or the Further Consolidated Appropriations Act of 2024, present only statutory issues. *Global Health Council*, 2025 WL 2371608, at *20.

**c. Agency expertise.** *Finally*, plaintiffs' claims do not fall outside the "agency's expertise." *Elgin*, 567 U.S. at 15. Plaintiffs contend that "agency adjudications are generally ill suited to address structural constitutional challenges," Br. 37 (quoting *Carr v. Saul*, 593 U.S. 83, 92 (2021)), but ignore that the Supreme Court expressly limited that assessment to "the specific context" of "Appointments Clause challenges," *Carr*, 593 U.S. at 93 & n.5. Here, by contrast, plaintiffs seek remedies for allegedly unlawful employment terminations, which falls decidedly within the scope of the CSRA. The agency's expertise also could be relevant to "threshold questions that may accompany" plaintiffs' otherwise broad claims. *Elgin*, 567 U.S. at 22-23; *see Axon*, 598 U.S. at 195 (noting that *Elgin* relied on the agency's "expertise on a raft of ordinary employment issues surrounding the employee's contention that the Equal Protection Clause barred his discharge"). As the district court emphasized, "plaintiffs' suit plainly poses at least 'preliminary' employment-related questions where such issues are the only ones they have standing to raise." JA208. "Here, even if the farthest reaches of plaintiffs' lawsuit involve 'separation-of-powers issues' and 'whether a statute or the Constitution has authorized the

36

President to act in a particular way,' the 'preliminary' questions the lawsuit poses are plainly employment-related—such as the lawfulness of the government's changes to plaintiffs' … employment conditions." JA121. For example, "the agency could moot the need to resolve the unions' constitutional claims" if it found a violation of "the RIF statute." JA208 (quoting *NTEU*, 770 F. Supp. 3d at 11). In any event, "even assuming" that plaintiffs' claims raise "questions that are 'outside the MSPB's expertise,' that consideration does not outweigh the other two factors that counsel in favor of precluding district court review." *Ahuja*, 62 F.4th at 565 (citation omitted).

### B.    Plaintiff Unions Lack Standing To Assert Any Other Claims.

Plaintiff unions do not allege any potentially cognizable injury apart from their members' concrete personnel actions. They thus lack standing to challenge any other actions or to seek remedies that are broader than necessary to redress their alleged employment-related injuries.

**1.** Article III standing is a "bedrock constitutional requirement that [the Supreme] Court has applied to all manner of important disputes." *United States v. Texas*, 599 U.S. 670, 675 (2023). It is "built on a single basic idea—the idea of separation of powers." *Id*. The requirement that plaintiffs demonstrate standing "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system," *id*. at 675-76, by ensuring that federal courts do not become

37

"forums for the ventilation of public grievances" more properly resolved through the democratic process, *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc*., 454 U.S. 464, 473 (1982).

To establish standing, plaintiffs "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Plaintiffs also "must demonstrate standing for each claim" they seek to press "and 'for each form of relief sought,' even if the various claims are derived from similar facts or raise similar legal questions." *Center for Biological Diversity*, 144 F.4th at 304 (quoting *DaimlerChrysler Corp.*, 547 U.S. at 352). And the "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). These limitations work to ensure that federal courts do not sit to "exercise general legal oversight of the Legislative and Executive Branches" but to redress concrete injuries to cognizable interests. *TransUnion*, 594 U.S. at 423-24.

Courts routinely enforce these limits by requiring plaintiffs to establish standing for every action that they challenge. For example, in a case challenging the approval of permits for oil and gas wells, the plaintiffs sought to challenge a group of permits "in the aggregate." *Center for Biological Diversity*, 144 F.4th at 300. This Court recognized, however, that because "each [permit] is a distinct agency action, plaintiffs must establish standing to challenge each," *id.* at 309, including by

showing how each permit "contribute[d] to their injury in fact," *id.* at 305. This Court held that plaintiffs lacked standing because they had "not alleged whether or how the newly permitted wells will cause [their alleged] harms at the locations they identify as where they live, work, or travel." *Id.* at 305-06. The Court refused to relax these requirements merely because plaintiffs attempted to aggregate their claims: "The fact that Plaintiffs have elected to combine their claims against more than 4,000 [permits] into one case does not convert the separate permitting actions into a single federal agency action." *Id.* at 310.

The Supreme Court similarly has rejected attempts to "challenge a more generalized level of Government action" instead of "specifically identifiable Government violations of law." *Defenders of Wildlife*, 504 U.S. at 568. Such a generalized approach presents "obvious difficulties insofar as proof of causation or redressability is concerned." *Id.* The Court has acknowledged the appeal of that approach from a plaintiff's perspective, especially one with institutional interests: The case-by-case adjudication of concrete disputes arising in concrete factual settings is "assuredly not as swift or as immediately far-reaching a corrective process as those interested in systemic improvement would desire." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990). Nonetheless, the Court has steadfastly insisted that programmatic challenges are "rarely if ever appropriate for federal-court adjudication." *Defenders of Wildlife*, 504 U.S. at 568. "In light of [the] overriding

and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, [courts] must put aside the natural urge to proceed directly to the merits of [an] important dispute and to 'settle' it for the sake of convenience and efficiency." *Raines*, 521 U.S. at 819-20.

**2.** Plaintiff unions seek to unwind the alleged "closure" of USAID. JA61-62. Organizations like plaintiffs can assert standing in two ways: (1) associational standing on behalf of their injured members, or (2) organizational standing for an injury to the organizations themselves. *See PETA*, 797 F.3d at 1093. Plaintiffs claim both, but at most they can establish standing only to challenge employment-related actions. Br. 28-30.

**a.** Start with associational standing—the unions' main focus. *Id.* An organization can sue on behalf of its injured members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024).

Plaintiff unions' members, however, have only plausibly been injured by the termination of their employment. The unions acknowledge that their members' injuries relate to "continued employment." Br. 28 (citing JA445-79). They do not even claim that their members are injured in any other way, simply declaring that

there was a single decision to shut down USAID that included the employment related harms their members face. Br. 29. Plaintiffs do nothing, however, to trace these employment related injuries to anything other than the termination of their employment. For example, they highlight actions transferring leases, taking down webpages, and reorganizing lines of authority. But they do not explain how they were injured by any of these actions. Plaintiff unions therefore "do not … have standing to challenge" those actions, because they "have alleged no concrete and particularized injuries flowing from those actions specifically." JA194. In short, plaintiffs cannot leverage alleged employment-related injuries to challenge anything other than those employment-related actions.

Plaintiff unions' members' alleged intangible injuries likewise provide no basis to challenge the agency's alleged closure. Those harms, too, flow from their members' employment. Even worse for plaintiffs, they are not cognizable under Article III. Plaintiffs contend that their members experienced emotional harm from the removal of a wall of pictures, "violent anti-USAID rhetoric," and "fears of a 'global humanitarian crisis.'" JA193. Intangible harms may be cognizable when they have "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion*, 594 U.S. at 425. But plaintiffs' injuries have no such analogue. There is no traditional cause of action based on emotional harm from a government employer's changes to a display in its own building, from

41

political speech that criticizes a federal agency generally, or from changes in conditions in developing countries. To the extent plaintiff unions claim these events were stressful for their members, stress "is not a concrete injury." *Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1191 (7th Cir. 2021). And to the extent plaintiff unions allege other harms that are "common to all members of the public," these too are "undifferentiated" and "generalized grievance[s]" that do not confer standing. *Defenders of Wildlife*, 504 U.S. at 575-76.

Plaintiff unions' principal contention is that the Executive Branch is encroaching on the Legislative Branch's prerogatives by closing an agency established by statute, but apart from employment-related injuries, they have not identified any cognizable harm from those alleged actions. Plaintiffs' interest in vindicating the separation of powers provides no basis for such a claim, because "[a]ll citizens" share "an interest in the independence of each branch of Government." *Reservists Comm. to Stop the War*, 418 U.S. at 220, 226-27. This "generalized interest … is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.*; *Valley Forge*, 454 U.S. at 482-83. And any such programmatic injury is not redressable, as it would require "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of … administration, contrary to the more modest role Article III envisions."

42

*DaimlerChrysler Corp.*, 547 U.S. at 346; *see also Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring).

b.      Plaintiffs' claim for organizational standing is largely duplicative and fails for similar reasons. Br. 30. Organizational standing requires a "concrete and demonstrable injury" to its "core business activities," as a "mere setback to [the organization's] abstract social interests is not sufficient." *PETA*, 797 F.3d at 1093. Nor is the "diversion" of resources in response to defendants' actions sufficient. *Alliance*, 602 U.S. at 391, 395. Plaintiffs simply conclude they have suffered "interference with their core activities supporting members and loss of membership." Br. 30. But their basis for this continues to be employment related harms to their members and "divert[ing] resources from other needs to assisting members employed by USAID." *Id.* Being injured by increased demand for one's services is odd to say the least. But even if those injuries are cognizable for plaintiff unions as organizations, the injuries all trace to their members' loss of employment. JA401-02. And they fail to engage with binding precedent that the type of diversion of resources they allege is insufficient for organizational standing. *Alliance*, 602 U.S. at 391-92. So once again, the harms, if any, all stem from employment-related injuries and must be channeled.

3.      Plaintiffs' principal contention is that they are challenging the entire alleged closure of USAID as a single separation-of-powers violation, not just

43

personnel actions. Br. 29. But that attempt to bundle the personnel actions together with other distinct actions and claim that their injuries stem generally from the "singular decision to abolish USAID" (Br. 28-29) must fail. Plaintiffs cannot "engage in 'artful pleading' to make an end-run around the strictures of Article III." *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022). Instead, "courts must consider plaintiffs' actual injury—not the labels plaintiffs put on that injury." *Id.* Plaintiffs mistake the fundamental limitations on the remedial powers of Article III courts.

The district court's treatment of plaintiffs' claims—requiring standing to challenge an agency action in order to seek relief from that action—was exactly right. JA191, 193-94. It is well established that a plaintiff must demonstrate standing for each form of relief it seeks. *Town of Chester*, 581 U.S. at 439. Plaintiff attempts to evade that rule by claiming that it is challenging a single agency action, the "decision to abolish USAID." Br. 28-29. But an "abstract decision" by an agency does not amount to a final agency action. *Biden v. Texas*, 597 U.S. 785, 809 (2022). Instead, the decision must be implemented through "many individual actions," and it is *those* actions that constitute final agency actions under the APA. *Lujan*, 497 U.S. at 892-93.

Nor can plaintiffs succeed by grouping together "a collection of many individual" agency actions "that cannot be packaged together and laid before the courts for wholesale correction under the APA." *Widakuswara II*, 2025 WL

1288817, at *3 (quoting *Lujan*, 497 U.S. at 893). Plaintiffs may not conceptualize an agency action so broadly that remedying their claims would require courts "to exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).

More generally, plaintiffs' attempt to obtain remedies from agency actions that did not injure them or their members is contrary to fundamental principles of redress, which require that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73. Given the admittedly job-related injuries at issue, an employment-based remedy to plaintiffs' members would provide "complete relief." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). Plaintiffs cannot reasonably argue otherwise.

Yet plaintiffs impermissibly seek remedies which "are broader than necessary to provide complete relief to each plaintiff with standing." *Id.* (staying broader-than-necessary injunctions). Plaintiffs seek to reverse USAID's "shutdown" through an order to appoint an independent Acting Administrator of USAID, reopen USAID buildings, restore USAID computer systems and webpages, and generally prevent "any action to dissolve USAID." JA88-91. These remedies would go "far beyond, and thus would *not* redress," any employment-related injury that they allegedly experienced. JA195. Plaintiffs do not even attempt to explain why damages or reinstatement would not provide complete relief to them and their members. Nor, on

the other hand, do plaintiffs ever explain how preventing the reorganization or transfer of USAID functions, requiring grants to be paid, and restoring websites would provide them or their members *any* relief at all. *Id.* Any "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). But plaintiffs' proposed programmatic judicial overhaul of USAID casts a much broader net than basic standing principles allow.

Plaintiffs' cases are not to the contrary. All of those cases involve plaintiffs challenging specific agency actions that directly harmed them, even though vacatur or rulemaking might impact others. Br. 29-30. Here, by contrast, Plaintiffs' claims all relate to employment related actions that are distinct from any other agency action. And so are the remedies. As explained, Congress enacted specific and exclusive statutory schemes for addressing such employment related claims. Allowing plaintiffs to bootstrap broader agency actions to their distinctly employment related harms would permit employees to evade and undermine Congress's reticulated schemes despite having no injuries related to the other actions they seek to challenge. Plaintiffs' argument flips the separation of powers on its head by ignoring Article III standing and Congress's statutory scheme. *See Alliance*, 602

U.S. at 378 ("standing is built on a single basic idea—the idea of separation of powers.").

## II.    Plaintiff Oxfam Lacks Article III Standing.

Oxfam, for its part, lacks standing entirely. Oxfam does not receive USAID grant funding. JA195. Oxfam thus relies on the downstream effects of terminating funding to other organizations, alleging that Oxfam has diverted resources, experienced reduced partnership opportunities because of the government's funding decisions, and has lost the technical expertise of USAID. None of these theories are valid.

**1.** Oxfam asserts organizational standing. Like any plaintiff, Oxfam must demonstrate that it suffered "actual or threatened injury in fact" to its own interests that is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision." *Center for Biological Diversity*, 144 F.4th at 314 (quoting *American Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020)). The injury must be "actual or imminent, not speculative," meaning "the injury must have already occurred or be likely to occur soon." *Alliance*, 602 U.S. at 381. The injury also must be "'concrete'—that is, 'real, and not abstract.'" *TransUnion*, 594 U.S. at 424 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)).

47

Oxfam's first theory of standing is that it has "diverted resources" to "fill the $63 billion void left by USAID's abrupt dissolution." JA82. This injury is not cognizable under Article III. Oxfam alleges an increase in the number of aid projects needing funding, a harm that Oxfam concedes is to its "mission." *Id.* Ordinarily, a business is not injured by an increase in demand for its services. To the extent Oxfam has an interest in *eliminating* demand for its services, that interest reflects its "issue-advocacy" and "social interests," which are insufficient to establish organizational standing. *PETA*, 797 F.3d at 1093. Similarly, the Supreme Court has "cautioned against" finding organizational standing "beyond circumstances in which the challenged action 'directly affected and interfered with [a plaintiff's] core business activities.'" *Center for Biological Diversity*, 144 F.4th at 315 (quoting *Alliance*, 602 U.S. at 395-96). Here, the funding gap that Oxfam describes does not interfere with its own provision of services.

Oxfam's reallocation of resources also is not attributable to the government's grant decisions regarding other organizations. The Supreme Court recently rejected a similar attempt to establish standing in *Alliance for Hippocratic Medicine*, 602 U.S. 367. The plaintiff doctors sought to challenge the government's regulation of a drug, claiming that the government's policies caused certain medical injuries, and thus, that the doctors were forced to divert their time and resources to treat those patients rather than others. *Id.* at 390. The Supreme Court unanimously rejected this

48

argument. The Court explained that the "causal link" between the government's policies and those alleged injuries "is too speculative or otherwise too attenuated to establish standing." *Id.* Similarly here, Oxfam's alleged injuries make predictions about complicated funding decisions of humanitarian projects and its partner organizations. Br. 26. Oxfam's decision to fund some projects rather than others—in response to the government's decisions about its own funding priorities—is simply too attenuated an injury to satisfy Article III. Indeed, the alleged harm is even more attenuated here because Oxfam cannot show that defendants' choice not to fund *others'* projects in turn harms Oxfam.

Rather than address *Alliance*'s main conclusions, Oxfam instead focuses on *Alliance*'s warning that standing does not exist when an organization attempts to manufacture it, for example, by "expending money to gather information and advocate against the defendant's action." 602 U.S. at 394; Br. 24. Yet Oxfam skips over *Alliance*'s conclusion that resource diversion like this in response to a government policy is not grounds for standing. The doctors in *Alliance* claimed that the government's conduct would increase the burden on their practices and force them to expend resources to treat additional harms. *Alliance*, 602 U.S. at 391-92. That mirrors Oxfam's argument here that the loss of funding to other organizations will cause them to surge resources to fill the increased demand for aid.

Perhaps realizing *Alliance* largely forecloses its organizational standing arguments, Oxfam instead focuses on a narrow line of pre-*Alliance* precedent, contending that standing exists when an organization is forced to redirect its resources in hindrance of its programmatic policies. Br. 25. However, to the extent these cases survive *Alliance*, they recognized standing in narrow contexts that do not support Oxfam here. Oxfam attempts to characterize its diversion of resources as impacting its "programmatic priorities." *Id.* But Oxfam's allegations do not suffice.

In *American Anti-Vivisection Society*, the organization had standing when it relied on agency information that it would recirculate to the public. *American Anti-Vivisection Society v. United States Department of Agriculture*, 946 F.3d 615, 619 (D.C. Cir. 2020). When the agency stopped providing this information, the Society, in conformity with its central mission, had to create this information itself. *Id.* Here, Oxfam has not shown a direct need for information, let alone that it was forced to produce such information itself. Br. 26.

Similarly, in *PETA*, the D.C. Circuit found organizational standing for PETA to challenge the United States Department of Agriculture's failure to issue a bird-specific welfare regulation. *PETA*, 797 F.3d at 1094. As a result, the failure to regulate bird welfare (1) prevented PETA from submitting USDA complaints to prevent cruelty to birds and (2) deprived PETA of bird safety information that it

50

would historically circulate to the public. *Id*. Oxfam does not have an injury as concrete as the inability to file complaints here.

Moreover, this precedent should not be extended, as this Court has twice "cautioned against" reading its "organizational injury precedents" too broadly after *Alliance*. *Ctr. for Biological Diversity*, 144 F.4th at 315; *see also Indep. Mkt. Monitor for PJM v. FERC*, 2025 WL 3760365, at *5 (D.C. Cir. Dec. 30, 2025). If anything, *Center for Biological Diversity* cuts against Oxfam, as the Court found that environmental activists did not have standing to challenge oil and gas lease changes. 144 F.4th at 304. The Court found that the Center's alleged injuries, though related to their mission, were insufficient for standing only pertaining to "issue advocacy." *Id.* at 315. The thrust of *Center*'s injuries was the organization's subsequent need to spend money to support its policy goals in opposition to the government's leasing changes. *Id.* Likewise, here, while Oxfam may spend more money financing its policy objectives, Oxfam is similarly not injured as the Court found in *Center*.

At bottom, it is Oxfam's choice which projects to fund. In *Alliance*, the Court emphasized that an organization cannot "manufacture its own standing" and "spend its way into standing simply by expending money" in response to a challenged action. 602 U.S. at 394. It thus is "incorrect" to argue that "standing exists when an organization diverts its resources in response to a defendant's actions." *Id.* at 395.

The Court explained that, in some situations, where a defendant's actions "directly affected and interfered with" an organization's core business activities, the plaintiff's resulting diversion of resources can establish standing. But where the challenged government action poses no "similar impediment" to the organization's business, the diversion of resources is insufficient. *Id.* Oxfam faces no "impediment" to make its own funding decisions and remains free to allocate its resources as it deems appropriate. Thus, its diversion of resources in response to the government's grant decisions regarding other non-parties is not "the kind of injury" that can establish standing. *Id.* Accepting Oxfam's theory of injury would allow myriad organizations to challenge any resource-limited policy that addresses only part of an unmet need because the party would prefer for the government to fully meet that need and render the organization's services unnecessary.

**2.** Oxfam's second theory of standing similarly fails for lack of causation. Oxfam alleges that partner organizations responded to their loss of USAID grant funding by ending contracts with Oxfam. Br. 23. In such cases, where a "plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is … ordinarily substantially more difficult to establish." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Here, that is because "[t]he traceability and redressability prongs become problematic when third persons not party to the litigation must act in order for an injury to arise or be cured." *Doe v. Virginia Dep't*

*of State Police*, 713 F.3d 745, 755 (4th Cir. 2013); *see also Center for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005).

Any financial harm to Oxfam is due to "the independent action of some third party not before the court." *See Arpaio*, 797 F.3d at 19 (quoting *Defenders of Wildlife*, 504 U.S. at 561). Oxfam acknowledges that it cannot raise injuries to third parties to gain standing. Br. 23. Yet its argument appears to be that the independent actions of those third parties in response to their own injuries must in turn cause Oxfam a cognizable injury. Oxfam's astonishing argument would mean that grant recipients would have standing only to challenge the termination of their individual grants, but Oxfam would have *broader* standing to challenge anyone's grant termination *because* of those injuries to a myriad of third parties. This butterfly-effect theory of standing is not the law. Instead, as the district court correctly recognized, Oxfam's alleged injury "turns on an 'independent variable': the decision (or lack thereof) by those entities to discontinue the particular programs in which Oxfam participates." JA197 (quoting *Nw. Airlines, Inc. v. FAA*, 795 F.2d 195, 204 (D.C. Cir. 1986)). "In such circumstances, 'causation [is] sufficiently tenuous that standing should be denied.'" *Id.* (quoting *Mideast Sys. & China Civ. Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1174, 1178 (D.C. Cir. 1986)).

**3.**    Oxfam also alleges that it has suffered an informational injury because it relied on USAID's "technical know-how, research, and evidence." Br. 26. The

district court correctly concluded that this vague allegation was "not sufficiently concrete or particularized" to support standing because Oxfam did not explain how "it specifically" relied on USAID. JA198. Oxfam tries to clarify that it relied on USAID for "engineer[ing] and implement[ing] 'lifesaving ideas at scale.'" Br. 26. But that is no more specific. These general, vague statements fail to establish an informational injury.

A "purely informational injury" is not enough for standing. *Hekel v. Hunter Warfield, Inc.*, 118 F.4th 938, 942 (8th Cir. 2024). To carry its burden of demonstrating a "sufficiently concrete and particularized informational injury," Oxfam must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). Oxfam does not even attempt to point to any statutory requirement that USAID provide it any expertise or information. As such, Oxfam lacks a concrete injury for its claims. *See New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 157 (D.D.C. 2016) ("Plaintiffs' alleged informational injury—*i.e.*, that they did not receive information that [the agency] failed to collect (where the disclosure provision upon which

54

Plaintiffs rely to support this assertion does not require the collection of such information)—is not a cognizable injury for standing purposes.").

Oxfam cites a district court decision, *Doctors for America*, where doctors were deprived of medical information when the Centers for Disease Control removed data resources the doctors used for prescribing medications or evaluating FDA medical product approvals. *Drs. For Am. v. OPM*, 766 F. Supp. 3d 39, 48 (D.D.C. 2025). Here, unlike *Doctors for America*, Oxfam cites no specific examples of information it lacks and how it would have used the information. Instead, Oxfam's claim is more akin to *Independent Market Monitor for PJM v. FERC*, where this Court held that the plaintiff lacked informational injury standing because it did not explain why it needed the information or could not otherwise get it. 2025 WL 3760365, at *5 (D.C. Cir. Dec. 30, 2025). At bottom, Oxfam does not identify any information or assistance USAID is required to provide and which Oxfam requires to operate. Oxfam thus lacks any concrete injury and fails to establish standing.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

JEANINE PIRRO
  *United States Attorney*

SARAH WELCH
  *Counsel to the Assistant Attorney General*

 */s/ Tiberius Davis*
TIBERIUS DAVIS
*Counsel to the Assistant Attorney General*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202)-514-4357*
*Tiberius.Davis@usdoj.gov*

January 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,709 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Tiberius Davis*
Tiberius Davis
*Counsel to the Assistant Attorney General*

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Tiberius Davis*
Tiberius Davis
*Counsel to the Assistant Attorney General*